# 26-

# United States Court of Appeals

### for the

# Second Circuit

In Re: JBR, INC.,

*Petitioner.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JBR, INC., DBA Rogers Family Company,

*Petitioner,*

– v. –

KEURIG GREEN MOUNTAIN INC., as successor to Keurig, Incorporated,
FKA Green Mountain Coffee Roasters Inc.,

*Respondent.*

ON PETITION FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PETITION FOR WRIT OF MANDAMUS
## TO THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DANIEL JOHNSON JR.
DAN JOHNSON LAW GROUP, LLP
*Attorneys for Petitioners JBR, Inc. d/b/a
Rogers Family Company*
100 Pine Street, Suite 1250
San Francisco, California 94111
(415) 604-4500
dan@danjohnsonlawgroup.com

**CORPORATE DISCLOSURE STATEMENT**

Petitioner is a privately held company, and has no parent corporation or stockholders.

/s/ Daniel Johnson Jr.

Daniel Johnson Jr.

Dan Johnson Law Group LLP

*Counsel for Petitioners*

*JBR, Inc., d/b/a Rogers Family Company*

Dated: April 28, 2026

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................ i

TABLE OF AUTHORITIES ................................................................................ iii

STATEMENT OF JURISDICTION ........................................................................ 1

STATEMENT OF RELIEF SOUGHT ..................................................................... 2

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ............................... 3

STATEMENT OF THE CASE ............................................................................... 4

    A.    Procedural History Through the Prior Mandamus Petitions ..................... 4

    B.    The District Court's July 26, 2024 Representation .................................... 5

    C.    Subsequent Events: Promise Half-Kept; Promise Half-Broken ................ 6

    D.    Continuing and Worsening Prejudice ..................................................... 8

RELEVANT LEGAL STANDARDS ...................................................................... 9

ARGUMENT ..................................................................................................... 11

I.      INTRODUCTION ...................................................................................... 11

II.    REASONS WHY THE WRIT SHOULD ISSUE .................................... 15

    A.    JBR Has No Other Adequate Means to Obtain the Relief Sought. ........... 16

    B.    JBR's Right to the Writ Is Now Clear and Indisputable. ......................... 17

        1.    The District Court Has Now Broken Its Own Schedule. ...................... 17

        2.    Every Predicate the District Court Identified Has Been Resolved. ...... 18

        3.    The District Court Has Failed to Act on the Rule 53 Question It Itself Invited. .................................................................................................... 19

        4.    Precedent Supports the Granting of this Writ ...................................... 21

        5.    This Case Is the Paradigm for Supervisory Mandamus in Complex MDL Litigation. ....................................................................................... 22

    C.    Issuance of the Writ Is Appropriate Under the Circumstances. ............... 23

III.   CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Cement Antitrust Litig.*
(MDL No. 296) ...............................................................................4, 23

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004).................................................................*passim*

*Chudasama v. Mazda Motor Corp.*,
123 F.3d 1353 (11th Cir. 1997) ..............................................22, 23

*In re Fine Paper Antitrust Litig.*,
685 F.2d 810 (3d Cir. 1982) ...........................................................1

*In re Harris County*,
Case No. 21-3637, ECF No. 6-1 (6th Cir. March 11, 2022) .............................11

*Hassine v. Zimmerman*,
160 F.3d 941 (3d Cir. 1998) ...............................................2, 14, 21

*Hong Mai Sa v. Doe*,
406 F.3d 155 (2d Cir. 2005) ............................................................1

*In re Howmedica Osteonics Corp.*,
867 F.3d 390 (3d Cir. 2017) ............................................................1

*Johnson v. Rogers*,
917 F.2d 1283 (10th Cir. 1990) .................................................2, 11

*Madden v. Myers*,
102 F.3d 74 (3d Cir. 1996) ...........................................3, 11, 14, 21

*In re Maggitti*,
No. 24-1660, 2024 WL 1952863 (3d Cir. May 3, 2024)........................1, 14, 19

*McClellan v. Young*,
421 F.2d 690 (6th Cir. 1970) ..........................................................2

*In re Mikula*,
218 F. App'x 12 (2d Cir. 2007)................................................................1, 3, 19

*Roche v. Evaporated Milk Ass'n*,
319 U.S. 21, 63 S. Ct. 938, 87 L. Ed. 1184 (1943)..............................................10

*In re United States*,
886 F.3d 448 (5th Cir. 2018) ........................................................11, 22

*Will v Calvert Fire Ins. Co.*,
437 U.S. 655 (1978).................................................................10

*Will v. United States*,
389 U.S. 90 (1967)..................................................................1

**Statutes**

28 U.S.C. § 1651 .................................................................10

All Writs Act, 28 U.S.C. § 1651(a) .................................................1, 12

**Other Authorities**

Fed R. App. P. 21 ................................................................1, 12, 28

Fed R. App. P. 23 .................................................................20

Fed. R. App. P. 32(a)(5)...........................................................28

Fed. R. App. P. 32(a)(6)...........................................................28

Fed. R. Civ. P. 53 ..........................................................*passim*

Fed. R. Civ. P. 54 .................................................................17

iv

## STATEMENT OF JURISDICTION

This Court has jurisdiction to issue a writ of mandamus under the All Writs Act, 28 U.S.C. § 1651(a), and Federal Rule of Appellate Procedure 21. *See Hong Mai Sa v. Doe*, 406 F.3d 155, 158 (2d Cir. 2005) (recognizing mandamus jurisdiction); *In re Mikula*, 218 F. App'x 12, 13–14 (2d Cir. 2007) (same).

Mandamus is a "drastic" remedy reserved for "extraordinary" situations. *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (quoting *Kerr v. U.S. Dist. Ct.*, 426 U.S. 394, 402 (1976)); *Will v. United States*, 389 U.S. 90, 95 (1967). To obtain the writ, a petitioner must demonstrate: (1) "no other adequate means to attain the relief he desires"; (2) that his "right to issuance of the writ is clear and indisputable"; and (3) that "the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 380–81 (cleaned up); *see also In re Howmedica Osteonics Corp.*, 867 F.3d 390, 401 (3d Cir. 2017) (formulating the test as "(1) a clear and indisputable abuse of discretion or error of law, (2) a lack of an alternate avenue for adequate relief, and (3) a likelihood of irreparable injury").

Although a district court's management of its docket is generally discretionary, *see In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817 (3d Cir. 1982), a writ of mandamus "may issue where a District Court's undue delay is tantamount to a failure to exercise jurisdiction." *In re Maggitti*, No. 24-1660, 2024 WL 1952863, at *1 (3d Cir. May 3, 2024) (quoting *Madden v. Myers*, 102 F.3d 74, 79

1

(3d Cir. 1996)). "[A]t some point, delay by the district court could become so excessive as to warrant the issuance of a writ of mandamus." *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998); *see also Johnson v. Rogers*, 917 F.2d 1283, 1285 (10th Cir. 1990) (granting writ after fourteen-month delay); *McClellan v. Young*, 421 F.2d 690, 691 (6th Cir. 1970) (granting writ where district court delayed habeas ruling).

## STATEMENT OF RELIEF SOUGHT

JBR respectfully requests that this Court issue a writ of mandamus directing the United States District Court for the Southern District of New York to take one or more of the following actions, in the alternative:

A. Issue rulings on the cross-motions for summary judgment (Add.18, Add.24) within sixty (60) days of this Court's order; or

B. In the alternative, refer the cross-motions for summary judgment and any remaining Daubert and class-related motions to Special Master Hon. Richard J. Holwell (Ret.) under Federal Rule of Civil Procedure 53 within thirty (30) days, with directions for a Report and Recommendation on a defined schedule; or

C. In the further alternative, hold a status conference, set a firm trial date, and rule on the unresolved letter motion for appointment of a Special Master (Add.199) within thirty (30) days.

JBR further requests that, if any of the foregoing relief is granted, the matter be referred to this panel for any further proceedings. *See In re Mikula*, 218 Fed.Appx. 12, 14 (2d Cir. 2007) (mandamus denied without prejudice with proviso that any reinstituted petition "shall be referred to this panel").

**STATEMENT OF THE ISSUE PRESENTED FOR REVIEW**

1.  Whether a district court's failure, for nearly five years, to rule on fully briefed cross-motions for summary judgment—after the court itself represented to this Court (in response to a prior mandamus petition) and to the parties (in a docket order) that the motions would be decided on a defined timetable, and after every contingency the court identified as a prerequisite to ruling has been resolved— constitutes "undue delay is tantamount to a failure to exercise jurisdiction" warranting issuance of a writ of mandamus under *Cheney* and *Madden v. Myers*, 102 F.3d 74 (3d Cir. 1996).

2.  Whether, in the alternative, the District Court's twenty-one-month failure to rule on a Federal Rule of Civil Procedure 53 letter motion that the District Court itself invited the parties to brief constitutes a clear and indisputable abuse of discretion warranting a writ directing reference to Special Master Holwell.

3.  Whether, in the further alternative, the District Court's failure to hold any status conference for nearly six years—during which time JBR's founder has died, multiple key witnesses have retired or left the company, and Keurig's allegedly

3

anticompetitive conduct has continued unabated—warrants supervisory mandamus directing the District Court to convene a status conference and set a firm trial date, or order the District Court to request that the Rogers case be returned to the Eastern District of California. *See In re Cement Antitrust Litig.* (MDL No. 296), 688 F.2d 1297 (9th Cir. 1982).

## STATEMENT OF THE CASE

### A.    Procedural History Through the Prior Mandamus Petitions

This multidistrict litigation, transferred and consolidated in the Southern District of New York in 2014, alleges that Keurig has engaged in a sweeping, decade-long scheme of anticompetitive conduct in the single-serve coffee pod market, including exclusive dealing arrangements with coffee roasters, distributors, and retailers, and the design of brewer formats intended to exclude unlicensed pods. JBR—a competing single-serve coffee pod manufacturer—was added as a plaintiff and has prosecuted its claims throughout.

Following years of discovery, the parties completed expert reports in late 2020 and early 2021 and submitted cross-motions for summary judgment, eleven Daubert motions, and a class certification motion in 2021. Add.199-Add.200. As described in JBR's prior submissions to this Court, the magnitude of the briefing was substantial: by 2023, seventeen motions remained pending, including nine Daubert

4

motions filed by Keurig, five filed by plaintiffs, the cross-motions for summary judgment, and the class certification motion. Add.200 (citing Add.147).

The last status conference held in this matter was conducted by Magistrate Judge Cave in October 2020. Add.9, Add.15, Add.5; Add.199. No status conference has been held since—a span of nearly six years.

Confronted with the District Court's prolonged inaction, JBR petitioned this Court for a writ of mandamus in 2022. On November 15, 2022, this Court denied the petition without prejudice, expressly stating that the petition was "DENIED without prejudice to renewal if the district court fails to take action on the pending motions within 60 days of the date of this order." Add.148. JBR renewed its petition. On June 28, 2023, this Court (Lynch, Lohier, and Bianco, JJ.) denied the renewed petition with a brief explanation: "While Petitioner may lack an adequate alternative means of obtaining relief, it has not made a showing that its right to the writ is clear and indisputable or that granting the writ is appropriate under the circumstances. *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380–81 (2004)." Add.198.

**B. The District Court's July 26, 2024 Representation**

On July 23, 2024, after another year of inaction following the second mandamus denial, JBR filed a letter motion in the District Court requesting (i) a status conference, (ii) appointment of a Special Master, and (iii) referral of pending motions to that Master under Federal Rule of Civil Procedure 53. Add.199. JBR's

5

letter detailed the cumulative prejudice to plaintiffs from the multi-year delay, including witness deaths, retirements, and the continued harm caused by Keurig's ongoing exclusionary conduct. Add.199 & Add.204-Add.206, ¶¶ 2-8.

On July 26, 2024, the District Court entered the following docket order in response:

> The Court is in the process of resolving the outstanding motions, an endeavor that has taken longer due to the voluminous record, number of parties, and complexity of issues. The parties can expect a ruling on the Daubert motions by the fall. The remaining motions will be decided shortly thereafter. To the extent that other parties also request that I appoint Judge Holwell as Special Master to resolve any of the pending motions, they shall so advise the Court, by letter, no later than August 2, 2024.

Add.208. On August 2, 2024, TreeHouse Foods, Inc., Sturm Foods, Inc., and Bay Valley Foods, LLC (collectively, the "TreeHouse Plaintiffs") filed a responsive letter substantially supporting JBR's position—agreeing on the prejudice from continued delay; supporting reference of the class certification motion (though not summary judgment) to Special Master Holwell. Add.212-Add.213.

### C. Subsequent Events: Promise Half-Kept; Promise Half-Broken

*The Daubert ruling.* Consistent with its July 26, 2024 representation, the District Court issued its omnibus Opinion and Order on the Daubert motions on January 3, 2025 (unsealed January 30, 2025). Add.215. That ruling resolved the eleven pending Daubert motions and is now nearly fifteen months old.

*The class certification ruling.* In November 2025, the District Court issued its order on the Direct Purchasers' motion for class certification. Add.387.

*The summary judgment motions.* The cross-motions for summary judgment—the only remaining dispositive motions in the case—have not been ruled on. They were filed in 2021. They are over four years old.

*The Special Master question.* The District Court's July 26, 2024 Order invited the parties to advise the Court by August 2, 2024 if they intended to join JBR's request that Special Master Holwell be appointed to resolve pending motions. The TreeHouse Plaintiffs timely responded. Add.212. Twenty-one months later, the District Court has not ruled on JBR's letter motion or otherwise addressed the Rule 53 question it itself put before the parties.

*The Cave spoliation order.* On March 28, 2022, Magistrate Judge Cave issued a comprehensive Opinion and Order finding that Keurig had committed extensive ESI and document spoliation, recommending an award of attorneys' fees and an evidentiary spoliation jury instruction. Add.26. Keurig filed objections in 2022. Add.145. In its January 17, 2023 Opinion and Order, the District Court represented that it intended to resolve those objections *before* ruling on Daubert. Add.197; *see also* Add.212-Add.213 (TreeHouse letter highlighting same). The Court resolved the objections on July 31, 2025. Add.342.

7

On February 11, 2026, the TreeHouse Plaintiffs and another Plaintiff, McLane, filed a letter requesting "clarification" on the schedule, observing that "[t]he Daubert motions were resolved nearly a year ago, and the Court issued its Class Certification Order in November 2025" and that "[t]he Court has not held a status conference since 2020." Add.387. That letter remains unanswered.

### D. Continuing and Worsening Prejudice

Each successive month of delay produces irreversible prejudice to JBR's ability to present its case at trial. As JBR documented to the District Court in 2024:

> Several of JBR's fact witnesses are in their 70s or 80s. Several of JBR's 30(b)(6) and expert witnesses (and witnesses it will seek to cross-examine) are either retired or in the process of retiring raising questions as to their availability for trial. Additionally, numerous Keurig and third-party witnesses whom JBR may call in its case have retired, changed careers, or passed away.

Add.199. Specific examples include: founder Jon Rogers (deceased during the pendency of this case); CEO Pete Rogers (departed JBR); 30(b)(6) witness Tom Garber (retired 2022); 30(b)(6) witness and expert Bob Giacomelli (retired 2023); CFO and 30(b)(6) witness Mike Sarina (departed JBR). Two of JBR's expert witnesses (Bob Giacomelli and Ken Castleman) are in their seventies. *See* Add.204-Add.206, ¶¶ 3-8.

Beyond the dissolving evidentiary record, JBR and the market continue to be injured by Keurig's ongoing exclusionary conduct—conduct directly relevant to the pending summary judgment motions. As JBR detailed in 2024, Keurig has

continued to enter into new exclusionary agreements (including with La Colombe in July 2023 and Lavazza in February 2024) that contain exclusionary clauses similar to those at issue in the Plaintiffs' motion for summary judgment. *See* Add.206. Keurig has also launched new brewer formats designed to exclude unlicensed pods, including a March 2024 announcement of compostable portion packs. *Id*.

These ongoing harms are not mere atmospherics. They define the stakes of further delay: each unaddressed month is another month in which an injunction the merits of which the District Court has refused to adjudicate cannot issue, another month in which Keurig's allegedly unlawful conduct continues to lock JBR and other competitors out of relevant markets, and another month in which witnesses whose testimony JBR will need at trial age, retire, or die.

## RELEVANT LEGAL STANDARDS

28 U.S.C. § 1651 provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." As the Supreme Court held in *Will v Calvert Fire Ins. Co.*, 437 U.S. 655 (1978), "[t]here can be no doubt that, where a district court persistently and without reason refuses to adjudicate a case properly before it, the court of appeals may issue the writ 'in order that [it] may exercise the jurisdiction of review given by law.'" (quoting *Insurance Co. v. Comstock*, 16 Wall. 258, 270, 21 L. Ed. 493 (1873)). "Otherwise the appellate

9

jurisdiction could be defeated and the purpose of the statute authorizing the writ thwarted by unauthorized action of the district court obstructing the appeal." *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26, 63 S. Ct. 938, 941, 87 L. Ed. 1184 (1943).

The legal requirements for justifying a writ are well established: "First, 'the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires' . . . . Second, the petitioner must satisfy 'the burden of showing that [his] right to issuance of the writ is clear and indisputable.' Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 380-81.

Where a district court has engaged in undue delay in adjudicating a case, there is precedent for the relevant Court of Appeals ordering the district judge to resolve the case. *In re United States*, 886 F.3d 448 (5th Cir. 2018). In that case, the Court of appeals ordered the district court to hear and adjudicate two pending summary judgment motions within 30 days. *Id*. The case had been pending for over nine years, and the motions at issue has similarly been pending for multiple years. As the Court noted, "all three requirements [for a writ] are easily met. . . . We recognize that this is a complex matter and district court judges have broad discretion in managing their dockets. . . . 'However, discretion has its limits.'" *Id*. (*quoting Sims v. ANR Freight Sys., Inc.*, 77 F.3d 846, 849 (5th Cir. 1996). The Court, as other

10

courts have, recognized that "justice delayed is justice denied." *Id*. (*quoting Johnson v. Roger*, 917 F.2d 1283, 1285 (10th Cir. 1990). *See also Madden v. Myers*, 102 F.3d 74, 79 (3d Cir. 1996) ("[A[n appellate court may issue a writ of mandamus on the grounds that undue delay is tantamount to a failure to exercise jurisdiction."); *Johnson*, 917 F.2d at 1285 (writ issued for motion pending for 14 months with no action). These same principles have been recognized in the context of a court's failure to rule on a party's motion in an MDL, leading the appellate court to remand the case out of the MDL. *In re Harris County*, Case No. 21-3637, ECF No. 6-1 (6th Cir. March 11, 2022) (stating "a party's rights in one case cannot be impinged upon 'to create efficiencies in the MDL generally.'"), quoting *In re Nat'l Prescription Opiate Litig*., 956 F.3d 838, 841 (6th Cir. 2020)./

## ARGUMENT

## I.      INTRODUCTION

JBR, Inc. ("JBR"), by and through undersigned counsel, respectfully petitions this Court, pursuant to the All Writs Act, 28 U.S.C. § 1651(a), and Federal Rule of Appellate Procedure 21, to issue a writ of mandamus directing the United States District Court for the Southern District of New York (Hon. Vernon S. Broderick) to: (1) rule on the dispositive cross-motions for summary judgment that have been pending and fully briefed for over four years; (2) in the alternative, refer those motions and the unresolved Federal Rule of Civil Procedure 53 question to Special

11

Master Hon. Richard J. Holwell (Ret.); and (3) hold a status conference and set a trial date in this 12 year old multidistrict antitrust litigation or order the District Court to request that the Rogers case be returned to the Eastern District of California.

This is the third occasion on which JBR has been compelled to seek this Court's intervention. The first petition, filed in 2022, was denied by this Court "without prejudice to renewal if the district court fails to take action on the pending motions within 60 days of the date of this order." Add.148. The second petition, renewed in 2023, was denied on the ground that JBR had not yet "made a showing that its right to the writ is clear and indisputable or that granting the writ is appropriate under the circumstances." Add.198 (citing *Cheney*, 542 U.S. at 380–81).

JBR returns to this Court because the predicate that defeated the prior petition has now collapsed. Three intervening developments—none of which existed when the panel ruled in June 2023—establish a clear and indisputable right to relief and make issuance of the writ appropriate under the circumstances.

*First*, on July 26, 2024, the District Court itself made an on-the-record commitment that the pending motions would be decided on a defined timeline. The Court stated that "[t]he parties can expect a ruling on the *Daubert* motions by the fall" of 2024 and that "[t]he remaining motions will be decided shortly thereafter." Add.208. The *Daubert* ruling did issue—on January 3, 2025. Add.215. The class

12

certification motion was decided in November 2025. But the dispositive cross-motions for summary judgment, which the Court promised would follow "shortly," have now remained undecided for an additional fifteen months.

*Second*, every contingency the District Court identified as a predicate to ruling on summary judgment has now been resolved. With the exception of one recent Keurig motion concerning an amended damages analysis not relevant to summary judgment, *Daubert* is decided. Class certification is decided. Keurig's objections to Magistrate Judge Cave's March 28, 2022 spoliation order have been decided. Nothing now stands between the District Court and resolution of the summary judgment motions except the District Court's continuing inaction.

*Third*, the District Court has likewise failed to rule on JBR's July 23, 2024 letter motion for the appointment of a Special Master under Federal Rule of Civil Procedure 53—a motion the Court itself invited briefing on in its July 26, 2024 Order, and which the parties (JBR and Keurig) timely briefed. Add.199, Add.208, Add.212. That request has now sat for twenty-one months without ruling, even though the District Court has previously appointed Special Master Holwell to manage discovery disputes in this very case and the parties have already paid him over $368,000 to develop expertise in the underlying record. Add.201.

The District Court's prolonged refusal to act on the dispositive motions—despite its own representation that they would be decided "shortly" after Daubert,

13

despite the resolution of every prerequisite the Court identified, and despite the Court's further failure to act on a Rule 53 reference it invited—has now crossed the line from "discretionary" docket management into "undue delay [that] is tantamount to a failure to exercise jurisdiction." *Madden v. Myers*, 102 F.3d 74, 79 (3d Cir. 1996); *see also In re Maggitti*, 2024 WL 1952863, at *1 (3d Cir. May 3, 2024) (same standard); *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998) ("[A]t some point, delay by the district court could become so excessive as to warrant the issuance of a writ of mandamus.").

The harm to JBR continues to accumulate. JBR's co-founders Jon and Barbara Rogers both died during the pendency of this case. JBR's former CEO Pete Rogers has left the company. JBR's 30(b)(6) witness Tom Garber retired in 2022. Its 30(b)(6) witness Bob Giacomelli—one of two JBR designated experts already in their seventies—retired in 2023. Its CFO and 30(b)(6) witness Mike Sarina left JBR.

Even Keurig has experienced major management changes within this time period, most notably a CEO transition in 2024 along with substantial executive-team reshuffling in 2022–2025. And last year a planned spin-off and merger of the coffee business of the company was announced, resulting in Keurig combining with the coffee giant Peets.

Numerous Keurig and third-party witnesses have likewise died, retired, or changed careers. *See* Add.199 & Add.204-Add.206, ¶¶ 2–6, 8. The evidentiary

14

record is dissolving in real time. Meanwhile, by the District Court Plaintiffs' own representation, "Keurig's anticompetitive conduct has continued unabated such that Plaintiffs and the market continue to be harmed with each passing day." Add.387.

Rogers reviewed the Court's docket and to date 69 lawyers have withdrawn from this case. Add.1. This number represents the loss in knowledge and experience of a mid-sized firm. While the exact harm cannot be calculated it is clear that the delay has impacted all of the parties.

JBR does not lightly invoke this Court's extraordinary supervisory power. But after twelve years of litigation, four years of fully briefed dispositive motions, two prior trips to this Court, an unkept timetable of the District Court's own making, and twenty-one months of silence on a Special Master question the District Court itself invited—the moment this Court contemplated in its November 15, 2022 Order has arrived. The writ should issue.

## II.    REASONS WHY THE WRIT SHOULD ISSUE

All three *Cheney* prongs are now satisfied. Two of them—adequate alternative means and clear-and-indisputable right—have been transformed since the prior denial by the District Court's own July 26, 2024 representation, by the resolution of every prerequisite the District Court invoked, and by the District Court's further failure to act on a Rule 53 reference it itself invited.

15

## A. JBR Has No Other Adequate Means to Obtain the Relief Sought.

This Court has already so held. In its June 28, 2023 Order denying the prior petition, the panel acknowledged that "Petitioner may lack an adequate alternative means of obtaining relief." Add.198. Nothing has changed on that prong, except that the inadequacy of alternative means has become more pronounced with each additional year of delay.

JBR cannot pursue interlocutory appeal. There is no order to appeal—the entire problem is the absence of any order. JBR cannot trigger a Rule 54(b) judgment without a ruling on the dispositive motions. JBR cannot wait for final judgment, because the path to final judgment is being held shut by the very inaction this petition seeks to redress. And JBR cannot, consistent with its duty to its case and its witnesses, simply continue to wait while the evidentiary record continues to dissolve.

JBR has, in good faith, exhausted every reasonable alternative short of mandamus: it has filed letter motions; it has joined in other parties' letter motions; it has briefed the Special Master question the District Court invited; it has waited the period this Court contemplated in its November 15, 2022 Order; it has waited an additional year after the prior denial; and it has waited the further fifteen months between Daubert and the present petition. The available alternatives are exhausted. The first *Cheney* prong is satisfied.

16

### B. JBR's Right to the Writ Is Now Clear and Indisputable.

When this Court considered JBR's prior petition in June 2023, it concluded that JBR had not yet shown a "clear and indisputable" right to relief. That conclusion was tenable then. It is no longer tenable now. Three intervening developments—cumulative and reinforcing—establish a right to relief that satisfies even the demanding standard articulated in *Cheney*.

### 1. The District Court Has Now Broken Its Own Schedule.

Most significantly, the District Court has now failed to honor the timetable it itself set in response to the prior round of complaints. On July 26, 2024, the District Court did more than acknowledge that the motions were pending. It made a specific representation to the parties about timing: Daubert by "the fall" of 2024; remaining motions "shortly thereafter." Add.208.

The first half of that representation was kept: Daubert was decided on January 30, 2025. Add.215. The second half has not been kept. "Shortly thereafter" has now stretched to fifteen months—and counting. "Shortly" and "fifteen months" are not, on any reasonable construction of the English language, the same span of time.

This is a categorical change from the record before the panel in 2023. The 2023 panel was asked to evaluate delay in the abstract, against the general standard that docket management is discretionary. The current panel is asked to evaluate delay against the District Court's own publicly committed timetable, which the

17

District Court has now broken by an order of magnitude. The undue delay is no longer a function of competing impressions of how long is too long. It is a function of the District Court's own benchmark, set in response to a prior mandamus petition's aftermath, and now demonstrably violated.

The Third Circuit's recent decisions denying mandamus petitions for delay turn precisely on the absence of this kind of broken commitment. In *In re Maggitti*, the panel denied mandamus on the basis that "[w]e are confident that the District Court will issue a ruling in due course." 2024 WL 1952863, at *1. That confidence was warranted because the district court there had not promised anything specific. Here, the District Court did promise something specific—and it has not delivered. Where a district court has committed to a defined timeline in response to a prior mandamus petition, and then has materially failed to honor that commitment, an appellate court's confidence that the district court "will issue a ruling in due course" is no longer reasonable. *Cf. In re Mikula*, 218 Fed.Appx. 12, 14 (2d Cir. 2007) (denying mandamus without prejudice but expressly providing for renewal if the magistrate judge "d[id] not" rule within thirty days).

### 2. Every Predicate the District Court Identified Has Been Resolved.

When the District Court informed the parties in its July 26, 2024 Order that the motions were taking longer because of "the voluminous record, number of

18

parties, and complexity of issues," it was implicitly representing that those features of the case warranted incremental delay. Add.208. That representation might have justified delay in 2024. It cannot justify delay in 2026.

With exception of one motion filed last month on an amended damages report, Daubert motions (filed in 2021) are decided. The complex expert-evidence questions have been adjudicated—so the summary judgment record, with all its expert reports and rebuttal opinions, has now been judicially curated. Class certification is decided. The complex Rule 23 questions are adjudicated.

In other words: every contingency the District Court has invoked—expert evidence (Daubert), class issues (class certification), record complexity (managed for purposes of Daubert)—has been resolved. What remains is the pure summary judgment question, which has been fully briefed since 2021. There is no further preliminary work to do. The motions are ready. The only thing standing between the parties and a ruling is the District Court's continuing inaction.

### 3. The District Court Has Failed to Act on the Rule 53 Question It Itself Invited.

The District Court's own July 26, 2024 Order specifically invited briefing on whether to refer matters to Special Master Holwell. Add.208. That invitation was not idle: the District Court has previously appointed Judge Holwell to manage discovery disputes in this very case, the parties have already paid him over $368,000

19

to develop expertise in the underlying record, and he is uniquely positioned to manage what remains. Add.201.

JBR briefed the issue. Add.199. The TreeHouse Plaintiffs briefed the issue. Add.212. Twenty-one months have passed. The District Court has neither ruled nor explained the further delay. This is a discrete, fully briefed procedural request, on a question the District Court itself opened, and it has gone unanswered for the better part of two years. That is itself a failure of the kind described in *Madden v. Myers* and *Hassine v. Zimmerman*: prolonged inaction on a matter that has been placed before the court and that the court is duty-bound to resolve.

An appellate court evaluating whether a district court's delay has crossed the line into abdication should treat compounded inaction differently from isolated delay. Here, the District Court's failure to rule on the Rule 53 question reinforces, rather than mitigates, the failure to rule on summary judgment: the Rule 53 reference would have provided an off-ramp for the district court itself, allowing the merits work to proceed in front of a Special Master who has already been compensated to learn the record. The District Court's declining either to rule on the dispositive motions or to refer them to a Master who could rule on them is, in functional terms, a refusal to allow the case to proceed at all.

20

### 4.     Precedent Supports the Granting of this Writ

The Fifth Circuit case *In re United States*, 886 F.3d 448 (5th Cir. 2018) is on all fours with the issue to be decided here. The Court of Appeals in *In re United States* ordered the district court to hear and adjudicate two pending summary judgment motions within 30 days. *Id.* The case had been pending for over 9 years, and the motions at issue had been pending for multiple years. As the Court noted, "all three requirements [for a writ] are easily met. . . . We recognize that this is a complex matter and district court judges have broad discretion in managing their dockets. . . . 'However, discretion has its limits.'" *Id.* (*quoting Sims v. ANR Freight Sys., Inc.*, 77 F.3d 846, 849 (5th Cir. 1996).

In *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353 (11th Cir. 1997), the Eleventh Circuit reversed sanctions imposed by a district court that had failed to rule on a pending dispositive motion (a motion to dismiss a fraud claim) before allowing the case to proceed through years of contentious discovery. The court held that the district court had "effectively abdicate[d] its responsibility to manage a case involving contentious litigants" and that "[f]ailure to consider and rule on significant pretrial motions before issuing dispositive orders can be an abuse of discretion." *Id.* at 1355-56, 1367.

*Chudasama* involved the failure to rule on a single motion in a single-plaintiff product liability, for nearly five years, on cross-motions for summary judgment in a

decade-old multidistrict antitrust litigation, after the district court's promised timeline had been broken, every prerequisite the district court invoked has been resolved, and a Rule 53 alternative the district court itself invited remained undecided.

If the failure to rule on a motion to dismiss before pressing forward with discovery was abdication in *Chudasama*, the failure to rule on dispositive cross-motions for summary judgment—motions filed more than four years ago, and fully briefed, the resolution of which determines whether this case proceeds to trial at all—is abdication a fortiori.

### 5. This Case Is the Paradigm for Supervisory Mandamus in Complex MDL Litigation.

The Ninth Circuit's decision in *In re Cement Antitrust Litig.* (MDL No. 296), 688 F.2d 1297, 1304-05 (9th Cir. 1982), recognized that the courts of appeals possess supervisory mandamus authority in complex multidistrict antitrust litigation when needed to ensure the orderly administration of the district courts. The same considerations apply here. This is a multidistrict antitrust litigation. It has been pending in some form for fourteen years. It involves nationwide markets and ongoing harm to competition. It implicates witnesses and documents in jurisdictions across the country. It is, in short, precisely the kind of case in which a court of appeals' supervisory authority is appropriately exercised.

Two prior mandamus petitions have already been adjudicated by this Court. If a third mandamus petition—filed after the District Court's own promised timetable has been broken, after every prerequisite the District Court identified has been resolved, and after twenty-one months of unexplained silence on a Rule 53 reference the District Court itself invited—cannot warrant relief, then it is not clear what facts ever could. Such a result would convert the conditional language of this Court's November 15, 2022 Order into a nullity and would license indefinite delay in even the most complex civil cases.

**C.  Issuance of the Writ Is Appropriate Under the Circumstances.**

The third *Cheney* prong asks whether the writ is "appropriate under the circumstances." 542 U.S. at 381. The circumstances here weigh heavily in favor of issuance.

First, the harm from continued delay is irreparable in the literal sense. JBR's founder cannot be un-deceased. Witnesses who have retired or left their positions cannot be unretired or returned to the positions they held when their depositions were taken; their testimony at trial will be more difficult to obtain, and their memories of relevant events will continue to fade. Deceased witnesses' testimony cannot be presented at all. Each month of delay locks in additional irreversible degradation of the trial record.

23

Second, the harm extends beyond JBR. Plaintiffs have alleged, and as the TreeHouse Plaintiffs reiterated as recently as February 11, 2026, "Keurig's anticompetitive conduct has continued unabated such that Plaintiffs and the market continue to be harmed with each passing day." Add.387. The record before the District Court is replete with evidence of new exclusionary agreements (*e.g.*, with La Colombe in July 2023 and Lavazza in February 2024) and new product launches designed to reinforce Keurig's market position while the dispositive motions sit unaddressed. Continued delay in adjudicating Plaintiffs' antitrust claims means continued delay in any potential injunctive relief, with consequent harm to the public interest in competitive markets.

Third, the relief JBR seeks is narrowly tailored. JBR does not ask this Court to direct any particular substantive ruling. JBR asks only that the District Court rule, or alternatively that it refer the matters to a Special Master who can rule, alternatively that it convene a status conference and set a trial date. If none of these options are available, Rogers respectfully requests that its case be returned to the Eastern District of California where the case was originally filed. Each form of relief leaves the substantive merits entirely with the District Court (or with its designated Master). No prong of the requested relief intrudes on the District Court's discretion to decide the motions however it sees fit. The relief simply requires that some decision be made.

24

Fourth, the proposed deadlines are reasonable. The summary judgment motions have been fully briefed for over four years. They have already been read by the District Court (and by Special Master Holwell, whose work designating confidential exhibits required examination of the underlying summary judgment record). Sixty days for a ruling, or thirty days for a Rule 53 reference, is generous given that history.

Fifth, this Court's November 15, 2022 Order expressly contemplated renewal in circumstances of continuing inaction. Add.148. That contemplation governs here. JBR is now, at long last, presenting precisely the sort of compounded, documented, and benchmarked failure that this Court's prior orders made room for.

## III. CONCLUSION

Mandamus is a drastic remedy reserved for extraordinary circumstances. The circumstances here are extraordinary. Cross-motions for summary judgment in a decade-old multidistrict antitrust litigation have been pending for over four years. The District Court has held no status conference for nearly six years. The District Court itself committed in July 2024 that the remaining motions would be decided "shortly" after Daubert; Daubert was decided fifteen months ago; the remaining summary judgment motions remain pending. The District Court itself invited Rule 53 briefing twenty-one months ago and has not ruled.

25

JBR's co-founders have died. Its witnesses are aging out. Its market position continues to be foreclosed by conduct the District Court has refused to adjudicate. After two prior trips to this Court, after this Court's express invitation to renew, after the District Court's own broken timetable, the moment for the writ has arrived.

JBR respectfully requests that this Court issue a writ of mandamus directing the District Court to rule on the cross-motions for summary judgment within sixty (60) days, or alternatively to refer those motions to Special Master Holwell within thirty (30) days, or alternatively to hold a status conference, set a firm trial date, and rule on the unresolved Rule 53 letter motion within thirty (30) days. JBR further requests that any reinstated proceedings be referred to this panel.

Respectfully submitted,

JBR, Inc., d/b/a Rogers Family Company, *Petitioners*

*/s/ Daniel Johnson Jr.*
Daniel Johnson Jr. (CA Bar No. 57409)
DAN JOHNSON LAW GROUP, LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: 415-604-4500
dan@danjohnsonlawgroup.com
*Counsel for Petitioners*
*JBR, Inc., d/b/a Rogers Family Company*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the word limit of Fed. R. App. P. 21(d)(1) because, excluding the portions exempted by Fed R. App. P. 21(a)(2)(C),

[X] this brief contains 6,002 words

[  ] this brief uses monospaced type and contains [   ] lines

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font; or

[  ] this brief or other document has been prepared in a monospaced typeface using [   ] in [   ].

Dated: April 28, 2026

## **CERTIFICATE OF SERVICE**

I certify that on April 28, 2026, this petition and the accompanying addendum were filed electronically with the Clerk of the Second Circuit Court of Appeals through the Court's electronic filing system, which will accomplish service on counsel for all parties.

Dated: April 28, 2026

/s/ Daniel Johnson Jr.
Daniel Johnson Jr. (CA Bar No. 57409)
DAN JOHNSON LAW GROUP, LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: 415-604-4500
dan@danjohnsonlawgroup.com

28

# 26-

# United States Court of Appeals
### for the
# Second Circuit

In Re: JBR, INC.,

*Petitioner.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JBR, INC., DBA Rogers Family Company,

*Petitioner,*

– v. –

KEURIG GREEN MOUNTAIN INC., as successor to Keurig, Incorporated,
FKA Green Mountain Coffee Roasters Inc.,

*Respondent.*

ON PETITION FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## ADDENDUM TO PETITION FOR WRIT OF MANDAMUS
## TO THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK
## Volume 1 of 2 (Pages Add.1-Add.198)

DANIEL JOHNSON JR.
DAN JOHNSON LAW GROUP, LLP
*Attorneys for Petitioners JBR, Inc. d/b/a*
  *Rogers Family Company*
100 Pine Street, Suite 1250
San Francisco, California 94111
(415) 604-4500
dan@danjohnsonlawgroup.com

CP COUNSEL PRESS    (800) 4-APPEAL • (392608)

| TAB | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Table of Attorneys Withdrawn from 14-md-2542 as of 2026-04-24 | Add.1 |
| 2 | 2019-09-30 Opinion & Order (ECF No. 688) | Add.5 |
| 3 | 2020-10-20 Scheduling Order (ECF No. 1152) | Add.9 |
| 4 | 2020-10-28 Scheduling Order (ECF No. 1160) | Add.15 |
| 5 | 2021-08-25 Plaintiffs' Motion for Summary Judgment (ECF No. 1489) | Add.18 |
| 6 | 2021-08-25 Keurig Motion for Summary Judgment (ECF No. 1493) | Add.24 |
| 7 | 2022-03-28 Opinion & Order (ECF No. 1815 (redacted public version of ECF No. 1806)) | Add.26 |
| 8 | 2022-04-11 Keurig Green Mountain, Inc.'s Motion and Objections to Magistrate Judge Cave's March 28, 2022 Opinion & Order (ECF No. 1816) | Add.145 |
| 9 | 2022-04-19 Table of pending motions (ECF No. 1818-1) | Add.147 |
| 10 | 2022-11-15 Order denying petition, In re JBR, Inc., No. 22-2079 (Document 29) | Add.148 |
| 11 | 2023-01-17 Opinion & Order (ECF No. 1978) | Add.149 |
| 12 | 2023-06-28 Order denying renewed petition, In re JBR, Inc., No. 22-2079 (Document 57) | Add.198 |
| 13 | 2024-07-23 Letter requesting special master (ECF No. 2342) | Add.199 |
| 14 | 2024-07-23 Johnson declaration in support of letter request (ECF No. 2342-1) | Add.203 |
| 15 | 2024-07-26 Order on Letter requesting special master (ECF No. 2344) | Add.208 |
| 16 | 2024-08-02 Letter requesting special master (ECF No. 2346) | Add.212 |

| | | |
|---|---|---|
| 17 | 2025-01-30 Opinion & Order (ECF No. 2375) | Add.215 |
| 18 | 2025-07-31 Opinion & Order (ECF No. 2395) | Add.342 |
| 19 | 2026-02-11 Letter request concerning outstanding motions and trial date (ECF No. 2432) | Add.387 |

## Compilation of Attorneys Withdrawn

| No. | Attorney | Party | Withdrawn | ECF Request | ECF Order |
|---|---|---|---|---|---|
| 1 | John A Kehoe | Todd W. Springer (Individual) | 2/3/2015 | 234 | 235 |
| 2 | Linda P. Nussbaum | Henry A. Rocker, David Rosenthal (Individuals) | 6/3/2015 | 270 | 273 |
| 3 | Bradley J. Demuth | Henry A. Rocker, David Rosenthal (Individuals) | 6/3/2015 | 270 | 273 |
| 4 | Mark Bryan Goldstein | Jeffrey Rosen (Individual) | 1/14/2016 | 307 | 308 |
| 5 | Ryan D. Fahey | Bay Valley Foods, LLC, Sturm Foods, Inc., Treehouse Foods, Inc. | 3/7/2016 | 310 | 312 |
| 6 | Robert G. Retana | IPP, Yelda Mesbah Bartlett, Lavinia Simona Biasell, Holly Ann Buss, Teena Marie Johnson, Lori Jo Kirkhart, Tracy Elizabeth Moreno, David Wayne Nation, Gregory Rose, Lauren Jill Schneider, Rhett Montgomery Tanselle (Individuals) | 3/17/2016 | 313 | 314 |
| 7 | Peter A. Barile III | Henry A. Rocker, David Rosenthal (Individuals) | 4/6/2016 | 315 | 316 |
| 8 | Lauren Ilene Dubick | IPP | 5/9/2026 | 317 | 318 |
| 9 | Danielle P. Mindlin | Keurig | 6/2/2017 | 367 | 558 |
| 10 | Amanda Steiner | Todd W. Springer (Individual) | 1/3/2018 | 393 | 396 |
| 11 | Bradley J. Demuth | DPP | 1/31/2018 | 415 | |
| 12 | Anna Lamut | Bay Valley Foods, LLC, Sturm Foods, Inc., Treehouse Foods, Inc. | 4/25/2018 | 421 | 425 |
| 13 | Marissa C. Nardi | Bay Valley Foods, LLC, Sturm Foods, Inc., Treehouse Foods, Inc. | 4/25/2018 | 423 | 426 |
| 14 | Sean P. DeBruine | JBR, Inc. | 5/3/2018 | 429 | 431 |
| 15 | Michael M. Liskow | IPP | 9/26/2018 | 445 | 446 |
| 16 | Erin C. Durba | DPP | 11/13/2018 | 459 | 460, 461 |
| 17 | Bernard Persky | Ney Silverman Insurance Associates, L.L.C. | 1/2/2019 | 490 | 491, 492 |
| 18 | Fei-Lu Qian | James G. Long | 1/15/2019 | 499 | 500 |
| 19 | Charles T. Caliendo | Charles T. Caliendo (Individual) | 1/24/2019 | 502 | 506 |
| 20 | Veronica W. Glaze | Yelda Mesbah Bartlett | 2/20/2019 | 538 | 540 |
| 21 | James Allen Glenn | JBR, Inc. | 7/12/2019 | 642 | 677 |
| 22 | Gregory M Hopkins | Keurig | 7/30/2019 | 653 | 655 |
| 23 | Stewart Headlee | Keurig | 7/30/2019 | 653 | 655 |
| 24 | Laura Conley | Keurig | 9/27/2019 | 686 | 689 |
| 25 | Eun Sun Jang | Keurig | 7/8/2020 | 1059 | 1062 |

Add.1

## Compilation of Attorneys Withdrawn

| No. | Attorney | Party | Withdrawn | ECF Request | ECF Order |
|-----|----------|-------|-----------|-------------|-----------|
| 26 | Alexander L. Simon | IPP | 8/14/2020 | 1082 | |
| 27 | Bruce L. Simon | IPP | 8/17/2020 | 1084 | |
| 28 | Hollis Salzman | Kenneth B. Burkley, Roger Davidson, Benjamin Krajcir, James G. Long, Linda Major, Ney Silverman Insurance Associates, L.L.C., Sally Rizzo, Henry A. Rocker, Todd W. Springer (Individuals) | 10/22/2020 | 1154 | 1156 |
| 29 | Kelli L. Lanski | Bay Valley Foods, LLC, Sturm Foods, Inc., Treehouse Foods, Inc. | 1/26/2021 | 1233 | 1235 |
| 30 | Joseph C. Bourne | IPP | 3/17/2021 | 1262 | 1263 |
| 31 | Samuel G. Fuller | Keurig | 6/7/2021 | 1380 | 1381, 1398, 1399 |
| 32 | Christopher Fitzpatrick | Keurig | 10/18/2021 | 1559 | 1561 |
| 33 | Ian L. Papendick | Bay Valley Foods, LLC, Sturm Foods, Inc., Treehouse Foods, Inc. | 10/29/2021 | 1572 | 1576 |
| 34 | Shanna A. Lehrman | Bay Valley Foods, LLC, Sturm Foods, Inc., Treehouse Foods, Inc. | 10/29/2021 | 1574 | 1578 |
| 35 | Betsy C. Manifold | Jonna Dugan, Amy Gray, Patricia Hall, Armando Herrera, Mary Hudson, Brier Miller Minor, Patricia J. Nelson, Lorie Rehma, Shirley Schroeder, Constance Werthe (Individuals) | 11/11/2021 | 1619 | |
| 36 | Rachele R. Byrd | Jonna Dugan, Amy Gray, Patricia Hall, Armando Herrera, Mary Hudson, Brier Miller Minor, Patricia J. Nelson, Lorie Rehma, Shirley Schroeder, Constance Werthe (Individuals) | 11/11/2021 | 1619 | |
| 37 | Marisa C. Livesay | Jonna Dugan, Amy Gray, Patricia Hall, Armando Herrera, Mary Hudson, Brier Miller Minor, Patricia J. Nelson, Lorie Rehma, Shirley Schroeder, Constance Werthe (Individuals) | 11/11/2021 | 1619 | |
| 38 | Robert G. Litts | JBR, Inc. | 1/3/2022 | 1672 | 1682 |

Add.2

## Compilation of Attorneys Withdrawn

| No. | Attorney | Party | Withdrawn | ECF Request | ECF Order |
|-----|----------|-------|-----------|-------------|-----------|
| 39 | Deborah A. Elman | Class Plaintiffs | 1/12/2022 | 1678 | 1683 |
| 40 | Landon Y Jones | Keurig | 1/13/2022 | 1679 | 1686, 1687 |
| 41 | Lauren Fornarotto | Judy Hoyer (Individual) | 2/11/2022 | 1709 | 1889 |
| 42 | | Lorie Rehma (Individual) | 3/11/2022 | 1725 | 1924 |
| 43 | John F. Garvish, II | Judy Hoyer (Individual) | 3/18/2022 | 1754 | 1910 |
| 44 | Megan P. Fitzgerald | Bay Valley Foods, LLC, Sturm Foods, Inc., Treehouse Foods, Inc. | 5/20/2022 | 1835 | 1928 |
| 45 | Alexander J. Owings | BJ's Wholesale Club, Inc. | 6/13/2022 | 1845 | 1847 |
| 46 | David B. Rochelson | Class Plaintiffs | 6/30/2022 | 1856 | 1858 |
| 47 | Theodore Beloyeannis Bell | Bi-Lo Holding, LLC, Winn-Dixie Stores, Inc. | 7/8/2022 | 1859 | 1864 |
| 48 | Matthew James Geyer | Kenneth B. Burkley, Roger Davidson, Benjamin Krajcir, James G. Long, Linda Major, Ney Silverman Insurance Associates, L.L.C., Sally Rizzo, Henry A. Rocker, Todd W. Springer (Individuals) | 7/8/2022 | 1861 | 1865 |
| 49 | Michelle C. Clerkin | Class Plaintiffs | 10/12/2022 | 1920 | 1926 |
| 50 | Jacob O. Onile-Ere | Class Plaintiffs | 10/13/2022 | 1921 | 1927 |
| 51 | Jessica Roll | Keurig | 12/29/2022 | 1963 | 1969 |
| 52 | Guillermo Gabriel Zorogastua | IPP | 5/15/2023 | 2041 | |
| 53 | Benjamin E. Shiftan | IPP | 5/15/2023 | 2042 | |
| 54 | Rachel Lerner Basu | Keurig | 9/18/2023 | 2140 | 2142 |
| 55 | Susan A. Bernstein | Class Plaintiffs | 4/25/2024 | 2300 | 2301 |
| 56 | Molly Ma | Keurig | 5/3/2024 | 2302 | 2306, 2307 |
| 57 | Lisa M. Danzig | Keurig | 5/30/2024 | 2318 | 2321 |
| 58 | Zach Tschida | Keurig | 7/19/2024 | 2338 | 2341 |
| 59 | Kellie Lerner | Class Plaintiffs | 10/14/2024 | 2355 | 2357 |
| 60 | Meegan Hollywood | Class Plaintiffs | 10/14/2024 | 2355 | 2357 |
| 61 | Evan C. Miller | Bay Valley Foods, LLC, Sturm Foods, Inc., Treehouse Foods, Inc. | 10/21/2024 | 2359 | 2362 |
| 62 | Kathryn Hunt Muse | The Illinois Attorney General on behalf of the People of the State of Illinois | 12/2/2024 | 2363 | 2364, 2365 |
| 63 | Laura A. Komarek | McLane Company, Inc. | 4/3/2025 | 2381 | 2382, 2383 |

## Compilation of Attorneys Withdrawn

| No. | Attorney | Party | Withdrawn | ECF Request | ECF Order |
|---|---|---|---|---|---|
| 64 | Pearson Warshaw, LLP | IPP | 7/17/2025 | 2393 | 2394 |
| 65 | Isabel Tuz | Keurig | 12/23/2025 | 2424 | 2427 |
| 66 | Rachel Lerner | Keurig | 12/23/2025 | 2424 | 2427 |
| 67 | Shannon Manley | Keurig | 12/23/2025 | 2424 | 2427 |
| 68 | William V. Reiss | Kenneth B. Burkley, Roger Davidson, James G. Long, Sally Rizzo, Henry A. Rocker, Todd W. Springer | 2/4/2026 | 2428 | 2429 |
| 69 | Gregory W Langsdale | BJ's Wholesale Club, Inc. | 3/6/2026 | 2439 | 2441 |

Add.4

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/30/19.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

IN RE:  KEURIG GREEN MOUNTAIN          :     14 MD 2542 (VSB)(HBP)
SINGLE SERVE COFFEE ANTITRUST
LITIGATION                             :     OPINION
                                             AND ORDER
------------------------------------X

PITMAN, United States Magistrate Judge:

By letter motion dated September 17, 2019, defendant seeks an Order to compel plaintiff TreeHouse to produce documents produced in Keurig, Inc. v. Sturm Foods, Inc., Civ. No. 10-841-SLR, 2012 WL 4049799 (D. Del. Sept. 13, 2012), aff'd, 732 F.3d 1370 (Fed. Cir. 2013) ("the Sturm Litigation") (Letter Motion, dated Sept. 17, 2019 (Docket Item 681)).  Having heard oral argument on September 23, 2019, for the reasons set forth below, defendant's motion is denied.

Defendant argues that it is entitled to the Sturm Litigation documents because "evidence adduced during the prior litigation is directly relevant to the bases for Keurig prosecuting the claims, as well as its decision to later seek an appeal . . . ."  (Letter Motion, dated Sept. 17, 2019 (Docket Item 681) at 3).  TreeHouse contends that the documents are not relevant because defendant did not possess them at the time it decided to commence the Sturm Litigation and defendant did not rely on them on appeal.  Thus, TreeHouse contends the documents do not bear on the reasonableness of defendant's decision to commence the Sturm

Add.5

Litigation or to appeal the District Court's adverse summary judgment decision.

TreeHouse's arguments are persuasive. Logic dictates that a litigant cannot decide to commence a lawsuit based on information that is subsequently disclosed in discovery after the commencement of the lawsuit. In <u>Hoffman-La Roche Inc. v. Genpharm Inc.</u>, 50 F. Supp. 2d 367, 380 (D.N.J. 1999), the district court noted that

> [t]he resolution of the question whether plaintiffs' suit is objectively baseless . . . involves the determination of whether plaintiffs undertook a reasonable investigation <u>before filing suit</u>, whether plaintiffs knew or should have known that [defendant] had not infringed the . . . patents, and whether a reasonable litigant could have realistically expected success on the merits <u>at the time the suit was filed</u>.

(Emphasis added). Thus, documents produced in discovery in the <u>Sturm</u> Litigation cannot inform the determination of whether defendant's commencement of the litigation was reasonable. Accordingly, the documents sought by defendant are not relevant to TreeHouse's sham litigation claims in this action.

TreeHouse is also correct that the documents are not relevant to defendant's decision to appeal the District Court's adverse judgment. Defendant's appeal in the Sturm Litigation raised a pure question of law, namely whether "the district court erred by declining to apply the substantial embodiment test articulated by the Supreme Court in <u>Quanta Computer, Inc. v. LG Electronics, Inc.</u>, 553 U.S. 617, 128 S. Ct. 2109, 170 L.Ed.2d 996

2

Add.6

(2008) . . . ." <u>Keurig, Inc. v. Sturm Foods, Inc.</u>, 732 F.3d 1370, 1372 (Fed. Cir. 2013). In defendant's appellate brief, it claimed that "the district court erred by expressly disregarding the substantial embodiment test . . . ." (Brief of Plaintiff-Appellant Keurig, Incorporated, <u>Keurig Incorporated v. Sturm Foods, Inc.</u>, Docket 2013-1072, dated Jan. 14, 2013, at 10). At oral argument, defendant conceded none of the documents produced in that action were included in the appendix submitted to the Federal Circuit. Thus, because defendant did not rely on the documents at issue on appeal, I do not see how they can be relevant to assessing whether defendant's decision to appeal was reasonable.[1] No competent attorney would omit important discovery material from an appellate appendix.

---

[1] At least one case has considered documents produced in discovery in assessing whether a party had a reasonable basis to commence the litigation. <u>Matsushita Elec. Corp. v. Loral Corp.</u>, 974 F. Supp. 345, 349-51, 356 (S.D.N.Y. 1997) (Jones, D.J.). Given the nature of the issue Keurig raised in its appeal in the Sturm Litigation and the fact that no documents produced in discovery were included in the appendix on appeal, it does not appear that any of the documents produced in the Sturm Litigation could explain defendant's decision to pursue its claims in that action. Thus, I need not decide whether it is appropriate to follow <u>Matsushita</u>.

3

Add.7

Accordingly, for all the foregoing reasons, defendant's motion is denied.  The Clerk of the Court is respectfully requested to mark Docket Item 681 closed.

Dated:  New York, New York
        September 30, 2019

SO ORDERED

_____
HENRY PITMAN
United States Magistrate Judge

Copies transmitted to:

All Counsel

4

Add.8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: KEURIG GREEN MOUNTAIN SINGLE-SERVE
COFFEE ANTITRUST LITIGATION

CIVIL ACTION NO.: 14 MD 2542 (VSB) (SLC)

**SCHEDULING ORDER**

**SARAH L. CAVE,** United States Magistrate Judge.

Before the Court is Plaintiffs' motion for (1) an order directing Defendant Keurig to produce its experts for a deposition before the submission of Plaintiffs' expert reply briefs and (2) modification of the expert discovery schedule and the Daubert, class certification, and dispositive motion briefing schedules (the "Motion"). (ECF No. 1104). The Court received letter-briefing from the parties (ECF Nos. 1104, 1119, 1127, 1131 and 1138) and conducted a lengthy discovery conference on the Motion with the parties today, October 20, 2020.

Plaintiffs argue that the Stipulation and Order Regarding non-Discoverability of Certain Expert Materials and Communications (the "Expert Stipulation") (ECF No. 495) expressly contemplated that expert depositions would take place before the deadline for service of Plaintiffs' reply expert reports (the "Reply Report Deadline"), and that that the Court's March 26, 2020 scheduling order at ECF No. 887 (the "Scheduling Order")[1] specifically contemplated the need to revisit the expert schedule once expert disclosures were made. (ECF No. 1104 at 2).

Keurig argues that the Expert Stipulation was subject to the Scheduling Order, which directed the parties to take expert depositions during the two months _after_ the Reply Report

---

[1] The Scheduling Order revised the prior scheduling order implemented by the Honorable Vernon S. Broderick in August of 2019, following lengthy negotiations between the parties and a court conference (ECF No. 668) (the "August 2019 Scheduling Order").

Add.9

Deadline.  (ECF No. 1131 at 1–2).  Specifically, Keurig contends that the language of the Scheduling Order, that "[t]he parties shall cooperate to schedule depositions during the months of December and January" was a negotiated point that was intended to ensure that expert depositions would take place after the Reply Report Deadline.  (Id. at 2).   In addition, Keurig argues that Plaintiffs have not shown good cause for their other requested amendments to the Scheduling Order.  (Id. at 2).

Despite the fact that the August 2019 Scheduling Order was thoroughly-negotiated by the sophisticated counsel in this complex litigation, the language to which the parties point regarding the timing of the expert depositions is ambiguous, especially when compared to the examples of other case management scheduling orders provided by the parties.  See, e.g., In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., No. 9 Civ. 1419 (SAS), ECF No. 31 filed May 11, 2020 (S.D.N.Y.) (setting a specific date for expert depositions to commence after the exchange of reply reports); In re Am. Express Anti-Steering Rules Antitrust Litig., No. 11 MD. 2221, ECF No. 224 filed Dec. 18, 2012 (E.D.N.Y.) (setting a specific time period during which expert depositions would occur, after sur-rebuttal reports were exchanged).  Absent the language that appears in these examples, the Court finds that the parties had not previously agreed to a specific date on which expert depositions would commence.  The Court continues to encourage the parties to cooperate to schedule expert depositions.  In light of the ambiguity in the Scheduling Order, however, while nothing prevents the parties from conferring and agreeing to schedule an expert deposition before the Reply Report Deadline, the Court declines to compel any party to produce an expert for deposition before the Reply Report Deadline.

Add.10

The Direct Purchaser Plaintiffs also ask the Court to amend the Daubert briefing schedule to include deadlines for reply briefs. (ECF No. 1104 at 3). Reply briefs were not contemplated in the initial scheduling order, nor were they included in the revised Scheduling Order, and they will not be added now. Accordingly, this request is DENIED.

Separately, Plaintiff JBR, Inc. ("JBR") again seeks to sever its case from this multi-district litigation, seeking a transfer of the case to the Eastern District of California. (ECF No. 1104 n.4). In the alternative, JBR seeks to file its motions for summary judgment without the completion of expert discovery of class certification briefing and seeks to have its entire case separately tried on the earliest available trial date without waiting for the completion of other cases. (Id.) Both Judge Broderick and this Court have previously denied JBR's request as premature, and this request is again DENIED, without prejudice to renewal after the close of expert discovery. (See ECF No. 848 (denying JBR's request for remand to the Eastern District of California without prejudice to renewal at the close of expert discovery)).

Finally, based on the parties' submissions and the arguments presented at the discovery conference, the pretrial schedule in this matter is revised as follows:

1. Expert Discovery

    a. All expert discovery shall be completed by **April 7, 2021.**

    b. Any Defendant or Counterclaim-Defendant that wishes to submit a report from an expert witness must submit that report as required by Fed. R. Civ. P. 26(a)(2)(B) by **December 7, 2020**.

    c. Any Plaintiff or Counterclaim-Plaintiff seeking to submit a response to any report submitted by Defendant or Counterclaim-Defendant on behalf of its expert witness must submit that report by **February 1, 2021**.

3

Add.11

    d. Depositions of expert witnesses shall be completed by **April 7, 2021**. The parties shall cooperate to schedule depositions between **February 2, 2021** and **April 7, 2021**.

    e. Except by leave of court, each expert witness may be deposed only once.

2. By **May 5, 2021**, the parties are to submit a joint letter updating the Court on the status of the case, including but not limited to whether any party intends to file a dispositive motion and what efforts the parties have made to settle the action.

3. Class Certification

    a. Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs (together, "Class Plaintiffs") shall file and serve their motions for class certification by **May 24, 2021.**

    b. Defendants shall file and serve their opposition to class certification by **June 16, 2021**.

    c. Class Plaintiffs shall file and serve their replies in support of class certification by **August 18, 2021.**

4. Dispositive Motions

    a. All dispositive motions shall be filed and served on **August 18, 2021**. Should any party seek to file a dispositive motion prior to this date, that party must first meet and confer in good faith with the opposing party to determine whether that issue is appropriately ripe for a dispositive motion. If the Court determines that the issue is appropriately ripe, it will set a briefing schedule thereafter.

    b. If the parties are unable to resolve the ripeness issues through meet and confer, the party seeking to file an early dispositive motion shall file a letter brief on the ripeness issue with the Court.

    c. Opposition to dispositive motions shall be filed by **September 29, 2021**.

    d. Replies to dispositive motions shall be filed by **November 10, 2021**.

5. <u>Daubert</u> Motions

    a. All <u>Daubert</u> motions relating to Defendant's class certification experts shall be filed by **April 21, 2021.**

    b. All oppositions to <u>Daubert</u> motions relating to Defendant's class certification experts, and all <u>Daubert</u> motions relating to Class Plaintiffs' class certification

4

Add.12

experts, including as to any non-class issues on which such experts opine, shall be filed by **June 16, 2021.**

c.  All oppositions to <u>Daubert</u> motions relating to Class Plaintiffs' class certification experts, including as to any non-class issues on which such experts opine, shall be filed by **August 18, 2021.**

d.  All <u>Daubert</u> motions relating to experts not opining on class certification issues shall be filed by **August 18, 2021.**

e.  All oppositions to <u>Daubert</u> motions relating to experts not opining on class certification issues shall be filed by **September 29, 2021.**

f.  All replies to <u>Daubert</u> motions relating to experts not opining on class certification issues shall be filed by **November 10, 2021**.

g.  Except by leave of court, each expert witness shall be subject to only one <u>Daubert</u> motion.

6.  The stipulation and entry of this Case Management Plan and Scheduling Order, and the dates provided herein, are without prejudice to any party's right to seek permission from the Court for modification of the schedule following the disclosure of expert witnesses. After disclosure of expert witnesses, and no later than **August 28, 2021**, the parties shall meet and confer in good faith regarding whether any modifications to the schedule herein are appropriate.

7.  Unless otherwise ordered by the Court, the joint pretrial order and additional submissions required by Rule 6 of Judge Broderick's Individual Rules and Practices shall be due **August 18, 2021**, or if any dispositive motion is filed, 30 days from the Court's decision on such motion. This case shall be trial ready 60 days from the close of discovery or from the Court's decision on any dispositive motion.

8.  Counsel for the parties have not proposed an alternative dispute resolution for this case.

9.  The length of any trial is yet to be determined.

10. The entry of this Case Management Plan and Scheduling Order, and the dates provided herein, are without prejudice to Plaintiffs' and Counterclaim-Plaintiff's right to seek leave of Court to update their damages calculations to the time of trial.

11. Each Plaintiff may join any other motion, opposition or reply filed by any other Plaintiff.

Add.13

The parties have five business days to confer and jointly notify the Court of any necessary corrections to this scheduling order.

The Clerk of Court is respectfully directed to amend the case schedule as outlined herein, and to close the Motion at ECF No. 1104.

Dated:      New York, New York
            October 20, 2020                          SO ORDERED

                                                      _____
                                                      SARAH L. CAVE
                                                      United States Magistrate Judge

Add.14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: KEURIG GREEN MOUNTAIN SINGLE-SERVE COFFEE ANTITRUST LITIGATION | CIVIL ACTION NO.: 14 MD 2542 (VSB) (SLC) |
| | **AMENDED SCHEDULING ORDER** |

**SARAH L. CAVE,** United States Magistrate Judge.

The Court is in receipt of the joint letter addressing corrections and raising a dispute regarding the amended scheduling order (ECF No. 1159). Regarding the dispute as to the class certification briefing schedule, the Court has amended the schedule such that Keurig now has 46 days to respond, and Plaintiffs have 40 days to reply. The Court set these dates to ensure class certification briefing is complete before dispositive motion briefing begins, as Judge Broderick has previously instructed.

The operative case management schedule is as follows:

1.  All motions for spoliation and sanctions relating to known conduct to such date shall be filed by **April 19, 2021.** The parties are to confer as to a proposed briefing schedule and provide a proposed schedule to the Court by **November 6, 2020.**

2.  Expert Discovery

    a.  All expert discovery shall be completed by **April 7, 2021.**

    b.  Any Defendant or Counterclaim-Defendant that wishes to submit a report from an expert witness must submit that report as required by Fed. R. Civ. P. 26(a)(2)(B) by **December 7, 2020**.

    c.  Any Plaintiff or Counterclaim-Plaintiff seeking to submit a response to any report submitted by Defendant or Counterclaim-Defendant on behalf of its expert witness must submit that report by **February 1, 2021**.

Add.15

d.  Depositions of expert witnesses shall be completed by **April 7, 2021**. The parties shall cooperate to schedule depositions between **February 2, 2021** and **April 7, 2021**.

e.  Except by leave of court, each expert witness may be deposed only once.

3.  By **May 5, 2021**, the parties are to submit a joint letter updating the Court on the status of the case, including but not limited to whether any party intends to file a dispositive motion and what efforts the parties have made to settle the action.

4.  Class Certification

a.  Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs (together, "Class Plaintiffs") shall file and serve their motions for class certification by **May 24, 2021.**

b.  Defendants shall file and serve their opposition to class certification by **July 9, 2021**.

c.  Class Plaintiffs shall file and serve their replies in support of class certification by **August 18, 2021.**

5.  Dispositive Motions

a.  All dispositive motions shall be filed and served on **August 18, 2021**. Should any party seek to file a dispositive motion prior to this date, that party must first meet and confer in good faith with the opposing party to determine whether that issue is appropriately ripe for a dispositive motion. If the Court determines that the issue is appropriately ripe, it will set a briefing schedule thereafter.

b.  If the parties are unable to resolve the ripeness issues through meet and confer, the party seeking to file an early dispositive motion shall file a letter brief on the ripeness issue with the Court.

c.  Opposition to dispositive motions shall be filed by **September 29, 2021**.

d.  Replies to dispositive motions shall be filed by **November 10, 2021**.

6.  <u>Daubert</u> Motions

a.  All <u>Daubert</u> motions relating to Defendant's class certification experts shall be filed by **April 21, 2021.**

b.  All oppositions to <u>Daubert</u> motions relating to Defendant's class certification experts, and all <u>Daubert</u> motions relating to Class Plaintiffs' class certification

Add.16

experts, including as to any non-class issues on which such experts opine, shall be filed by **June 16, 2021.**

c.  All oppositions to <u>Daubert</u> motions relating to Class Plaintiffs' class certification experts, including as to any non-class issues on which such experts opine, shall be filed by **August 18, 2021.**

d.  All <u>Daubert</u> motions relating to experts not opining on class certification issues shall be filed by **August 18, 2021.**

e.  All oppositions to <u>Daubert</u> motions relating to experts not opining on class certification issues shall be filed by **September 29, 2021.**

f.  All replies to <u>Daubert</u> motions relating to experts not opining on class certification issues shall be filed by **November 10, 2021**.

g.  Except by leave of court, each expert witness shall be subject to only one <u>Daubert</u> motion.

7.  Counsel for the parties have not proposed an alternative dispute resolution for this case.

8.  The length of any trial is yet to be determined.

9.  The entry of this Case Management Plan and Scheduling Order, and the dates provided herein, are without prejudice to Plaintiffs' and Counterclaim-Plaintiff's right to seek leave of Court to update their damages calculations to the time of trial.

10. Each Plaintiff may join any other motion, opposition or reply filed by any other Plaintiff.


Dated:      New York, New York
            October 28, 2020                          SO ORDERED

                                          _____
                                          SARAH L. CAVE
                                          United States Magistrate Judge

3

Add.17

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| | x |
| IN RE: | : ECF Case |
| | : |
| | : MDL No. 2542 |
| KEURIG GREEN MOUNTAIN SINGLE- | : |
| SERVE COFFEE ANTITRUST LITIGATION | : Master Docket No. 1:14-md-02542-VSB |
| | : |
| *This document concerns all related actions.* | : Hon. Vernon S. Broderick |
| | |
| | **ORAL ARGUMENT REQUESTED** |
| | x |

## <u>NOTICE OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law, dated August 25, 2021; Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment; the Declaration of Aldo A. Badini, dated August 25, 2021, and all exhibits thereto; and all prior proceedings in this action, Plaintiffs TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc. (collectively, "TreeHouse"), JBR, Inc. (d/b/a Rogers Family Company ("JBR"), McLane Company, Inc. ("McLane"), and Direct Purchaser Plaintiffs ("DPPs") (collectively, "Plaintiffs") will move this Court, before The Honorable Vernon S. Broderick, United States District Judge, at the Thurgood Marshall United States Courthouse, Courtroom 518, 40 Foley Square, New York, New York, at a date and time to be determined by the Court, for summary judgment or partial summary judgment on the following issues:

1) TreeHouse, JBR and McLane move for summary judgment as to liability for a ruling that the restrictive provisions in Keurig's agreements restraining its Brand Competitors from dealing with Competitive Cup manufacturers are (i) per se unlawful; or at a minimum are (ii)

unreasonable restraints of trade under a quick look analysis; and/or (iii) are not reasonably necessary to achieve a legitimate, procompetitive justification; in connection with TreeHouse's, JBR's, and McLane's claims for a Conspiracy, Concerted Refusals to Deal & Group Boycott Violation pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1; Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10(1)-(2); Wisconsin Antitrust Act, Wis. Stat § 133.03(1); and Donnelly Act, N.Y. Gen. Bus. Law § 340;

2) Plaintiffs move for partial summary judgment for rulings that the restrictive provisions in Keurig's agreements with Competitive Cup machine and input suppliers (i) satisfy the agreement element of Plaintiffs' claim; (ii) are not reasonably necessary to achieve a legitimate, procompetitive justification; and/or (iii) any legitimate, procompetitive justification could have been achieved in a manner less restrictive of free competition; in connection with Plaintiffs' claims for an Exclusive Dealing violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; Section 3 of the Clayton Act, 15 U.S.C. § 14; Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/3(1)-(4); Wisconsin Antitrust Act, Wis. Stat. §§ 133.03(1)-(2); and Donnelly Act, N.Y. Gen. Bus. Law § 340;

3) TreeHouse, JBR, and McLane move for summary judgment as to liability, fact of damage, and injunctive relief for rulings that the Loyalty Clauses in Keurig's KAD and KARD agreements (i) violate Section 3 of the Clayton Act; (ii) are per se unlawful under the Sherman Act; (iii) entitle TreeHouse to damages in an amount to be proven at trial; and (iv) entitle TreeHouse, JBR, and McLane to injunctive relief; in connection with their tying claims, including TreeHouse's, JBR's, and McLane's claims for a Tying Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; and Section 3 of the Clayton Act, 15 U.S.C. § 14;

4) Plaintiffs move for partial summary judgment for rulings that Keurig's implementation

2

of CBT, Keurig's Lock-Out Technology (i) constitutes anticompetitive and exclusionary conduct; (ii) was not reasonably necessary to achieve a legitimate, procompetitive justification; and/or (iii) any legitimate, procompetitive justification could have been achieved in a manner less restrictive of free competition; in connection with Plaintiffs' claims under Section 2 of the Sherman Act, 15 U.S.C. § 2;

5) TreeHouse and JBR move for summary judgment as to liability, damages, and injunctive relief for rulings that Keurig's literally false statements (i) constitute false advertising; (ii) entitle TreeHouse to damages; and (iii) entitle TreeHouse and JBR to injunctive relief; in connection with TreeHouse's and JBR's claims pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); New York Consumer Protection Act, N.Y. Gen. Bus. Law §§ 349-350; Illinois Consumer Fraud and Deceptive Brand Practices Act, 815 Ill. Comp. Stat 505/1 et seq.; and Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1 et seq.;

6) Plaintiffs move for summary judgment dismissing Keurig's affirmative defenses of unclean hands and *in pari delicto*; and

7) McLane moves for summary judgment affirming that (i) it has standing to pursue its claims as a direct purchaser; (ii) Keurig cannot assert a pass-on defense to McLane's claims; and (iii) McLane is entitled to recover damages for any overcharges on its K-Cup purchases found by the finder of fact.

Dated: New York, New York
    August 25, 2021

Respectfully submitted,
**WINSTON & STRAWN LLP**


By: /s/ *Aldo A. Badini*

Aldo A. Badini
abadini@winston.com
Susannah P. Torpey

3

Add.20

storpey@winston.com
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166-4193
(212) 294-6700
(212) 294-4700 (fax)

Dan K. Webb
dwebb@winston.com
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, IL 60601-9703
(312) 558-5600

Diana L. Hughes
dhughes@winston.com
**WINSTON & STRAWN LLP**
333 South Grand Avenue
Los Angeles, CA 90071
(213) 615-1700

*Counsel for Plaintiffs TreeHouse
Foods, Inc., Bay Valley Foods, LLC
and Sturm Foods, Inc.*


Daniel Johnson Jr. (CA Bar No. 57409)
Mario Moore (CA Bar No. 231644)
Robert G. Litts (CA Bar No. 205984)
**DAN JOHNSON LAW GROUP, LLP**
1350 Old Bayshore Highway, Suite 520,
Burlingame, CA 94010
Telephone: 415-604-4500
Email: dan@danjohnsonlawgroup.com
Email: mario@danjohnsonlawgroup.com
Email: robert@danjohnsonlawgroup.com

*Counsel for Plaintiff JBR, Inc. (d/b/a Rogers
Family Company)*


Alexander G. Brown (*Pro Hac Vice*)
James C. Grant (*Pro Hac Vice*)
Valarie C. Williams (*Pro Hac Vice*)
B. Parker Miller (*Pro Hac Vice*)
**ALSTON & BIRD LLP**

4

1201 West Peachtree Street
Atlanta, GA 30309
Phone: 404-881-7000
Fax: 404-881-7777
alex.brown@alston.com
jim.grant@alston.com
valarie.williams@alston.com
parker.miller@alston.com

Steven L. Penaro
**ALSTON & BIRD LLP**
90 Park Avenue
15th Floor
New York, NY 10016-1387
Phone: 212-210-9400
Fax: 212-210-9444
steve.penaro@alston.com

*Counsel for Plaintiff McLane Company, Inc.*

Michael M. Buchman
Michelle C. Clerkin
Jacob O. Onile-Ere
**MOTLEY RICE LLC**
777 Third Avenue, 27th Floor
New York, NY 10017
(212) 577-0050
mbuchman@motleyrice.com
mclerkin@motleyrice.com
jonileere@motleyrice.com

Robert G. Eisler
Deborah A. Elman
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500
reisler@gelaw.com
delman@gelaw.com

William V. Reiss
David B. Rochelson
Matthew Geyer
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600

5

Add.22

New York, NY 10022
(212) 980-7400
wreiss@robinskaplan.com
drochelson@robinskaplan.com
mgeyer@robinskaplan.com

*Counsel for Direct Purchaser Plaintiffs*

6

Add.23

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: KEURIG GREEN MOUNTAIN SINGLE-SERVE COFFEE ANTITRUST LITIGATION | MDL No. 2542 <br><br> Master Docket No. 1:14-md-02542 (VSB) (SLC) |
| This Document Relates to: All Cases | **Oral Argument Requested** |

### KEURIG'S NOTICE OF MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law in Support of Keurig's Motion for Summary Judgment, Keurig's Statement of Undisputed Materials Facts in Support of its Motion for Summary Judgment, the Declaration of Lisa M. Danzig in Support of Keurig's Motion for Summary Judgment, and the exhibits appended thereto, Defendant Keurig Green Mountain Inc. hereby moves for an Order granting Keurig summary judgment.

In accordance with the Court's August 4, 2021 Order, opening summary judgment briefs shall be filed on August 25, 2021, opposition briefs shall be filed on October 27, 2021, and any reply memoranda of law shall be filed on December 15, 2021. Oral argument is hereby requested.

Add.24

Dated: August 25, 2021

/s/ Leah Brannon
CLEARY GOTTLIEB STEEN & HAMILTON LLP
**Leah Brannon**
**George S. Cary**
**Kenneth S. Reinker**
**Carl Lawrence Malm**
**Lisa M. Danzig**
lbrannon@cgsh.com
gcary@cgsh.com
kreinker@cgsh.com
lmalm@cgsh.com
ldanzig@cgsh.com
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone:  202-974-1500
Facsimile:  202-974-199

**Rahul Mukhi**
rmukhi@cgsh.com
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000


/s/ Wendelynne J. Newton
BUCHANAN INGERSOLL & ROONEY PC
**Wendelynne J. Newton**
**Gretchen L. Jankowski**
**Mackenzie A. Baird**
wendelynne.newton@bipc.com
gretchen.jankowski@bipc.com
mackenzie.baird@bipc.com
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219-4413
Telephone: 412-562-8800

*Attorneys for Defendant Keurig Green Mountain, Inc.*

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE KEURIG GREEN MOUNTAIN SINGLE-SERVE
COFFEE ANTITRUST LITIGATION.

CIVIL ACTION NO.: 14 MD 2542 (VSB) (SLC)

**OPINION & ORDER**

**SARAH L. CAVE**, United States Magistrate Judge.

## I. INTRODUCTION

Before the Court are Plaintiffs' motion for spoliation sanctions against Defendant Keurig (ECF No. 1282 ("Plaintiffs' Motion")),[1] and Keurig's motion for spoliation sanctions against Plaintiffs TreeHouse and JBR, Inc. ("JBR") (ECF No. 1289 ("Keurig's Motion")) (together, the "Motions")).

## II. BACKGROUND

### A. Factual Background

The Court assumes familiarity with the factual background in this MDL litigation, which has been set forth in numerous prior orders. See, e.g., In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., No. 14 MD 2542 (VSB) (SLC), 2020 WL 8465433, at *1 (S.D.N.Y. Oct. 30, 2020). As previously summarized by the Honorable Henry B. Pitman in his Opinion and Order at ECF No. 636, a principal feature of Keurig's coffee makers is their use of small, disposable plastic

---

[1] Plaintiffs' Motion is asserted by TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc. (collectively "TreeHouse"), McLane Company, Inc. ("McLane"), and the Direct Purchaser Plaintiffs ("DPPs") only. (ECF Nos. 1282; 1290 at 5 n.1; 1632 at 1).

cups, usually containing ground coffee.[2] After a cup is inserted into Keurig's coffee maker—most relevant here, the Keurig 2.0 Brewer—heated water is passed though it and coffee drips into a coffee cup placed below. In addition to manufacturing and selling coffee makers, Keurig also manufactures and sells the disposable cups ("K-Cups"). Plaintiffs manufacture and sell disposable cups that can be used in Keurig's coffee makers and compete with Keurig's K-Cups in that market.

In general terms, Plaintiffs allege that Keurig violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, the Clayton Act, 15 U.S.C. § 14, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and multiple state statutes by: (1) filing baseless lawsuits against two of the Plaintiffs; (2) entering into "non-competition," tying, and exclusive dealing agreements; (3) threatening companies who would do business with Keurig's competitors; (4) re-designing its coffee makers to render competitors' cups unusable in Keurig's machines; and (5) maligning competitors and interfering with their business relationships. See In re Keurig, 2020 WL 8465433, at *1.

Additional factual background pertinent to each of the Motions is set forth in Sections IV.B.1, IV.C.1, and IV.D, below.

**B.  Procedural Background**

**1.  Fact Discovery Schedule**

On February 11, 2014, TreeHouse filed its complaint. (Complaint, Treehouse Foods, Inc. et al. v. GMCR, et al., No. 14 Civ. 905 (VSB) (S.D.N.Y. Feb. 11, 2014), ECF No. 2 (the "TreeHouse Complaint")). At a status conference on June 19, 2014, Judge Broderick set schedules for filing the consolidated amended complaints, and briefing motions for expedited discovery and to

---

[2] Before 2014, Keurig was known as Green Mountain Coffee Roasters, Inc. ("GMCR"). (ECF No. 1284-11 at 2).

Add.27

dismiss, among other topics. (ECF min. entry June 19, 2014). As to document preservation pending resolution of the anticipated motions, Judge Broderick stated, that he "hope[d] that all parties, the plaintiffs and defendants, have done what they need to do vis-à-vis their clients on document preservation[,]" and encouraged the parties to meet and confer to submit a proposed protocol for electronically stored information ("ESI"). (ECF No. 33 at 4, 37–38),

On July 1, 2014, Judge Broderick adopted the parties' joint ESI stipulation. (ECF No. 41 (the "ESI Order")). Pursuant to the ESI Order, the parties agreed to "take reasonable steps in good faith to prevent the loss, destruction, alteration, overwriting, deletion, shredding, incineration, or theft of any document or data the party knows, or reasonably should know, falls within the scope of Federal Rule of Civil Procedure 26(b)(1)." (Id. at 4). As of the date of the ESI Order, TreeHouse and Keurig (among other parties) each represented that they had "implemented a data preservation plan, issued preservation memoranda to relevant employees, and [] confirmed with IT personnel that auto-deletions are suspended and that measures have been implemented to prevent the manual deletion of email by individual custodians." (Id. at 5; see id. at 8 (confirming that parties had issued "preservation or 'litigation hold' communications to all individuals reasonably identified as having information that may be potentially relevant")). The parties also agreed "to ask each of their document custodians whether he or she maintains potentially responsive documents or data in any of the electronic or hard-copy sources listed [in the ESI Order], whether at the custodian's office, home, or online." (Id. at 16). If a party concluded that a source of information listed in the ESI Order was "inaccessible or that collection from or search of any of those sources would be unduly burdensome," the parties agreed to meet and confer to attempt to resolve the issue. (Id.)

3

Add.28

On July 23, 2014, Judge Broderick granted Plaintiffs limited expedited document and deposition discovery on eight topics relating to the Keurig 2.0 Brewer, including user manuals, design specifications, marketing materials, and the "Lock-Out" feature. (ECF No. 57 at 3–4). Discovery otherwise remained stayed pending resolution of Keurig's motions to dismiss. (Id. at 5). Despite the stay, Plaintiffs served third-party subpoenas on several former Keurig employees, whose obligation to respond was suspended during the stay. (ECF No. 1284-4 at 2).[3]

On July 23, 2014, the consolidated amended class action complaints on behalf of indirect purchasers and the DPPs, respectively, ("CACs") were filed. (ECF Nos. 61, 65). On August 31, 2016, TreeHouse served its first set of document requests on Keurig. (ECF No. 1693-1 at 29).

By order dated September 27, 2016, Judge Broderick directed the parties, within fourteen and 30 days of the ruling on the motions to dismiss, respectively, to fulfill their custodian obligations under ¶ VI.H.1 of the ESI Order and their search term obligations under ¶ VI.E of the ESI Order. (ECF No. 345 (the "Sept. 2016 Order") at 1; see ECF No. 1699-1 at 106). On November 29, 2017, Judge Broderick largely denied Keurig's motion to dismiss and ordered discovery to commence, with all deadlines under the Sept. 2016 Order beginning to run on December 1, 2017. (ECF No. 379). See In re Keurig, 383 F. Supp. 3d 187 (S.D.N.Y. 2019). Pursuant to the Sept. 2016 Order, by the end of 2017, the parties were to have identified custodians and search terms pursuant to the ESI Order. (ECF No. 41 ¶¶ VI.E, VI.H.1). Of the original 29 Agreed Custodians for Keurig the parties identified in late 2017 and early 2018, 23 were former

---

[3] Plaintiffs served subpoenas on former Keurig employees Mark Baynes, Kristin Cefalo, Suzanne DuLong, Brian Kelley, Nick Lazaris, Peter Leemputte, Lizzie Manganiello, Fran Rathke, Kevin Sullivan, Ian Tinkler, Scott Vogel, and John Whoriskey. (ECF No. 1284-4 at 2). Of these, Plaintiffs' Motion alleges spoliation as to DuLong, Rathke, Tinkler, and Whoriskey. (See ECF Nos. 1286 at 11 n. 5–6, 12 n.9, 16 n.17; 1287-1; 1287-5; 1391-1).

4

Add.29

employees, and of an additional 25 Agreed Custodians identified during fact discovery, 21 were former employees.  (ECF No. 1699-1 at 107).  An order dated May 10, 2018 required Keurig to produce documents related to the <u>Sturm</u> Litigation, but "[t]he time period for which all other documents are to be collected and produced [was] January 1, 2009 through December 31, 2017." (ECF No. 434 at 2).[4]

Pursuant to the Preliminary Case Management Plan and Scheduling Order, the initial deadline for completion of "substantial productions of all documents" for the Agreed Custodians was April 30, 2018.  (ECF Nos. 354-1 ¶¶ 7(i), 7(k); 379 at 4).[5]  Pursuant to a joint stipulation and order dated December 12, 2018, the Court extended until January 4, 2019 the deadline for TreeHouse, JBR, and Keurig to substantially complete document production for the initial Agreed Custodians, as well as twelve additional Keurig custodians, five additional TreeHouse custodians, and one additional JBR custodian.  (ECF No. 484 (the "Production Deadline Order") at 1).  The Production Deadline Order also set January 11, 2019 as the deadline for substantial production in response to TreeHouse's subpoenas to Keurig's former employees.  (<u>Id.</u> at 2).

On May 20, 2020, the parties completed fact discovery.  (ECF No. 887 at 1).[6]

## 2. **The Motions**

Pursuant to a schedule adopted by the Court, the Motions were filed on April 19, 2021, and briefing was completed by June 7, 2021.  (ECF Nos. 1160; 1171; 1282; 1289).  The crux of

---

[4] The "<u>Sturm</u> Litigation" refers to Keurig's patent and trademark infringement and false advertising lawsuit against TreeHouse subsidiary Sturm Foods, Inc. ("Sturm"), following Sturm's August 2010 introduction of cups competitive with the K-Cups.  (ECF No. 581 at 10–11).  <u>See</u> <u>Keurig, Inc. v. Sturm Foods, Inc.</u>, 732 F.3d 1370, 1374 (Fed. Cir. 2013) (affirming summary judgment dismissing Keurig's patent claims).
[5] Keurig's 54 Agreed Custodians are listed in ECF No. 1287-1.
[6] Non-party discovery was completed by May 18, 2020.  (ECF No. 839 at 1).

Add.30

both Motions is alleged spoliation of relevant evidence.  Plaintiffs' Motion is based on Keurig's alleged: (i) failure to conduct proper and timely custodian interviews; (ii) loss of hard drives for nine custodians; (iii) inability to access hard drives for 15 custodians; (iv) destruction of hard copy notes; (v) failure to collect emails from its litigation hold repository; and (vi) delayed production of correct transactional data for experts' use.  (ECF No. 1286 at 6; see infra § IV.B).  As remedies for Keurig's alleged spoliation, Plaintiffs ask the Court to preclude Keurig from introducing evidence on certain issues, deliver an adverse inference instruction, and award Plaintiffs attorneys' fees and costs they incurred in bringing Plaintiffs' Motion, investigating Keurig's production deficiencies, challenging Keurig's privilege designations, and investigating the incorrect transactional data.   (ECF No. 1286 at 30).

Keurig's Motion is directed at TreeHouse and JBR.  (ECF Nos. 1289; 1290).  Keurig argues that TreeHouse failed to preserve ESI starting in the fall of 2013 when it began contemplating suit against Keurig, and instead waited months or years to implement litigation holds, leading to the "spoliation of critical evidence and significant prejudice to Keurig."  (ECF No. 1290 at 6).  Keurig asks the Court to preclude TreeHouse from "relying on the selective evidence that was preserved related to the spoliated topics[,]" as well as an award of attorneys' fees and costs "for the expense Keurig has incurred in attempting to remedy TreeHouse'[s] discovery misconduct." (Id. at 26).  Keurig argues that JBR has failed to produce any documents corroborating JBR's allegation that "at a meeting on January 31, 2014 Costco told JBR it would not expand JBR's distribution because of the Keurig 2.0 Brewer."  (Id. at 27).  Keurig asks the Court to "preclude JBR from affirmatively introducing testimony or using any evidence about Costco purportedly

6

Add.31

reducing its distribution of JBR's portion packs in 2014 as a result of any action by Keurig." (Id. at 29).

At a conference on August 3, 2021, the Court asked the parties whether they could jointly submit "a very basic timeline . . . of the preservation notices laid against the key events" pertaining to the Motions.  (ECF No. 1506 at 12:4–9).  The parties agreed to consider the request and advise whether it was "achievable or not."  (Id. at 15:17–21).  On August 5, 2021, the Court issued an order outlining the topics for a stipulated set of facts as to both Motions, informing the parties that any stipulation "must contain citations to the relevant exhibit(s) accompanying the Motions[,]" and set a deadline of September 30, 2021 for the parties to notify the Court whether they would in fact submit any stipulations.  (ECF No. 1434 (the "Aug. 5 Order") at 1).  On September 30, 2021, the parties filed a joint update as to the status of their efforts to agree on sets of stipulated facts relating to the Motions, and requested clarification about certain topics in the Aug. 5 Order.  (ECF No. 1553).  On October 1, 2021, the Court issued an order setting November 19, 2021 as the deadline for any stipulated sets of facts on the Motions, including, inter alia, "citations to the relevant exhibits accompanying the Motions."  (ECF No. 1554 (the "Oct. 1 Order") at 1 (emphasis added)).  The Court also instructed the parties that, "[t]o the extent that the parties cannot otherwise stipulate to a fact requested in the Aug[.] 5 Order, the Stipulations shall set forth each parties' position as to that fact without argument[.]"  (Id. at 2 (emphasis added)).

On November 19, 2021, the parties filed stipulated sets of facts pertaining to the Motions.  (ECF No. 1632 (the "Stipulations")).  The Court held conferences with the parties on November 24, 2021 to discuss the Stipulations (ECF Nos. 1644; 1649), and on December 16, 2021

7

Add.32

to discuss the format of oral argument on the Motions.  (ECF Nos. 1432; 1665).  On January 11 and 12, 2022, the Court heard nearly ten hours of oral argument on the Motions via videoconference.  (ECF Nos. 1432; 1698-1; 1698-2; ECF min. entries Jan. 11–12, 2022).

### III. LEGAL STANDARDS

#### A. The Court's Authority

This action has been referred to me for general pretrial management pursuant to 28 U.S.C § 636(b) and Fed. R. Civ. P. 72(a).  (ECF No. 419; ECF min. entry Oct. 14, 2019).  Accordingly, I have broad authority to impose discovery sanctions.  See Doubleline Cap. LP v. Odebrecht Fin., Ltd., No. 17 Civ. 4576 (GHW) (BCM), 2021 WL 1191527, at *4 (S.D.N.Y. Mar. 30, 2021); Man Zhang v. City of New York, No. 17 Civ. 5415 (JFK) (OTW), 2019 WL 3936767, at *4 (S.D.N.Y. Aug. 20, 2019). Orders imposing discovery sanctions "are ordinarily considered non-dispositive, and therefore fall within the grant of Rule 72(a), 'unless the sanction disposes of a claim.'"  Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16 Civ. 1318 (GBD) (BCM), 2017 WL 3671036, at *16 (S.D.N.Y. July 18, 2017) ("Joint Stock Co. I") (quoting Seena Int'l v. One Step Up, Ltd., No. 15 Civ. 1095 (PKC) (BCM), 2016 WL 2865350, at *10 (S.D.N.Y. May 11, 2016)), adopted by, 2017 WL 4712639 (S.D.N.Y. Sept. 28, 2017).  "A magistrate judge's authority to order (rather than recommend) a discovery sanction does not depend on the relief requested, but rather depends on the 'sanction the magistrate judge actually imposes.'"  Charlestown Cap. Advisors, LLC v. Acero Junction, Inc., 337 F.R.D. 47, 59 (S.D.N.Y. 2020) (quoting Joint Stock Co. I, 2017 WL 3671036, at *16 (internal citation omitted)).

Here, neither Plaintiffs nor Keurig seek case-dispositive sanctions (see supra §§ IV.A–D), and as set forth below, the discovery sanctions awarded do not "'fully dispose of a claim or

8

Add.33

defense.'" <u>Seena Int'l</u>, 2016 WL 2865350, at \*11 (quoting <u>Oracle USA, Inc. v. SAP AG</u>, 264 F.R.D. 541, 546 (N.D. Cal. 2009)).  Accordingly, under the referral for general pretrial supervision, it is appropriate for me to resolve the Motions "in the first instance."  <u>Lokai Holdings LLC v. Twin Tiger USA LLC</u>, No. 15 Civ. 9363 (ALC) (DF), 2018 WL 1512055, at \*7 (S.D.N.Y. Mar. 12, 2018).  If any objections are filed, Judge Broderick would then review my rulings on a "clearly erroneous" or "contrary to law" standard.  Fed. R. Civ. P. 72(a); <u>see</u> 28 U.S.C. § 636(b)(1)(A).

### B. <u>Legal Standards for Spoliation</u>

As one District Judge of this Court aptly explained:

> In an era where vast amounts of electronic information is available for review, discovery in certain cases has become increasingly complex and expensive.  Courts cannot and do not expect that any party can meet a standard of perfection.  Nonetheless, the courts have a right to expect that litigants and counsel will take the necessary steps to ensure that relevant records are preserved when litigation is reasonably anticipated, and that such records are collected, reviewed, and produced to the opposing party. . . . By now, it should be abundantly clear that the duty to preserve means what it says and that a failure to preserve records—paper or electronic—and to search in the right places for those records, will inevitably result in the spoliation of evidence.

<u>Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC</u>, 685 F. Supp. 2d 456, 461 (S.D.N.Y. 2010), <u>abrogated on other grounds</u>, <u>Chin v. Port Auth. of N.Y. & N.J.</u>, 685 F.3d 135 (2d Cir. 2012).

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999).  For spoliation "sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence <u>actually existed and was destroyed</u>." <u>Farella v. City of New York</u>, Nos. 05 Civ 5711 & 05 Civ. 8264 (NRB), 2007 WL 193867, at \*2 (S.D.N.Y. Jan. 25, 2007); <u>see</u> <u>La Belle v. Barclays Cap. Inc.</u>, No. 19

9

Add.34

Civ. 3800 (JPO) (GWG), 2022 WL 121065, at *6 (S.D.N.Y. Jan. 13, 2022) (explaining that "a party

seeking spoliation sanctions must necessarily show that the evidence at issue actually existed").

Plaintiffs seek spoliation sanctions under both Rules 37(b) and 37(e) (ECF Nos. 1286 at

19–20; 1693-1 at 6; 1699-1 at 23).[7]  Keurig seeks spoliation sanctions solely under Rule 37(e).

(ECF Nos. 1290 at 5; 1699-1 at 202; 1699-4 at 3–4).

### 1.  Rule 37(b)

Where a party breaches its court-ordered discovery obligations, the court supervising

discovery is permitted to "issue further just orders," including, as relevant here, an order: "(i)

directing that the matters embraced in the order or other designated facts be taken as

established for purposes of the action, as the prevailing party claims; [or] (ii) prohibiting the

disobedient party from supporting or opposing designated claims or defenses, or from

introducing matters in evidence . . . ."  Fed. R. Civ. P. 37(b)(2)(A); see Karsch v. Blink Health Ltd.,

No. 17 Civ. 3880 (VM) (BCM), 2019 WL 2708125, at *14 (S.D.N.Y. June 20, 2019); (explaining that

Rule 37(b) sanctions are appropriately imposed for non-compliance with a court order directing

compliance with discovery requests).  "Even in the absence of a discovery order, a court may

impose sanctions on a party for misconduct in discovery under its inherent power to manage its

---

[7] During oral argument, Plaintiffs also invoked the Court's inherent authority to award discovery sanctions. (ECF Nos. 1693-1 at 6; 1699-21 at 23).  "A 'particularized showing of bad faith' is necessary to justify exercising that power[,]" and the Court analyzes Keurig's intent in § IV.B.2.d, infra.  CAT3, LLC v. Black Lineage, Inc., 164 F. Supp. 3d 488, 501 (S.D.N.Y. 2016) (quoting United States v. Int'l Brotherhood of Teamsters, 948 F.2d 1338, 1345 (2d Cir. 1991)); see West, 167 F.3d at 779 (explaining that most severe sanctions under the court's inherent authority require showing of "willfulness, bad faith, or fault").

own affairs." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 106–107 (2d Cir. 2002).

> A party seeking an adverse inference sanction under Rule 37(b) must establish:
>
> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

Residential Funding Corp., 306 F.3d at 107 (quoting Byrnie v. Town of Cromwell, 243 F.3d 93, 107–12 (2d Cir. 2001)). "[A] showing of prejudice is not required." Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., 328 F.R.D. 100, 120 (S.D.N.Y. 2018).

The culpable state of mind for purposes of spoliation sanctions under Rule 37(b) requires a finding that the party acted knowingly in bad faith, through gross negligence, or through ordinary negligence. See Residential Funding Corp., 306 F.3d at 108, 113. "In the discovery context, negligence is a failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." In re Pfizer Inc. Secs. Litig., 288 F.R.D. 297, 314 (S.D.N.Y. 2013) (internal citations omitted). Failing to institute a litigation hold is not gross negligence per se, but a factor the court should consider, along with "whether the party implemented good document or evidence preservation practices. . . ." Alter v. Rocky Point Sch. Dist., No. 13 Civ. 1100 (JS) (AKT), 2014 WL 4966119, at *11 (E.D.N.Y. Sept. 30, 2014) (internal citation omitted). Under Rule 37(b)(2), both "intentional or grossly negligent destruction of evidence in bad faith" as well as "intentional or grossly negligent acts that hinder discovery . . . even if those acts are not ultimately responsible for the unavailability of the evidence[,]" may "support an inference that the destroyed evidence was

11

Add.36

harmful to the destroying party[.]"  Residential Funding Corp., 306 F.3d at 110 (explaining that

"purposeful sluggishness" may support an inference that spoliated evidence was "likely harmful"

to party that failed to preserve).

### 2.  Rule 37(e)

The 2015 amendments to the Federal Rules of Civil Procedure replaced former Rule 37(e)

with new language that specifically addresses spoliation of ESI, providing that, "[i]f [ESI] that

should have been preserved in the anticipation or conduct of litigation is lost because a party

failed to take reasonable steps to preserve it, and it cannot be restored or replaced through

additional discovery, the court" may, on a finding of prejudice, "order measures no greater than

necessary to cure the prejudice[.]"  Fed. R. Civ. P. 37(e)(1).[8]  On a "finding that the party acted

with the intent to deprive another party of the information's use in the litigation[,]" the court

may: "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury

that it may or must presume the information was unfavorable to the party; or (C) dismiss the

action or enter a default judgment."  Fed. R. Civ. P. 37(e)(2).

Rule 37(e) thus requires the following three-part analysis:

"The first is to decide if the rule applies at all – that is, if a party failed to take
'reasonable steps' to preserve [ESI] 'that should have been preserved in the
anticipation or conduct of litigation.'  Fed. R. Civ. P. 37(e).  If so, then the second
step is to decide if there has been 'prejudice to another party from loss of the
information,' in which case the Court 'may order measures no greater than
necessary to cure the prejudice.'  Fed. R. Civ. P. 37(e)(1).  Lastly, the third step to
consider – regardless of prejudice to any other party – is whether the destroying
party 'acted with the intent to deprive another party of the information's use in
the litigation,' in which event a court may consider whether to impose the most

---

[8] The parties agree that the 2015 Amendments to Rule 37(e) apply to the Motions.  (ECF Nos. 1286 at 19–20; 1290 at 5 n.3).

severe of measures such as mandatory presumptions or instructions that the lost information was unfavorable or the entry of default judgment."

Doubleline Cap., 2021 WL 1191527, at *4–5 (quoting Coan v. Dunne, 602 B.R. 429, 437 (D. Conn. Apr. 16, 2019)).

### a. Duty to preserve and reasonable steps

As to the first step, "[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001). As explained in the seminal case of Zubulake v. UBS Warburg LLC:

> "While a litigant is under no duty to keep or retain every document in its possession[,] . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request."

220 F.R.D. 212, 217 (S.D.N.Y. 2003) ("Zubulake IV") (quoting Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 72 (S.D.N.Y. 1991)). Thus, the duty to preserve arises "when a party should have known that the evidence may be relevant to future litigation." Kronish v. United States, 150 F.3d 112, 126 (2d Cir. 1998). "[O]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." Treppel v. Biovail Corp., 249 F.R.D. 111, 118 (S.D.N.Y. 2008) (quoting Zubulake IV, 220 F.R.D. at 218). "Relevance," for purposes of Rule 37(e), "is 'an extremely broad concept.'" Orbit One Commc'ns, Inc. v. Numerex Corp., 271 F.R.D. 429, 436 (S.D.N.Y. 2010) (quoting Condit v. Dunne, 225 F.R.D. 100, 105 (S.D.N.Y. 2004)).

Once the duty to preserve attaches, a party and its counsel must "take reasonable steps to preserve" relevant evidence. Moody v. CSX Transp., Inc., 271 F. Supp. 3d 410, 426 (W.D.N.Y.

13

Add.38

2017); see Fed. R. Civ. P. 37(e)(1).  Counsel's "obligations extend further than simply advising her clients as to what documents might be necessary in the litigation . . . .  Counsel has an obligation to 'become fully familiar with her client's document retention policies, as well as the client's data retention architecture.'"  Cruz v. G-Star, Inc., No. 17 Civ. 7685 (PGG), 2019 WL 4805765, at *12 (S.D.N.Y. Sept. 30, 2019) (quoting Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("Zubulake V")).  To meet that obligation "will invariably involve speaking with information technology personnel, who can explain system-wide backup procedures and the actual (as opposed to theoretical) implementation of the firm's [document retention] policy."  Zubulake V, 229 F.R.D. at 432.  Counsel must also "take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched."  Id.  Parties and their counsel likewise "have a duty to make sure that discoverable information is not lost."  Id. at 433.

### b. **Prejudice**

As to the second step, sanctions under Rule 37(e)(1) "may only be imposed [on] a finding of prejudice to the moving party[.]"  Lokai Holdings, 2018 WL 1512055, at *7; see id. at *12.  Neither party has "a burden of proving or disproving prejudice," and Rule 37(e) "leaves judges with discretion to determine how best to assess prejudice in particular cases."  Fed. R. Civ. P. 37(e)(1) adv. comm. n. to 2015 amend.  Some courts have found prejudice based on the moving party's showing that the spoliated evidence "would be helpful to them in connection with establishing several elements of their [] claims."  Doubleline Cap., 2021 WL 1191527, at *7.  While the moving party need not establish the loss of a "smoking gun," "[i]t is sufficient if the existing evidence plausibly 'suggests' that the spoliated ESI could support the moving party's case."  Karsch, 2019 WL 2708125, at *21 (quoting Coan, 2019 WL 1620412, at *7); see Moody, 271 F.

14

Add.39

Supp. 3d at 432 (finding that moving party established prejudice by making "plausible, concrete suggestions as to what [the destroyed] evidence might have been").

"Proof of relevance[,]" however, "does not necessarily equal proof of prejudice." Karsch, 2019 WL 2708125, at *20 (quoting Best Payphones, Inc. v. City of New York, Nos. 1-CV-3924, 1-CV-8506, & 3-CV-192 (JG) (VMS), 2016 WL 792396, at *5 (E.D.N.Y. Feb. 26, 2016) (internal citation omitted)).  The moving party must come forward with "plausible, concrete suggestions as to what [the destroyed] evidence might have been." Moody, 271 F. Supp. 3d at 432 (internal citations omitted); see Karsch, 2019 WL 2708125, at *21 ("It is sufficient if the existing evidence plausibly 'suggests' that the spoliated ESI could support the moving party's case.") (quoting Coan, 2019 WL 1620412, at *7).  "Where the discovery violation involves spoliation or withholding of evidence, the absence of prejudice can be shown by demonstrating, for example, that the other parties were able to obtain the same evidence from another source, or that during discovery they never asked for the evidence later shown to have been spoliated." R.F.M.A.S., Inc. v. So, 271 F.R.D. 13, 25 (S.D.N.Y. 2010); see Fed. R. Civ. P. 37(e) (permitting sanctions for spoliation of ESI only if "it cannot be restored or replaced through additional discovery").  Emails sent to or from a custodian are not "permanently lost or unrecoverable" if they are replaceable through other custodians. Karsch, 2019 WL 2708125, at *17 n.21; see Morgan v. Art Found. Ltd v. McKenzie, Nos. 18 Civ. 4438 & 18 Civ. 8231 (AT) (BCM), 2020 WL 5836438, at *19 (S.D.N.Y. Sept. 30, 2020) (holding that deleted emails obtainable from other parties and non-parties were not "permanently lost"); GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc., 282 F.R.D. 346, 359 (S.D.N.Y. 2012) (explaining that spoliation sanctions are not warranted if "the information was preserved in other locations") (citing Orbit One, 271 F.R.D. at 442); Fed. R. Civ. P. 37(e) adv. comm. n. to 2015 amend. ("Because

15

Add.40

[ESI] often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere.")

### c. <u>Intent to deprive</u>

As to the third step, the intent standard for imposing the "particularly harsh" sanctions under Rule 37(e)(2), <u>Lokai Holdings</u>, 2018 WL 1512055, at *8, "is both stringent and specific." <u>Doubleline Cap.</u>, 2021 WL 1191527, at *8.  Rule 37(e)(2) contemplates "not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence."  <u>Leidig v. Buzzfeed, Inc.</u>, No. 16 Civ. 542 (VM) (GWG), 2017 WL 6512353, at *11 (S.D.N.Y. Dec. 19, 2017).  If an intent to deprive is found, "no separate showing of prejudice is required, because 'the finding of intent [to deprive] . . . support[s] . . . an inference that the opposing party was prejudiced by the loss of information.'"  <u>Doubleline Cap.</u>, 2021 WL 1191527, at *5 (quoting <u>Lokai Holdings</u>, 2018 WL 1512055, at *8).

The moving party bears the burden of showing "that the spoliating party acted with the intent to deprive, not merely the intent to destroy."  <u>Doubleline Cap.</u>, 2021 WL 1191527, at *8. "An intent to deprive can be found either from a conscious act of destruction or a 'conscious dereliction of a known duty to preserve electronic data.'"  <u>Fashion Exch. LLC v. Hybrid Promotions, LLC</u>, No. 14 Civ. 1254 (SHS) (OTW), 2019 WL 6838672, at *5 (S.D.N.Y. Dec. 16, 2019) (quoting <u>Ungar v. City of New York</u>, 329 F.R.D. 8, 13 (E.D.N.Y. 2018)).  In addition, the moving party must show that the spoliating party had "the intent of depriving [its adversary] <u>in this litigation</u> of that evidence."  <u>Doubleline Cap.</u>, 2021 WL 1191527, at *8; <u>see Johnson v. L'Oreal USA</u>, No. 18 Civ. 9786 (LGS), 2020 WL 5530022, at *4 (S.D.N.Y. Sept. 15, 2020) (denying request for adverse inference in absence of "evidentiary basis for Plaintiff's allegations that [the

Add.41

defendant] acted with an intent to deprive Plaintiff of relevant ESI in this litigation") (emphasis added).  Courts in this Circuit have considered four factors in determining whether a party acted with the intent to deprive:

> "(1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator."

Charlestown Cap. Advisors., 337 F.R.D. at 67 (quoting Moody, 271 F. Supp. 3d at 431 (citation omitted)).

### 3.  Burden of proof

Courts in this Circuit have "divided with respect to the appropriate standard of proof to apply to a claim of spoliation.  Some utilize the preponderance of the evidence standard applicable in most contexts in civil litigation.  Others require that the more demanding 'clear and convincing' standard be met."  CAT3, LLC v. Black Lineage, Inc., 164 F. Supp. 3d 488, 498 (S.D.N.Y. 2016) (internal citation omitted).  Here, the Court will apply the "appropriate standard of proof [] depend[ing], in part, on the specific issue to be decided."  Berger v. N.Y.C. Police Dep't, No. 13 Civ. 6084 (VSB), 2016 WL 11706217, at *3 n.9 (S.D.N.Y. 2016).  With respect to prejudice, the Court will apply the preponderance of the evidence standard.  See CAT3, 164 F. Supp. 3d at 499.  Bad faith and intent to deprive must be shown by "clear and convincing evidence."  Lokai Holdings, 2018 WL 1512055, at *8; see Europe v. Equinox Holdings, Inc., No. 20 Civ. 7787 (JGK) (KHP), 2022 WL 832027, at *4 (S.D.N.Y. Mar. 21, 2022) (requiring "clear and convincing evidence" of intent to deprive to support award of sanctions under Rule 37(e)(2)); CAT3, 164 F. Supp. 3d at 499 (same).

Under either standard, "speculative assertions as to the existence of documents do not suffice to sustain a motion for spoliation of evidence." Dilworth v. Goldberg, 3 F. Supp. 3d 198, 202 (S.D.N.Y. 2014) (quoting Tri-County Motors, Inc. v. Am. Suzuki Motor Corp., 494 F. Supp. 2d 161, 177 (E.D.N.Y. 2007)). The parties must:

> set forth, with . . . specificity, the materials which would have been helpful in prosecuting [their] claims. Relevance cannot be established solely on the basis of conjecture. Nor can a finding of relevance be grounded solely on the basis that some evidence in the custody of key witnesses no longer exists. [Each movant] has the burden of articulating what that evidence is with some degree of factual detail.

Alter, 2014 WL 4966119, at *12. Similarly, the moving party must show that the lost information "was not only probative, but that it would affirmatively support the movant's claim." Ungar, 329 F.R.D. at 15 (internal citations omitted); see Man Zhang, 2019 WL 3936767, at *6 (requiring moving party to "'adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed . . . evidence would have been' favorable to its case") (quoting Khatabi v. Bonura, No. 10 Civ. 1168 (ER), 2017 WL 10621191, at *7 (S.D.N.Y. Apr. 21, 2017). In short, "sanctions are not warranted unless there is proof that some information of significance has actually been lost." Orbit One, 271 F.R.D. at 431.

### 4. Types of sanctions

"In situations where sanctions are warranted, district courts have broad discretion in 'crafting [a proper] sanction for spoliation.'" Alter, 2014 WL 4966119, at *5 (quoting West, 167 F.3d at 779); see Daval Steel Prod. v. M/V Fakredine, 951 F.2d 1357, 1365 (2d Cir. 1991) (collecting cases describing courts' "wide discretion" to select appropriate sanctions); Europe, 2022 WL 832027, at *3 (explaining that district courts have "broad discretion to fashion appropriate corrective measures"). The Second Circuit has listed four factors for district courts to consider in

exercising this discretion: "(1) the willfulness of the non-compliant party or the reason for the noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance." S.N.E. Tel. Co. v. Glob. NAPs Inc., 624 F.3d 123, 144 (2d Cir. 2010) (citation omitted). "[T]hese factors are not exclusive and they need not each be resolved against the sanctioned party." Syntel Sterling, 328 F.R.D. at 120. The Court may consider "the full record in the case in order to select the appropriate sanction." S.N.E. Tel. Co., 624 F.3d at 144 (citation omitted).

When determining the appropriate remedy for a violation of Rule 37(b), a court "should impose the least harsh sanction" that will "serve as an adequate remedy; the range of sanctions, from the least harsh to the harshest, include further discovery, cost-shifting, fines, special jury instructions, preclusion, entry of default judgment, and dismissal." Slovin v. Target Corp., No. 12 Civ. 863 (HB), 2013 WL 840865, at *6 (S.D.N.Y. Mar. 7, 2013); see Grammar v. Sharinn & Lipshie, P.C., No. 14 Civ. 6774 (JCF), 2016 WL 525478, at *3 (S.D.N.Y. Feb. 8, 2016) (explaining that courts "should always seek to impose the least harsh sanction that will remedy the discovery violation and deter such conduct in the future"). "Ultimately, 'it is always preferable for issues to be adjudicated on the merits, rather than pursuant to discovery sanctions.'" Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd., 330 F.R.D. 134, 139 (S.D.N.Y. Jan. 18, 2019) (quoting Black v. Bowes, No. 05 Civ. 108 (GEL), 2006 WL 3771097, at *7 (S.D.N.Y. Dec. 21, 2006)). In addition, the Court "must" award "reasonable expenses, including attorney's fees caused by the failure" to

19

Add.44

comply with court orders under Rule 37(b), "unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

The sanctions available under Rule 37(e)(1)—on a showing of prejudice—also may be "no greater than necessary to cure the prejudice[.]" Fed. R. Civ. P. 37(e)(1). If the prejudice were additional time and expense incurred in obtaining discovery, "monetary sanctions may be a sufficient cure." Doubleline Cap., 2021 WL 1191527, at *5. More "serious measures" include preclusion of evidence, "permitting the parties to present evidence and argument to the jury regarding the loss of information," and instructions to the jury as to how to consider such evidence. Id. (quoting Fed. R. Civ. P. 37(e)(1) adv. comm. n. to 2015 amend).

As noted above, the "particularly harsh" sanctions in Rule 37(e)(2), including adverse inference instructions—which Plaintiffs seek against Keurig (see ECF No. 1286 at 29–30)—require proof of an "intent to deprive," a showing that on its own "support[s] . . . an inference that the opposing party was prejudiced by the loss of information[,]" and therefore does not require an independent showing of prejudice. Lokai Holdings, 2018 WL 1512055, at *8 (quoting Fed. R. Civ. P. 37(e) adv. comm. n. to 2015 amend.). An adverse inference instruction permits the jury to make "an inference that the evidence would have been unfavorable to the party responsible for its destruction." Zubulake IV, 220 F.R.D. at 216 (citation omitted). The adverse inference is meant to restore a prejudiced party to the "position [it] would have been in absent the wrongful destruction of evidence by the opposing party." Kronisch, 150 F.3d at 126. An adverse inference instruction is "an extreme sanction and should not be imposed lightly." Treppel, 249 F.R.D. at 120. "[W]ithout some proof that the [spoliating party]'s actions created an unfair evidentiary

20

Add.45

imbalance, an adverse inference is not appropriate." Richard Green (Fine Paintings) v. McClendon, 262 F.R.D. 284, 291 (S.D.N.Y. 2009).

Finally, in addition to any other sanctions imposed under Rule 37(e), "a court has the discretion to award attorneys' fees and costs to the moving party, to the extent reasonable to address any prejudice caused by the spoliation." Lokai Holdings, 2018 WL 1512055, at *9. As the Second Circuit has explained, "a party that disregards its [discovery] obligations may create a reasonable suspicion that further investigation is warranted, and thereby imposes costs on its adversary that would never been incurred had the party complied with its obligations in the first instance[,]" and an award of monetary sanctions compensates the adversary "for costs it should not have had to bear." Klipsch Grp., Inc. v. ePro E-Com. Ltd., 880 F.3d 620, 634 (2d Cir. 2018).

## IV. DISCUSSION

### A. The Stipulations

The parties failed to follow the Court's instructions in the Aug. 5 and Oct. 1 Orders in two respects. First, contrary to the Court's instruction that the stipulated facts—and any opposing facts—be set forth without argument, the parties have used the Stipulations as a vehicle to expand or add to the arguments in their memoranda of law. (See ECF Nos. 1434; 1554 at 2). For example, one reads no further than the second page of the Stipulations before Keurig presents a "preliminary statement," and Plaintiffs present their "[p]osition with [r]espect to [r]eplies," a reference to Keurig's replies to the numerous instances in which Plaintiffs, instead of setting forth the alternative version of a particular fact with citation to an exhibit "accompanying" the Motions, advance arguments about why they cannot agree to Keurig's proposed stipulated fact or other grounds of disagreement. (ECF No. 1632 at 2). Another example of Plaintiffs' failure to

21

Add.46

comply with the Court's direction not to include argument is proposed stipulated fact #11, in which "Plaintiffs stipulate to the fact that Ms. Cote's employment ended in March 2014" and that she "did not receive a preservation notice for this litigation," but then argue at length why they "do not have sufficient knowledge and information" to agree to other aspects of Keurig's proposed stipulated fact #11, and add various other limitations on the fact to which they supposedly just stipulated. (Id. at 6 ¶ 11). The Stipulations contain myriad other examples in which the Plaintiffs, and to a lesser extent Keurig, abused the Court's invitation to clarify and narrow the facts in dispute on the Motions, and instead further argue with each other and muddle the factual record. (See, e.g., id. at 7 ¶ 13, 9 ¶ 17, 11 ¶ 25, 15 ¶ 43, 16 ¶ 45). Accordingly, the Court has disregarded all portions of the Stipulations that constitute argument.

Second, despite the Court's instructions in the Aug. 5 and Oct. 1 Orders that the Stipulations were to contain "citations to the relevant exhibits accompanying the Motions," (ECF Nos. 1434 at 1; 1554 at 1 (emphasis added)), Plaintiffs, without first seeking leave, filed with the Stipulations more than three dozen additional exhibits totaling over 400 pages that did not originally accompany Plaintiffs' Motion (the "New Exhibits"). (ECF Nos. 1635; 1636; 1638). Keurig asked "the Court to strike or disregard these additional documents [] outside the [M]otions record." (ECF No. 1632 at 2). Citing Second Circuit precedent inviting a district court to consider the "full record" to determine appropriate sanctions, Plaintiffs argue that the Court should consider the New Exhibits. (ECF No. 1699-1 at 16; see ECF No. 1693-1 at 4). Plaintiffs also assert that Keurig knew Plaintiffs intended to submit additional exhibits but did not raise the issue with the Court, and thus "waive[d] [] any objections to additional evidence." (ECF No. 1699-1 at 17).

22

Add.47

The problem with Plaintiffs' argument is that they submitted the New Exhibits <u>before</u> oral argument and <u>without</u> first seeking permission.  Keurig objected to and thus has not responded to the New Exhibits.  (ECF No. 1632 at 2).  The Second Circuit's recognition that the Court "is free to consider 'the full record in the case in order to select the appropriate sanction'" does not explain Plaintiffs' failure to seek leave of Court first, before simply adding exhibits to support their Motion months after briefing was completed.  <u>S.N.E. Tel. Co.</u>, 624 F.3d at 144 (citing <u>Nieves v. City of New York</u>, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)).  (<u>See</u> ECF No. 1693-1 at 4 (citing <u>S.N.E. Tel. Co.</u>)).  Plaintiffs' reliance on <u>Syntel Sterling</u> is also misplaced, because the court in that case "entered an order requiring certain supplemental submissions from the parties."  328 F.R.D. at 117.  (<u>See</u> ECF No. 1693-1 at 4).  No such order was entered here, and as noted above, the Court's orders specified that any stipulations of fact contain citations to exhibits "accompanying the Motions."  (ECF Nos.  1434 at 1; 1554 at 1).  If Plaintiffs concluded that they could not adequately respond to the topics the Court listed in the Aug. 5 Order, it was incumbent on <u>Plaintiffs</u> to request permission to submit additional exhibits to support of their Motion.

Instead, Plaintiffs have submitted what is, in effect, an unauthorized sur-reply, which neither the Court's Local Civil Rule 6.1(b), nor the Court's Individual Practices, nor the briefing schedule on the Motions, contemplated.  <u>See Lawtone-Bowles v. U.S. Bank Nat'l Ass'n</u>, No. 19 Civ. 5786 (PMH), 2021 WL 1518329, at *1 n.3 (S.D.N.Y. Apr. 16, 2021) ("'Local Civil Rule 6.1(b) does not contemplate the filing of a sur-reply.'") (quoting <u>Sachs v. Matano</u>, No. 15-CV-6049 (JFB) (AKT), 2016 WL 4179792, at *2 n.5 (E.D.N.Y. July 15, 2016), <u>adopted</u> <u>by</u>, 2016 WL 4186708 (E.D.N.Y. Aug. 4, 2016)).  (<u>See</u> ECF Nos. 1160; 1171).  "The Court need not consider a sur-reply [] where permission was neither sought nor granted."  <u>Lawtone-Bowles</u>, 2021 WL 1518329, at *1

Add.48

n.3; see Bisesto v. Uher, No. 19 Civ. 1678 (KMK), 2019 WL 2537452, at *2 (S.D.N.Y. June 20, 2019) (collecting cases declining to consider unauthorized sur-reply submissions); Anthropologie, Inc. v. Forever 21, Inc., No. 07 Civ. 7873 (RJS) (MHD), 2009 WL 690239, at *5 n.2 (S.D.N.Y. Mar. 13, 2009) (declining to consider additional exhibits submitted without court permission and noting that such a "manner of proceeding, besides being contemptuous of court rules, deprives the other side of an opportunity to respond"]).

The Court finds that Plaintiffs' submission of the New Exhibits without prior court permission was improper, and therefore declines to consider the New Exhibits in deciding Plaintiffs' Motion.

## B. Plaintiffs' Motion

### 1. Factual Background

#### a. Keurig's Document Policies

Pursuant to Keurig's Acceptable Use of Assets Corporate Policy (the "Acceptable Use Policy"), employees were instructed to save company documents not to their local drives ("C:"), which were not backed up, but rather on network or "share" drives ("K:", "H:", or "X:"), which were backed up. (ECF Nos. 1340-6 at 6; 1284-11 at 5; 1391-3 at 7).[9]  Custodians Ron DiFabio and Ian Tinkler, for example, testified that they followed this instruction. (ECF Nos. 1340-9 at 3; 1340-2 at 8)). Other employees apparently did not. (See, e.g., ECF No. 1393-10 at 3 (Chad Collett

---

[9] TreeHouse refers to the K: drive as "the home share My Documents folder." (ECF No. 1699-1 at 54). It is undisputed that the K: drive was a network storage location, separate from an employee's hard (C:) drive. (Id. at 143–44, 146). In 2017, Keurig replaced the home share with "OneDrive" as the default network storage location. (ECF Nos. 1340-1 at 16; 1340-4 at 5). Keurig employees could save documents to the X: and H: drives that would be accessible to other employees. (ECF No. 1699-1 at 145). The Court uses the term "network drive" to include the K:, X:, or OneDrive network storage locations.

24

Add.49

testifying that he stored "all of [his] work, as a course of habit, on the computer," and that he was "aware" of the network drive but "did not use it")).  When employees left Keurig, they were required to confirm that they had "returned" all documents, devices, and media "relating in any way to" Keurig's business, and had deleted "any other company property" from their personal devices.  (ECF No. 1340-37 at 5; see 1340-33 ¶ F; 1340-30 ¶ F; 1340-42 ¶ 8.E).  Several Keurig custodians testified that they complied with that instruction.  (See, e.g., ECF Nos. 1340-11 at 5 (Dwight Brown); 1340-21 at 3 (Donald Holly); 1340-22 at 4 (Michelle Stacy); 1340-23 at 3 (Bruce Godfrey); 1340-16 at 5 (Tom Ferguson)).  Others did not.  (ECF Nos. 1284-16 at 5–10; 1284-31 at 2 (Donald Barberio)).  Keurig also preserved ESI of a departing employee by running a computer script that "package[d] up their data," and saving it in a folder labeled with the employee's name on a network share drive, which was collected for this litigation (ECF No. 1340-4 at 10–11).  Keurig's IT department also checked whether the employee was on a legal hold, and if they were, stored either the whole computer or the hard drive.  (Id. at 3, 8–9).

### b.  Hard Drives

When a Keurig employee's computer was upgraded, Keurig migrated data from the old computer to the new computer.  (ECF No. 1340-4 at 5; 1340-7 at 6; 1340-8 at 3).  If an employee left with a Keurig-issued computer, after 30 days Keurig removed that computer from its domain, i.e., that computer was no longer connected to Keurig's network.  (ECF No. 1340-4 at 43–48).

Before April 2019, Keurig did not have a centralized asset management system to keep track of devices issued to its personnel.  (ECF No. 1287-4 at 4–5).  Instead, it had a "ticketing system" that had been in place since 2013 or 2014 ("Remedy"), but when Keurig transitioned to a new system in 2019 ("Service Now"), it did not retain the information that had been in Remedy.

(Id. at 6-7, 10–11, 13).  When Remedy was in place, a departing employee would turn in his or her computer to the location where he or she had worked; former employees' computers were generally not sent to a centralized legal hold site, and computers subject to a legal hold during the Remedy phase were kept in a "well-marked" container.  (Id. at 15–16).

In 2014, when this litigation started, Keurig did not have a litigation hold software, and used a service called CommVault to store email.  (ECF No. 1287-4 at 17–18).  Keurig did not "take any steps at that point in time to determine which devices Keurig had issued to an individual [were] under litigation hold."  (Id. at 17–18).  Keurig's IT department also did not at that time check storage locations of devices to see if any were under litigation hold.  (Id. at 18).

The computers Keurig issued to its employees were encrypted, meaning they could only be accessed using an encryption key.  (ECF No. 1287-4 at 19–20).  Keurig used two encryption systems: McAfee from 2009 until 2012 or 2013, and Bitlocker thereafter.  (ECF No. 1287-4 at 20–22).  Both systems use a server to manage encryption by creating encryption keys and issuing an encryption command to the computer to encrypt the device.  (Id. at 20).  In 2012, Keurig (then GMCR) drafted but did not implement an Encryption Key Management Standard, and Keurig's current procedures for managing encryption keys are not documented.  (ECF Nos. 1287-9; 1287-4 at 27).

The McAfee encryption server contained the unlock code for locked devices, and kept track of the PC name, host name, and other information about the device. (ECF No. 1287-4 at 23, 28).  At some point, Keurig removed all active computers from McAfee encryption, but kept the McAfee encryption server in case it needed decryption keys for drives on litigation holds.  (Id. at 24).  Over time, the number of Keurig IT employees with access to the McAfee encryption server

Add.51

dwindled to zero; after that, no one at Keurig knew the password, how to use McAfee, or where the encryption keys were stored. (Id. at 25). There was a period in 2018 that Keurig could not access the McAfee encryption server at all. (Id. at 25–26). By April 2018, Keurig asserts that it regained access to the McAfee encryption server. (ECF No. 1632 at 68 ¶ 137 (citing ECF No. 1284-17 at 4 (indicating that Keurig IT was provided with "all available McAfee decryption files on 4/17/2018")). As a result of this litigation, Keurig relearned the McAfee processes and "cracked the code" to regain access to the McAfee encryption server sometime before 2019, after which Keurig regained access to the vault of encryption keys in the McAfee encryption server. (ECF No. 1287-4 at 25–26). But not all encryption keys were successful at decrypting drives that had been encrypted using the McAfee system. (Id. at 26). Keurig reached out to McAfee, but it was unable to help. (Id.)

The encryption server that Keurig used after McAfee was called Bitlocker. (ECF No. 1287-4 at 22). The "trust" between a computer and the Bitlocker encryption server lapsed after 30 days, after which the hard drive from that computer could no longer be inserted into a new Keurig computer and accessed, but it could be imaged, decrypted, and produced. (ECF No. 1340-4 at 45–49). Although Keurig does not now have a documented system for managing encryption keys, (ECF No. 1287-4 at 27), both the McAfee and Bitlocker encryption servers kept some, but not all, encryption metadata. (ECF No. 1340-4 at 41–42).

### c. CommVault

Starting in 2011 (ECF No. 1340-4 at 12), "once a Keurig employee was placed on a litigation hold, his or her emails were journaled in an email archive developed by CommVault[,]" which holds the data until the litigation hold is released. (ECF No. 1287-19 at 3). "Keurig utilized

Add.52

CommVault to archive email until it transitioned to Office 365 in 2016[,]" at which time it began using the "'litigation hold' feature of Office 365 to preserve email communications for individuals placed on a litigation hold."  (Id.; see ECF No. 1699-1 at 108, 112-13).[10]  CommVault also backed up servers and emails.  (ECF No. 1340-4 at 12). Keurig produced over one million emails from CommVault.  (ECF No. 1336 at 13).

On August 6, 2018, Keurig discovered that the CommVault emails for most of the initial 29 Agreed Custodians were not collected, processed, or produced.  (ECF No. 1287-19 at 3).  By October 31, 2018, Keurig had collected and produced documents from CommVault.  (ECF No. 1693-1 at 39; 1699-3 at 67).

### d.  Transactional Data

In the Fall of 2019, the parties discovered that a "material" amount of data was missing from Keurig's transactional data production.  (ECF No. 1284-51 at 3–4; see ECF Nos. 808-2; ECF Nos. 769).[11]   By the time the error was discovered, "Plaintiffs had already invested months of work and significant resources into analyzing Keurig's incorrect data."  (ECF No. 1286 at 19).[12] The Court ordered Keurig to complete reproduction of its transactional data by March 19, 2020, which was later extended to April 20, 2020.  (ECF Nos. 839, 887).  Plaintiffs do not contend that Keurig spoliated any transactional data.  (ECF No. 1699-1 at 58).

---

[10] Before 2016, Keurig's email platform was Microsoft Exchange.  (ECF No. 1699-1 at 111).

[11] Transactional data "refers to financial data on sales of portion packs and brewers, which typically includes, among other things, quantity, price, product information, and customer information."  (ECF No. 1676 at 2).

[12] TreeHouse also made a supplemental production of SAP transactional data on March 19, 2020.  (ECF No. 1340-24; 1340-25).  McLane did not timely produce its sales data for 2018–2019.  (ECF No. 1340-44; 1340-45).

Add.53

2. **Analysis**

a. **Duty to Preserve**

Keurig's duty to preserve documents arose on February 4, 2014, when TreeHouse filed its complaint. (TreeHouse Complaint). See Kronisch, 150 F.3d at 126 (noting that "obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation— most commonly when suit has already been filed"); Richard Green, 262 F.R.D. at 289 (holding that duty to preserve "arose no later than" date complaint was filed). Keurig's obligation to preserve extended to ESI of custodians identified in the pleadings, Initial Disclosures, and the Agreed Custodian list.

b. **Reasonableness of Preservation and Collection Efforts**

Plaintiffs argue that Keurig's preservation and collection efforts were not reasonable because, ultimately, data from at least 23 custodians was lost or irretrievable. (ECF No. 1286 at 22; 1391-1). They contend that Keurig lost the hard drives of at least nine custodians, was unable to decrypt the data from nine custodians, and could not image computers of six custodians due to physical damage. (ECF No. 1286 at 21–22 (citing ECF No. 1284-48; 1287-4 at 31–33, 35–38)). By Plaintiffs' count, Keurig did not produce hard copy documents for nine custodians. (ECF Nos. 1693-1 at 70).

"To fulfill its obligation to preserve evidence 'a litigant must take affirmative steps to prevent inadvertent spoliation.'" Raymond v. City of New York, No. 15 Civ. 6885 (LTS) (SLC), 2020 WL 1067482, at *9 (S.D.N.Y. Mar. 5, 2020) (quoting R.F.M.A.S., 271 F.R.D. at 24). "Discovery from 'key players' in the litigation should be preserved." Id. (quoting Alter, 2014 WL 4966119, at *9). "At the outset of the litigation, each party must identify all sources of potentially relevant

29

Add.54

evidence and implement a 'litigation hold' suspending any routine document destruction or other processes involved in the ordinary course of business that might result in the destruction of potentially relevant evidence." R.F.M.A.S., 271 F.R.D. at 24. "Counsel cannot just implement a litigation hold and then sit on his [or her] hands, hoping that parties retain and produce all relevant information." Ryan v. Rock Grp., NY. Corp., No. 18 Civ. 2600 (GHW), 2019 WL 6841874, at *4 (S.D.N.Y. Dec. 16, 2019). Rather, the Federal Rules of Civil Procedure "obligate counsel to monitor compliance so that all sources of discoverable information are identified and searched." Id.; see Richard Green, 262 F.R.D. at 290 ("Attorneys must take responsibility for ensuring that their clients conduct a comprehensive and appropriate document search.") (citation omitted); Zubulake V, 229 F.R.D. at 432 ("Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched."). Thus, at a minimum, then, Keurig was obligated to: (i) issue litigation holds at the outset of this litigation; (ii) communicate directly with custodians identified in Keurig's initial disclosures; and (iii) instruct all employees to produce copies of their electronic files and safely store backup media. See Zubulake V, 229 F.R.D. at 433–34.

Applying these principles, the Court examines Keurig's preservation and collection efforts as to (i) litigation holds and custodian interviews, (ii) hard drives, and (iii) hard copy documents.

### i.   Litigation Holds and Custodian Interviews

"Within six days" of TreeHouse's filing of its complaint in this action, Keurig issued litigation hold notices to over 400 employees, and over time, to an additional 300. (ECF Nos. 1336 at 12; 1699-1 at 106, 109). Six custodians did not receive litigation hold notices at all: Ken Crites, Don Holly, Steve Smits, and Chris Stevens, who left before TreeHouse's Complaint was filed;

Susan Cote, who left in March 2014; and Brad Tidwell, who left in August 2015, before the McLane complaint was filed. (ECF No. 1632 at 6 ¶ 11, 7 ¶ 13, 11 ¶ 25, 15 ¶ 43, 19 ¶ 47, 19 ¶¶ 48–49). On November 26, 2019, Keurig informed Plaintiffs that it had "conducted custodial interviews of the former employees" it was able to contact, and offered to advise Plaintiffs which former employees it could not reach if Plaintiffs would do the same. (ECF Nos. 1284-2 at 2; 1284-4 at 5; 1632 at 26 ¶ 64). The parties do not appear to have reached a consensus on how documents were collected from their respective former employees.

Plaintiffs argue that Keurig did not timely interview eleven custodians to determine whether they had any relevant documents: ten former employees, and one (Ben Yoder) who was still an employee in 2018, when discovery commenced. (ECF Nos. 1287-1 at 11; 1284-4 at 2; 1287-5; 1632 at 22–23 ¶¶ 61–62).[13] For example, Michelle Stacy, Keurig's former President, and Tom Ferguson, former Vice President of US Hot Beverages and Senior Vice President, Sales for Grocery/Drug/Club, testified that Keurig's counsel first contacted them in October or November 2019, more than five years after this action commenced. (ECF Nos. 1284-5 at 3; 1284-7 at 3; 1287-1 at 5, 9; see ECF No. 1632 at 34 ¶ 78, 42 ¶ 95). Don Holly, Former Vice President of Beverage Quality, testified that Keurig's counsel did not contact him about preservation of documents at all, although Keurig contends that it did ask Holly whether he had any responsive documents. (ECF Nos. 1393-7 at 3; 1287-1 at 6; 1340-1 at 16).

Keurig notes that it did interview Yoder, albeit not until September or October of 2019 in anticipation of his deposition, following which it collected and produced notebooks he had still

---

[13] The eleven custodians are: Don Barberio; Larry Blanford; Dwight Brown; Ron DiFabio; Tom Ferguson; Steve Ferreira; Bruce Godfrey; Don Holly; Bob McCall; Michelle Stacy; and Ben Yoder. (ECF Nos. 1287-5; 1632 at 22 ¶ 60).

Add.56

retained.  (ECF No. 1336 at 25; <u>see</u> ECF No. 1340-7 at 5).  As to the remaining ten custodians, Keurig asked them whether they had documents, and produced those documents. (ECF No. 1340-1; <u>see</u>, <u>e.g.</u>, 1340-20 (Tom Jarona)).  Keurig asserts that the remaining employees testified that they did not retain any documents when they left the company.  (ECF Nos. 1340-11 at 3–4 (Brown); 1340-21 at 3 (Holly); 1340-22 at 4 (Stacy); 1340-23 at 3–4 (Godfrey); 1340-17 at 4 (Barberio); 1340-16 at 5 (Ferguson)).   Keurig produced over 675,000 documents from the custodial files of the eleven custodians whom Plaintiffs allege Keurig did not timely interview. (ECF No. 1336 at 26–27).

Keurig's obligation to distribute litigation hold notices and "oversee compliance with" the preservation instructions was well-settled at the time TreeHouse filed its Complaint.  <u>Zubulake V</u>, 229 F.R.D. at 431–32.  Keurig's recognition of these obligations is in fact memorialized in the ESI Order, pursuant to which Keurig committed to "take reasonable steps" to preserve information and "ask each of [its] document custodians" whether and where they maintained potentially responsive documents.  (ECF No. 41 at 4, 16).  Yet, as noted above, out of the 54 Agreed Custodians, Keurig did not timely interview eleven, or about 20%, and failed to send a litigation notice at all to six, or about 11%.  Not until months after the January 4, 2019 deadline for substantial completion of production did Keurig interview seven Agreed Custodians about whether they had responsive documents.  (ECF Nos. 1632 at 27–28 ¶ 66 (Barberio), 29 ¶ 69 (Blanford), 31 ¶ 72 (Brown), 33 ¶ 75 (DiFabio), 34 ¶ 78 (Ferguson), 42 ¶ 95 (Stacy); 1340-1 at 16 (Holly)).

That some of these custodians were no longer employees did not mitigate Keurig's preservation obligations.  Courts have "insist[ed] that corporations, at the very least, ask their

Add.57

former employees to cooperate before asserting that they have no control over documents in former employees' possession." Export-Import Bank of U.S. v. Asia Pulp & Paper Co., 233 F.R.D. 338, 341 (S.D.N.Y. 2005). Here, Keurig asserted that documents in the custody of former employees "were no longer within the possession, custody or control of Keurig." (ECF No. 1284-4 at 3). While Plaintiffs served multiple third-party subpoenas on former Keurig employees during the stay, (ECF No. 1284-4 at 2), Keurig nevertheless had the obligation to ensure that these former employees continued to preserve potentially responsive documents in the meantime. See Sekisui Am. Corp. v. Hart, 945 F. Supp. 2d 494, 507–08 (S.D.N.Y. 2013) (finding plaintiff grossly negligent for taking six months to notify IT vendor of obligation to preserve documents pursuant to litigation hold, resulting in destruction of "the ESI of at least two significant former [] employees"); see also F.D.I.C. v. Horn, No. CV-12-5958 (DRH) (AKT), 2015 WL 1529824, at *8 (E.D.N.Y. Mar. 31, 2015) (holding that defendant had obligation to preserve potentially relevant emails of former employees).

Accordingly, the Court finds that Keurig's failure to distribute litigation holds to six custodians and timely interview eleven custodians constitutes a failure to comply with the ESI Order under Rule 37(b)(2)(A), as well as a failure to take "reasonable steps" to preserve ESI under Rule 37(e). See Charlestown Cap. Advisors, 337 F.R.D. at 61–62 (holding that counsel's failure to oversee compliance with litigation hold notices resulted in spoliation).

### ii.   Hard Drives

TreeHouse contends that Keurig spoliated the hard drives of 23 custodians through loss, inability to decrypt, damage, or a combination thereof.  (ECF Nos. 1286 at 9–12, 20; 1287-5).[14]

Keurig collected over 90 hard drives and laptops, from which it collected and produced data, but "did not locate hard drives used by Bruce Godfrey, Don Barberio, or Chris Stevens." (ECF No. 1284-11 at 6; see ECF No. 1699-1 at 117).[15]  Of the 70 collected, at least 62 were from Bitlocker-encrypted devices.  (ECF No. 1402-1 at 87; 1699-3 at 18).  As noted above, Keurig did not, however, "take any steps" when this action commenced "to determine which devices Keurig had issued to an individual [were] under litigation hold."  (ECF No. 1287-4 at 17–18).  Keurig's IT department also did not at that time check storage locations of devices to locate and collect any drives were under litigation hold.  (Id. at 18).

Hard drives for the following custodians could not be decrypted due to lost or inoperable encryption keys: John Wettstein, Steve Ferreira, Tom Novak, Dave Manly, Susan Cote, Ken Crites, Ian Tinkler, Dwight Brown, and Ron DeFabio (two hard drives).  (ECF Nos. 1284-17 at 4–5; 1340-4 at 46–48).  Keurig engaged a vendor, D4, to attempt to access three Bitlocker-encrypted hard drives.  (ECF Nos. 1284-17; 1340-4 at 39, 48).  Due to physical damage, D4 was unable to image hard drives for Michelle Stacy, Jimmy Huang, Fran Rathke, Jim Shepard, Susan DuLong, and Will Billings.  (ECF No. 1284-17 at 2–3).

---

[14] The 23 custodians are: Don Barberio; Will Billings; Dwight Brown; Susan Cote; Ken Crites; Ron DiFabio; Suzanne DuLong; Steve Ferreira; Bruce Godfrey; Don Holly; Jimmy Huang; Sherry Hurley; David Manly; Joe Mueller; Tom Novak; Fran Rathke; Jim Shepard; Steve Smits; Michelle Stacy; Chris Stevens; Brad Tidwell; Ian Tinkler; and Jon Wettstein.  (ECF No. 1287-5).

[15] Keurig was initially unable, but ultimately able, to locate Sweeney's hard drive, from which it produced twelve unique documents.  (ECF Nos. 1340-12 at 2; 1340-1 at 28).

34

Keurig offered Plaintiffs remediation efforts for the lost (Stevens, Godfrey, Barberio) or inaccessible hard drives (Billings, Brown, Cotes, Crites, DiFabio, DuLong, Ferreira, Huang, Manly, Novak, Rathke, Shepard, Stacy, Tinkler, Wettstein), as follows: (1) provide a Keurig Rule 30(b)(6) witness on preservation and collection that would not count against Plaintiffs' Rule 30(b)(6) topic and hour limits; (2) produce chain of custody records and summary of its vendor's efforts; (3) allow TreeHouse's vendor to try to image or decrypt devices at Keurig's expense (if the vendor was able to access them). (ECF No. 1284-45 at 3). Keurig facilitated a call between D4 and Plaintiffs' vendor, and thereafter, TreeHouse took possession of five hard drives to be analyzed by its vendor. (ECF No. 1284-40).[16]

In October 2019, TreeHouse's vendor confirmed that it had been unable to recover data from hard drives for Shepard, Billings, DuLong, Rathke and Stacy, and Plaintiffs elected not to try to access Huang's. (ECF No. 1284-40 at 3–4, 9). Plaintiffs chose to send Stacy's and Rathke's hard drives to a data recovery center for further analysis. (Id. at 3). Through these additional measures, Rathke's drive yielded eleven unique documents, (ECF No. 1284-30 at 2), and Stacy's hard drive yielded about 4,600 additional emails. (ECF Nos. 1340-10 at 2; 1632 at 93 ¶ 174).[17] Plaintiffs deposed Stacy three months after these emails were produced, but did not question her about any of them. (ECF No. 1340-1 at 26).

---

[16] These hard drives were for custodians Billings, DuLong, Shepard, Rathke, and Stacy. (ECF No. 1284-40 at 2–4).

[17] The parties dispute whether the additional 4,600 emails were duplicative. (ECF No. 1632 at 94 ¶ 175).

Add.60

Despite these efforts, six hard drives could not be imaged,[18] and ten could not be decrypted across 15 custodians.  (ECF No. 1336 at 16).[19]  As discussed further below, Keurig produced documents from network drives for all 15 custodians, (ECF Nos. 1336 at 16; 1340-1; 1699-1 at 128), and from later-in-time hard drives for ten of these custodians (Cote, DiFabio, Ferreira, Huang (two hard drives),[20] Manly, Novak, Rathke (two hard drives), Stacy, Tinkler, and Wettstein).  (ECF Nos. 1336 at 16; 1340-1; 1632 at 71 ¶ 143, 85 ¶ 163, 87 ¶ 166).  For the remaining five (Crites, DuLong, Billings, Brown, and Shepard), Keurig produced documents from alternative sources.  (See § IV.B.2.c, infra).

Keurig was unable to locate nine hard drives for custodians Barberio, Godfrey, Holly, Hurley, Mueller, Smits, Stevens, Tidwell, and Wettstein; all except Holly, Smits, and Stevens (who left Keurig in 2013) had received preservation notices, and all had left Keurig by the time discovery commenced in early 2018.  (ECF Nos. 1287-1 at 9; 1336 at 16 n.20; 1632 at 10–11 ¶¶ 24–25, 15 ¶¶ 42–43, 18 ¶¶ 46–47; 1699-1 at 131–32).

Altogether, 16 hard drives, although preserved, were inaccessible, and nine hard drives were lost altogether for 23 Agreed Custodians whose files were required to be preserved and searched.   Even if the Court infers that these 25 hard drives were lost or became inaccessible due to the passage of time or in the ordinary course of Keurig's business, Keurig's failure to preserve this ESI was, at least, a negligent violation of the ESI Order under Rules 37(b)(2)(A) and

---

[18] The six custodians with damaged hard drives were Billings, DuLong, Huang, Rathke, Shepard, and Stacy. (ECF No. 1632 at 76 ¶ 149).

[19] The fifteen custodians were Billings, Brown, Cote, Crites, DiFabio, DuLong, Ferreira, Huang, Manly, Novak, Rathke, Shepard, Stacy, Tinkler, and Wettstein.  (See ECF No. 1340-1).

[20] Huang also testified that he transferred everything from his computer to the share drive ("OneDrive"). (ECF No. 1340-39 at 4; 1632 at 84 ¶ 162).

Add.61

a failure to take reasonable steps under Rule 37(e).  See Learning Care Grp., Inc. v. Armetta, 315 F.R.D. 433, 438 (D. Conn. 2016) (finding that plaintiff's failure to save laptop from destruction in ordinary course "was careless"); Hawley v. Mphasis Corp., 302 F.R.D. 37, 49 (S.D.N.Y. 2014) (finding that defendant's failure to preserve former employee's laptop from "regular information technology operations protocols" was "at a minimum" gross negligence).

### iii.    Hard copy documents

Plaintiffs' Motion argues that hard copy documents are missing from two custodians: Don Barberio and Tom Ferguson.  (ECF Nos. 1286 at 14–15; 1287-5 at 2, 9).  At oral argument, Plaintiffs alleged that hard copy documents were also missing for three additional custodians, John Whoriskey, Suzanne DuLong, and Ron DiFabio.  (ECF Nos. 1693-1 at 33–35, 37; 1699-1 at 45–47).

Keurig's non-production of hard copy documents came to light in August 2019, when Plaintiffs were scheduled to take the deposition of Bob McCall, former Senior Vice President of Engineering at Keurig who was involved in the design and testing of the Keurig 2.0 Brewer and portion packs and whom Keurig listed in its December 15, 2017 Initial Disclosures.  (ECF No. 1284-22 at 2).  McCall left his employment at Keurig on May 31, 2017.  (ECF Nos. 1284-22 at 3; 1284-24 at 2).  In response to a non-party subpoena Plaintiffs served on McCall on July 25, 2019, shortly before his deposition was to occur, he produced 20 handwritten notebooks that Keurig had not previously produced, resulting in the adjournment of McCall's deposition.  (ECF Nos. 1284-22 at 2–3; 1284-24 at 2–3).  Keurig reimbursed Plaintiffs for half the costs that one of Plaintiffs' attorneys incurred for McCall's adjourned deposition, or about $1,100.  (ECF Nos. 1284-23 at 2; 1284-24 at 4).

Add.62

Similarly, in September 2019, the deposition of Ben Yoder, Keurig's Vice President of Business Development, was adjourned when, two days before the scheduled date, Keurig informed Plaintiffs that it had learned of 21 handwritten notebooks in Yoder's possession that had not yet been produced. (ECF Nos. 1284-25 at 2; 1284-26 at 3; 1632 at 21 ¶ 56). After Plaintiffs demanded confirmation that Keurig had asked all custodians whether they possessed hard copy documents or notebooks, Keurig produced hard copy documents from five additional custodians. (ECF Nos. 1284-26 at 2–3; 1284-27 at 2; 1284-28 at 2; 1284-29 at 2; 1284-30 at 2). At a conference on September 23, 2019, Judge Pitman noted that the notebooks were "documents that really should have been produced long ago had a search for responsive documents been done with the appropriate level of diligence[,]" and ordered Keurig to reimburse TreeHouse $2,469 for the costs of Yoder's rescheduled deposition. (ECF No. 691 at 43).

Don Barberio, Keurig's former Vice President of At-Home Sales, testified that he kept a yellow binder that may have contained notes of meetings with Giant Eagle, Wakefern, Kroger, Ahold, and others, but, despite having received a litigation hold notice in February 2014, threw the binder away when he cleaned out his office on his departure from Keurig in June 2014. (ECF Nos. 1284-16 at 5–10; 1284-31 at 2; 1632 at 3 ¶¶ 2–3). On his departure, Barberio turned in his Keurig-issued laptop and telephone to Human Resources. (ECF No. 1284-16 at 9). Plaintiffs contend that Barberio's notes would have been relevant to their allegations that Keurig lied about the quality of TreeHouse's cups, among other topics, to convince customers to adopt the Keurig 2.0 Brewer. (ECF No. 1286 at 15). For example, Barberio met with Publix's president on January 29, 2014, but the only record of the discussion during that meeting is an email to Tom Ferguson (Keurig's SVP of Grocery, Club, and Drug) stating that Publix was aware that its brand

38

Add.63

of cup would not function in the Keurig 2.0 Brewer, which the broker characterized as "Mission accomplished." (ECF No. 1287-14 at 2).

Suzanne DuLong, Keurig's former Vice President of Global Communications who received a litigation hold notice on March 31, 2016, testified that she left any hard copy documents at Keurig when her employment ended December 2016. (ECF Nos. 1632 at 8–9 ¶¶ 16–17; 1340-35 at 7).

John Whoriskey, Keurig's former Vice President, At Home and Head of U.S. Sales and Marketing who received a litigation hold notice on February 17, 2014 and left Keurig in December 2015, testified that he did not keep a notebook and after a meeting, discarded any notes he might have taken during that meeting. (ECF Nos. 1393-16 at 3–4; 1632 at 20–21 ¶¶ 54–55).

Tom Ferguson, who left Keurig in April 2016 and was added as a custodian in December 2017, testified that it was "very possible" that he never took notes in meetings with retailers, but did not "recall exactly whether or not [he] did[.]" (ECF Nos. 1393-5 at 3; 1287-1 at 5; 1632 at 9 ¶ 18). Ferguson also participated in meetings with prospective customers, during which "consumer safety" was discussed. (ECF No. 1664-4 at 3–6).

As to the fifth custodian, Ron DiFabio, Plaintiffs asserted at oral argument that he testified that he left any hard copy documents at Keurig when he left in March 2016. (See ECF Nos. 1693-1 at 35; 1632 at 8 ¶ 14).

Keurig disputes that any hard copy documents were spoliated. As to McCall and Yoder, Keurig ultimately produced their notebooks, and reimbursed TreeHouse for the costs associated with the late production. (ECF Nos. 1284-26 at 2; 1284-27 at 2; 691 at 43; 1284-24 at 4; 1632 at 116–17 ¶ 211). As to Barberio, Keurig points out that he described himself as not "a big note

39

taker," and stated that anything important "would go to Tom Ferguson" with "meeting highlights." (ECF No. 1340-17 at 5–6). Keurig also notes that later in his testimony, Barberio said he did not hold onto notes. (ECF No. 1340-17 at 8 ("I think it was thrown out the next day, after the meeting. I didn't hold on to scratches on a pad.")). Similarly, Whoriskey testified that he did not have notebooks, and if he took notes he would discard them after meeting and anything he "felt like retaining would have ultimately been on [his] computer." (ECF No. 1340-18 at 3). Keurig asserted that it "checked again" for DuLong's hardcopy documents after her June 19, 2019 deposition but did not locate any. (ECF No. 1699-1 at 148). As to Ferguson, Keurig notes his testimony was ambiguous as to whether he took notes during meetings. (ECF No. 1340-16 at 3).

Of the five custodians for whom Keurig has not produced hard copy documents, the Court finds that Plaintiffs have shown that Keurig failed to take reasonable steps to preserve relevant hard copy documents for one, Barberio. Barberio, Keurig's former Vice President of At Home Sales, participated in meetings with customers in late 2013 and early 2014 during which, Plaintiffs allege, Keurig told customers that the 2.0 Brewer would not be compatible with customers' cups. (ECF Nos. 1287-13 at 3; 1286 at 15; 1287-8; see TreeHouse Complaint, ¶ 27). Although it is undisputed that Keurig sent a litigation hold notice to Barberio on February 17, 2014, Barberio did not recall receiving it and Keurig's counsel did not contact him until the summer of 2019 to ask whether he had any potentially responsive documents. (ECF Nos. 1632 at 3 ¶ 3; 1284-16 at 5, 7, 10). Although he said he was not "a big note taker," (ECF No. 1340-17 at 5), he also testified that he kept a yellow binder containing any notes he had taken of meetings with customers including Giant Eagle, Wakefern, Kroger, and Ahold, but threw it out when he left Keurig in June 2014. (ECF No. 1284-16 at 8; see ECF No. 1632 at 3 ¶ 2). Thus, because Keurig failed to take

40

Add.65

reasonable steps to confirm that Barberio had received and complied with the litigation hold notice, identifiable, potentially responsive documents were lost. See Zubulake V, 229 F.R.D. at 432 (discussing counsel's obligation to "oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents").

Plaintiffs have not made this showing as to the other four custodians. DuLong received a litigation hold notice on March 31, 2016, and, as Keurig's policy required, left hard copy documents in her office when her employment at Keurig ended in December 2016. (ECF Nos. 1632 at 8–9 ¶¶ 16–17; 1340-35 at 7; see ECF Nos. 1340-37 at 5, ¶ F; 1340-33 at 4, ¶ F; 1340-30 at 4 ¶ F; 1340-42 at 9 ¶ 8.E). Plaintiffs, however, did not ask DuLong in her deposition about the nature of the hard copy documents she left in her office, and thus have not shown that Keurig failed to preserve any potentially relevant documents, let alone any documents that would have been adverse to Keurig as would justify an adverse inference sanction. See Turner, 142 F.R.D. at 77 (denying request for adverse inference where plaintiff failed to show that destroyed maintenance records would have been unfavorable to defendants). Further, Keurig produced over 106,000 documents for DuLong, including documents from one of her hard drives and shared drives, which was the location where, she testified, she saved "[j]ust about everything[.]" (ECF No. 1340-35 at 4).

Ferguson did not testify that he had a practice taking notes, and instead stated that he could not "recall specifically when [he] might have taken notes[,]" and was "honestly not sure" whether he disposed of any handwritten notes after he left Keurig. (ECF No. 1664-4 at 8–10). Similarly, Whoriskey testified that he "may have" taken notes during meetings, but did not keep a notebook and "[a]nything that [he] felt like retaining would have ultimately been on [his]

41

Add.66

computer." (ECF No. 1340-18 at 3). Plaintiffs therefore have not shown that Ferguson and Whoriskey had kept any notes relevant to Plaintiffs' claims, let alone that Keurig failed to preserve them. See Orbit One, 271 F.R.D. at 438 ("Sanctions are not warranted merely because information is lost; the evidence must be shown to have been 'relevant.'").

As to the fifth custodian, DiFabio, Plaintiffs represented at oral argument that he testified that he left any hard copy documents at Keurig when he left in March 2016, but this testimony was not included in any exhibit that accompanied Plaintiffs' Motion. (See ECF No. 1693-1 at 35).[21] Even if the Court were to consider their representation as to DiFabio's testimony, Plaintiffs have not shown that DiFabio left behind any relevant notes of Keurig's meetings with customers about the 2.0 Brewer in late 2013 and early 2014: to the contrary, DiFabio does not appear on the list of Keurig employees who gave presentations about the 2.0 Brewer to customers, and although he was copied on an email summarizing the status of meetings with customers, the summary does not indicate him as having attended any of those meetings. (See ECF Nos. 1287-8; 1287-13). Plaintiffs have therefore not shown that Keurig failed to preserve any relevant hard copy documents for DiFabio. See Chin, 685 F.3d at 162 (requiring, for adverse inference, proof "that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense").

Accordingly, the Court finds that Plaintiffs have demonstrated that Keurig violated Rule 37(b)(2)(A) by failing to preserve, as required by the ESI Order, relevant hard copy documents for Barberio, but not for DuLong, Ferguson, Whoriskey, or DiFabio.

---

[21] The parties submitted excerpts from DiFabio's deposition testimony, but the pages Plaintiffs cited during oral argument were not contained in any exhibit to the Motions. (Compare ECF No. 1693-1 at 35 with ECF Nos. 1287-3 and 1340-9).

42

Add.67

### c. **Prejudice**

The Court must evaluate whether Plaintiffs have been prejudiced by Keurig's failure to preserve hard drives for the 23 custodians listed above (see § IV.B.2.b.ii & n.14, supra), in which case the Court "may order measures no greater than necessary to cure the prejudice[.]" Fed. R. Civ. P. 37(e)(1).[22] The Court's "evaluation of prejudice from the loss of information necessarily includes evaluation of the information's importance in the litigation." Fed. R. Civ. P. 37(e)(1) adv. comm. n. to 2015 amend. Where Plaintiffs have been able to obtain discovery from alternative sources, the evaluation of prejudice shifts "from one of kind to one of degree." Coan, 602 B.R. at 440.

The Court must consider the "full record" in determining prejudice and corresponding sanctions. S.N.E. Tel. Co., 624 F.3d at 144. In evaluating Plaintiffs' assertions of prejudice, the Court therefore begins at the macro level. In this eight-year multidistrict litigation consolidating over 30 related actions, Keurig: (i) issued litigation hold notices to over 700 custodians; (ii) collected documents from 54 Agreed Custodians as well as non-custodial sources agreed by the parties; (iii) produced 3.8 million documents equating to over 11 million pages; (iv) preserved and collected 99 hard drives, of which 93 were successfully imaged and over 70 were successfully decrypted; and (v) produced seven million pages of documents from prior litigations. (ECF No. 1336 at 6; 1699-3 at 16, 18). In addition, Plaintiffs deposed 23 of the 30 custodians whose information Keurig allegedly spoliated, served dozens of non-party subpoenas on Keurig's former employees and the customers and suppliers at issue in this litigation, and participated in dozens

---

[22] As noted in §III.B.1, supra, a showing of prejudice is not required for sanctions under Rule 37(b) for Keurig's failure to comply with the ESI Order.

of meet-and-confers with Keurig as well as 17 discovery conferences with me (in addition to several more with Magistrate Judge Pitman). (ECF No. 1699-3 at 16). This is not, therefore, a case in which Plaintiffs are bereft of evidence to support their claims.

Turning to the micro level, the Court will now examine each of the 23 custodians for whom hard drives were lost or inaccessible to determine whether Plaintiffs have been prejudiced by Keurig's conduct.[23]

### i.    Don Barberio

Don Barberio, former Vice President of At-Home Sales, worked at Keurig from June 1996 until June 2014. (ECF No. 1632 at 3 ¶ 3). In his role, he participated in meetings with customers whom TreeHouse alleges were lost to Keurig after the roll-out of the 2.0 Brewer, including Giant Eagle, Wakefern, Ahold, and Kroger. (ECF Nos. 1287-13 at 3; 1286 at 15; 1287-8; see TreeHouse Complaint, ¶ 27). Barberio testified that he would call or email Tom Ferguson with any "highlights" of customer meetings. ECF No. 1340-17 at 6–7).

Barberio received a litigation hold notice on February 17, 2014 (ECF No. 1632 at 3 ¶ 3), and when he left Keurig in June 2014, he met with Tom Ferguson and an individual from Human Resources to turn in his phone and laptop. (ECF Nos. 1284-16 at 9; 1340-17 at 3). Despite Ferguson's presence when Barberio returned his devices and the litigation hold, Barberio's laptop was lost, which Keurig knew by January 2019. (ECF Nos. 1287-5 at 2; 1284-11; 1340-2 at 3; 1632 at 44 ¶ 99). Barberio testified that he did not use a share drive, and "had no idea what a share drive" was. (ECF No. 1340-17 at 3). Keurig did not find or produce any documents from Barberio's share drive. (ECF No. 1284-11 at 6).

---

[23] See n.14, supra.

Keurig produced over 21,000 emails for Barberio, and nearly 81,000 emails for Ferguson, to whom Barberio sent customer meeting updates, and, on failing to locate Barberio's hard drive, and added as a custodian Barberio's supervisor (Jim Travis), for whom Keurig produced 25,813 documents.  (ECF Nos. 1336 at 17; 1284-11 at 6; 1340-1 at 3; 1699-3 at 33).[24]  Still, Keurig produced essentially <u>no</u> non-email documents for Barberio.  His testimony that he did not know what a share drive was leads to the reasonable inference that any documents he saved were saved to his hard drive only.  Given his central role in meetings with Keurig's key customers about the 2.0 Brewer in late 2013 and early 2014, the Court finds that Plaintiffs were prejudiced by Keurig's failure to preserve Barberio's hard drive.

### ii.    Will Billings

Will Billings, Keurig's former Senior Director of Project Management, left Keurig on November 5, 2015.  (ECF Nos. 1287-1 at 2; 1632 at 3 ¶ 4).  Plaintiffs anticipated that he would have "knowledge of private label sales, [Keurig]'s marketing to retailers, and the Keurig 2.0 Brewer[,]" as well as "communications relating to Keurig's key brand licensees," such as Unilever, Starbucks, Dunkin' Donuts, and J.M. Smucker.  (ECF Nos. 1287-5 at 3; 1391-1 at 9).  He received a litigation hold notice on February 17, 2014 and was added as a custodian on October 3, 2018.  (ECF Nos. 1287-1 at 2; 1632 at 3 ¶ 5).  Billings' hard drive was damaged and could not be imaged, a fact that Plaintiffs contend Keurig knew by September 2018 but did not disclose until May 20, 2019.  (ECF Nos. 1340-1 at 4; 1284-17 at 3; 1693-1 at 39, 133; 1284-45 at 3).  Keurig provided

---

[24] In the Motions and the Stipulations, the parties largely dispute each other's representations as to the number of documents produced for each custodian.  (<u>See</u> ECF Nos. 1632 at 52–63 ¶¶ 106–29, 149-54 ¶¶ 1–12; 1699-1 at 132–33, 234; 1699-2 at 33–34).  The Court is unable to independently verify these figures, and, accordingly, has taken each party at their word and adopted their representations as to their own productions.

Add.70

Billings' hard drive to TreeHouse, whose vendor attempted but was still unable to recover any data. (ECF No. 1284-40 at 3). Plaintiffs chose not to depose Billings, but state that they "may have" done so "if documents from his hard drive had been produced." (ECF 1391-1 at 9–10). Keurig produced over 105,000 documents from Billings' custodial files, including 1,122 documents from his share drive spanning the entire period of his employment. (ECF No. 1391-1 at 9).

The fact that Keurig produced over 1,100 documents from Billings' share drive gives rise to the reasonable inference that his practice was to store documents in a central location, not on his hard drive, in compliance with Keurig's Acceptable Use Policy. (ECF Nos. 1340-6 at 6; 1284-11 at 5; 1391-3 at 7). In addition, these documents span the entire period of his employment, and supplement more than 90,000 other documents that Keurig produced from Billings' custodial file. Despite having over 105,000 documents for Billings, whom Plaintiffs claim was a key witness relating to Keurig's dealings with customers and licensees, Plaintiffs chose not to depose him and offer nothing more than speculation to support their assertion that unique documents existed on his hard drive but were not produced. Accordingly, the Court finds that Plaintiffs have failed to show prejudice from the inability to access Billings' hard drive. See Rhoda v. Rhoda, No. 14 Civ. 6740 (CM), 2017 WL 4712419, at *4 (S.D.N.Y. Oct. 3, 2017) (denying request for adverse inference sanction where "the likelihood of prejudice to Defendant [was] a nullity" where plaintiffs had produced over 30,000 other documents relevant to the issues and "[d]efendant's counsel, for whatever reason, failed to ask [a plaintiff] any questions concerning the deleted emails during her deposition").

46

Add.71

### iii.   Dwight Brown

Dwight Brown was a Senior Vice President of the Marketing Center of Excellence and Vice President of Consumer Marketing.  (ECF Nos. 1287-1 at 2–3; 1632 at 5 ¶ 8).  He received the "Degnan Email" (see § IV.B.2.d.iv, infra) as well as a litigation hold notice on February 17, 2014 and was added as a custodian on October 3, 2018.  (ECF Nos. 1287-1 at 2; 1287-15 at 3; 1632 at 5 ¶ 9).  Brown left Keurig on August 29, 2014.  (ECF Nos. 1287-1 at 2; 1632 at 5 ¶ 8).

Brown testified at his deposition that he saved "the majority" of documents relating to Keurig's business on his share drive.  (ECF No. 1340-11 at 5, 8).  He initially testified that the only documents he saved on his hard drive were "confidential personnel documents or something personal . . . [his] resume, for example. . . ."  (Id. at 5).  After Plaintiffs' counsel showed him a June 2011 email chain in which he asked for help extracting a presentation for a business meeting that he had saved only to his laptop and not to the share drive, Brown acknowledged that he had saved this presentation only to his hard drive on his laptop, but reiterated that "the share drive is where the majority of [his] documents that [he] saved would sit."  (Id. at 8–9).  The email noted that a "Keurig org. folder" had been retrieved from Brown's laptop hard drive, and contained Brown's comment that he had learned "a valuable lesson" from not saving the presentation to his share drive.  (Id. at 7, 9).

Keurig was unable to decrypt Brown's hard drive, and although its vendor, D4, was able to image the hard drive, D4 was unable to access it due to lack of an encryption key.  (ECF Nos. 1340-1 at 5–6; 1284-17 at 4; 1632 at 69 ¶ 140).  Keurig produced over 101,000 documents from Brown's custodial file, including 221 unique documents from his share drive.  (ECF No. 1340-1 at 6).  Included in his share drive documents were the presentation and the Keurig org. folder

47

Add.72

referenced in the June 2011 email.  (Id.)  This gives rise to the reasonable inference that, even if Brown had saved documents to his laptop hard drive before June 2011, after that time, he saved them to the share drive, from which Keurig produced his documents, including the two that were initially saved on his laptop hard drive.  Accordingly, the Court finds that, like Billings, Plaintiffs have failed to demonstrate prejudice from Keurig's inability to decrypt Brown's hard drive.

### iv.   Susan Cote

Susan Cote was the Senior Category Director for Specialty Coffee at Keurig.  (ECF Nos. 1632 at 5 ¶ 10; 1287-1 at 3).  She left Keurig in March 2014 and did not receive a litigation hold notice.  (ECF Nos. 1632 at 6 ¶ 11; 1284-31 at 3).  Due to her involvement with the Roaster Advisory Council, which Plaintiffs allege shows collusion among roasters who had agreements with Keurig, Plaintiffs identified Cote as a custodian in their Second Amended Initial Disclosures in October 2018.  (ECF Nos. 1287-1 at 3; 1391-1 at 18-19; 1287-5 at 5–6).

Keurig preserved three hard drives for Cote, from two of which, including her last-in-time hard drive, Keurig produced documents dated through the end of her employment in March 2014.  (ECF Nos. 1391-1 at 18; 1284-48 at 2).  Cote's third hard drive was McAfee-encrypted, but Keurig's vendor determined that the encryption key was invalid.  (ECF No. 1284-17 at 4).  Keurig sought McAfee's help, but McAfee was not able to "troubleshoot a decryption key . . . ."  (ECF No. 1340-4 at 28–30).  Keurig produced over 89,000 documents for Cote, including from the two other hard drives, as noted, as well as over 2,500 documents from her network drive, which contained documents from January 2009 through February 2014.  (ECF Nos. 1391-1 at 18; 1632 at 71 ¶ 143; 1699-3 at 28).  The fact that her more recent hard drives contained documents dating to January 2010 is consistent with Keurig's policy to migrate data from older to newer hard drives.

48

Add.73

(ECF No. 1340-4 at 5–6).  Plaintiffs chose not to depose Cote, asserting prejudice from "the lack of documents produced" relating to the Roaster Advisory Council.  (ECF No. 1391-1 at 19; 1632 74–75 ¶ 147).

Based on the number of documents Keurig produced for Cote, including from her more recent hard drives and network drives, the Court finds that Plaintiffs have not shown prejudice from Keurig's inability to access her older, McAfee-encrypted hard drive.  Plaintiffs had tens of thousands of documents relating to Cote and spanning her entire employment, which was plenty of fodder for deposition questioning.  That Plaintiffs chose not to depose her is more reflective of their assessment of her lesser importance to their claims than of prejudice.

### v.    Ken Crites

Ken Crites was the Senior Category Director, Category.  (ECF Nos. 1287-1 at 3; 1632 at 7 ¶ 12).  He left Keurig in March 2013, before TreeHouse filed its Complaint, and so did not receive a litigation hold notice.  (ECF Nos. 1287-1 at 3; 1632 at 7 ¶ 13).  Plaintiffs added Crites as a custodian in October 2018.  (ECF No. 1287-1 at 3).  In May 2019, Keurig disclosed to Plaintiffs that it was unable to access Crites' hard drive due to an invalid encryption key.  (ECF No. 1284-45 at 3).  Keurig's vendor, D4, tried but was also unable to access the hard drive.  (ECF No. 1284-17 at 4–5).

Keurig produced over 50,000 documents for Crites, including 85 documents from his network drive dated from February 2009 until February 2013.  (ECF Nos. 1391-1 at 22–23; 1699-3 at 28).  Keurig's production for Crites also included thousands of documents related to Bigelow, one of the customers TreeHouse alleged it lost to Keurig.  (ECF Nos. 1391-1 at 23; 1287-5 at 6–7).

Add.74

Plaintiffs did not depose Crites, and therefore did not ask him whether he saved to his hard drive any documents that might have been favorable to Plaintiffs. See Rhoda, 2017 WL 4712419, at *4 (finding no prejudice where defendants' counsel failed to ask plaintiff about allegedly deleted documents or otherwise "prove that the substance of the missing emails would have been favorable" to defendant "and thus unfavorable to Plaintiffs"). Accordingly, the Court finds that Plaintiffs have not been prejudiced by the inability to access Crites' hard drive.

### vi.     Ron DiFabio

Ron DiFabio was the Senior Vice President of At-Home Sales from September 2008 until March 2016. (ECF Nos. 1632 at 8 ¶ 14; 1287-1 at 4). He received a litigation hold notice on February 17, 2014. (ECF Nos. 1632 at 8 ¶ 15; 1287-1 at 4). Keurig designated him as a witness with knowledge of Keurig's relationship with retailers, the Keurig 2.0 brewer, K-cups, and McLane, and Plaintiffs assert that he "was heavily involved in day-to-day and high-level communications with and about retailers" whom TreeHouse alleges it lost as customers. (ECF No. 1287-5 at 7). For example, DiFabio testified that although WalMart would not enter "a duration commitment," it was willing to "continue with [Keurig] as a private-label supplier . . . ." (ECF No. 1287-3 at 5). DiFabio testified that everything he and his "direct reports did were always saved on a share drive." (ECF No. 1340-9 at 3).

Keurig preserved five hard drives from DiFabio's computers. (ECF No. 1284-48 at 2). Keurig did not have an encryption key for two of DiFabio's hard drives, and as a result, Keurig's vendor, D4, was unable to access the data. (ECF No. 1284-17 at 4–5). Keurig decrypted and produced documents from the other three hard drives, including his last-in-time hard drive, which contained documents dating through the end of his employment. (ECF No. 1284-48 at 2;

50

Add.75

1391-1 at 26; 1632 at 71 ¶ 143).  In total, Keurig produced over 280,000 documents for DiFabio, including over 3,700 documents from his network drive, which were dated over his entire employment period, and documents from the "rdifabio" share folder and other folders he and his team used.  (ECF No. 1391-1 at 26).  Plaintiffs appear not to have asked DiFabio in his deposition whether any agreement with WalMart was put in writing, and if so, where he stored it.  (ECF Nos. 1287-3; 1340-9; 1391-1 at 27).  Another Keurig witness, Joe Mueller, and a WalMart representative testified that there was no such agreement.  (ECF No. 1340-13 at 3–4; 1340-14 at 3–4).

Given DiFabio's testimony that he saved all documents to the share drive, combined with Keurig's production from his last-in-time hard drive (as well as tens of thousands of other documents), the Court finds that Keurig's inability to access two, older hard drives did not prejudice Plaintiffs.

### vii.    Suzanne DuLong

Keurig's preservation efforts concerning DuLong are summarized above.  (See § IV.B.2.b.i–ii, supra).  Keurig was unable to image one of DuLong's two hard drives.  (ECF No. 1287-5 at 8).  Keurig's vendor, D4, tried but was also unable to image the hard drive due to possible physical damage.  (ECF No. 1284-17 at 3).  Keurig provided DuLong's hard drive to TreeHouse, which was also unable to access it.  (ECF Nos. 1699-3 at 19; 1284-40 at 3-4).

Keurig produced over 106,000 documents for DuLong, including from her other hard drive and thousands of documents from the "suz" and corporate communications share drives to which, she testified, she saved "[j]ust about everything."  (ECF Nos. 1340-35 at 4; 1699-3 at 40;

Add.76

1391-1 at 31–34).  Given DuLong's testimony and Keurig's production, the Court finds that Keurig's inability to access one of her hard drives did not prejudice Plaintiffs.

### viii.    Steve Ferreira

Steve Ferreira was Keurig's Vice President of Finance, Business Analytics, Demand Planning and Strategy from April 2004 until April 2016.  (ECF Nos. 1287-1 at 5; 1287-5 at 10; 1632 at 9 ¶ 20).  Ferreira received a litigation hold notice on February 16, 2015, and was under a pre-existing litigation hold relating to other matters.  (ECF Nos. 1287-1 at 5; 1632 at 10 ¶ 21).  In its Amended Initial Disclosures, Keurig designated Ferreira as having knowledge of development and expansion of the 2.0 Brewer.  (ECF Nos. 1287-5 at 10; 1284-43 at 6).

In July 2018, TreeHouse raised with Keurig concerns about deficiencies in the production with respect to Ferreira (and other custodians).  (ECF No. 1287-24 at 12).  By September 2018, Keurig had determined that it was unable to decrypt one of Ferreira's hard drives, but did not disclose that fact to Plaintiffs until May 2019.  (ECF Nos. 1284-17; 1284-45 at 3).  Keurig provided D4 with an encryption key for Ferreira's hard drive, but D4 determined the encryption key was invalid.  (ECF No. 1284-17 at 4).

Keurig produced over 141,000 documents for Ferreira, including from three of his four hard drives and 141 documents from his network drive.  (ECF Nos. 1340-1 at 12–13; 1284-48; 1391-1 at 37–39; 1632 at 71 ¶ 143).  Ferreira also produced to Plaintiffs in response to a subpoena three documents he had saved on his home computer.  (ECF Nos. 1699-3 at 55; 1393-6 at 3).  The latest document produced from Ferreira's network drive was dated October 2014, and the latest document from his hard drives was dated October 22, 2015.  (ECF Nos. 1284-48 at 2; 1391-1 at 37–38).  Because of this nearly six-month gap in the documents Keurig produced for

Add.77

Ferreira, the Court finds that Plaintiffs have been prejudiced by Keurig's failure to preserve a valid encryption key for Ferreira's hard drive.

### ix.   Bruce Godfrey

Bruce Godfrey worked for Keurig from September 2010 until April 2017, most recently as Director of Market Research.  (ECF Nos. 1287-1 at 5; 1632 at 10 ¶ 22).  Godfrey received a litigation hold notice on February 17, 2014.  (ECF No. 1287-1 at 5; 1632 at 10 ¶ 23).  When Godfrey left Keurig in April 2017, he returned his laptop and cellphone.  (ECF No. 1340-23 at 6–7).  Plaintiffs allege that Godfrey's submission in June 2016 of a memo in which he voiced his opinion that "consumers did not want the so-called 'benefits' of the 2.0 Brewer" led to his termination two months later.  (ECF No. 1287-5 at 11–12; see ECF No. 1287-7 at 3).  Godfrey testified that he and his Consumer Insights Group were "trying to put everything" on a shared drive.  (ECF No. 1340-23 at 7–8).  Despite his return of his laptop, which was subject to a litigation hold, Keurig was unable to locate Godfrey's hard drive, a fact that Keurig did not disclose to Plaintiffs until after Godfrey's deposition.  (ECF Nos. 1284-11 at 6; 1632 at 44 ¶ 99).

Keurig produced over 109,000 documents for Godfrey, including over 3,000 documents from his network (X:) drive that span his entire employment, and another 3,700 from additional share drives, including the research libraries the Consumer Insights Group maintained.   (ECF Nos. 1699-3 at 34, 48; 1391-1 at 42–43).  Keurig also collected and produced Godfrey's June 2016 memo from three sources, including multiple copies that were attachments in Godfrey's emails.  (ECF Nos. 1699-1 at 137; 1699-3 at 36, 48; 1391-1 at 44).

Although Keurig's failure to preserve Godfrey's hard drive represents a greater degree of negligence, given that he expressly turned in his laptop in April 2017, well after Keurig's

Add.78

preservation obligation arose, the Court also finds that because Keurig's production of Godfrey's documents from the network drives spans his entire employment and included multiple copies of the June 2016 memo, Plaintiffs have not been prejudiced by Keurig's failure to preserve the hard drive.

### x.    Don Holly

Don Holly worked at Keurig from July 2001 until October 2013, most recently as Vice President of Beverage Quality.  (ECF Nos. 1632 at 10 ¶ 24; 1287-1 at 6).  Because he left Keurig before TreeHouse filed its Complaint, Holly did not receive a litigation hold notice for this litigation, but he turned in his laptop when he left.  (ECF Nos. 1632 at 11 ¶ 25; 1393-7 at 3).  Keurig designated Holly as a person with information about Keurig's supplier relationships and the quality of K-cups.  (ECF Nos. 1284-43 at 7; 1287-5 at 12).  Plaintiffs allege that Holly "signed and negotiated the supply agreements" with the suppliers of K-cup components, thus "block[ing] TreeHouse's access to work with those suppliers on its single-serve products."  (ECF Nos. 1287-5 at 13; Amended and Supplemental Complaint, Treehouse Foods, Inc. et al v. GMCR, et al., No. 14 Civ. 905 (VSB) (S.D.N.Y. Dec. 2, 2014), ECF No. 86 ¶¶ 262–78 ("TreeHouse Amended Complaint")).  In response to a motion by TreeHouse, in February 2020, the Court ordered Keurig to "produce Don Holly's custodial documents regarding the negotiation of the supplier agreements between Keurig and Curwood, Phoenix Cups, and Winpak[,]" which was the first time Holly was added as a custodian.  (ECF Nos. 733; 1287-1 at 6).  Plaintiffs assert (without citation to an exhibit

accompanying the Motions[25]) that Holly received a litigation hold notice in connection with the Sturm litigation.  (ECF No. 1287-5 at 13).

Keurig was unable to locate the hard drive from Holly's laptop.  (ECF Nos. 1632 at 44 ¶ 99; 1391-1 at 46–47).  In response to the Court's order, Keurig collected over 250,000 documents from Holly's email, network drive, and archived email from CommVault, and produced 288 documents in response to the Court's order, including communications with Curwood, Phoenix Cups, and Winpak, and over 8,900 documents for which Holly was a custodian.  (ECF Nos. 1340-38; 1632 at 56–57 ¶¶ 112–14; 1391-1 at 47–48).  Plaintiffs also received documents from Grupo Phoenix in response to a subpoena, but Holly did not appear on those documents.  (ECF No. 1699-1 at 134).

Because Holly left Keurig before its preservation obligation relating to this litigation arose, Holly was added as a limited custodian in February 2020, and Keurig produced almost 300 documents from a collection of 250,000 from his network drive and email, the Court finds that Plaintiffs have not been prejudiced by Keurig's inability to locate his hard drive.  See Rhoda, 2017 WL 4712419, at *4.

### xi.   Jimmy Huang

Jimmy Huang has worked at Keurig as Senior Director of Engineering since January 2005. (ECF Nos. 1287-1 at 6; 1632 at 12 ¶ 26).  He received a litigation hold notice on April 17, 2014. (ECF Nos. 1287-1 at 6; 1632 at 12 ¶ 27).  Keurig designated Huang as a person with knowledge "regarding the development of the 2.0 Brewer software" and the supplier of the 2.0 Brewer's ink

---

[25] Plaintiffs cite a "Mar. 11, 2020 S. Southall Email," but did not submit it as an exhibit to the Motion.  (ECF No. 1287-5 at 13; see ECF Nos. 1284; 1287; 1391; 1393).

technology.  (ECF No. 1287-5 at 13; see ECF No. 1284-43 at 4).  Huang was the custodian of the source code for the 2.0 Brewer.  (ECF No. 952 at 2–3).  Huang testified that "all the files" on his computer were "transferred to the OneDrive."  (ECF No. 1340-39 at 4).

In July 2018, TreeHouse raised concerns about deficiencies in Keurig's production for Huang.  (ECF No. 1287-24 at 13–14).  Specifically, TreeHouse asserted that Huang's production included only five communications with the ink supplier, less than 650 documents concerning the 2.0 Brewer, and few documents from before 2014.  (ECF No. 1287-24 at 13).  Keurig had learned in March 2018 that the older of the two hard drives that Keurig collected for Huang was physically damaged and made a "clicking" noise, "which is indicative of a mechanical failure," such that Keurig and D4 were unable to image it using "ordinary means."  (ECF No. 1632 at 76 ¶ 149; 1284-40 at 9; 1284-17 at 2; 1340-40 at 7).  TreeHouse, McLane, and the DPPs elected not to analyze Huang's hard drive.  (ECF No. 1284-40 at 9).  JBR's post-fact discovery attempt to access the hard drive, with which Keurig cooperated, was also unsuccessful.  (ECF No. 1340-40 at 3).

Keurig produced approximately 85,000 documents from Huang's files, including over 1,500 documents from OneDrive, and from his last-in-time hard drive.  (ECF Nos. 1632 at 83–84 ¶ 161; 1391-1 at 49–51; 1699-3 at 40).  Based on Huang's testimony that he transferred all the files from his hard drive to OneDrive, and Keurig's production of documents from his last-in-time hard drive, the Court finds that Plaintiffs were not prejudiced by Keurig's failure to prevent damage to Huang's older hard drive.

### xii.    Sherry Hurley

Sherry Hurley worked at Keurig from August 2011 until June 2018, and was the Collaborative Planning, Forecasting and Replenishment Manager.  (ECF Nos. 1287-1 at 6; 1632 at

12 ¶ 28).  She was on the Customer Focused Team for WalMart, one of the customers whom TreeHouse alleges it lost.  (ECF Nos. 1287-5 at 14; 1287-20 at 34).  Hurley received a litigation hold notice on February 17, 2014.  (ECF Nos. 1287-1 at 6; 1632 at 12 ¶ 29).  She was added as a custodian at McLane's request in May 2019.  (ECF Nos. 1391-1 at 54; 1281-5 at 6; 1632 at 58 ¶ 115).

Keurig was unable to locate a hard drive for Hurley.  (ECF Nos. 1287-5 at 14; 1632 at 44 ¶ 99).  Keurig produced over 109,000 emails and attachments from Hurley's files, 62,000 of which related to WalMart.  (ECF Nos. 1632 at 58 ¶ 116; 1391-1 at 54; 1699-3 at 37).  Keurig also produced over 44,000 documents from Hurley's supervisor, Brad Tidwell, including 419 from his share drive.  (ECF No. 1632 at 59 ¶ 117).   Keurig does not appear to have produced any documents from Hurley's network drives.  (See ECF Nos. 1693-1 at 66, 72; 1699-3 at 33; 1391-1 at 54).  Plaintiffs did not depose Hurley.  (ECF No. 1632 at 59 ¶ 118).

Although Keurig failed to preserve Hurley's hard drive and has not explained its non-production of documents from her network share drives, given her late addition as a custodian, the production of documents from an alternative custodian, and McLane's decision not to depose her, the Court finds that Plaintiffs were not prejudiced by Keurig's failure to preserve.  See Rhoda, 2017 WL 4712419, at *4.

### xiii.    David Manly

David Manly worked for Keurig from December 2002 until September 2014 and was the Senior Vice President of Innovation and Vice President and General Manager of Away-From-Home.   (ECF Nos. 1287-1 at 7; 1632 at 12 ¶ 30).  From September 2014 until July 2015, Manly worked as an independent contractor focusing on Keurig's cold-beverage appliance.   (ECF

Add.82

Nos. 1632 at 12 ¶ 30; 1340-8 at 3–6). Keurig designated Manly as a person with discoverable information regarding Keurig's relationships with distributors, marketing of the 2.0 Brewer and K-cups, customer inquiries, competition, and the Away-From-Home Office Coffee. (ECF No. 1287-5 at 14). Plaintiffs assert that Manly also sent violation notices to distributors and was involved in developing the 2.0 Brewer. (ECF No. 1287-5 at 14–15). Manly is also mentioned in TreeHouse's Amended Complaint. (TreeHouse Amended Complaint, ¶¶ 189, 490, 521; see ECF No. 1287-1 at 7). Manly received a litigation hold notice on February 17, 2014. (ECF Nos. 1287-1 at 7; 1632 at 13 ¶ 31). At his deposition, Manly testified that information from his older laptops were transferred to his new laptops. (ECF No. 1340-8 at 3, 6).

Keurig preserved three hard drives for Manly, but was unable to decrypt one of them. (ECF No. 1284-48 at 2–3). The two that Keurig was able to decrypt and produce included his last-in-time hard drive. (ECF Nos. 1284-48 at 2; 1699-3 at 28; 1632 at 71 ¶ 143). Keurig produced over 150,000 documents for Manly, including the documents from his last-in-time hard drive and over 2,800 documents from his network drive. (ECF No. 1391-1 at 55–56). Keurig also produced from CommVault emails for Manly dating back to May 2011. (ECF No. 1340-1 at 19). In response to a subpoena from Plaintiffs, Manly produced documents from his personal laptop, to which he had downloaded files when he retired from Keurig. (ECF Nos. 1340-8 at 3–5; 1391-1 at 56).

Based on Keurig's production of documents from Manly's last-in-time hard drive and his network drive, and Manly's production of additional documents in response to Plaintiffs' subpoena, the Court finds that Plaintiffs were not prejudiced by Keurig's inability to access Manly's older hard drive.

58

Add.83

### xiv.   Joe Mueller

Joe Mueller worked for Keurig from October 2013 until March 2015, and was Senior Vice of Sales.  (ECF Nos. 1287-1 at 8; 1632 at 13 ¶ 34).  Mueller reported to DiFabio and "was responsible for all the interaction between" Keurig and Walmart, one of the customers whom TreeHouse alleges it lost.  (ECF Nos. 1284-47 at 3–4; 1287-20 at 34).  He received a litigation hold notice on February 17, 2014.  (ECF Nos. 1287-1 at 8; 1632 at 13 ¶ 35).  Mueller was added as a custodian in May 2019 for the McLane case.  (ECF Nos. 1287-1 at 8; 1391-1 at 63; 1632 at 59 ¶ 119).

Keurig was unable to locate Mueller's hard drive.  (ECF Nos. 1287-5 at 17; 1284-48 at 3; 1632 at 44 ¶ 99).  Keurig searched Mueller's network drive, "which contained no documents." (ECF No. 1391-1 at 63).  Keurig produced over 34,000 emails for Mueller.  (ECF Nos. 1340-1 at 21; 1391-1 at 63; 1632 at 59 ¶ 120).  DiFabio, to whom Mueller reported, testified that he and his direct reports saved everything to network drives.  (ECF No. 1340-9 at 3).

Because Keurig only produced emails for Mueller, and produced no network drive documents notwithstanding DiFabio's assertion that his team saved all documents there, the Court finds that there is a gap in Keurig's production as to Mueller that has prejudiced Plaintiffs.

### xv.   Tom Novak

Tom Novak worked at Keurig from November 2007 to May 2017, and was the Senior Vice President for Beverage Research & Development.  (ECF Nos. 1287-1 at 8; 1632 at 14 ¶ 36).  He received a litigation hold notice on February 17, 2014.  (ECF Nos. 1287-1 at 8; 1632 at 14 ¶ 37). Keurig identified Novak as having discoverable information about the development of the 2.0 Brewer and Keurig's relationship with Sagentia.  (ECF Nos. 1284-43 at 8; 1287-5 at 17).

59

Add.84

Keurig preserved four hard drives for Novak, including his older McAfee-encrypted hard drive, which it was unable to decrypt.  (ECF Nos. 1284-48 at 3; 1284-45 at 3).  Keurig's vendor, D4, attempted to decrypt Novak's McAfee-encrypted hard drive, but found the encryption key to be invalid.  (ECF No. 1284-17 at 4).  In July 2018, TreeHouse raised concerns about deficiencies in Keurig's production for Novak, and Keurig learned by September 2018 that Novak's McAfee-encrypted hard drive was inaccessible.  (ECF Nos. 1284-17 at 3; 1287-24 at 11).

Keurig produced over 76,000 documents for Novak, including documents from his other three more recent, Bitlocker-encrypted hard drives and 606 documents from his network drive.  (ECF Nos. 1340-1 at 22; 1284-48 at 2; 1632 at 72 ¶ 143).  Although Plaintiffs press the point that the latest document from his other three hard drives was dated November 12, 2015 (ECF No. 1391-1 at 64), Plaintiffs do not dispute that the inaccessible McAfee-encrypted hard drive was Novak's oldest hard drive, and that Keurig produced documents from his network drive, among other sources.  Accordingly, the Court finds that Plaintiffs have not been prejudiced from Keurig's inability to access Novak's older, McAfee-encrypted hard drive.

### xvi.    Fran Rathke

Fran Rathke worked at Keurig from October 2003 until December 2015, and served as Chief Financial Officer.  (ECF Nos. 1287-1 at 9; 1632 at 14 ¶ 38).  Rathke received a litigation hold notice on February 17, 2014.  (ECF Nos. 1287-1 at 9; 1632 at 14 ¶ 39).  Keurig identified Rathke as having discoverable information about corporate finance, and as one of the individuals involved in the decision to file the Sturm litigation.  (ECF Nos. 1284-43 at 8; 1284-52 at 5–6).

Keurig preserved three hard drives for Rathke, but was unable to image the oldest of the three.  (ECF Nos. 1284-45 at 3; 1284-48 at 3; 1632 at 76 ¶ 149).  D4 was unable to image Rathke's

oldest hard drive due to "read errors" caused by "possible physical damage." (ECF No. 1284-17 at 3). Keurig knew this by March 2018, but did not disclose it until May 20, 2019, one day after Plaintiffs deposed Rathke. (ECF Nos. 1284-45 at 3; 1284-17 at 3; 1287-5 at 18–19). Keurig provided the inaccessible hard drive to TreeHouse, which sent it to one vendor who was unsuccessful and then to a data recovery center that recovered eleven documents from it. (ECF Nos. 1284-40 at 3; 1340-1 at 23; 1340-31 at 4). In addition to those eleven documents, Keurig produced over 108,000 documents for Rathke, including documents from her two other hard drives—one of which was her last-in-time hard drive and contained documents through the end of her employment—and over 3,000 documents from her network drive. (ECF Nos. 1391-1 at 69; 1284-48 at 3). Plaintiffs took Rathke's deposition and did not seek to re-open her deposition following the recovery of the additional eleven documents. (See ECF No. 1340-31). The Court finds that Plaintiffs incurred and are entitled to recover the costs of the data recovery center's efforts to retrieve the additional documents from the oldest hard drive, for which Keurig declined to pay (ECF No. 1340-31 at 2–3), but, given the sources and volume of Keurig's production for Rathke, Plaintiffs were not otherwise prejudiced by Keurig's inability to access the older hard drive.

### xvii.    Jim Shepard

Jim Shepard worked at Keurig from July 2005 until September 2016, and was a Senior Director of Engineering. (ECF Nos. 1287-1 at 9; 1632 at 14 ¶ 40). Shepard received a litigation hold notice on April 17, 2014. (ECF Nos. 1287-1 at 9; 1632 at 14 ¶ 41). Keurig did not designate Shepard in its Amended Initial Disclosures (ECF No. 1284-43), but TreeHouse asserted that Shepard had discoverable information about the 2.0 Brewer and Keurig's "anticompetitive

61

Add.86

conduct," including "Keurig's attempts to design technology that would lock out competition." (ECF No. 1287-5 at 19).

Neither Keurig nor D4 were able to image Shepard's hard drive, possibly due to physical damage, a fact that Keurig knew by September 2018 but did not disclose to Plaintiffs until May 2019.  (ECF Nos. 1284-17 at 3; 1284-45 at 3).  Keurig provided Shepard's hard drive to TreeHouse, whose vendor was also unable to access it.  (ECF No. 1284-40 at 3).

Keurig produced more than 156,000 documents for Shepard, including from his network (X:) drive and other folders that he and the brewer engineering group accessed.  (ECF No. 1391-1 at 72).  In addition, in response to a non-party subpoena from Plaintiffs, Shepard produced over 2,200 documents from an external hard drive he had kept when he left Keurig.  (ECF Nos. 1391-1 at 72; 1632 at 90 ¶ 170).   Plaintiffs chose not to depose Shepard, so there is no testimony to suggest there were documents on his inaccessible hard drive that were not otherwise produced by Keurig or Shepard himself.  Accordingly, the Court finds that Plaintiffs have not been prejudiced by Keurig's inability to access Shepard's hard drive.

#### xviii.    Steve Smits

Steve Smits worked at Keurig from January 2012 to July 2013, and was a Vice President of At-Home Sales.  (ECF Nos. 1287-1 at 9; 1632 at 15 ¶ 42).  Smits had left Keurig by the time TreeHouse filed its Complaint and therefore did not receive a preservation notice.  (ECF Nos. 1287-1 at 9; 1632 at 15 ¶ 43).  Keurig identified Smits in its Amended Initial Disclosures as having discoverable information about Keurig's relationships with WalMart, Sam's Club, and McLane and the sale of the Keurig 2.0 Brewer and K-cups, but Plaintiffs did not add him as a custodian

62

Add.87

until the McLane complaint was filed in 2019.  (ECF Nos. 1284-43 at 9; 1287-1 at 9; 1391-1 at 75; 1632 at 60 ¶ 122).

Keurig was unable to locate Smits' hard drive.  (ECF Nos. 1284-48; 1632 at 44 ¶ 99).  Keurig produced approximately 13,000 documents for Smits, including 606 documents from his network drive that spanned his entire employment.  (ECF No. 1391-1 at 75–76).  Plaintiffs contend that Keurig's failure to preserve Smits' hard drive has resulted in irreparable loss of records of meetings with customers (ECF No. 1391-1 at 76), but Smits left months before Keurig's meetings with customers about the 2.0 Brewer in late 2013 and early 2014 that Plaintiffs allege were anti-competitive.  (ECF Nos. 1287-8; 1287-13; see ECF No. 581 at 10).  Accordingly, the Court finds that Plaintiffs have not been prejudiced by Keurig's failure to preserve Smits' hard drive.

### xix.    Michelle Stacy

Michelle Stacy was employed at Keurig from November 2008 until March 2014, and was the President of Keurig, Inc.  (ECF Nos. 1287-1 at 9; 1632 at 16 ¶ 44).  Stacy announced her departure from Keurig in August 2013, at which time she "was no longer in the office" and was not actively working after August 30, 2013.  (ECF Nos. 1632 at 16 ¶ 45; 1340-22 at 3).  Stacy did not receive a litigation hold notice, but left her files at Keurig, and her transition agreement required her to leave her devices behind as well.  (ECF Nos. 1287-1 at 9; 1632 at 16 ¶ 45; 1340-22 at 4; 1340-42 ¶ 8.E).  Keurig designated Stacy in December 2017 as having discoverable information regarding Keurig's relationships with customers, suppliers, distributors, and brands, and company strategy.  (ECF No. 1284-43 at 9).  Keurig also identified Stacy as participating in the decision to file the Sturm litigation, such that Plaintiffs argue she would have had additional documents relevant to their sham litigation claim.  (ECF Nos. 1284-52 at 6; 1699-1 at 70).

63

Keurig preserved three hard drives for Stacy, one of which neither Keurig nor D4 was able to image and access due to possible physical damage. (ECF Nos. 1284-17 at 2; 1284-45 at 3). Keurig knew the hard drive was inaccessible by March 2018, but did not disclose that fact to Plaintiffs until May 2019. (ECF Nos. 1284-17 at 2; 1284-45 at 3). Keurig provided the hard drive to TreeHouse, whose vendor was unable to recover any additional documents through ordinary means, but was able to recover some additional documents through extraordinary means at TreeHouse's expense. (ECF Nos. 1699-3 at 42; 1340-31 at 2–3; 1391-1 at 77–78).

Keurig produced over 125,000 documents from Stacy's files, including documents from three of her hard drives, including her last-in-time hard drive, which contained documents dated through September 5, 2013. (ECF Nos. 1284-48; 1632 at 92 ¶ 173; 1391-1 at 76–77). Following the extraordinary efforts by TreeHouse's vendor, 4,600 documents were produced from Stacy's fourth hard drive, although the parties dispute whether these documents were duplicates of emails Keurig had previously produced in a different format. (ECF Nos. 1340-10 at 2; 1632 at 93–94 ¶¶ 174–75; 1699-3 at 43). Keurig does not appear to have produced any documents from Stacy's network drive. (ECF No. 1693-1 at 73). Plaintiffs deposed Stacy three months after receiving the documents from the fourth hard drive, but did not question her about them. (ECF Nos. 1391-1 at 78–79; 1699-3 at 43). Plaintiffs incurred and are entitled to recover the costs of the data recovery center's efforts to retrieve the additional documents from Stacy's fourth hard drive, for which Keurig declined to pay (ECF No. 1340-31 at 2–3), but, as with Rathke, given the sources and volume of Keurig's production for Stacy, Plaintiffs were not otherwise prejudiced by Keurig's inability to access the fourth hard drive.

64

Add.89

### xx.    Chris Stevens

Chris Stevens worked for Keurig from February 1996 until April 2013, and was Vice President for Corporate Relations and Customer Development.  (ECF Nos. 1287-1 at 9; 1632 at 18 ¶ 46).  Stevens left Keurig before TreeHouse filed its Complaint, and did not receive a litigation hold notice.  (ECF Nos. 1287-1 at 9; 1340-43; 1632 at 18 ¶ 47).  Plaintiffs added Stevens as a custodian in December 2017, asserting that he had discoverable information concerning Keurig's anti-competitive conduct.  (ECF No. 1287-5 at 21).

Keurig was unable to locate Stevens' hard drive.  (ECF Nos. 1632 at 44 ¶ 99).  Keurig produced over 59,000 documents for Stevens, including over 1,100 documents from his network drive that span his employment.  (ECF Nos. 1391-1 at 80; 1632 at 61 ¶ 124).  Plaintiffs did not depose Stevens, so there is no testimony to suggest that he saved documents on his hard drive rather than on the network drive as required by Keurig's policy.  (ECF No. 1632 at 61 ¶ 125).  Particularly given Stevens' departure before this action commenced, the Court finds that Plaintiffs were not prejudiced by Keurig's inability to locate Stevens' hard drive.

### xxi.    Brad Tidwell

Brad Tidwell worked for Keurig from August 2013 until August 2015, and was the Supply Chain Lead.  (ECF Nos. 1287-1 at 10; 1632 at 19 ¶ 48).  Tidwell was not designated as a custodian until May 2019, after the McLane action was filed, and did not receive a litigation hold notice.  (ECF Nos. 1287-1 at 9; 1632 at 19 ¶ 49; 1391-1 at 84).  In its Amended Initial Disclosures, Keurig designated Tidwell as having discoverable information about the company's supply chain and

Add.90

McLane.  (ECF No. 1284-43 at 9).  Plaintiffs represent that Tidwell testified that he monitored Keurig's inventory levels at WalMart.  (ECF No. 1287-5 at 22).[26]

Keurig was unable to locate Tidwell's hard drive.  (ECF Nos. 1284-48 at 3; 1632 at 44 ¶ 99).  Keurig produced almost 45,000 documents for Tidwell, including over 400 documents from his network drive.  (ECF Nos. 1391-1 at 84-85; 1632 at 59 ¶ 117, 61 ¶ 127).  Because of the volume of documents produced for Tidwell, including hundreds of documents from his network drive, and the absence of other evidence that he saved unique documents only to his hard drive, the Court finds that Plaintiffs were not prejudiced by Keurig's inability to locate Tidwell's hard drive.

### xxii.    Ian Tinkler

Ian Tinkler worked for Keurig from March 2005 until August 2015, and was Vice President for Research and Development/Brewer Engineering.  (ECF Nos. 1287-1 at 10; 1632 at 20 ¶ 50).  Tinkler received a litigation hold notice on April 17, 2014.  (ECF Nos. 1287-1 at 10; 1632 at 20 ¶ 51).  Keurig and TreeHouse both designated Tinkler in their first sets of Initial Disclosures, and in its Amended Initial Disclosures, Keurig listed Tinkler as having discoverable information about the design of the 2.0 Brewer and the Sturm litigation.  (ECF Nos. 1287-1 at 10; 1287-5 at 23; 1284-43 at 9).[27]

Keurig preserved three hard drives for Tinkler, including his last-in-time hard drive.  (ECF No. 1284-48 at 3).  Keurig did not have a valid decryption key for Tinkler's oldest, McAfee-encrypted hard drive.  (ECF Nos. 1284-17 at 4; 1632 at 65 ¶ 132).  Keurig knew it was unable to

---

[26] In ECF No. 1287-5, Plaintiffs quote from Tidwell's deposition transcript, but did not include any excerpts from his deposition transcript as an exhibit accompanying the Motions.
[27] In ECF No. 1287-5, Plaintiffs again quote from a deposition transcript but have not included excerpts from the deposition transcript as an exhibit accompanying their Motion.

66

decrypt Tinkler's McAfee-encrypted hard drive by September 2018, but did not notify Plaintiffs until May 2019. (ECF Nos. 1284-17 at 3–4; 1284-45 at 3).

Keurig produced over 201,000 documents for Tinkler, including from his other two hard drives, one of which was his last-in-time and contained documents through the end of his employment in August 2015.  (ECF Nos. 1391-1 at 85–88; 1632 at 71–72 ¶¶ 143–44; 1284-48 at 3).  Keurig also produce over 600 documents from Tinkler's network drive, which is location to which, he testified, he saved electronic files.  (ECF Nos. 1340-2 at 7; 1391-1 at 86).  Because of the volume of documents Keurig produced for Tinkler, including from his network drive and his last-in-time hard drive, the Court finds that Plaintiffs were not prejudiced by Keurig's inability to decrypt his older, McAfee-encrypted hard drive.

### xxiii.    Jon Wettstein

Jon Wettstein worked for Keurig from April 1993 until May 2014, and was Vice President of Operations.  (ECF Nos. 1287-1 at 11; 1632 at 20 ¶ 52).  He received a litigation hold notice on February 17, 2014.  (ECF Nos. 1287-1 at 11; 1632 at 20 ¶ 53).  Keurig identified Wettstein as having discoverable information about its relationship with suppliers.  (ECF No. 1287-5 at 24).

Wettstein had five hard drives, four of which Keurig preserved, including his last-in-time hard drive, and a laptop, from which the hard drive had been removed.  (ECF Nos. 1284-48 at 4; 1632 at 44 ¶ 99; 1284-17 at 3).  D4 was unable to decrypt one of the four hard drives that were preserved.  (ECF No. 1284-17 at 4).  Keurig knew that fact by September 2018, but did not disclose it to Plaintiffs until May 2019.  (Id.; ECF No. 1284-45 at 3).

Keurig produced over 61,000 documents for Wettstein, including from the four accessible hard drives, one of which was his last-in-time and contained documents through the end of his

Add.92

employment in May 2014.  (ECF Nos. 1287-1 at 11; 1284-48 at 4; 1632 at 62 ¶¶ 128–29, 71 ¶ 143).

Keurig also produced documents from Wettstein's network drive.  (ECF No. 1699-3 at 28).  Based

on Keurig's production of documents from Wettstein's four other hard drives, including his last-

in-time, and from his network drive, the Court finds that Plaintiffs were not prejudiced by Keurig's

failure to preserve the hard drive from his laptop and inability to access the older hard drive.

*     *     *

In sum, the Court finds that Plaintiffs were prejudiced by Keurig's failure to preserve ESI

on hard drives for Barberio, Ferreira, and Mueller, and, as to Rathke and Stacy, were prejudiced

to the extent that Plaintiffs incurred the costs of undertaking additional measures to recover

discoverable information from their damaged hard drives.

### d. Intent

As set forth in § III.B.2.c, <u>supra</u>, the Court may not award the harsher sanctions for

spoliation of ESI under Rule 37(e)(2) unless Plaintiffs have shown by clear and convincing

evidence that Keurig had "the intent of depriving [Plaintiffs] <u>in</u> <u>this</u> <u>litigation</u> of that evidence."

<u>Doubleline Cap.</u>, 2021 WL 1191527, at *8 (noting that "[i]t is the movant's burden to demonstrate

that the spoliating party acted with the intent to deprive, not merely the intent to destroy"); <u>see</u>

<u>Lokai Holdings</u>, 2018 WL 1512055, at *7 ("Absent a showing of 'intent to deprive another party

of the information's use in the litigation, the sanctions enumerated under subsection (2) of

Rule 37(e) are not available."); <u>CAT3</u>, 164 F. Supp. 3d at 495; Fed. R. Civ. P. 37(e)(2) (requiring

"finding that the party acted with the intent to deprive another party of the information's use in

the litigation").

68

Add.93

In the first instance, this case is distinguishable from those in which the allegedly spoliating party exhibited "persistent non-responsiveness . . . to discovery requests" with "no adequate explanation." Cordius Trust v. Kummerfeld, No. 99 Civ. 3200 (DLC), 2008 WL 113664, at *2–4 (S.D.N.Y. Jan. 11, 2008) (awarding adverse inference sanction after finding that defendants "withheld the requested documents intentionally and in bad faith" over eight years). Rather, "in the context of the entire discovery process in this case," the Court finds that Keurig largely "did comply with its discovery obligations[.]" In re Pfizer, 288 F.R.D. at 317. Keurig's efforts, as detailed above (see § IV.B.2.b–c, supra), "may not have been perfect," but Keurig "did endeavor to meet all its obligations" as Plaintiffs inquired about perceived gaps for certain custodians (see ECF No. 1287-24), as Keurig and its vendor determined that hard drives were inaccessible (see ECF No. 1284-17), and as information was produced from alternative sources (see ECF Nos. 1699-3 at 23, 28, 33, 40). In re Pfizer, 288 F.R.D. at 318. If, as Plaintiffs argue, Keurig had engaged in "intentional destruction" to "gain[] an advantage in the litigation," then "one would assume" the record would show loss, destruction, or inaccessibility of all hard drives, rather than the isolated gaps the Court has found. Europe, 2022 WL 832027, at *7.

In addition, the Court is not prepared to find that Keurig "acted unreasonably in assuming that its employees complied with [the] policy" that instructed them to save documents to network drives rather than local hard drives, despite Plaintiffs' "claim that employees frequently violated the policy." La Belle, 2022 WL 121065, at *8. (See ECF Nos. 1340-6 at 6; 1284-11 at 5; 1391-3 at 7). While "it is a better practice for a company to make a searching inquiry of all relevant employees to determine whether they violated a company policy regarding use of devices[,]" the Court finds that Keurig did not act "unreasonably in assuming the policy was

Add.94

followed and limiting its document search . . . until the issue was brought to its attention." La Belle, 2022 WL 121065, at *8.

Plaintiffs seek to prove Keurig's intent by pointing to "circumstantial evidence" of Keurig's "[c]onscious dereliction of a known duty to preserve" electronic data. (ECF No. 1286 at 24; see ECF Nos. 1693-1 at 98; 1390 at 4). See Ungar, 329 F.R.D. at 13. This circumstantial evidence includes Keurig: (i) failing to interview custodians promptly (ECF Nos. 1286 at 8–9; 1284-5 at 3; 1287-3 at 3; 1664-4 at 9); (ii) allowing its access to the McAfee encryption server lapse (ECF No. 1286 at 10–12; see § IB.B.1.b, supra); (iii) failing to maintain the hard drive ticketing system (ECF Nos. 1286 at 13; 1287-4 at 6–7); (iv) asking custodians, in the 2012 Degnan Email, to engage in a ███████████████████████████████ (ECF Nos. 1286 at 16; 1287-15 at 2–3; 1390 at 3–4; see § IV.B.2.d.iv, infra); (v) representing that its productions were substantially complete when it was aware of its inability to access 16 hard drives, and waiting until May 2019 to notify Plaintiffs about the hard drives (ECF Nos. 1286 at 25; 1284-8 at 2; 1284-17 at 2–5; 1284-45 at 3–4); and (v) waiting until the last day of party discovery to notify Plaintiffs of "material" errors in its transactional data (ECF Nos. 1286 at 19; 1284-51 at 3). The Court considers each category of circumstantial evidence in turn.

### i.    Interviews

As discussed in § IV.B.2.b.i, supra, Keurig failed to interview multiple custodians until shortly before their depositions in 2019 and 2020, instead of contemporaneous with the date the custodians received litigation hold notices. (See ECF Nos. 1393-3 at 5–6 (Barberio); 1393-4 at 3 (Brown); 1393-5 at 4 (Ferguson); 1393-6 at 3 (Ferreira); 1393-7 at 3 (Holly); 1391-2 at 3 (Stacy)). Although the ESI Order did not set an express deadline for the parties to interview custodians

70

Add.95

(ECF No. 41 at 16–17), Keurig's failure to interview custodians in a timely manner resulted in the loss of Barberio's hard copy notes and hard drive, which appeared to contain unique discoverable information.  (See §§ IV.B.2.b.ii–iii & IV.B.2.c.1, supra).  Keurig had over three months between the date when Barberio received the litigation hold notice and the date his employment ended to interview him about his custodial documents.  (ECF Nos. 1287-1 at 2; 1632 at 3 ¶¶ 2–3).  Indeed, as he was leaving, Barberio met with Ferguson and an HR representative to turn in his phone and laptop, and yet, neither his laptop nor the materials he recalled leaving in his office was preserved.  (ECF Nos. 1284-16 at 8–9; 1340-17 at 3).

Numerous courts in this Circuit have confirmed that parties and their counsel must timely monitor compliance with litigation holds, and that the failure to do so constitutes, at a minimum, negligence.  See, e.g., Herman v. City of New York, 334 F.R.D. 377, 385 (E.D.N.Y. 2020) (finding that defendants' use of "'self-collection' practices without monitoring compliance was grossly negligent"); Richard Green, 262 F.R.D. at 290 (finding that defendant and her counsel "were at least negligent" in failing to implement litigation hold and search for responsive documents) (internal citation omitted); Zubulake V, 229 F.R.D. at 432 ("Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched.")

The Court finds that Keurig's counsel's failure to conduct a timely interview of Barberio specifically, and of its custodians generally, was negligent, and with respect to Barberio, perhaps grossly negligent, but does not conclude that these actions constitute clear and convincing evidence of an intent to deprive Plaintiffs of favorable information in this litigation.  Unlike cases in which courts have found intent where a party did not issue a litigation hold at all, Keurig cast

Add.96

a wide net in timely issuing litigation holds to over 700 custodians.  See, e.g., Ottoson v. SMBC Leasing & Fin., Inc., 268 F. Supp. 3d 570, 583–84 (S.D.N.Y. 2017) (granting adverse inference where plaintiff intentionally deleted and made no attempts to preserve key emails).  Here, Keurig sloppily implemented that litigation hold by not following up with certain of its custodians sooner to make sure that net was capturing what was required under the ESI Order.  That conduct, under this Court's precedent, constitutes negligence, not an intent to deprive.  See Raymond, 2020 WL 7055572, at *12 (finding that failure to preserve monthly reports was "negligent conduct" that did "not rise to the level of intent to destroy evidence"); see also Alter, 2014 WL 4966119, at *11 (finding that counsel's failure to "directly oversee or engage" in document collection efforts following issuance of litigation hold constituted negligence, but not "an intent to spoliate material evidence").

### ii.    Access to McAfee Encryption Server

Plaintiffs argue that Keurig "knowingly" allowed its access to the McAfee encryption server to lapse, and that in doing so, Keurig "willfully violated" its obligations under the ESI Order sufficient to satisfy the "intent to deprive" standard under Rule 37(e)(2).  (See ECF Nos. 1286 at 10–12; 1693-1 at 99).  As Keurig points out, however, it stopped using McAfee in 2012 or 2013, before this litigation, and transitioned its encryption to Bitlocker.  (ECF No. 1340-4 at 22–25; see § IV.B.1.b, supra).  Keurig performed a "rolling implementation" of the transition from McAfee to Bitlocker to minimize "the risk of corrupting the drive when [] switch[ing] encryption from one to another."  (ECF No. 1340-4 at 25).  As one would expect with an encryption system—the purpose

72

Add.97

of which is to avoid improper interception and tampering[28]—Keurig limited access to the McAfee encryption server to "a list of IT people", who, over time, left Keurig such that there were no longer any active employees with the password. (ECF No. 1340-4 at 27). When Plaintiffs sought production of the hard drives with McAfee encryption in 2018, Keurig "relearn[ed]" the processes to access the McAfee encryption server, and by April 17, 2018, "cracked the code" to regain "access to the vault of keys in the system," which it provided to D4 to assist in accessing the hard drives. (ECF Nos. 1340-4 at 27–28; 1284-17 at 5). When Keurig learned that "[n]ot all of [the] encryption keys were successful at decrypting those drives," Keurig sought McAfee's help in "troubleshoot[ing]" the problem of encryption keys that did not work. (ECF No. 1340-4 at 28–29; see ECF No. 1632 at 63–65 ¶ 130). Using this process, Keurig was able to decrypt eleven McAfee-encrypted drives, but several remained inaccessible. (ECF Nos. 1699-3 at 18; 1632 at 65 ¶ 132).[29] Keurig offered to Plaintiffs several remedial measures, including production of a Rule 30(b)(6) witness, production of chain of custody records, and allowing TreeHouse's vendor to try to image or decrypt the devices, with "reasonable fees" paid by Keurig. (ECF No. 1284-45 at 3). As set forth above, Keurig also produced tens of thousands of documents from alternative

---

[28] See, e.g., KCG Holdings, Inc. v. Khandekar, No. 17 Civ. 3533 (AJN), 2020 WL 1189302, at *2 (S.D.N.Y. Mar. 12, 2020) (discussing use of encryption to limit the individuals who are capable of decrypting and viewing its contents); United States v. Zak, No. 16-CR-65-V, 2017 WL 4358140, at *4 (W.D.N.Y. Oct. 2, 2017) (noting that failure to use encryption rendered data "vulnerable to both interception and tampering by third parties as it was transmitted over the internet").

[29] In the Stipulations, the parties agreed that "Keurig was unable to decrypt seven McAfee-encrypted hard drives preserved from seven custodians: Susan Cote, Ken Crites, Steve Ferreira, Dave Manly, Tom Novak, Ian Tinkler, and Jon Wettstein." (ECF No. 1632 at 65 ¶ 132). During oral argument, Keurig represented that "10 could not be decrypted," but did not identify the three additional custodians. (ECF No. 1699-3 at 18). From the record, the Court infers that Dwight Brown is one of these custodians. (ECF Nos. 1391-1 at 12; 1284-45 at 3).

73

Add.98

sources for each of the custodians whose hard drives could not be decrypted. (See ECF No. 1699-3 at 23, 28, 33, 40).

The Court has little difficulty concluding that Keurig's conduct with respect to the McAfee encryption server was not the behavior of a party intending to deprive its adversaries of relevant documents favorable to the adversaries' claims. Employees change jobs, memories fade, and technology does not always work as expected, but the loss of access to evidence in the ordinary course of business does not by itself demonstrate intent. See Rothman v. City of New York, No. 19 Civ. 225 (CM) (OTW), 2019 WL 6210815, at *4 (S.D.N.Y. Nov. 21, 2019) (finding that destruction of video footage "in the course of business and pursuant to a pre-existing retention policy" did not evidence "intent to deprive plaintiff of evidence"); Fashion Exch., 2019 WL 6838672, at *5 (finding that, although plaintiff exhibited "lackadaisical approach to its discovery obligations," evidence lost due to "server crash" was not deliberate). The steps that Keurig took to restore access to the McAfee encryption server, as well as the remedial efforts it undertook (and offered to take) after informing Plaintiffs of the encryption issue, were reasonable. See Man Zhang, 2019 WL 3936767, at *7 (finding that defendants did not act with intent to deprive plaintiff of evidence where they investigated and reported the destruction of video footage once ordered by the court and produced evidence from alternative sources). While one might envision different steps Keurig could have taken to ensure that an encryption server no longer in use remained accessible, the Court finds that its failure to do so amounts to, at most, ordinary negligence, far from the intent to deprive required for the severe sanctions under Rule 37(e)(2). See Doubleline Cap., 2021 WL 1191527, at *8 (denying request for adverse inference sanction where plaintiff failed to establish that defendants' destruction of encryption keys was done "with

74

Add.99

the intent of depriving <u>plaintiffs</u> <u>in</u> <u>this</u> <u>litigation</u> of that evidence"); <u>Berger</u>, 2016 WL 11706217,

at *5 (finding that failure to preserve room in same condition in which plaintiff had worked was

negligent).

### iii.    Ticketing System

Plaintiffs argue that Keurig's failure to maintain the Remedy ticketing system, which was

operative from 2014 to 2019, resulting in the inability to locate nine custodians' hard drives, is

evidence of Keurig's intent. (ECF Nos. 1286 at 9–10, 12–13; 1390 at 6; 1632 at 95 ¶ 178).[30] Keurig

no longer has access to the tickets that were contained in Remedy. (ECF No. 1287-4 at 7, 11).

Keurig maintains that Remedy was not a chain-of-custody system, but rather a work ticket system

for assigning tasks to IT personnel. (ECF Nos. 1336 at 22; 1699-1 at 157–58; 1632 at 95 ¶¶ 179–

80). During oral argument, Plaintiffs appeared to concede this point, acknowledging that Remedy

was the system that showed "who in HR initiated a repossession ticket for IT to start the off-

boarding process for an employee and prompts them to collect their computer." (ECF No. 1699-

1 at 30–31).

The Court finds that Keurig did not act negligently, let alone intentionally, in failing to

maintain the tickets in the Remedy system. The record reflects that Remedy's purpose was to

track IT work assignments, not custody of computers, and was maintained by an outside provider,

not by Keurig. (ECF Nos. 1287-4 at 10–11; 1340-4 at 43). A Remedy work ticket was closed once

the IT employee completed the task as to a computer and returned it to the operator. (ECF

No. 1340-4 at 43–44). Plaintiffs fail to explain how this information is relevant, let alone how it

---

[30] The nine custodians Plaintiffs identify are Barberio, Godfrey, Holly, Hurley, Mueller, Smits, Stevens, Tidwell, and Wettstein. (ECF No. 1286 at 9 n.2).

would be favorable to their case.  See Chin, 685 F.3d at 162.  For preservation purposes, Keurig kept computers subject to a litigation hold in a secured office or storage closet marked by asset-tag stickers, and had several means to determine a computer's user.  (ECF No. 1287-4 at 7–8).  While Keurig now has an asset management system that does a better job of tracking computers to users, Plaintiffs do not point to any case demonstrating that the failure to have such a system constitutes negligence, let alone an intent to deprive.  (See ECF Nos. 1286 at 12–13; 1390 at 6–7).

### iv.    Degnan Email

Plaintiffs argue that an email Keurig's in-house counsel sent in 2012 evidences Keurig employees' intentional deletion of documents.  (ECF Nos. 1286 at 16–17; 1390 at 4 & n.5; 1693-1 at 85, 92, 129, 135).  On September 26, 2012, Keurig's in-house counsel, Michael J. Degnan, sent an email asking employees to █████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ (ECF No. 1287-15 at 3 (the "Degnan Email"); see ECF No. 1693-1 at 129).  The Degnan Email circulated internally at Keurig, with the instruction, ███████████████████████████ █████████████████████████████████████████████████████████ ██████████████████████████ (ECF No. 1287-15 at 2 at 2).

Plaintiffs criticize Keurig for not explicitly telling employees to "preserve" data, and instead using the word ████████  and ask the Court to find that █████████████████ ████████████████████████████████████ (ECF No. 1286 at 16).  Plaintiffs assert

76

Add.101

that all six recipients of the Degnan Email have spoliation issues, further evidencing Keurig's intent to deprive Plaintiffs of favorable evidence. (ECF No. 1693-1 at 92, 116).[31]

Keurig points out that it ███████████████████████████████████ ███ from both custodial and non-custodial sources, and therefore Plaintiffs have not been deprived of any evidence. (ECF No. 1336 at 11). One of the recipients, Ian Tinkler, for example, testified that he did not "destroy anything" in response to the Degnan Email, (ECF No. 1340-2 at 6), and another, Bob McCall, testified that he did not direct any of his reports to "clean up their PC." (ECF No. 1340-3 at 3). Kevin Campbell, Keurig's Rule 30(b)(6) witness on document preservation, also testified that Keurig's 2012 document collection effort involved collecting copies and preserving the data in its original form or at its original source. (ECF No. 1340-4 at 50). Keurig also argues that Plaintiffs briefed and argued the theory that the Degnan Email ████ ██████████████████ in connection with their motion to compel additional discovery as to Degnan, which the Court denied without prejudice, Judge Broderick affirmed, and Plaintiffs never renewed. (ECF No. 1336 at 10; see ECF Nos. 706; 716; 750; 811; 871; 1081).

The Court finds that the Degnan Email does not support a finding that Keurig failed to take reasonable preservation steps or destroyed any evidence. The Court thoroughly considered Plaintiffs' theory in denying their motion to compel Keurig to produce documents about Project Squid from Degnan's custodial file and produce Degnan for a deposition, and Judge Broderick found that conclusion neither "contrary to law [n]or clearly erroneous." (ECF Nos. 750 at 1–2; 1081 at 4). The Court invited Plaintiffs to renew their application if they found Degnan's

---

[31] The six recipients were: Dwight Brown, Brian McCall, Ian Tinkler, John Whoriskey, Richard Sweeney, and Kevin Sullivan. (ECF Nos. 1286 at 16 n.17; 1693-1 at 116; 1287-15 at 3).

testimony "necessary as to a discrete issue or issues material to the claims or defenses in this action," but Plaintiffs did not do so.  (ECF No. 750 at 2).  In addition, Plaintiffs' theory that the Degnan Email ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████ (ECF No. 1287-15 at 2).

Finally, as to the six recipients of the Degnan Email, the Court has already determined that Plaintiffs did not suffer prejudice as to Brown, Tinkler, and Whoriskey.  (See §§ IV.B.2.b.iii, IV.B.2.c.iii, IV.B.2.c.xxii, supra).  As to McCall, Keurig did produce his notebooks (albeit belatedly), his deposition was rescheduled, and Keurig offered to defray the costs of the rescheduled deposition, an offer that JBR chose not to accept.  (ECF Nos. 1284-24 at 3; 1699-3 at 60).  As to Sweeney, Keurig produced over 123,000 documents from his custodial file, including from his laptop.  (ECF Nos. 1391-1 at 82; 1632 at 109 ¶ 200).  For Sullivan, Keurig produced over 110,000 documents, and searched his network drive but found no responsive documents.  (ECF Nos. 1391-1 at 81; 1284-11 at 6 n.8).  The volume and scope of Keurig's production for each of the six recipients of the Degnan Email belies any inference that Keurig intended to deprive Plaintiffs of these custodians' documents.  See Karsch, 2019 WL 2708125, at *22 (declining to find intent to deprive under Rule 37(e)(2) where server that plaintiff failed to preserve "contained some of the emails sent and received by some of the witnesses in this action" but "did not contain all or even most of their potentially relevant communications"); Casale v. Kelly, 710 F. Supp. 2d 347, 366 (S.D.N.Y. 2010) (where plaintiffs had not shown selective production, finding that failure to produce small number of documents did not support a finding of intent); Phoenix Four, Inc. v. Strategic Res. Corp., No. 05 Civ. 4837 (HB), 2006 WL 1409413, at *7 (S.D.N.Y. May 23, 2006)

78

Add.103

(declining to award adverse inference instruction where defendants produced, albeit late, large volume of additional ESI).

### v.    Delayed Notification

Plaintiffs complain that Keurig's failure to provide earlier notice of document preservation issues.  (ECF Nos. 1286 at 18–19; 1390 at 10–11; 1693-1 at 42; 1699-1 at 48-49).  Plaintiffs point to Keurig's delays in disclosing the CommVault emails, in reproducing the transactional data, and its inability to locate or access the 23 custodians' hard drives as further evidence to support a finding that Keurig acted with intent to deprive Plaintiffs of information favorable to their claims.  (ECF Nos. 1286 at 18–19; 1390 at 10–11).

The Court declines to draw Plaintiffs' requested inference.  First, as Keurig points out, the issue concerning CommVault was not preservation, but rather collection, of emails.  (ECF No. 1699-3 at 67).  The week after the April 30, 2018 initial deadline for substantial production of documents, Keurig notified Plaintiffs that it had substantially completed its obligations.  (ECF Nos. 354-1 at 3; 1284-9 at 2).  Three months later, in early August 2018, Keurig notified Plaintiffs that it had not gathered archived emails from CommVault for most of the initial 29 Agreed Custodians.  (ECF No. 1287-19 at 3).  By the end of October 2018, Keurig had collected and produced documents from CommVault.  (ECF Nos. 1693-1 at 39; 1699-3 at 67).  The Court also extended until January 4, 2019 the deadline for TreeHouse, JBR, and Keurig to substantially complete their productions for the Agreed Custodians.  (ECF No. 484 at 1).  Indeed, McLane and TreeHouse also supplemented their productions following the substantial completion deadline.  (ECF No. 1699-3 at 67).  Plaintiffs point to no lost information or prejudice from the delayed

79

Add.104

production of the CommVault data, and accordingly, this issue does not support a finding of intent.

The Court reaches a similar conclusion as to the delayed production of the transactional data.  In February 2020, Plaintiffs raised issues about the completeness of Keurig's transactional data production, and Keurig subsequently determined that rows of data were in fact missing.  (ECF No. 769).  Following a conference with the parties, the Court ordered Keurig to reproduce its data by March 19, 2020, and Keurig did so by March 17, 2020.  (ECF Nos. 839; 1693-1 at 41; 1699-3 at 66).  The Court also extended the expert discovery deadline to mitigate any prejudice.  (ECF Nos. 839; 1286 at 19).

Third and finally, the Court cannot conclude, from the timing of Keurig's disclosures about the hard drives for 23 custodians, that Keurig intended to deprive Plaintiffs of information favorable to their case.  At oral argument, the Court asked Plaintiffs the direct question when Keurig should have notified them about the lost, undecrypted, or inaccessible hard drives.  (ECF Nos. 1699-1 at 26–27; 1693-1 at 131).  Pointing to the "as soon as possible" language in the ESI Order, Plaintiffs argued that Keurig should have notified Plaintiffs within "several weeks, months even, but at the very latest . . . before the initial deadline for substantial completion of documents . . . ."  (ECF No. 1699-1 at 48–49).  The document on which Plaintiffs rely for the assertion that Keurig knew several of the hard drives were inaccessible is a letter from D4 to Keurig dated June 3, 2019.  (ECF No. 1284-17).  That document reflects that Keurig provided four hard drives (for Stacy, Huang, Rathke, and Wettstein) to D4 in March 2018, and an additional thirteen hard drives (for Shepard, DuLong, Billings, Wettstein, Ferreira, Novak, Manly, Cote, Crites, Tinkler, Brown, and DiFabio (two)) in September 2018.  (ECF No. 1287-17 at 2–4).  The letter is unclear,

80

Add.105

however, when D4 determined that its efforts to access these hard drives were unsuccessful and communicated that determination to Keurig.  From the excerpts of the deposition of Keurig's Rule 30(b)(6) document preservation witness (Campbell), Plaintiffs did not ask <u>when</u> Keurig became aware that D4's efforts were unsuccessful.  (<u>See</u> ECF Nos. 1287-4; 1340-4; 1391-3).  The failure to ask that question is curious, given the ferocity with which Plaintiffs have argued that Keurig withheld information about the hard drives.  While Keurig might have been able to notify Plaintiffs a few months earlier, even had it done so, the record does not demonstrate what additional evidence might have been saved.  Indeed, once Keurig notified Plaintiffs of the problems with the hard drives, TreeHouse ultimately chose to deploy extraordinary measures to recover documents from only two of the hard drives, for Stacy and Rathke.  (ECF No. 1340-31 at 2–3).

In sum, the Court finds that Plaintiffs' proffered circumstantial evidence is, at best, "inconclusive on the issue of [] spoliative intent." <u>Coan</u>, 602 B.R. at 440; <u>Bursztein v. Best Buy Stores, L.P.</u>, No. 20 Civ. 76 (AT) (KHP), 2021 WL 1961645, at *8 (S.D.N.Y. May 17, 2021) (finding that plaintiff had not met burden of showing intent by clear and convincing evidence where record was "unclear" whether defendants' conduct in losing relevant evidence "intentionally deprive[d]" plaintiff of evidence or was "simply the product of incompetence").  The Court is not convinced that Keurig acted "for the specific purpose of gaining an advantage in this litigation[.]" <u>Karsch</u>, 2019 WL 2708125, at *22.  Rather, Keurig's negligence in executing its preservation obligations falls in line with cases where courts have found similar degrees of negligence and incompetence but, like here, an absence of evidence to show an intent to deprive Plaintiffs of information for use in this litigation.  In <u>Fashion Exch. LLC v. Hybrid Promotions, LLC</u>, for example,

Add.106

the court found that plaintiff's "stunning" level "of negligence and/or incompetence" still was not "akin to an intent to deprive," even though plaintiff's "lackadaisical approach to its discovery obligations ha[d] certainly wasted" the parties' and the court's "time in attempting to ascertain what documents exist and could be produced."  2019 WL 6838672, at *5.  Similarly, in Leidig v. Buzzfeed, Inc., notwithstanding "plaintiffs' misleading and contradictory explanations for their failure to properly preserve evidence[,]" the court found "insufficient evidence that plaintiffs acted with an intent to deprive [defendant] of the" spoliated ESI.  2017 WL 6512353, at *11–12.  In Charlestown Capital Advisors LLC v. Acero Junction Inc., defendants made numerous "obfuscations and misdirections" about spoliated emails before disclosing the issue one month before the end of fact discovery, leading to four discovery extensions, but the court nevertheless did not find that defendants' "actions were taken 'for the specific purpose of gaining an advantage in this litigation,'" and declined to award sanctions under Rule 37(e)(2).  337 F.R.D. at 67 (quoting Karsch, 2019 WL 2708125, at *22).

Although Plaintiffs promote the inference that there was a pattern of spoliation as to the Degnan Email recipients and WalMart-related custodians (see ECF Nos. 1390 at 2–4; 1693-1 at 94, 120), the Court's custodian-by-custodian review reveals no pattern in the custodians whose hard drives were lost or inaccessible, or whose emails or notes were not preserved, nor any evidence that Keurig selectively failed to preserve any ESI.  See Man Zhang, 2019 WL 3936767, at *7 (finding defendants did not act with intent where, inter alia, "nothing in the record suggests that Defendants selectively destroyed evidence" and sufficient other evidence existed supporting plaintiffs' claims); Casale, 710 F. Supp. 2d at 366 (same).  For example, four of the six WalMart-

Add.107

related custodians that Plaintiffs highlight were not added as custodians until May 2019,[32] and Keurig's productions for each were substantial, including tens of thousands of documents pertaining to communications with WalMart. (See § IV.B.2.c, supra; ECF No. 1632 at 103 ¶ 192 (indicating that Keurig produced over 447,000 documents from Whoriskey's custodial files)). Plaintiffs chose not to depose Hurley (ECF No. 1632 at 59 ¶ 118), and the Court has determined that Plaintiffs were prejudiced only by the inability to access Mueller's hard drive. (See § IV.B.2.c.xiv, supra). Similarly, the Court has rejected Plaintiffs' argument that spoliation issues with the Degnan Email recipients supported an inference of Keurig's intent to deprive. (See § IV.B.2.d.iv, supra).

The cases in which courts have found clear and convincing evidence of intent to deprive, and on which Plaintiffs rely to support a finding of Keurig's intent, are distinguishable. (ECF Nos. 1286 at 30 & n.42; 1390 at 3–4 & n.4; 1693-1 at 107–08). In Ottoson v. SMBC Leasing & Finance, Inc., the plaintiff "produced no documents or emails concerning her communications with" affiants whose statements she submitted in support of her claims, destroyed evidence of a report that completely undermined her claims, and "admitted that she deleted emails during times when she had a duty preserve them" and that she did not make "any attempt to preserve" other key emails. 268 F. Supp. 3d at 581–83. As a result of the plaintiff's failure to take reasonable steps to preserve any email communications with her witnesses, the defendants were unable to inspect those communications and had no alternative source of "this critical evidence." Id. at 584. Keurig's productions were robust by contrast (see § IV.B.2.c, supra), and Plaintiffs had

---

[32] Tidwell, Hurley, Mueller, and Smits were added in May 2019, while DiFabio and Whoriskey were original Agreed Custodians. (See ECF No. 1287-1).

83

Add.108

numerous sources of information on which to question Keurig's witnesses during the depositions

Plaintiffs chose to take. Even Plaintiffs have not gone so far as to argue that Keurig made no

attempt to preserve discoverable information.[33]

In Sekisui American Corp. v. Hart (see ECF Nos. 1693-1 at 154–55; 1286 at 27), the court

found intent where plaintiff did not implement a litigation hold until 15 months after it notified

defendants of its intent to sue, did not notify its ESI vendor of the duty to preserve until three

months after plaintiffs filed its complaint, and instructed its ESI vendor to delete multiple email

boxes for key custodians. 945 F. Supp. 2d 494, 499–500, 506–08 (S.D.N.Y. 2013). The court

specifically found that the deletion of the "ESI was intentional: not only was potentially relevant

ESI destroyed at the behest of [plaintiff's] employee after the duty to preserve had attached but

such direction was given with at least the knowledge of [plaintiff's] then-President [], if not his

outright approval." Id. at 507. Given that plaintiff had "willfully and permanently destroyed the

ESI of at least two key players in this litigation[,]" the court found that an adverse inference

instruction was warranted. Id. at 508. There is simply no evidence that Keurig willfully and

intentionally deleted ESI on the level that arose in Sekisui. Likewise, Keurig did not exhibit the

"'aggressively willful'" violation of court orders regarding the production of ESI that they had

"mislaid" and then engaged in "a near-constant stream of factual misdirection that significantly

delayed – and nearly derailed – [defendant's] efforts to obtain highly probative ESI that plaintiffs

---

[33] Plaintiffs' reliance on cases from outside the Second Circuit to support their intent argument, (see, e.g., ECF Nos. 1693-1 at 107–09; 1390 at 4 & n.4), is unnecessary, given the substantial precedent in the Second Circuit for analysis of sanctions under Rules 37(b) and 37(e), and in some cases, is incorrect where the cases employ an analysis not deployed by courts in this Circuit. See, e.g., CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n, No. 14-CV-1191 (JLS) (KSC), 2019 WL 6527951, at *10 (S.D. Cal. Dec. 4, 2019) (following Ninth Circuit precedent permitting intent under Rule 37(e)(2) by preponderance of the evidence, not clear and convincing evidence).

were twice ordered to produce." Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC,

No. 16 Civ. 1318 (GBD) (BCM), 2019 WL 4727537, at *26–28, 32 (S.D.N.Y. Sept. 26, 2019) ("Joint

Stock Co. II").  (ECF No. 1286 at 30 n.42).

Accordingly, the Court finds that Plaintiffs have not met their burden of showing by clear

and convincing evidence that Keurig intended to deprive them of favorable evidence in this

litigation.

### e. Remedies

The Court has determined that Keurig failed to comply with Rule 37(b) and 37(e) by:

(i) failing to issue litigation holds to six custodians and failing to interview eleven custodians

(§ IV.B.2.b.i, supra); (ii) failing to preserve 25 hard drives (§ IV.B.2.b.ii, supra); and (iii) failing to

preserve Barberio's hard copy documents (§ IV.B.2.b.iii, supra).  The Court has also found that

Plaintiffs were prejudiced by Keurig's failure to preserve hard drives for Barberio, Ferreira, and

Mueller, and that TreeHouse was prejudiced by having to incur the costs of additional measures

to recover relevant documents from the damaged hard drives of Rathke and Stacy.  (§ IV.B.2.c,

supra).  The Court must now determine the appropriate sanctions under Rules 37(b) and 37(e).

Having determined that the record does not contain clear and convincing evidence that

Keurig acted "with the intent to deprive [Plaintiffs] of the information's use" in this action, the

more severe sanction of an adverse inference under Rule 37(e)(2) is not appropriate.  Fed. R. Civ.

P. 37(e)(2); see Europe, 2022 WL 832027, at *6 (finding that, where only one month of data was

missing, "the prejudice is not great" and therefore harsher sanctions under Rule 37(e)(2),

including adverse inference, were not warranted); Charlestown Cap. Advisors, 337 F.R.D. 47, 52

(finding that, despite failure to produce discoverable ESI, record did "not contain clear and

85

Add.110

convincing evidence that" defendants acted with intent to deprive and therefore declining to impose Rule 37(e)(2) sanctions); Lokai Holdings, 2018 WL 1512055, at *16 (declining to impose Rule 37(e)(2) sanctions where "evidence [of state of mind was] capable of more than one interpretation" and court would "not make a finding of intent to deprive on the basis of suspicion alone").  Instead, under Rule 37(e)(1), the sanctions must be "no greater than necessary to cure the prejudice" to Plaintiffs.  Fed. R. Civ. P. 37(e)(1); see Coan, 602 B.R. at 440 (after finding prejudice, considering "what measures are necessary to cure this prejudice").  The Court may, however, continue to consider the sanctions of preclusion and adverse inference for Keurig's violations of the ESI Order under Rule 37(b)(2)(A).  See Xiao Hong Zheng v. Perfect Team Corp., 739 F. App'x 658, 661 (2d Cir. 2018) ("Rule 37(b)(2)(A)(i) expressly permits adverse inference sanctions[.]"); Slovin, 2013 WL 840865, at *6 (noting that sanctions available under Rule 37(b)(2)(A) include "special jury instructions" and "preclusion").

### i.  **Attorneys' Fees and Costs**

Under Rule 37(b)(2)(C), a court "must" award expenses, including attorneys' fees, caused by a party's failure to comply with court orders "unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).  Rule 37(e)(1) authorizes a court to award attorneys' fees and costs to the moving party to the extent reasonably necessary to remediate any prejudice caused by the spoliation.  Fed. R. Civ. P. 37(e)(1); see Karsch, 2019 WL 2708125, at *26; Lokai Holdings, 2018 WL 1512055, at *9; CAT3, 164 F. Supp. 3d at 502.

The Court finds that an award of attorneys' fees and costs to Plaintiffs is warranted under both Rules 37(b)(2)(C) and 37(e)(1).  Keurig represented on May 7, 2018 that it had substantially

86

Add.111

completed its production for the Agreed Custodians.  (ECF No. 1284-9).  Keurig knew at the time, however, that it had been unable to access at least four hard drives for Agreed Custodians, and had engaged D4 to assist in extracting information from those hard drives.  (ECF No. 1284-17 at 2–3).  In the interim, Plaintiffs discerned deficiencies in Keurig's productions for eight custodians, and in July 2018, raised concerns with Keurig.  (ECF No. 1287-24).  Over the next several months, the parties met and conferred and Keurig made additional document productions, until, in May 2019, Keurig offered various remedial measures for the 25 hard drives that were lost or inaccessible.  (ECF No. 1284-45 at 2–3).  Plaintiffs incurred not only the expense of investigating the deficiencies but also of continued efforts to confirm the nature, scope, and volume of information that was not preserved.  Although the Court has determined that actual prejudice extended to only a handful of custodians, Plaintiffs did incur "expenses associated with prodding" Keurig into confirming which hard drives were lost or inaccessible, and with identifying where possible gaps in Keurig's production remained.  Karsch, 2019 WL 2708125, at *26; see Learning Care Grp., Inc. v. Armetta, 315 F.R.D. 439, 440-41 (D. Conn. 2016) (awarding attorneys' fees and costs where delayed notification of missing emails and destroyed laptop "hindered discovery").

The Court does not intend that every expense related to document discovery, or even every expense related to Keurig's violations of the ESI Order, be imposed on Keurig, because Rule 37(b)(2)(C) limits the award to "reasonable" expenses "caused by" Keurig's violations of court orders, and Rule 37(e)(1) requires tailoring to "ameliorate[] the economic prejudice imposed on" Plaintiffs.  CAT3, 164 F. Supp. 3d at 502.  While a precise determination of reimbursable attorneys' fees and expenses would follow Plaintiffs' submission of a fee application with supporting documentation, the Court contemplates that reasonable attorneys'

87

Add.112

fees and expenses for the following periods and categories would be permitted: (i) Plaintiffs'
efforts from May 7, 2018 to July 25, 2018 to determine deficiencies in Keurig's productions for
Agreed Custodians (see ECF Nos. 1284-9; 1287-24); (ii) preparing for and participating in meet-
and-confer communications and calls concerning Keurig's productions for the Agreed Custodians
between July 25, 2018 and May 20, 2019 (see ECF Nos. 1287-24; 1284-45); (iii) undertaking
additional measures with respect to the hard drives for Rathke and Stacy that TreeHouse selected
to send to its vendor (see ECF No. 1284-40); (iv) investigating discrepancies in Keurig's
CommVault productions (see ECF No. 1287-10); (v) investigating discrepancies in Keurig's
transactional data from February 7, 2019 until February 2020 (see ECF No. 769); (vi) Plaintiffs'
experts' costs while working with Keurig's deficient transactional data between February 7, 2019
and February 2020 (see ECF Nos. 769; 769-2; 839); and (vii) preparing the Motion and presenting
oral argument.  Reimbursable expenses under this instruction would not include expenses Keurig
has already paid or been ordered to pay.  (See, e.g., ECF Nos. 1284-23 at 2; 1284-24 at 4).

The Court expects the parties to meet and confer to reach agreement on Plaintiffs'
expenses that fall within these instructions. If they are unable to reach an agreement, Plaintiffs
may make an application to the Court for the calculation of reasonable attorneys' fees and costs.
See Karsch, 2019 WL 2708125, at *26, 28 (instructing parties on categories of reimbursable
expenses under Rules 37(b)(2)(C) and 37(e)(1) and permitting subsequent application
accompanied by supporting documentation).

### ii.  **Presentation of Evidence**

As an additional sanction, Plaintiffs will be permitted to present evidence to the jury
concerning Barberio's hard copy documents that were not preserved, and the gaps left by the

Add.113

failure to preserve hard drives for Barberio, Ferreira, and Mueller, and the jury will be permitted to consider that evidence, along with the other evidence in the case, in evaluating Plaintiffs' claims and Keurig's defenses in their deliberations.  See Europe, 2022 WL 832027, at *7 (as remedy for Rule 37(e)(1) violation, permitting plaintiff to "present evidence to the jury" about lost data).  "Such a sanction (as distinguished from a mandatory or permissive adverse inference instruction) is permitted under Rule 37(e)(1) without any predicate finding of intent to deprive." Karsch, 2019 WL 2708125, at *27 (citing Fed. R. Civ. P. 37(e)(1) adv. comm. n. to 2015 amend.); see Leidig, 2017 WL 6512353, at *14 (permitting party to "present evidence to the jury" that the opposing party lost ESI that should have been preserved).

The Court finds that this remedy is appropriate for three reasons.  First, this sanction recognizes that, apart from the expenses Plaintiffs incurred in following up on gaps in Keurig's production and bringing their Motion, Plaintiffs suffered prejudice from the loss of evidence that should have been preserved.  This sanction will thus "help 'rectify the evidentiary imbalance'" that Keurig created "by spoliating relevant ESI" as well as Barberio's hard copy documents. Karsch, 2019 WL 2708125, at *27 (quoting Linde v. Arab Bank, PLC, 706 F.3d 92, 102 (2d Cir. 2013)).  Second, this sanction "provides the jury, as finder of fact, with context for that evidentiary imbalance, which is itself relevant evidence going to the parties' credibility and other factual issues."  Id.  Third, this sanction does not encroach on Judge Broderick's authority to determine the scope of any spoliation evidence to be presented at trial and "to craft any related jury instructions on a full evidentiary record."  Id.; see Europe, 2022 WL 832027, at *7–8 (declining to order specific jury instruction for Rule 37(e)(1) violation because the "trial judge will

89

Add.114

be in the best position to instruct the parties on the introduction of evidence and arguments that can be made and then determine the precise language of any necessary jury instruction").

Accordingly, Plaintiffs may present evidence on Keurig's failure to preserve Barberio's hard copy documents and hard drives for Barberio, Ferreira, and Mueller, and may request that Judge Broderick deliver a jury instruction informing the jury "that it may consider that evidence, along with all the other evidence in the case, in making its decision."  Fed. R. Civ. P. 37(e) adv. comm. n. to 2015 amend.; see Lokai Holdings, 2018 WL 1512055, at *17 (granting, under Rule 37(e)(1), moving party permission to seek spoliation jury instruction in form to be approved by district judge).

### iii.    Other Sanctions

The Court finds that Plaintiffs' other requested sanctions of preclusion of evidence or adverse inferences "are not commensurate with" Keurig's conduct.  Syntel Sterling, 328 F.R.D. at 128.  First, contrary to Plaintiffs' broad assertions, the Court's examination has shown that the prejudice to Plaintiffs is limited to the loss of hard copy documents for one custodian (Barberio), and the loss of ESI as to three custodians (Barberio, Ferreira, and Mueller).  (See §§ IV.B.2.b–c, supra).  Plaintiffs' financial prejudice with respect to Rathke's and Stacy's hard drives will be ameliorated by the Court's award of costs.  (See § IV.B.2.e.i, supra).  This narrow range of prejudice "weigh[s] against imposing the harsh sanctions that [Plaintiffs] seek."  Syntel Sterling, 328 F.R.D. at 123.

Second and similarly, the preclusion and adverse inferences that Plaintiffs seek are not "congruous with the misconduct at issue."  Syntel Sterling, 328 F.R.D. at 123.  (ECF Nos. 1286 at 29–30; 1693-1 at 115).  The Court has not failed to observe that Plaintiffs ably completed fact

Add.115

and expert discovery, and have submitted summary judgment papers supported by voluminous exhibits, undermining any inference that Keurig's discovery conduct prevented them from gathering sufficient evidence to support their claims.  (See ECF Nos. 1497; 1565; 1656).  To award the preclusions and adverse inferences that Plaintiffs seek would run afoul of "the well-settled preference in this Circuit for courts to resolve litigation disputes on their merits rather than through discovery sanctions."  Syntel Sterling, 328 F.R.D. at 123; see Black, 2006 WL 3771097 at *7.  Accordingly, the Court denies Plaintiffs' request for preclusion and adverse inference instructions.

### C.  Keurig's Motion as to TreeHouse

Keurig claims that TreeHouse failed to implement litigation holds on a timely basis, resulting in the spoliation of five categories of discoverable evidence: (i) documents related to Project Charter and communications with TreeHouse's customers about the launch of the 2.0 Brewer; (ii) Adam Spratlin's documents; (iii) information from TreeHouse's Ahold and Kroger sales teams; (iv) documents for Judy Clark and Away From Home ("AFH") sales; and (v) Craig Lemieux's documents.  (ECF Nos. 1290 at 6–25; 1699-4 at 3).  A review of the timeline regarding the launch of the Keurig 2.0 Brewer leading up to this litigation is therefore necessary to analyze Keurig's Motion.

#### 1.  Factual Background

On September 10, 2013, during an "Investor Day" call, Keurig announced the release of the 2.0 Brewer, but acknowledged that it had not yet determined or disclosed whether unlicensed K-Cups would function in the new machine.  (ECF Nos. 1632 at 118–19 ¶ 1; 1342-5 at

Add.116

22).  In mid-October 2013, Keurig was continuing to consider "several options on how to program the 2.0 brewers."  (ECF Nos. 1342-6 at 3; 1342-7 at 2).

On October 24, 2013, TreeHouse's Chairman, Sam Reed, sent a letter to the TreeHouse board reviewing results for the third quarter of 2013, projecting results for 2014, and discussing strategic challenges to TreeHouse's products, including the "strategic risk" posed by Keurig's introduction of the 2.0 Brewer.  (ECF No. 1298-1 at 15 (the "Reed Letter"); see id. at 12–13).  Reed described that TreeHouse had undertaken a "comprehensive defense agenda" executed by external and in-house counsel working with its single-serve beverage ("SSB") team, and led by a consultant, Bill Ford (the "Steering Group"), which "kicked off" on October 21, 2013.  (Id. at 15; 1298-3 at 24–25).  TreeHouse initially asserted the attorney-client privilege and work product protection over the Reed Letter, (ECF No. 1298-2 at 2), but later produced it, subject to the Rule 502(d) Order, and has since withdrawn the assertion of work product over the Reed Letter. (ECF Nos. 1338 at 14 n.8; 1388-1 at 2; 1699-1 at 260-61; 1699-2 at 12; see ECF No. 571).

On October 29, 2013, Keurig's CEO, Brian Kelley, was quoted in a USA Today article as saying that "we're still deciding on exactly how we will handle the unlicensed pod."  (ECF Nos. 1632 at 119 ¶ 2; 1298-3 at 5).

On November 15, 2013, the Steering Group, which also included TreeHouse's General Counsel, Tom O'Neill, and one of its external counsel, Jo Osborn, met to discuss a "Defense Approach" in response to the "Potential Threat from" Keurig, the first prong of which was "Legal Action."  (ECF Nos. 1298-3 at 9, 23; 1298-4 at 3; 1632 at 120 ¶ 3; 1699-2 at 16; 1693-2 at 31). One of the Steering Group members who attended the November 15, 2013 meeting, David Vermylen, testified that, at that time, TreeHouse was consulting with outside counsel about a

92

Add.117

potential legal action against Keurig.  (ECF No. 1284-4 at 4).  On December 3, 2013, H+K Strategies sent a memorandum to O'Neill detailing possible strategies in response to Keurig's launch of the 2.0 Brewer, and offered to "[p]rovide litigation support to [TreeHouse] if a suit [were] filed against" Keurig.  (ECF No. 1298-5 at 3).

In a December 19, 2013 email, Adam Spratlin, TreeHouse's Director of Engineering, discussed with an employee of R.A. Jones, which supplied TreeHouse with machines for making unfiltered products, that R.A. Jones' non-compete agreement with Keurig precluded it from providing TreeHouse a quote for packaging supplies.  (ECF No. 1298-6 at 3 (the "Spratlin Email")).  After the Spratlin Email circulated internally within TreeHouse over the next few weeks, on January 28, 2014, O'Neill forwarded the Spratlin Email to Winston & Strawn LLP, whom TreeHouse had recently engaged to represent it in potential litigation against Keurig.  (ECF Nos. 1298-6 at 2; 1699-4 at 15–16; see 1693-2 at 49 (reflecting that the "[f]irst privilege log entry for Winston & Strawn lawyers is January 20, 2014")).  The same day, Winston & Strawn requested "[f]actual [f]ollow [u]p" from TreeHouse for use in drafting TreeHouse's complaint.  (ECF Nos.  1298-9 at 2–3; 1342 ¶ 2).  In its Complaint, TreeHouse cited the Spratlin Email in support of the allegation that it was unable to secure machines from R.A. Jones in 2013 or thereafter find another supplier "willing to sell it machinery used to make non-filtered Compatible Cups." (TreeHouse Complaint, ¶¶ 179–85).

By mid-January 2014, TreeHouse had discussed the Keurig 2.0 Brewer with at least four of its customers.  (ECF No. 1298-14 at 9–10).  At least one of these customers decided to "stay the course," i.e., not to upgrade its products to the Keurig 2.0 Brewer.  (ECF Nos. 1298-15 at 2; 1298-14 at 10).  The Steering Group continued its efforts throughout January 2014 as well.  (ECF

Add.118

No. 1298-14 at 17 ("Update for 01/09/14"); id. at 4 ("Update for 01/13/14"); id. at 5 (showing meetings in January 2014)).  The slides for the January 9, 2014 meeting show that Project Charter's "legal" and "PR" tasks were "[o]n standby."  (ECF No. 1298-14 at 17).

TreeHouse "sent its first round of litigation hold notices to employees on February 4, 2014."  (ECF No. 1632 at 120 ¶ 4; see ECF Nos. 1298-18; 1342 ¶ 3).  This first round of employees included Harry Overly, Chief Customer Officer (ECF No. 1342-1 at 3), Craig Lemieux, President of the Beverages Division (ECF No. 1342-2 at 3), Martin Reynolds, head of marketing for single-serve beverages (ECF No. 1342-3 at 3), and Tom Jarona, Director of Procurement (ECF No. 1347-4 at 3).  (See ECF No. 1298-18).  Spratlin, however, did not receive a litigation hold notice until January 25, 2017.  (ECF No. 1298-18 at 3).

On February 5, 2014, Keurig's CEO Brian Kelley stated in an earnings call that the Keurig 2.0 Brewer would use "proprietary interactive capabilities so that the brewer can identify the inserted Keurig pack . . . ."  (ECF Nos. 1632 at 120 ¶ 5; 1347-8 at 6).

By the time its Board of Directors met on February 5 and 6, 2014, TreeHouse had spoken with at least six of its customers about the impact of the Keurig 2.0 Brewer.  (ECF No. 1298-13 at 7).  During this meeting, the Board continued "to consider alternatives to litigation[.]"  (ECF No. 1342 ¶ 4).  TreeHouse's production includes contemporaneous notes from two of the six customer meetings.  (ECF No. 1298-15 at 2–3).

In early February 2014, TreeHouse contacted suppliers to inquire about contractual restrictions against "selling any materials to anyone for Keurig type products."  (ECF No. 1298-11 at 2; see ECF No. 1298-10 at 2).  For example, TreeHouse's Director of Procurement, Tom Jarona, contacted a representative of Boyd Technologies on February 6, 2014 seeking specifications for

94

Add.119

a project involving "coffee filter paper alternative[,]" saying that "[t]ime [was] of the essence[.]" (ECF No. 1298-12 at 2–4). Jarona ultimately did not provide Boyd with the information it requested to respond to TreeHouse's request. (Id.)

On February 11, 2014, TreeHouse filed its Complaint. (TreeHouse Complaint). As noted above, on July 1, 2014, the Court entered the ESI Order. (ECF No. 41). On December 2, 2014, TreeHouse filed an amended complaint, (TreeHouse Amended Complaint), and on February 2, 2015, Keurig moved to dismiss, during the pendency of which discovery was stayed. (ECF Nos. 223; 329). After Judge Broderick denied Keurig's motion to dismiss on November 29, 2017, discovery commenced, and by December 15, 2017, the parties exchanged initial disclosures and lists of proposed custodians. (ECF Nos. 379; 1347-9; 1347-10; 1347-11).

While Keurig's motion to dismiss was pending, TreeHouse's counsel "continued to investigate sources of relevant information . . . and supervised the issuance of additional holds to other employees as soon as it was notified of an employee's relevance or discovered that an employee rotated into a relevant role." (ECF No. 1342 ¶ 6). TreeHouse sent additional litigation hold notices as follows:

- Judy Clark received a litigation hold on March 1, 2016 after she rotated into the role of Senior Vice President of Food/Away From Home Sales & Marketing, and was added as a custodian on December 15, 2017. (ECF Nos. 1298-18 at 2; 1347-12 at 4; 1632 at 149 ¶ 1).

- Gretchen Crawford, Director of Sales, received a litigation hold on January 25, 2017, and was added as a custodian on December 15, 2017. (ECF Nos. 1298-18 at 2; 1347-12 at 4).

- Adam Spratlin, Director of Engineering, received a litigation hold on January 25, 2017, and was added as a custodian on December 15, 2017. (ECF Nos. 1298-18 at 3; 1347-12 at 4).

95

Add.120

- Bobby Moorhead, part of the primary sales team for Ahold, received a litigation hold on March 20, 2017, and was added as a custodian in October 2018. (ECF Nos. 1298-26 at 2; 1347-13; 1632 at 152 ¶ 7).

TreeHouse states that it has produced nearly two million documents from 35 custodians and central databases. (ECF No. 1338 at 10).

### 2. Analysis

#### a. Duty to Preserve

Keurig argues that TreeHouse's duty to preserve arose in the Fall of 2013, "when it began preparing to file this lawsuit." (ECF No. 1290 at 6; see ECF No. 1699-4 at 6–9). As proof that TreeHouse contemplated litigation in the Fall of 2013, Keurig points to TreeHouse's assertion that the October 30, 2013 Reed Letter was subject to the work product protection, discussion of legal action at the November 15, 2013 Project Charter Meeting, consideration of potential class plaintiffs in December 2013, the December 19, 2013 Spratlin Email, and engagement of Winston & Strawn in early January 2014. (ECF Nos. 1290 at 6–8; 1699-4 at 6–17).

TreeHouse counters that its duty to preserve began "no earlier than February 5, 2014, when its Board began considering the possibility of litigation against Keurig (among other alternatives)." (ECF No. 1338 at 13). TreeHouse asserts that the Reed Letter "relates to defensive reverse engineering issues, not offensive litigation[.]" (Id. at 13–14 (quoting ECF No. 1298-1)). TreeHouse maintains that the litigation it anticipated in late 2013 and early January 2014 was an intellectual property infringement action by Keurig, given the precedent of the Sturm Litigation. (ECF No. 1693-2 at 28; see ECF No. 1298-1 at 12 (Reed referring to TreeHouse "hav[ing] prevailed against GMCR's various legal actions" in the past)). TreeHouse also states that the October 30, 2013 privilege log entry referring to the "Foley & Lardner" litigation does not refer to this action,

96

Add.121

in which TreeHouse is represented by Winston & Strawn, but rather a defense against possible intellectual property or false advertising litigation Keurig might initiate. (ECF Nos. 1298-2; 1693-2 at 29; 1699-1 at 260).

The Second Circuit has rejected the suggestion that simply being on notice of potential injury that might give rise to litigation triggers a duty to preserve. See Fujitsu Ltd. v. Fed. Expr. Corp., 247 F.3d 423, 436 (2d Cir. 2001) (affirming denial of spoliation sanctions where, after plaintiff informed defendant of damage to its container of silicon wafers, defendant "destroyed the container and wafers"). In the case of alleged spoliation by a plaintiff, the preservation obligation is deemed to arise on the date the plaintiff sent a demand letter or notice of claim, or filed the complaint. See Tomassini v. FCA US LLC, No. 3:14-CV-1226 (MAD/ML), 2020 WL 1938834, at *3 (N.D.N.Y. Apr. 22, 2020) (holding that "[c]ertainly, following the filing of his complaint, Plaintiff [] had a duty to preserve all evidence relevant to the litigation," including evidence he had previously removed from subject vehicle); Karsch, 2019 WL 2708125, at *18 (finding that plaintiff's duty to preserve arose on the date he sent "demand letter . . . threatening legal action"); Ottoson, 268 F. Supp. 3d at 581 (finding plaintiff had "an obligation to preserve [evidence] from . . . the date that her counsel sent a demand letter to Defendants threatening litigation and requesting Plaintiff's personnel file"). The preservation trigger in each of these cases was the date a plaintiff "decided" to sue the defendant. Best Payphones, 2016 WL 792396, at *4 (holding that plaintiff's obligation to preserve arose on date it filed its first litigation against same defendants).

In the cases Keurig cites, the courts recognized that a party's obligation to preserve relevant documents arose when litigation was filed or, at least, ostensibly threatened. (ECF

Add.122

Nos. 1290 at 6; 1384 at 5).  In Passlogix Inc. v. 2FA Technology, LLC, the court found that the defendant's duty to preserve arose on the date the plaintiff filed its complaint, such that the defendant's deletion of relevant emails six months later was a breach of that duty.  708 F. Supp. 2d 378, 413 (S.D.N.Y. 2010).  In Mastr Adjustable Rate Mortgage Trust 2006-OA2 v. UBS Real Estate Securities Inc., the court similarly held that the filing of related litigation put the plaintiff on notice of the "creditable probability of litigation."  295 F.R.D. 77, 84 (S.D.N.Y. 2013).  One court set the trigger even later, when the pending litigation was transferred to this District, where the requirements under Zubulake IV and Zubulake V were clearly established.  Pension Comm., 685 F. Supp. 2d at 476.  And in Capricorn Management Systems, Inc. v. Government Employees Insurance Co., the court based its conclusion that the plaintiff's duty to preserve arose six months before it filed the complaint on specific testimony and email correspondence with counsel showing that the plaintiff had in fact decided to file a lawsuit against the defendant six months before it filed the complaint.  No. 15-CV-2926 (DRH) (SIL), 2019 WL 5694256, at *9 (E.D.N.Y. July 22, 2019).

Here, Keurig has not provided evidence that TreeHouse decided to sue Keurig any earlier than the very end of January or early February 2014, when TreeHouse engaged Winston & Strawn, who then began drafting the Complaint.  Therefore, the Court finds that TreeHouse's distribution of litigation hold notices starting on February 4, 2014, a week before it filed the Complaint, reasonably complied with its obligations under precedent in the Second Circuit and this District.

Add.123

b. **Reasonableness of Steps Taken and Alternative Sources**

The Court's analysis turns to the reasonableness of the steps TreeHouse took to preserve evidence. TreeHouse has summarized the steps it took to preserve ESI as follows:

- TreeHouse issued litigation hold notices to 99 employees, including to 21 employees on February 4, 2014, before the original Complaint was filed. (ECF Nos. 1632 at 138–48; 1693-2 at 7).

- TreeHouse's document retention policy required employees to save materials "they believed to be relevant to potential litigation" regardless of whether they had received a litigation hold notice. (ECF Nos. 1338 at 10; 1342-8 at 2; 1342-9 at 2; 1342-10 at 153).

- TreeHouse had implemented the Enterprise Vault system in September 2013 to archive all employees' emails. (ECF Nos. 1342-10 at 154–55; 1342-9 at 6). Since at least April 2014, TreeHouse has used the "litigation hold" feature of Microsoft Exchange. (ECF No. 1342-9 at 4).

- TreeHouse's email and file servers were not enabled to perform automatic deletions since 2009, when it entered the single-serve business. (ECF Nos. 1298-18 at 3; 1693-2 at 88).

- TreeHouse "conducted an early round of hard drive collections," although when this occurred is not in the record. (ECF No. 1342 ¶ 5; see ECF No. 1699-1 at 264-65).

TreeHouse argues that, other than Lemieux, none of the six custodians that are the subject of Keurig's Motion were "key players, and, in any event, Keurig has failed to show spoliation of any of their documents." (ECF No. 1338 at 16). The Court examines TreeHouse's efforts as to each of these custodians.[34]

---

[34] The Court notes that Keurig has attempted to show TreeHouse's spoliation through several graphs purporting to indicate that the volume of emails produced from custodians' files increased after they were placed under litigation holds. (ECF Nos. 1290 at 14–21; 1699-1 at 225–32, 242–43). TreeHouse rejects these "document counting" graphs. (ECF Nos. 1693-2 at 71; 1699-2 at 33–34). As noted previously (see n.24), the Court observes that, throughout the Motions, the parties have disputed each other's document counting methods, and as with many other aspects of this litigation, refuse to cede an inch to the other's position. In any event, Keurig has not adequately explained its methodology for comparing custodians'

### i.  **Bobby Moorhead**

Bobby Moorhead has worked at TreeHouse since 1995, as a Director of Sales/Team Leader for Private Brands.  (ECF No. 1632 at 152 ¶ 7).  He supervised Gretchen Crawford, TreeHouse's sales team lead for customers such as Ahold.  (ECF Nos. 1298-28 at 3; 1699-1 at 236).  Moorhead received a litigation hold notice on March 20, 2017.  (ECF Nos. 1632 at 152 ¶ 7; 1298-26 at 2).  He was not designated as a custodian until October 2018.  (ECF Nos. 1298-26 at 2; 1347-13 at 2; 1693-2 at 58).

Keurig contends that TreeHouse "produced very few emails from him," noting that TreeHouse's production included 790 emails from Moorhead's files but 8,643 emails he sent or received in other custodians' files.  (ECF No. 1290 at 15–16).

TreeHouse responds that Moorhead, like other TreeHouse employees, was subject to the automatic email archiving process in Enterprise Vault since September 2013.  (ECF Nos. 1693-2 at 54; 1342-10 at 154–55).  TreeHouse also contends that Harry Overly was in fact "the key customer contact for TreeHouse's single-serve business[,]" and "Moorhead would have been in contact with" him and Bob Baker, to whom Moorhead reported.  (ECF No. 1338 at 17; 1347-24 at 3).  Overly and Baker were issued litigation holds on February 4, 2014, and Keurig deposed them both, but did not depose Moorhead.  (ECF Nos. 1298-18; 1342-1; 1342-13).  TreeHouse notes that it produced over 61,000 documents from 2014 to 2017 on which Moorhead is a custodian.  (ECF No. 1338 at 22; 1298-44 at 4 n.3).  Finally, TreeHouse points out that, despite

---

email volume before and after litigation holds, offered any expert testimony supporting its methodology, or pointed to any judicial precedent supporting the use of such a comparison to analyze spoliation.  Cf. CAT3, 164 F. Supp. 3d at 494–95 (discussing forensic expert's analysis of deleted emails).  (See ECF Nos. 1699-1 at 225–32, 242–43; 1699-2 at 87).  Accordingly, the Court has not considered Keurig's email volume comparison graphs in determining whether TreeHouse's preservation efforts were reasonable.

Keurig's association of Moorhead with Ahold, Keurig has not identified any Ahold meetings for which notes were not produced and, in any event, Ahold was not part of the Steering Group's retailer meeting plan.  (ECF Nos. 1693-2 at 69 (citing ECF No. 1298-3 at 14)).

The Court finds that the steps TreeHouse took with respect to Moorhead were reasonable.  First, his emails were automatically archived through Enterprise Vault.  Second, while the parties dispute the number of documents produced for Moorhead, it is clearly more than 10,000.  (ECF Nos. 1632 at 152 ¶ 8; 1699-4 at 35).  Third, Baker and Overly, Moorhead's supervisors, were included in the first round of litigation hold notices on February 4, 2014.  Fourth, Keurig chose not to depose Moorhead, and has not demonstrated that TreeHouse failed to preserve any of his discoverable ESI.

### ii.    Tom Rothers

Tom Rothers worked at TreeHouse from July 1992 through his retirement in October 2014, and was Director of Retail Sales.  (ECF Nos. 1632 at 152 ¶ 9; 1347-13 at 2).  Keurig contends that Rothers was responsible for TreeHouse's sales to Kroger.  (ECF No. 1699-1 at 236).  Rothers did not receive a litigation hold notice.  (ECF No. 1632 at 152 ¶ 9).  Rothers was added as a custodian by October 2018.  (ECF Nos. 1632 at 159 ¶ 12; 1347-13 at 2).

TreeHouse responds that "Rothers retired in 2014 and, as such, his responsibilities were winding down when the case was filed."  (ECF No. 1338 at 17).  On November 1, 2019, TreeHouse informed Keurig that it did not "have a copy of his work-issued computer" and, despite several efforts to reach him, had "no additional information concerning [his] document storage practices while at TreeHouse."  (ECF No. 1298-33 at 2; see ECF No. 1342-30 at 6).  After searching his email and documents from his share drive, TreeHouse produced over 25,000 documents on which

Add.126

Rothers was a primary or duplicate custodian. (ECF Nos. 1632 at 152–53 ¶ 10; 1342-30 at 5–6; 1298-33 at 8–9). As alternative custodians, TreeHouse points to Harry Overly, who spoke with Kroger's "entire private-brand team" about the Keurig 2.0 Brewer (ECF No. 1342-1 at 11), and Bob Baker, Vice President of Retail Sales and later Grocery & Dollar Sales, who also supervised Rothers, received a litigation hold notice on February 4, 2014, and was deposed by Keurig. (ECF Nos. 1338 at 17; 1298-18 at 2; 1342-13; 1342-30 at 4–5; 1632 at 164 ¶ 21; ECF No. 1699-1 at 262). TreeHouse notes that Keurig did not request Rothers as a custodian until August 2018, and ultimately did not depose him. (ECF Nos. 1342-61 at 4; 1338 at 23). Keurig responds that Overly testified that he had conversations with Kroger, but not "primary responsibility." (ECF No. 1384 at 7; 1342-1 at 11). TreeHouse also notes that Keurig deposed a key Kroger executive. (ECF No. 1347-60).

The Court finds that TreeHouse's preservation efforts for Rothers were reasonable. First, like the other custodians, Rothers' emails were archived through Enterprise Vault. Second, the record reflects that TreeHouse made multiple attempts to contact Rothers about his documents, albeit without success. Third, TreeHouse produced tens of thousands of documents for Rothers, as well as documents from suitable alternative custodians. Finally, Keurig deposed Kroger's representative and thus had the opportunity to hear directly from Kroger about its relationship with TreeHouse, while choosing not to depose Rothers.

### iii.    Gretchen Crawford

Gretchen Crawford has worked for TreeHouse from June 2006 to the present, in several roles including as Supply Chain Manager for WalMart, Senior Manager for Customer Supply Chain for WalMart and Target, Business Development Manager – East Coast, and Director of Retail

Add.127

Sales.  (ECF Nos. 1632 at 150 ¶ 3; 1298-28 at 4).  Crawford testified that, while she was a Business Development Manager, Ahold was also one of the accounts she handled.  (ECF No. 1298-28 at 4).  Moorhead was Crawford's supervisor.  (ECF Nos. 1298-28 at 3; 1699-1 at 236).  Crawford received a litigation hold notice on January 25, 2017.  (ECF Nos. 1298-18 at 2; 1632 at 139).

Crawford also testified that her computer was imaged, and that she maintained no hard copy files, transposed any handwritten notes into emails, and complied with the litigation hold notice.  (ECF No. 1347-24 at 4–5).  TreeHouse points to its production of over 82,000 documents on which Crawford was a custodian, as well as over 1,454 documents to or from Ahold.  (ECF No. 1338 at 22; 1298-44 at 8).  In addition, TreeHouse points to Overly, Baker, Kelly, and Lemieux as custodians who also had responsibilities relating to Ahold, were issued litigation hold notices on February 4, 2014, and, like Crawford, were deposed by Keurig.  (ECF No. 1338 at 18).

The Court finds that TreeHouse's preservation efforts for Crawford were reasonable.  First, Crawford was also subject to the Enterprise Vault archiving process.  Second, although Keurig deposed Crawford, it has not pointed to any testimony that she kept notes that were not preserved; to the contrary, she transposed any notes to emails, and TreeHouse produced her emails "dating back to her initial contact with Ahold."  (ECF No. 1298-44 at 8).  Third, Ahold was not included in the Retailer Meeting Plan the SSB was undertaking in the Fall of 2013 and early 2014, mitigating any suggestion that TreeHouse failed to preserve notes of such a non-existent meeting.  Finally, TreeHouse sent litigation hold notices to other Ahold salespeople on February 4, 2014, and produced their documents as well.

Add.128

### iv.    <u>Judy Clark</u>

Judy Clark worked at TreeHouse from September 2007 through December 2018, and her roles included Senior Director – Business Architecture, Vice President – Supply Chain Planning, SAP Implementation Leader, Senior Vice President – Logistics and Consumer Solutions, Senior Vice President and General Manager – AFH Sales and Marketing, and Senior Vice President of Sales, AFH, Canada, Condiments, and Meals.  (ECF No. 1632 at 149 ¶ 1).  During part of her tenure, she oversaw single-serve beverages, but no longer did so by the time TreeHouse filed its Complaint.  (ECF Nos. 1388-4 at 8; 1342-30 at 4; 1632 at 164 ¶ 22).  Clark received a litigation hold notice on March 1, 2016, after Clark took on a new role in the AFH business, and was not named as a custodian until December 2017.  (ECF Nos. 1298-18 at 2; 1347-12 at 4; 1632 at 149 ¶ 1).

TreeHouse's productions included over 116,000 documents on which Clark was a custodian, including from her hard drive.  (ECF Nos. 1632 at 149 ¶ 2; 1693-2 at 60).  Keurig used as exhibits during Clark's deposition several documents from her files to press the point that TreeHouse's failure to win AFH business was for reasons other than Keurig's conduct.  (ECF Nos. 1342-38; 1342-39; 1342-40; 1342-41; <u>see</u> ECF No. 1338 at 29 n.26).  Keurig did not, however, ask Clark any questions about other documents she might have had.  TreeHouse also noted that it produced almost 30,000 documents that refer to Office Coffee, Office Coffee Services, or OCS (the term for AFH cup sales).  (ECF Nos. 1342 ¶ 8; 1632 at 149 ¶ 2).  TreeHouse points to Gary Schachter, Robin Borchelt, Harry Overly, and Bill Ritcey as alternative custodians—all of whom Keurig deposed—who were involved in the AFH division, which included "lots of products that had nothing to do with single-serve beverages."  (ECF Nos. 1338 at 18, 28–29; 1632 at 149 ¶ 2).

Add.129

TreeHouse also produced nearly 27,000 documents relating to customers whose AFH business it alleges was lost to Keurig.  (ECF No. 1342 ¶ 9).  Although TreeHouse identified several brokers and seven other TreeHouse employees involved in the sale of portion packs in the AFH and OCS markets, Keurig did not depose any of them.  (ECF No. 1342-37 at 17–18).  Keurig also deposed TreeHouse's Rule 30(b)(6) designee on the AFH market.  (ECF No. 1342-10).

The Court finds that TreeHouse's preservation efforts as to Clark were reasonable.  First, as with the other custodians, Clark was subject to the Enterprise Vault archive as of September 2013.  (ECF No. 1342-10 at 154–55).  Second, notwithstanding the parties' disagreement on the exact volume of Clark's documents, TreeHouse produced an amount in the high tens of thousands, if not more than 100,000.  Third, TreeHouse produced documents pertaining to the AFH business from at least four other custodians whom Keurig deposed, in addition to an AFH Rule 30(b)(6) witness.  Finally, Keurig did not elicit from Clark any documents that she had that were not preserved or that documents arising from her role in the single-serve business before March 1, 2016 (when she received the litigation hold notice) were not preserved and produced.

### v.    **Adam Spratlin**

Adam Spratlin has worked for TreeHouse from January 2012 to the present, as Director of Engineering and Senior Director of Engineering.  (ECF No. 1632 at 153 ¶ 11).  Spratlin had "primary responsibility for procuring filling machinery throughout the relevant period, including identifying suppliers, obtaining quotes, and negotiating prices."  (ECF No. 1290 at 12; see ECF No. 1298-7 at 11–12).  Spratlin was on the "R&D / Engineering" team for Project Charter.  (ECF No. 1298-3 at 24).  As discussed above (§ see IV.C.1, supra), TreeHouse cited the Spratlin Email in support of the allegation that it was unable to secure machines from R.A. Jones in 2013 or

Add.130

thereafter find another supplier "willing to sell machinery to make non-filtered Compatible Cups." (TreeHouse Complaint, ¶¶ 179–85). Spratlin received a litigation hold notice on January 25, 2017, and was designated as a custodian on December 15, 2017. (ECF Nos. 1298-18 at 3; 1632 at 153 ¶ 11; 1347-12 at 5). Treehouse collected his hard drive on February 23, 2017. (ECF No. 1693-2 at 96). During his deposition, Spratlin testified that his practice had been to save incoming emails in project folders, and to periodically delete his sent email box. (ECF No. 1298-7 at 3–4). Keurig contends that Spratlin's missing documents would likely have shown that "TreeHouse was satisfied with its relationships with its input suppliers." (ECF No. 1290 at 25; see ECF No. 1699-1 at 224).

On April 14, 2020, after Spratlin's deposition, TreeHouse discovered that, due to a "technical issue," it had not properly processed and reviewed Spratlin's emails, and subsequently made a supplemental production of 1,600 additional documents, including copies of the Spratlin Email. (ECF No. 1298-24 at 2, 5; see ECF No. 1290 at 13 n.30; 1632 at 155–56 ¶¶ 4–6). TreeHouse contends that, despite the technical issue, it produced at least ten versions of the Spratlin Email from multiple custodians, including employees who "were managing and more regularly involved in TreeHouse's procurement activities than [] Spratlin." (ECF No. 1338 at 19 & n.10, 25; 1632 at 154 ¶ 12; see ECF Nos. 1342-14; 1342-15; 1342-16; 1342-17; 1342-18; 1342-19; 1342-20; 1342-21; 1342-22; 1342-23; 1342-24 at 4–5; 1347-4 at 3–6). TreeHouse produced over 67,000 documents on which Spratlin is a primary or duplicate custodian. (ECF No. 1338 at 25; 1693-2 at 53; 1632 at 154 ¶ 12). In addition to Spratlin, Keurig deposed Reed, Jarona, Overly, Reynolds, Lemieux, and Peskie, all of whom worked on TreeHouse's roll-out of its single-serve cups. (ECF Nos. 1338 at 28; 1342-24; 1347-4; 1342-1; 1342-2; 1342-3; 1342-4; 1342-50).

Add.131

The Court concludes that TreeHouse should have sent Spratlin a litigation hold notice in February 2014. TreeHouse relied on the Spratlin Email for a key allegation in its Complaint, and Spratlin's participation in Project Charter should have put TreeHouse on notice that he was a key custodian whose ESI needed to be preserved as of February 2014. See Charlestown Cap. Advisors, 337 F.R.D. at 61–62 (finding defendants' failure to take reasonable steps to preserve relevant ESI by failing to provide litigation hold memo to key custodian).

The Court finds, however, that other steps TreeHouse took were reasonable and mitigated the potential loss of any of Spratlin's ESI. First, as of September 2013, through Enterprise Vault, Spratlin's emails were archived, such that any sent emails he deleted were preserved, reviewed, and produced. (ECF Nos. 1342-10 at 154–55; 1699-1 at 265). Second, as noted above, the Spratlin Email was produced multiple times. (See ECF Nos. 1693-2 at 51; 1342-14 through 1342-23). Third, Spratlin's communication with the vendor referenced in the Spratlin Email began as a telephone call, suggesting that no email Spratlin sent is missing. (ECF Nos. 1298-7 at 6; 1693-2 at 52). Fourth, TreeHouse produced documents from at least seven other custodians who were involved in procurement or received the Spratlin Email, six of whom Keurig deposed. (ECF Nos. 1298-18; 1342-15 at 2). Accordingly, notwithstanding TreeHouse's delayed litigation hold notice to Spratlin, the Court finds that the other steps TreeHouse took with respect to Spratlin were reasonable and prevented the spoliation of his ESI.

### vi.    Craig Lemieux

Craig Lemieux worked at TreeHouse from March 2011 through December 2018, and his titles included Executive Vice President/Chief Operating Officer, Senior Vice President/General Manager – Sturm, and President of Beverages. (ECF Nos. 1632 at 150–51 ¶ 5; 1298-40 at 4). He

participated in TreeHouse's decision to develop portion packs.  (ECF No. 1298-41 at 3).  Lemieux was under a litigation hold relating to the Sturm Litigation since 2010, and received a litigation hold notice for this litigation on February 4, 2014.  (ECF Nos. 1298-18 at 3; 1298-43 at 7; 1632 at 150–51 ¶ 5; 1699-1 at 258; 1699-2 at 40).

Keurig contends that Lemieux is the "only custodian that was involved in TreeHouse's decision to enter in the single-serve beverage business in 2009, but TreeHouse produced no emails from that year from his files."  (ECF No. 1290 at 23).  Keurig calculates that TreeHouse produced only 661 emails from Lemieux's custodial files for 2009 to 2013 but produced 11,865 emails sent to or from him from others' files during the same period.  (ECF No. 1298-43 at 2, 5).  Keurig posits that Lemieux's documents would have shown that "TreeHouse was not delayed by Keurig in launching its unfiltered packs."  (ECF No. 1290 at 25).

TreeHouse responds that it offered to produce Lemieux's files produced in the Sturm litigation if Keurig would drop any spoliation argument, which Keurig declined, and the Court subsequently denied twice Keurig's motions to compel production of documents TreeHouse produced in the Sturm Litigation.  (ECF Nos. 1298-44 at 7; 1338 at 25; 688; 1002).  Aside from Lemieux, TreeHouse maintains that Reed, Vermylen, Overly, Reynolds, Jarona, and Peskie, all of whom Keurig deposed, were also involved in TreeHouse's decision to enter the single-serve business.  (ECF No. 1338 at 25 n.18).  TreeHouse produced over 132,000 documents for which Lemieux was the primary or duplicate custodian.  (ECF No. 1632 at 151 ¶ 6).  TreeHouse also preserved and searched Lemieux's hard drive, but did not identify any responsive, non-privileged documents.  (ECF No. 1298-33 at 3; 1632 at 165 ¶ 24).

The Court finds that TreeHouse's steps to preserve Lemieux's ESI were reasonable.  First, Lemieux's emails, like other custodians,' were archived in Enterprise Vault.  Second, he was in the first round of custodians to receive a litigation hold notice for this litigation in February 2014, and Keurig does not, and cannot, contend that TreeHouse had a preservation obligation for this litigation dating back to October 2010 when Sturm began selling single-serve cups.  (ECF No. 1347-44 ¶ 24).  Third, the volume of TreeHouse's production of documents for Lemieux rebuts any suggestion of spoliation, and Keurig has not pointed to any testimony or other evidence showing that Lemieux had ESI that was not preserved and reviewed.  Fourth, TreeHouse produced documents for other custodians, whom Keurig deposed, involved in the decision to enter the single-serve business; that those custodians' recollections of a ten-year old decision may have been foggy does not lead to an inference that Lemieux's ESI was lost.  (See ECF Nos. 1384 at 8; 1388-5 at 4; 1388-7 at 5–6; 1388-23 at 5–8).

*     *     *

In sum, as to each of the custodians and categories of ESI about which Keurig complains, the Court finds that TreeHouse's preservation efforts were reasonable, and Keurig has failed to show spoliation of ESI that would have been favorable to Keurig's defenses or unfavorable to TreeHouse's claims.  See Khatabi v. Bonura, No. 10 Civ. 1168 (ER), 2017 WL 10621191, at *7 (S.D.N.Y. Apr. 21, 2017) (explaining that, "for sanctions to be warranted, there must be extrinsic evidence to demonstrate that the destroyed evidence . . . would have been unfavorable to the destroying party") (internal quotation and citation omitted).

### c. **Prejudice & Remedies**

For similar reasons, Keurig "has not established prejudice." Rothman, 2019 WL 6210815, at *5 (denying spoliation sanctions motion). "[P]rejudice cannot be grounded on the basis that some evidence no longer exists." Capricorn Mgmt. Sys., Inc. v. Gov't Emp. Ins. Co., No. 15-CV-2926 (DRH) (SIL), 2019 WL 5694256, at *12 (E.D.N.Y. July 22, 2019). Here, Keurig has simply not established that ESI existed that TreeHouse failed to preserve, let alone that Keurig suffered prejudice as would justify sanctions under Rule 37(e)(1). Having failed to establish prejudice, a required element for an award of sanctions under Rule 37(e)(1), the Court declines to consider further Keurig's requested "'severe'" sanction of a preclusion order. Joint Stock Co. II, 2019 WL 4727537, at *30. Accordingly, Keurig's Motion as to TreeHouse is DENIED.

### D. **Keurig's Motion as to JBR**

Keurig asks for preclusion sanctions against JBR as a result of JBR's failure to preserve relevant evidence concerning a January 31, 2014 meeting between JBR and Costco (the "Costco Meeting"). (ECF No. 1290 at 27; see ECF No. 1699-1 at 251).

As alleged in JBR's Amended Complaint:

At a meeting between [JBR] and Costco on January 31, 2014, [JBR] was told that despite having prices lower than all other suppliers' Portion Packs – including Costco's Keurig-made private label – Costco would not be widening distribution for [JBR], or any other Competing Portion Pack supplier, until the Keurig 2.0 compatibility issue was resolved. During this same meeting, Costco informed [JBR] that it would be requiring [JBR] to implement a design change to its Costco packaging to inform customers that [JBR's] products were not compatible with the Keurig 2.0 Brewer.

(First Amended and Supplemental Complaint, JBR, Inc. v. Keurig Green Mountain, Inc., No. 14 Civ. 4242 (VSB) (S.D.N.Y. Dec. 8, 2014), ECF No. 83 ¶ 271). Jim Rogers was the only JBR representative at the Costco Meeting. (ECF No. 1699-2 at 75). In connection with JBR's motion for a preliminary

injunction ("PI") in this action (the "PI Proceeding"), Jon Rogers, then JBR's President, CEO and

Founder, submitted a declaration that discussed the Costco Meeting as follows:

> I am aware that on January 31, 2014, [JBR] met with representatives from Costco's Small Appliances Department, including Claudine Adamo, VP and General Merchandise Manager, Deirdre Bondarev, Assistant General Merchandise Manager, and Shannon Axthelm, Buyer to discuss [JBR's] business with Costco. At this meeting, Costco's representatives explained that Costco would not be widening distribution for any portion pack suppliers until the Keurig 2.0 issue was resolved. Thus, despite having lower prices than all of the other portion packs available for use in Keurig brewers, [JBR] would not be able to expand its availability of OneCup products at any additional Costco stores. At this same meeting, [JBR] was told that it would be required to implement a design change to its Costco packaging that would make clear that [JBR] products were not compatible with Keurig 2.0 brewers or Vue brewers.

(ECF No. 86 ¶ 38 (the "Jon Rogers Declaration")). The basis for Jon Rogers' statements was a

meeting he had with JBR's executives, including Jim Rogers and CFO Mike Sarina. (ECF No. 1699-

2 at 58–59). Attached to the Jon Rogers Declaration was a copy of the packaging modification,

which stated that the OneCup was "NOT compatible" with the 2.0 Brewer and which Costco

approved. (ECF No. 86-6 at 2). In addition, Sarina submitted a declaration in the PI Proceeding

attesting that:

> When [JBR's] representatives met with Costco in January 2014, [JBR] was told that it would be required to label its boxes to state that its OneCups were not compatible with the 2.0 [Brewer]. However, no date for commencing the labeling was defined by Costco at that time because Costco was uncertain as to the release date of the 2.0 [Brewer]. When Keurig accelerated its release date to August of [2014], Costco then requested that we sticker all boxes with non-compliance [sic] labels in order to be consistent with the timing of Keurig's release date.

(ECF No. 131 ¶ 11; see ECF No. 127-17 (excerpts of Sarina's deposition testimony)). After the

Costco Meeting, Costco employees who had attended communicated with each other about the

2.0 Brewer. (ECF No. 1348-9 at 2).

111

Add.136

Keurig cited Sarina's statements in opposing JBR's PI motion.  (ECF No. 124 at 10 n.3, 17, 19, 28, 33).  Judge Broderick also cited Sarina's statements in finding that, in February 2014, "Costco had already told JBR that it would be required to 'inform customers that [its] products were not compatible with the Keurig 2.0 [B]rewer[.]'"  (ECF No. 160 at 14 (quoting ECF No. 92 at 19 and citing ECF No. 127-17 at 166:19–167:24)).[35]

The same day as the Costco Meeting, Jim Rogers sent an email to Jon Rogers referencing advice from outside counsel about "antitrust litigation against Keurig," a communication over which JBR has asserted work product protection (the "Rogers Email").  (ECF No. 1298-55).  On March 13, 2014, JBR filed its original complaint in this case (Complaint, JBR, Inc. v. Keurig Green Mountain, Inc., No. 14 Civ. 4242 (VSB) (S.D.N.Y. Mar. 13, 2014), ECF No. 1).

When asked during his February 2019 deposition whether he remembered the Costco Meeting, Jim Rogers testified that he did not "recall that specific meeting," but recalled the topic of labeling JBR's cups as non-compatible with the Keurig 2.0 Brewer.  (ECF No. 1298-53 at 5).  Rogers testified that "sometimes" he took notes of in-person meetings with Costco, and if he had any notes of the Costco Meeting, he would have "followed up" and "thrown [them] away."  (Id. at 6–7).  Jim Rogers also testified that he had not been asked to preserve any documents.  (Id. at 7).

Keurig argues that "JBR has otherwise produced no documents corroborating" the Costco Meeting, and asks the Court to preclude JBR from "offering evidence about a purported loss of business at Costco."  (ECF No. 1290 at 27–28).  JBR responds that Keurig itself failed to seek

---

[35] With the Stipulations, JBR submitted additional evidence relating to the Costco Meeting, (see, e.g., ECF No. 1696-1 at 11–18 (citing ECF No. 1638)), but the Court declines to consider these exhibits, which did not accompany the Motions, for the reasons set forth above.  (See § IV.A, supra).

112

Add.137

discovery regarding the Costco Meeting, and in any event, contemporaneous evidence of the Costco meeting does exist, and Keurig has not shown prejudice. (ECF Nos. 1345 at 9–14; 1696-1 at 4–11).[36]

### 1. Duty to Preserve

JBR filed its complaint on March 13, 2014, and therefore had a duty to preserve no later than that date. See Tomassini, 2020 WL 1938834, at *3 (holding that plaintiff had duty to preserve as of filing of complaint); Best Payphones, 2016 WL 792396, at *4 (holding that plaintiff's obligation to preserve arose on date it filed its first litigation against same defendants); Passlogix, Inc. v. 2FA Tech., LLC, 708 F. Supp. 2d 378, 413 (S.D.N.Y. 2010) (holding that plaintiff's duty to preserve "attached, at a minimum" on the date it filed its original complaint); Turner, 142 F.R.D. at 73 (holding that plaintiff's preservation obligation arises "at least by the time the complaint [is] served").

As with TreeHouse, Keurig argues that JBR's preservation obligation arose earlier, on the date of the Costco Meeting in January 2014. (ECF No. 1290 at 28). For the same reasons the Court declined to impose an earlier preservation obligation on TreeHouse (see § IV.C.2.a, supra), the Court declines to impose such an obligation on JBR. While the Rogers Email suggests that JBR may have been considering in January 2014 bringing an action against Keurig (ECF No. 1298-55), Keurig has not shown any evidence that JBR "decided it was going to bring an action against" Keurig as of the date of the Costco Meeting. Best Payphones, 2016 WL 792396, at *4. Keurig has not offered any other evidence establishing that JBR decided to sue earlier than the date it filed

---

[36] JBR's additional argument that Keurig's Motion is untimely (ECF No. 1345 at 14) lacks merit given the Court-ordered schedule for the parties' submission of spoliation motions. (See § II.B.2, supra).

Add.138

its complaint, and therefore, the Court finds that JBR's preservation obligation arose on March 13, 2014.

### 2. Reasonableness of Steps Taken

JBR stores hard copy documents in a storage facility. (ECF No. 1348-2 at 4). Emails are stored on a server and are not automatically deleted, although employees are able to delete. (ECF No. 1348-2 at 5–6). Before 2018, JBR used Evault to store emails, and in 2019 began using the Barracuda Archiver platform. (ECF No. 1348-2 at 6–7). Although JBR does not have policies for retaining data of departing employees, departing employees' data was generally retained. (ECF No. 1348-2 at 8).

On December 7, 2011, in connection with Keurig's patent lawsuit against JBR, JBR issued a litigation hold notice. (ECF No. 1348-3 at 2; see ECF No. 1348-1). The record does not reflect who received this notice or what documents JBR instructed custodians to preserve. In "early 2014," JBR discussed internally and with its external counsel collecting and retaining electronic and hard copy documents related to this litigation. (ECF No. 1348 ¶ 12). JBR issued a litigation hold notice with respect to this action on April 3, 2014, more than one month after the Costco Meeting and three weeks after filing its complaint. (ECF No. 1298-54 at 3–4).

During fact discovery, JBR produced to Keurig over 1.3 million documents, including 40,866 documents from Jim Rogers' custodial files, and 52,834 emails he sent or received. (ECF No. 1348 ¶ 13). On February 12 and 13, 2019, Keurig deposed Jim Rogers, following which Keurig asked JBR to search for and produce several categories of documents he had referenced. (ECF Nos. 1298-53; 1348-4).[37] The categories Keurig asked JBR to search did not include documents

---

[37] Jon Rogers became ill during this litigation and was unable to be deposed. (ECF No. 1699-2 at 66).

Add.139

related to the Costco Meeting.  (ECF No. 1348-4).  Keurig acknowledges that JBR produced at least 23 emails relating to the Costco Meeting.  (ECF No. 1699-1 at 253-54).

Given that JBR's duty to preserve documents arose no later than March 13, 2014, the Court finds that was at least negligent in waiting until April 4, 2014 to issue its first litigation hold notice related to this action.  See Mastr Adjustable Mortgages Rate Trust, 295 F.R.D. at 85 (finding that failure to initiate litigation hold at inception of related litigation "was at least negligent").  While JBR refers to preservation notices sent in relation to Keurig's patent litigation in 2011, JBR has not explained who received these notices or what was preserved, and therefore, the Court cannot find that these earlier preservation notices assured that JBR was maintaining documents for this litigation.  Although JBR represents that, in "early 2014" it discussed with its outside counsel "collecting and retaining electronic and hard copy documents relevant to the litigation," (ECF No. 1348 ¶ 12), JBR has not shown what actions it took at that time to preserve relevant documents, and fails to explain why, despite being aware of its duty to preserve in "early 2014," it failed to issue litigation hold notices until April 4, 2014.  Accordingly, the Court finds that JBR was negligent in failing to issue litigation hold notices no later than March 13, 2014.

### 3.  Alternative Sources and Prejudice

Keurig contends that JBR included allegations about the Costco Meeting in its complaint, yet failed to preserve what "may have been the only contemporaneous record of the alleged meeting with [JBR's] largest customer regarding the 2.0 Brewer."  (ECF No. 1290 at 28).  JBR responds that Keurig cannot seek preclusion sanctions because it failed to investigate and seek discovery from "obvious sources of information that would pertain to the" Costco Meeting.  (ECF No. 1345 at 9).  JBR notes that Jim Rogers was the only witness whom Keurig questioned about

Add.140

the Costco Meeting, but TreeHouse did not show him any emails, the Jon Rogers Declaration, or any other documents to refresh his recollection about the date or attendees of the Costco Meeting.  (ECF Nos. 1345 at 12; 1699-2 at 67–68).

In May 2018, Plaintiffs subpoenaed Costco, and Keurig did so in January 2019.  (ECF Nos. 1348 ¶ 14; 1348-6).  Keurig's subpoena did not specifically request documents relating to the Costco Meeting.  (ECF No. 1348-6 at 10–11).  On June 12, 2020, Costco produced 846 documents.  (ECF No. 1348-7).  On June 17, 2020, Keurig deposed Costco's representative, Shannon Axthelm, but did not ask any questions about the Costco Meeting.  (ECF No. 1298-56; 1348-8).  Keurig did not depose Bondarev or Adamo, two Costco employees who attended the Costco Meeting, and did not ask Sarina during either of his depositions about the Costco Meeting. (ECF Nos. 1696-1 at 5, 18; 1699-2 at 61–62).

The Court concludes that Keurig has not shown that JBR's delay in issuing a litigation hold notice impeded Keurig's ability to defend against JBR's claims in this action.  First, Keurig has not shown that Jim Rogers took any notes at the Costco Meeting that JBR subsequently failed to preserve.  (See ECF No. 1699-2 at 55, 71–72).  Jim Rogers testified that "sometimes" he took notes of meetings with Costco, but Keurig neither refreshed his recollection about the date and circumstances of the Costco Meeting at issue, nor elicited testimony showing that he took notes at that meeting that he subsequently threw away.  Because the record does not support a finding that notes of the Costco Meeting "ever existed," the Court "cannot find that [JBR] had a duty to preserve them."  Man Zhang, 2019 WL 3936767, at *7; see Mastr Adjustable Rate Mortgages Trust, 295 F.R.D. at 87 (denying sanctions motion as to documents that "either never existed or were not destroyed").

116

Add.141

Second, even if the Court were to infer that Jim Rogers took and discarded notes of the Costco Meeting, Keurig has not "affirmatively demonstrate[d] that a reasonable trier or fact could find that the missing evidence would support" Keurig's defenses against JBR's claims. Orbit One, 271 F.R.D. at 439 (cleaned up); see Capricorn Mgmt. Sys., 2019 WL 5694256, at *12 (denying request for sanctions where defendants had not shown "with some degree of specificity how the purported missing e-mails would have been helpful" to their defense or counterclaims). To the contrary, as Judge Broderick has already found, during the Costco Meeting, Costco told JBR that JBR "would be required" to change its packaging to inform customers about the incompatibility of OneCups with the 2.0 Brewer, and it is undisputed that Costco subsequently approved JBR's revised packaging. (ECF Nos. 160 at 14; 86-6 at 2). While the significance of these facts as to JBR's claims and Keurig's defenses has yet to be finally resolved, the occurrence and the substance of the Costco Meeting are not in dispute, such that the more likely inference is that any notes Jim Rogers might have taken would have harmed, rather than helped, Keurig's defenses.

Third, Keurig is simply wrong that "we have no record of what happened" during the Costco Meeting. (ECF No. 1699-1 at 251). As Keurig acknowledged during oral argument, JBR produced 23 documents pertaining to the Costco Meeting. (ECF No. 1699-1 at 253–54). These documents were not the only source of evidence of what was discussed during the Costco Meeting. Keurig also had, through documents that Costco produced in response to the parties' subpoenas, and through deposition testimony of JBR's and Costco's witnesses, additional sources of evidence about the Costco Meeting. (See pp.110–12, 116, supra). That Keurig did not elicit more detail about what Jim Rogers and the Costco employees discussed during the Costco

117

Add.142

Meeting appears to have been Keurig's conscious choice rather than a lapse on the part of JBR. (See ECF No. 1696-1 at 18).  See Indem. Ins. Co. of N. Am. v. Liebert Corp., No. 96 Civ. 6675 (DC), 1998 WL 363834, at *5 (S.D.N.Y. June 29, 1998) (finding that defendants did not show "substantial prejudice" where they were able to depose third party witnesses with relevant knowledge); see also Pension Comm., 685 F. Supp. 2d at 479 (noting that defendants had "gathered an enormous amount of discovery—both from documents and witnesses[,]" and requiring defendants to "show through extrinsic evidence that the loss of the documents has prejudiced their ability to defend the case").

Because prejudice is a required element of sanctions under Rule 37(e)(1), and Keurig has failed to demonstrate prejudice from JBR's delayed issuance of litigation hold notices, the Court finds that there is no basis for sanctions against JBR.  Accordingly, Keurig's Motion as to JBR is DENIED.

### V. CONCLUSION

For the reasons set forth above:

1.  Plaintiffs' Motion is GRANTED IN PART and DENIED IN PART as follows:

    a.  Plaintiffs are entitled to recover reasonable attorneys' fees and expenses for the following periods and categories: (i) Plaintiffs' efforts from May 7, 2018 to July 25, 2018 to determine deficiencies in Keurig's productions for its Agreed Custodians; (ii) preparing for and participating in meet-and-confer communications and calls concerning Keurig's productions for its Agreed Custodians between July 25, 2018 and May 20, 2019; (iii) additional measures with respect to the hard drives for Rathke and Stacy that TreeHouse sent to its

Add.143

vendor; (iv) investigating discrepancies in Keurig's CommVault productions; (v) investigating discrepancies in Keurig's transactional data from February 7, 2019 until February 2020; (vi) Plaintiffs' experts' costs while working with Keurig's deficient transactional data between February 7, 2019 and February 2020; and (vii) preparing the Motion and presenting oral argument. The parties are expected to meet and confer and reach an agreement on Plaintiffs' attorneys' fees and expenses that fall within these instructions. If they are unable to agree, by **June 1, 2022**, Plaintiffs may request a conference with the Court to discuss a schedule for filing an application for attorneys' fees and expenses pursuant to this Opinion and Order;

b. At trial, Plaintiffs may present evidence regarding Keurig's failure to preserve (i) Barberio's hard copy documents, and (ii) hard drives for Barberio, Ferreira, and Mueller, and may request that Judge Broderick deliver a jury instruction informing the jury that it may consider that evidence, along with all the other evidence in the case, in their deliberations;

c. Plaintiffs' requested sanctions of preclusion of evidence or adverse inferences under Rule 37(e)(2) are DENIED;

2. Keurig's Motion as to TreeHouse is DENIED; and

3. Keurig's Motion as to JBR is DENIED.

Dated:     New York, New York          SO ORDERED.
           April 11, 2022

_____
SARAH L. CAVE
United States Magistrate Judge

119

Add.144

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>KEURIG GREEN MOUNTAIN SINGLE-SERVE COFFEE ANTITRUST LITIGATION<br><br>*This Document Relates to All Actions*. | MDL No. 2542<br><br>Master Docket No. 1:14-md-02542 (VSB) (SLC) |

**NOTICE OF DEFENDANT KEURIG GREEN MOUNTAIN, INC.'S**
**MOTION AND OBJECTIONS TO MAGISTRATE JUDGE CAVE'S**
**MARCH 28, 2022 OPINION & ORDER**

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law, Defendant Keurig Green Mountain, Inc. ("Keurig") moves this Court, before The Honorable Vernon S. Broderick, United States District Judge, at the Thurgood Marshall United States Courthouse, Courtroom 518, 40 Foley Square, New York, New York, pursuant to Rule 72 of the Federal Rules of Civil Procedure, for an order reversing in part Magistrate Judge Cave's March 28, 2022 Opinion & Order, ECF 1806.

Add.145

Dated: April 11, 2022

/s/ Wendelynne J. Newton

**Wendelynne J. Newton**
**Mackenzie A. Baird**
*wendelynne.newton@bipc.com*
*mackenzie.baird@bipc.com*
BUCHANAN INGERSOLL & ROONEY PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219-4413
Telephone: 412-562-8800

**Leah Brannon**
**Carl Lawrence Malm**
*lbrannon@cgsh.com*
*lmalm@cgsh.com*
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone:  202-974-1508
Facsimile:  202-974-1999

*Attorneys for Defendant Keurig Green Mountain, Inc.*

***In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, Civ. No. 14-2542 (VSB)**
Exhibit A to Plaintiffs' Letter Request for a Trial Date – Pending *Daubert*, Class Certification, and Summary Judgment Motions

| Filing Date | Motion & ECF Number |
|---|---|
| | ***Daubert*** |
| 1-15-2021 | Plaintiffs' Motion to Exclude the Report and Testimony of Proposed Expert Hon. Arthur J. Gajarsa (ECF No. 1220) |
| 6-16-2021 | Keurig's Motion to Exclude the Expert Report and Testimony of DPP Expert Gary L. French, Ph.D. (ECF No. 1406) |
| 8-18-2021 | Keurig's Motion to Exclude the Expert Reports and Testimony of Treehouse Expert Mohan Rao, Ph.D. (ECF No. 1439) |
| 8-18-2021 | Keurig's Motion to Exclude the Expert Reports and Testimony of Treehouse Expert Hal Poret (ECF No. 1442) |
| 8-18-2021 | Keurig's Motion to Exclude the Expert Reports and Testimony of Treehouse Expert Sarah Butler (ECF No. 1445) |
| 8-18-2021 | Keurig's Motion to Exclude Certain Opinions in the Expert Reports and Testimony of Hon. James Ware and Hon. Randall Rader (ECF No. 1449) |
| 8-18-2021 | Keurig's Motion to Exclude the Expert Reports and Testimony of McLane Expert Phillip M. Johnson, Ph.D. (ECF No. 1452) |
| 8-18-2021 | Keurig's Motion to Exclude the Expert Reports and Testimony of JBR Expert Gareth Macartney, Ph.D. (ECF No. 1456) |
| 8-18-2021 | Keurig's Motion to Exclude Opinions in the Expert Reports and Testimony of Treehouse Expert Lauren J. Stiroh, Ph.D. (ECF No. 1460) |
| 8-18-2021 | Keurig's Motion to Exclude the Expert Reports and Testimony of Treehouse Expert Dr. David Sibley (ECF No. 1464) |
| 8-18-2021 | Plaintiffs' Motion to Exclude Certain Opinions of Keurig Expert Keith R. Ugone, Ph.D. (ECF No. 1470) |
| 8-18-2021 | Plaintiffs' Motion to Exclude the Proposed Testimony of Kevin Murphy, Ph.D. (ECF No. 1474) |
| 8-18-2021 | Plaintiff JBR's Motion to Exclude the Proposed Testimony of Mark Wood (ECF No. 1478) |
| 8-18-2021 | Plaintiff JBR's Motion to Exclude the Proposed Testimony of Marc A. Hillmyer (ECF No. 1484) |
| | **Class Certification** |
| 5-24-2021 | Direct Purchaser Plaintiffs' Notice of Motion for Class Certification and Appointment of Class Representatives and Class Counsel (ECF No. 1359) |
| | **Summary Judgment** |
| 8-25-2021 | Plaintiffs' Motion for Summary Judgment (ECF No. 1489) |
| 8-25-2021 | Keurig's Motion for Summary Judgment (ECF No. 1493) |

Add.147

S.D.N.Y.-N.Y.C.<br>
14-cv-4242<br>
14-md-2542<br>
Broderick, J.

# United States Court of Appeals
### FOR THE
### SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 15th day of November, two thousand twenty-two.

Present:

> Robert D. Sack,
> Richard C. Wesley,
> Joseph F. Bianco,
> > *Circuit Judges*.

---

In re JBR, Inc.,

> *Petitioner*.

---

JBR, Inc., DBA Rogers Family Company,

> *Petitioner*,

v.                                                                              22-2079

Keurig Green Mountain Inc., as successor to
Keurig, Incorporated, FKA Green Mountain Coffee Roasters Inc.,

> *Respondent*.

---

Petitioner has filed a petition for a writ of mandamus directing the district court to either rule on pending motions for summary judgment or provide alternative relief. Upon due consideration, it is hereby ORDERED that the mandamus petition is DENIED without prejudice to renewal if the district court fails to take action on the pending motions within 60 days of the date of this order.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

CERTIFIED COPY ISSUED ON 11/15/2022

Add.148

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                       :

IN RE:                               :

                                    :

KEURIG GREEN MOUNTAIN SINGLE-     :
SERVE COFFEE ANTITRUST          :         14-MD-2542 (VSB)
LITIGATION                       :         14-MC-2542 (VSB)

                                    :

*This order relates to all cases*      :         **OPINION & ORDER**

                                    :
-------------------------------------------------------X

VERNON S. BRODERICK, United States District Judge:

      This Opinion & Order addresses 12 motions to seal or redact materials.  The parties, as

well as various non-parties, have made numerous requests seeking either the wholesale sealing of

dozens of documents or detailed line-item redactions covering thousands of pages of material.

This Opinion & Order covers an initial tranche of such requests.

      I assume familiarity with the background of this multidistrict litigation, which focuses on

antitrust claims brought against Keurig Green Mountain, Inc. ("Keurig"), and which is discussed

in more detail in my Opinion & Order of April 3, 2019.  (Doc. 581.)  Where additional

background is necessary, I address it in the context of the specific motion to seal or redact.

### I.     **Legal Standard**

      "The burden of demonstrating that a document submitted to a court should be sealed rests

on the party seeking such action."  *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d

Cir. 1997).  When a party requests sealing, the court must evaluate that request under both a

"common law right of public access to judicial documents," *Lugosch v. Pyramid Co. of

Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006), and the press and public's "qualified First

Amendment right to attend judicial proceedings and to access certain judicial documents."  *Id.* at

120 (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir.2004)).

### A.    The Common Law Right of Access

I begin with the standard for the common law right of access. This is an appropriate starting point because the test for whether a document can be sealed under the First Amendment is more stringent then under the common law. *Lugosch*, 435 F.3d at 124. If a sealing request cannot survive the common law test, it will not survive scrutiny under the First Amendment test.

A "common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch*, 435 F.3d at 119. Thus, a presumption of public access rooted in this common law attaches to materials classified as judicial documents. *Amodeo I*, 44 F.3d at 146. This right of access is essential to maintaining judicial accountability.

> The presumption of access is based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice. Federal courts exercise powers under Article III that impact upon virtually all citizens, but judges, once nominated and confirmed, serve for life unless impeached through a process that is politically and practically inconvenient to invoke. Although courts have a number of internal checks, such as appellate review by multi-judge tribunals, professional and public monitoring is an essential feature of democratic control. Monitoring both provides judges with critical views of their work and deters arbitrary judicial behavior. Without monitoring, moreover, the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings. Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions.

*Amodeo II*, 71 F.3d at 1048. Accordingly, "[i]t is not, and should not be, an easy matter to deny the public access to documents that are utilized in judicial proceedings and form part of the basis of judicial decision-making, since the public is ordinarily entitled to review such material in order to understand and evaluate the actions of the courts." *Newsday LLC v. Cnty. of Nassau*, 730 F.3d 156, 167 n.15 (2d Cir. 2013).

Courts evaluate the common law right of access with a three-step process. The court first

determines if the document to be sealed is a "judicial document." *Lugosch*, 435 F.3d at 119. "In order to be designated a judicial document, 'the item filed must be relevant to the performance of the judicial function and useful in the judicial process.'" *Id.* (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) (*Amodeo I*)). Accordingly, "the mere filing of a paper or document with the court is insufficient to render that paper a judicial document." *Amodeo I*, 44 F.3d at 145. Similarly, "[d]ocuments that play no role in the performance of Article III functions, such as those passed between the parties in discovery" are not judicial documents. *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) (*Amodeo II*). Documents that seek no relief from the court are also not judicial documents. *See, e.g.*, *In re New York City Policing During Summer 2020 Demonstrations*, No. 20CIV8924CMGWG, 2022 WL 7886182, at *2 (S.D.N.Y. Oct. 14, 2022).

Conversely, "documents submitted to a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents." *Lugosch*, 435 F.3d at 121. "Filings related to *Daubert* motions are [also] judicial documents subject to a significant presumption of access under the common law and the First Amendment." *In re Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis with Kinectiv Tech. & Versys Femoral Head Prod. Liab. Litig.*, No. 18-MC-2859 (PAC), 2021 WL 4706199, at *2 (S.D.N.Y. Oct. 8, 2021) ("*Zimmer*"); *see also Republic of Turkey v. Christie's Inc.*, 425 F. Supp. 3d 204, 221 (S.D.N.Y. 2019) (collecting cases). Motions for class certification are judicial documents as well. *See, e.g.*, *Tropical Sails Corp. v. Yext, Inc.*, No. 14 CIV. 7582, 2016 WL 1451548, at *3 (S.D.N.Y. Apr. 12, 2016); *Mark v. Gawker Media LLC*, No. 13-CV-4347 (AJN), 2015 WL 7288641, at *2 (S.D.N.Y. Nov. 16, 2015).

If a court determines that the documents at issue are judicial documents to which the

3

presumption of access applies, then in the second step "it must determine the weight of that presumption." *Lugosch*, 435 F.3d at 119. The "presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Amodeo II*, 71 F.3d at 1049. This information, and by extension the strength of the presumption "fall[s] somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Id.*

Summary judgment motions and papers filed in support of these motions enjoy "a strong presumption of access." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 142 (2d Cir. 2016); *see also Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982) ("[D]ocuments used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons.") This presumption exists regardless of the role the specific document plays in a court's adjudication of a motion. *Brown v. Maxwell*, 929 F.3d 41, 48 (2d Cir. 2019) ("We have expressly rejected the proposition that 'different types of documents might receive different weights of presumption based on the extent to which they were relied upon in resolving a motion for summary judgment.'" (quoting *Lugosch*, 435 F.3d at 123 (cleaned up)).

A significant presumption of access also exists for filings related to *Daubert* motions. *Zimmer*, 2021 WL 4706199, at *2 ("Filings related to Daubert motions are judicial documents subject to a significant presumption of access under the common law and the First Amendment."). As with motions for summary judgment, this presumption extends to all materials associated with *Daubert* motions. *See, e.g.*, *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, No. 20 CIV. 10832 (AT), 2022 WL 17751466, at *3 (S.D.N.Y. Dec. 19, 2022) (noting that supporting "financial documents [which] may assist the Court when resolving the pending

*Daubert* Motions . . . are subject to a substantial presumption of public access"); *In re Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis With Kinectiv Tech. & Versys Femoral Head Prod. Liab. Litig.*, No. 18-MC-2859 (PAC), 2021 WL 2258292, at \*2 (S.D.N.Y. June 3, 2021) ("Exhibits . . . submitted in connection with Plaintiffs' *Daubert* motion, are judicial documents subject to a significant presumption of public access.")

However, the presumption of access has only "modest" weight where the document is submitted in connection with discovery motions, motions to compel testimony, and motions to exclude certain deposition testimony. *In re New York City Policing During Summer 2020 Demonstrations*, 2022 WL 7886182, at \*2 (citing *Brown*, 929 F.3d at 50).

In the third step, "after determining the weight of the presumption of access, the court must 'balance competing considerations against it.'" *Lugosch*, 435 F.3d at 120 (quoting *Amodeo II*, 71 F.3d at 1049). Courts have identified several countervailing considerations that may overcome even strong presumptions of public access. The most relevant to this case is the possibility of competitive harm to an enterprise if confidential business information is disclosed. "The need to protect sensitive commercial information from disclosure to competitors seeking an advantage may" be an interest meriting sealing. *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MC-2542 (VSB), 2014 WL 12772236, at \*2 (S.D.N.Y. Nov. 5, 2014); *see also Standard Inv. Chartered, Inc. v. Fin. Indus. Regul. Auth., Ind.*, 347 F. App'x 615, 617 (2d Cir. 2009) (upholding a district court's finding that a business's "interest in protecting confidential business information outweighs [even] the qualified First Amendment presumption of public access"); *Rowe v. Google LLC*, No. 19 CIV. 8655 (LGS), 2022 WL 4467628, at \*2 (S.D.N.Y. Sept. 26, 2022) ("Preventing competitive harm is a countervailing interest that can override the public right of access."). Thus, courts in this District have permitted the redaction

5

Add.153

of confidential information such as sales and pricing data on the grounds that its disclosure would work a competitive harm on the disclosing enterprise. *See, e.g.*, *In the Matter of the Ex Parte Application of the Upper Brook Companies for an Order Directing Discovery In Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782*, No. 22-MC-97 (PKC), 2023 WL 172003, at*6 ("*Upper Brook*") ("A presumption of access may be outweighed by a party's interest in 'protecting confidential business information' from disclosure that would subject it to 'financial harm' or a 'significant competitive advantage.'") (quoting *Standard Inv. Chartered, Inc.*, 347 F. App'x at 617); *W.J. Deutsch & Sons Ltd. v. Diego Zamora, S.A.*, No. 1:21-CV-11003-LTS, 2022 WL 890184, at *3 (S.D.N.Y. Mar. 25, 2022) (granting a sealing request where "disclosure of this confidential business information would subject [movant] to a competitive disadvantage"); *Valassis Commc'ns, Inc. v. News Corp.*, No. 17-CV-7378 (PKC), 2020 WL 2190708, at *3 (S.D.N.Y. May 5, 2020) ("The demonstration of a valid need to protect the confidentiality of sensitive business information, such as pricing and compensation information, may be a legitimate basis to rebut the public's presumption of access to judicial documents").

Other courts, however, have been skeptical of sealing information that is commercially sensitive, particularly where it is highly relevant to the dispute and by extension, to the public's understanding of the court's decision. In *Ferring Pharmacueticals Inc. v. Serenity Phramauticals, LLC*, for example, Judge McMahon refused to permit the redaction of purportedly sensitive commercial information for a wide range of documents. No. 17CIV9922CMSDA, 2020 WL 949423 (S.D.N.Y. Feb. 27, 2020). The collective effect of these redactions would have been to force the court to "mak[e] 'secret' findings of fact" and "award secret damages," *id.* at *1–2, which Judge McMahon declined to do.

A further countervailing consideration is "the privacy interests of innocent third parties"

6

Add.154

which "should weigh heavily in a court's balancing equation." *Application of Newsday, Inc.*, 895 F.2d 74, 79–80 (2d Cir. 1990) (cleaned up). These privacy interests are "a venerable common law exception to the presumption of access." *Amodeo II*, 71 F.3d at 1051. However, not all third-party interests have equal weight. As *Olson v. Major League Baseball*, noted, an entity's "third-party status should be placed in context." 29 F.4th 59, 91 (2d Cir. 2022). In *Olson*, for example, the third-party privacy interests of the Yankees were lessened because of the nature of their association with the named defendant, which had the right to investigate the team. Accordingly, while the Yankees had a privacy interest, it was not comparable to that of a third party with no association with a named defendant. *Id.*

Several factors can diminish the weight of these countervailing considerations. First, if a court is to give weight to a party's asserted harms, those harms must be concretely and specifically described. "[B]road allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test." *Coventry Cap. US LLC v. EEA Life Settlements, Inc.,* No. 17CIV7417VMHBP, 2017 WL 5125544, at *3 (S.D.N.Y. Nov. 2, 2017) (quoting *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009)); *see also In re Google Digital Advert. Antitrust Litig.*, No. 21-CV-6841 (PKC), 2021 WL 4848758, at *3 (S.D.N.Y. Oct. 15, 2021) (declining to seal material where the "harms . . . are vaguely described[,] . . . rather conclusory . . . [and] do not identify privacy interests or concrete harms that outweigh the presumption of public access."); *In re SunEdison, Inc. Sec. Litig.*, No. 16-CV-7917 (PKC), 2019 WL 126069, at *1 (S.D.N.Y. Jan. 7, 2019) (questioning the appropriateness of sealing where a party "cite[s] generally to 'commercially sensitive, non-public information' without explaining why specific documents or information are sensitive or risk harm to any person or entity.")

Second, the older the information is, the less appropriate it is to seal that information,

particularly when the party does not explain with specificity why, despite the passage of time, the information should still be sealed.  *Compare Upper Brook*, 2023 WL 172003, at*6 (S.D.N.Y. Jan. 12, 2023) (denying sealing where movant failed "to show that the information is not 'stale'" or "why disclosure would still cause harm"); *In re Parmalat Sec. Litig.*, 258 F.R.D. at 250–56 (finding a diminished interest in sealing where the relevant documents were seven to fourteen years old and movant failed to explain their continued sensitivity); *Dawson v. Merck & Co.*, No. 112CV1876BMCPK, 2021 WL 242148, at *8 (E.D.N.Y. Jan. 24, 2021) ("Stale business records cannot support the necessary finding of harm"), *with City of Providence v. BATS Glob. Markets, Inc.*, No. 14-CV-2811 (JMF), 2022 WL 539438, at *3 (S.D.N.Y. Feb. 23, 2022) ("Although the document is several years old, the third-party privacy interest of Nasdaq's customer in preventing disclosure of this sensitive information regarding its trading and business strategies is significant."); *Encyclopedia Brown Prods., Ltd. v. Home Box Off., Inc.*, 26 F. Supp. 2d 606, 614 (S.D.N.Y. 1998) (finding that decade-old information should still be sealed where movant had credibly explained why the information would still create competitive harm).

The older the information contained in documents, the more detailed the supporting material should be submitted to support the sealing of the documents.  In *Home Box Off., Inc.*, for example, sealing requests for decade-old information were supported with sworn statements demonstrating that the older agreements were still in force or that the business practices reflected in those agreements were still in effect.  *Id.* at 613.  I have specifically drawn the parties' attention to this factor, and asked them to consider sealing requests in the context of "where we currently stand in the case, as opposed to where it stood when the case was initially filed" because "there may be certain things that time has overtaken and they're no longer sensitive, either from the companies' perspective or otherwise."  Transcript of Hearing Held Apr. 5, 2019,

Add.156

7:4–9.[1]

Third, and finally, the existence of a protective order covering a document is not, in and of itself, sufficient grounds to seal or redact that document. "[T]hat a document was produced in discovery pursuant to a protective order has no bearing on the presumption of access that attaches when it becomes a judicial document." *Doe v. U.S. Immigr. & Customs Enf't*, No. 19-CV-8892 (AJN), 2021 WL 3862708, at *3 (S.D.N.Y. Aug. 30, 2021); *see also Newsday LLC*, 730 F.3d at 166 ("[T]he facts necessary to show good cause for a protective order applicable to discovery documents that are not yet implicated in judicial proceedings will not necessarily meet the higher threshold imposed by the First Amendment with respect to judicial documents.") This is because "the showing required in connection with a sealing motion is significantly higher than the burden for obtaining a protective order in civil discovery." *Rojas v. Triborough Bridge & Tunnel Auth.*, No. 18-CV-1433 (PKC), 2022 WL 773309, at *4 (S.D.N.Y. Mar. 14, 2022).

The balancing of this presumption against the countervailing factors determines what findings a court must make to seal a document. Where a common law right of access applies, a court must "make specific, rigorous findings before sealing the document or otherwise denying public access." *Newsday LLC*, 730 F.3d at 167 n.15. However, if the weight of the presumption of access is modest, "a court must still articulate specific and substantial reasons for sealing such material," but "the reasons usually need not be as compelling as those required to seal" judicial documents like "summary judgment filings." *Brown*, 929 F.3d at 50.

### B.  *The First Amendment Right of Access*

The First Amendment provides a qualified right of access to court records. There are two approaches for determining if such a right attaches to a particular document. The "'experience

---

[1] Available at ECF No. 577.

and logic' approach requires the court to consider both whether the documents 'have historically been open to the press and general public' and whether 'public access plays a significant positive role in the functioning of the particular process in question.'" *Lugosch*, 435 F.3d at 120 (*Pellegrino*, 380 F.3d at 92). "The second approach considers the extent to which the judicial documents are "derived from or [are] a necessary corollary of the capacity to attend the relevant proceedings." *Lugosch*, 435 F.3d at 120 (quoting *Pellegrino*, 380 F.3d at 93). For example, "[t]he transcript of a proceeding is so closely related to the ability to attend the proceeding itself that maintaining secrecy is appropriate only if closing the courtroom was appropriate." *Newsday LLC*, 730 F.3d at 165.

Documents submitted to a court as part of a summary judgment motion enjoy a First Amendment right of access, *Brown*, 929 F.3d at 47, as do motions for class certification, s*ee, e.g., Yext, Inc.*, 2016 WL 1451548, at *3; *Gawker Media LLC*, 2015 WL 7288641, at *2, and *Daubert* motions, *see, e.g.*, *Zimmer*, 2021 WL 4706199, at *2; *Am. Railcar Indus., Inc. v. Gyansys, Inc.*, No. 14-CV-8533 (AJN), 2017 WL 11501880, at *1 (S.D.N.Y. May 8, 2017); *Republic of Turkey*, 425 F. Supp. 3d at 221.

If a First Amendment right of access applies, "documents may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Lugosch*, 435 F.3d at 120 (cleaned up). "Broad and general findings by the trial court . . . are not sufficient to justify closure," *id.* (internal quotations omitted), and the Court of Appeals has cautioned courts against making "generalized statements about the record as a whole" to justify sealing decisions, *Brown*, 929 F.3d at 48. The showing required to seal a document to which a First Amendment right of access attaches is thus more stringent than the showing required under the common law framework. *Lugosch*, 435 F.3d at

10

Add.158

124.

Higher values that may justify sealing even under this standard include "the privacy interests of innocent third parties."[2] *Matter of New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987). Courts have also found that in certain circumstances, business data such as pricing information and negotiations may remain under seal even where the First Amendment is implicated. *See, e.g.*, *Zimmer*, 2021 WL 4706199, at *2.

This latter category, however, is susceptible to abuse if liberally applied. *Ferring Pharmacueticals Inc.*, for example, decried the "abuse of the public filing rule" when parties sought to redact or seal expert analysis, agreement terms, and exhibits that would likely be introduced at trial. 2020 WL 949423, at *1–2. This is particularly true in the case of motions for summary judgment. *Joy*, for example, reversed the sealing of a report by the special litigation committee of a public company that was submitted in connection with a motion for summary judgment as part of a shareholder derivative action. 692 F.2d at 893. The Court of Appeals rejected the proposition that "derivative actions may be routinely dismissed on the basis of secret documents" because "confidence in the administration of justice would be severely weakened" and "any other rule might well create serious constitutional issues." *Id.* at 893. The *Joy* sealing analysis concluded by noting that "foreclosing public scrutiny of the grounds for this adjudication is wholly unjustifiable." *Id*. at 894.

Even when sealing is appropriate under either the common law or First Amendment framework, it must be "narrowly tailored," meaning that a court should "seal only that information that needs to be sealed in order to preserve higher values." *Signify Holding B.V. v.*

---

[2] Similarly, "as a general rule, there is no constitutional right of access to traditionally nonpublic government information." *N.Y. Times Co. v. Dep't of Justice*, 806 F.3d 682, 688 (2d Cir. 2015) (cleaned up).

11

Add.159

*TP-Link Rsch. Am. Corp.*, No. 21CV9472JGKKHP, 2022 WL 3704002, at *1 (S.D.N.Y. Aug. 26, 2022). When "some sealing of a judicial document is appropriate, the Second Circuit has directed that the Court should determine whether partial redaction of the private material is 'a viable remedy,' or whether the document presents 'an all or nothing matter.'" *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, No. 14-CV-6867 (VEC), 2016 WL 1071107, at *4 (S.D.N.Y. Mar. 18, 2016) (quoting *Amodeo II*, 71 F.3d at 1053).

Finally, while the moving party bears the burden of justifying sealing, the ultimate task of balancing these interests "rests heavily upon the shoulders of the trial judge." *Matter of New York Times Co.*, 828 F.2d at 116. The court must balance the harms of disclosure not only to the parties but also to non-parties who may not be before the court, s*ee, e.g.*, *id*., against protecting the interests of the public and press who, similarly, are frequently not before the court when sealing motions determining their rights of access are determined.

There is temptation, when a district court is faced with a deluge of sealing motions, to effectively outsource sealing determinations to the parties by approving or even pre-approving sealing requests that the parties agree on. This inevitably leads to large portions of the docket being filed under seal. *See, e.g.*, *Brown*, 929 F.3d at 46 (noting that after "the District Court entered a Sealing Order that effectively ceded control of the sealing process to the parties . . . 167 documents—nearly one-fifth of the docket—were filed under seal." This, as *Brown* noted is not acceptable. It is ultimately the district court's responsibility to supervise its records, *id.* at 51, and make its own findings when a party requests to seal or redact a document. With these principles in mind, I turn to the to the pending sealing requests.

## II.    Discussion

Currently, there are 37 sealing motions pending. I address 12 of these below based on the

12

standards set out above.

### A.  *The Dr. Gary French Materials (Doc. 1405, 1411)*[3]

Keurig and TreeHouse Foods, Inc., Bay Valley Foods, LLC, Sturm Foods, Inc.

(collective "TreeHouse") move to redact or otherwise seal certain information in Keurig's

memorandum of law to exclude the report and testimony of Dr. Gary French, as well as various

supporting exhibits.  Both parties seek to redact or completely seal different components of these

materials.  Specifically, Keurig seeks to completely seal exhibits at Docs. 1410-1, 1410-2, 1410-

4, and 1410-6.  It seeks partial redactions to its opposition motion at Doc. 1408, and exhibits at

Docs. 1410-3, 1410-15, 1410-17, 1410-18, and 1410-19.  (Doc. 1405.)  TreeHouse seeks partial

redactions to Doc. 1408, and to exhibits at 1410-17 and 1410-19.  (Doc. 1411.)

*Daubert* motions are subject to the qualified First Amendment right of access.  *Zimmer*,

2021 WL 4706199, at *2; *Gyansys, Inc.*, 2017 WL 11501880, at *1 (S.D.N.Y. May 8, 2017);

*Republic of Turkey*, 425 F. Supp. 3d at 221.  Accordingly, these papers may only be sealed or

redacted if movants can offer information that would support "specific, on the record findings"

"demonstrating that closure is essential to preserve higher values and is narrowly tailored to

serve that interest."  *Lugosch*, 435 F.3d at 120 (cleaned up).

Neither Keurig nor TreeHouse have met this burden.  Both parties note that this material

is subject to a protective order entered at Doc. 496 (the "Protective Order").  (Doc. 1405, at 1–2,

Doc. 1411, at 1.)  A document, however, cannot be sealed simply because it is subject to a

protective order.  *Newsday LLC*, 730 F.3d at 166.  The rationales the parties supply beyond this

consist of "[b]road and general findings" that "are not sufficient to justify closure."  *Lugosch*,

435 F.3d at 120 (cleaned up).  Keurig asserts only that the various documents contain

---

[3] "Doc." in each header references the relevant motion.

13

"commercially sensitive information" such as "margin and pricing data" or "transaction data." (Doc. 1405, at 1–2.)  It does not explain why this information is sensitive or how harm will result if it is disclosed.  Similarly, TreeHouse simply states that disclosure will "cause material injury" without explaining how or why that would result.  Neither party offers explanations for their proposed sealing on a document-by-document basis, which would be necessary for me to render the specific findings required to meet the stringent First Amendment requirements for sealing or redacting these filings.

The request to seal or redact these materials is therefore denied in its entirety.  However, at the parties' discretion, the names, emails, and phone numbers of Keurig employees in Doc. 1410-4 may be redacted.

### B.    *The Class Certification Opposition Materials (Doc. 1416)*

Keurig moves to redact and/or seal certain information in its memorandum of law opposing class certification for certain plaintiffs as well as exhibits submitted in support of this motion.  Specifically, Keurig seeks to completely seal exhibits at Docs. 1418-1, 1418-2, 1418-3, 1418-13, 1418-14, 1418-15, 1418-16, 1418-18, 1418-21, and 1418-25.  It seeks partial redactions to its opposition motion at Doc. 1420, and exhibits at Docs. 1418-4, 1418-8, 1418-9, and 1418-11.

The qualified First Amendment right of access applies to documents filed in connection with class certification proceedings.  *Yext, Inc.*, 2016 WL 1451548, at *3; *Gawker Media LLC*, 2015 WL 7288641, at *2.  As with the materials discussed in Section II.A, Keurig has not met the stringent burden required to seal materials to which a First Amendment right of access has attached.  For certain items, such as Docs. 1418-11, 1418-18, 1418-21, and 1418-25, it offers no justification beyond the fact that a party has named the document confidential or otherwise

14

Add.162

protected under the Protective Order; this is insufficient, *see Newsday LLC*, 730 F.3d at 166. For other items such as Docs. 1418-1, 1418-2, 1418-3, 1418-13, 1418-14, 1418-15, and 1418-16, Keurig simply states in a conclusory manner that the information contained is "commercially sensitive" or otherwise sensitive. It does not explain why these sensitivities implicate the "higher values" necessary to permit sealing when the First Amendment right of access is implicated. *Lugosch*, 435 F.3d at 120. Accordingly, Keurig has not provided me with information to support the kind of specific findings necessary to justify sealing.

The request to seal or otherwise redact these materials is therefore denied in its entirety. However, at the parties' discretion, the names, emails, and phone numbers of individual employees in Doc. 1418-25 may be redacted.

### C.    *The McLane Summary Judgment and Daubert Materials (Doc. 1746)*

Plaintiff McLane Company, Inc. ("McLane") proposes to redact information from a broad array of documents connected to various *Daubert* motions, class certification motions, and summary judgment motions. McLane requests redactions for three different categories of information: (1) information related to its supply and customer contractual material (Doc. 1746, at 2–4); (2) information related to its proprietary business practices, (*id.* 4); and (3) personal information of various individuals, (*id.* 4–5). It has provided appendices setting out the rationale for sealing or redacting each document. Docs. 1778-1–1778-3. Summary judgment and *Daubert* motions are subject to a First Amendment right of access, so the burden is on McLane to demonstrate that its requests are narrowly tailored to preserve higher values.

### 1.  Supplier and Customer Contractual Information

McLane requests to redact information about business relationships with customers and suppliers. The information it wishes to redact is set out at Docs. 1778-4 through 1778-52, and

summarized in Doc. 1778-1.  All the proposed redactions are connected to documents submitted in connection with *Daubert* motions, motions for class certification, or motions for summary judgment.

As a preliminary matter, although McLane has requested sealing pursuant to the three-part balancing test set out in *Lugosch*, 435 F.3d 110, motions for summary judgment, *Brown*, 929 F.3d at 47, class certification motions, *Yext, Inc.*, 2016 WL 1451548, at *3; *Gawker Media LLC*, 2015 WL 7288641, at *2, and *Daubert* motions involve the more stringent test associated with the First Amendment right of access, *see, e.g.*, *Zimmer*, 2021 WL 4706199, at *2, *Gyansys, Inc.*, 2017 WL 11501880, at *1.  Sealing commercially sensitive information may still be permissible under this standard, *Zimmer*, 2021 WL 4706199, at *2, but must be carefully policed for abuse, particularly when it is connected to a motion for summary judgment, *see generally Saks Inc. v. Attachmate Corp.*, No. 14 CIV. 4902 CM, 2015 WL 1841136, at *14–16 (S.D.N.Y. Apr. 17, 2015) (noting with concern the potential for parties to abuse commercial secrets designations and decrying "the worrying trend toward *de facto* secret litigation.")

With this in mind, I address McLane's requests in Table 1 below.  References to pages and paragraphs refer to a document's pagination and paragraph markers unless otherwise noted. I address each request individually, but the consistent thread of McClane's requested redactions is that it does not want to reveal that it consistently made more than 99 percent of its K-Cup sales to Walmart at a four to six percent mark-up over the price it paid.  Indeed, these two facts and minor variations on them account for the bulk of McClane's proposed redactions.  Even accepting that this might be confidential information, the point is simply too relevant to this dispute to permit sealing.  McClane's Walmart sales and mark-ups are basic facts underlying McClane's arguments against Keurig at numerous points.  Similarly, McLane makes repeated

16

Add.164

efforts to seal information related to how it sold K-Cups with Walmart, a sales relationship that appears to have terminated by 2016. Again, the business details of this relationship are an inextricable part of this case and McClane cannot initiate a lawsuit based on its K-Cup business and then seek to shield almost all of the salient details of this business from the public. As in *Joy*, it would be "unjustifiable" to prevent the public from fairly scrutinizing the adjudication of this dispute by concealing a key fact about the business dynamics at play in this case. 692 F.2d at 894. Moreover, accepting this would invariably result in the sensitive business exception swallowing the First Amendment Rule.

| Table 1: Sealing and Redaction Requests McLane Supplier and Customer Contractual Information | | | |
|---|---|---|---|
| McLane Exhibit Number of Document to be Sealed | Associated Doc. No. | Motion or Motions Associated With Sealing Request | Ruling |
| A1 | 1778-4 | *Daubert* | The request to redact this document is denied. Several proposed redactions cover generic material (*e.g.* "millions of dollars", "more than 99 percent"), that is sometimes not even associated with specific dates. Information presented at this level of generality is too broad to reasonably be considered commercially sensitive. Other redactions cover McClane's business relationship with Walmart, but in general terms that cannot reasonably be considered sensitive. Finally, some redactions discuss the 99 percent sales figure and the 4 to 6 percent mark-up, which I have already indicated is not a proper subject for sealing. |
| A2 | 1778-5 | Class Certification | The request to redact this document is denied, because proposed redactions contain general pricing information that is too non-specific to reasonably be considered sensitive. |

Add.165

| A3 | 1778-6 | *Daubert* | These redactions cover substantially the same information McClane seeks to redact in Docs. 1778-4 and 1778-5, and are denied for substantially the same reasons. |
|----|--------|-----------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| A4 | 1778-7 | *Daubert* | The request to redact this document is denied. The requested redaction contains general and non-specific information integrated into a hypothetical scenario. This material is not confidential information. |
| A5 | 1778-8 | *Daubert* | These redactions target information that is substantially similar to the redactions sought in Doc. 1778-6. Therefore, they are denied for substantially the same reasons. |
| A6 | 1778-9 | *Daubert,* Summary Judgment | These redactions target information that is substantially similar to the redactions sought in Doc. 1778-6, and are denied for substantially the same reasons. I further note that, since this information is submitted in connection with a summary judgment motion, there is even less of a basis to redact it than in Doc. 1778-6. |
| A7 | 1778-10 | *Daubert,* Summary Judgment | The requested to redact this document is denied. The requested redaction concerns a generic and conditional summary of business practices that cannot reasonably be considered commercially sensitive. |
| A8 | 1778-11 | *Daubert,* Summary Judgment | The request to redact this document is denied. The redaction concerns a single comparative price point from an unspecified time. This is not specific enough confidential data to overcome the presumption of access. |
| A9 | 1778-12 | *Daubert,* Summary Judgment | The request to redact this document is denied. The proposed redactions summarize business relationships from 2012 to 2015 exclusively between McClane, Keurig, and Walmart, the first two of which are adverse parties in this case. Seven to ten-year-old information about the relationship between two adverse parties is not the kind of confidential business information that could reasonably be expected to harm McClane. |
| A10 | 1778-13 | *Daubert,* Summary Judgment | The request to redact this document is denied. The proposed redactions are not actual business data but recitations of estimates or projections from an adverse |

18

Add.166

| | | | expert report. This is not the kind of confidential information that is properly sealed. |
|---|---|---|---|
| A11 | 1778-14 | Class Certification, *Daubert*, Summary Judgment | The request to redact this document is denied. Several redactions relate to facts I have already determined are not proper subjects for redaction in relation to Docs. 1778-6 and 1778-9. Others challenge expert projections and calculations of damages. It is not clear, and McClane does not explain, why expert projections developed by interested parties specifically for the use in litigation are confidential information that a competitor would reasonably rely on. |
| A12 | 1778-15 | *Daubert* | The request to redact this document is denied. These redactions are similar expert projections to the ones discussed in Doc. 1778-14, and their redaction is denied for substantially the same reasons. |
| A13 | 1778-16 | *Daubert* | The request to redact this document is denied. McClane suggests that this redaction relates to its relationship with third-party companies, but it appears to simply be an expert's estimate of various companies' market share without any apparent connection to McClain's business relationships. In the absence of more specific information, I cannot make the findings necessary to justify sealing. |
| A14 | 1778-17 | Summary Judgment | The request to redact this document is denied. The proposed redaction on page 106 of this document is a generic statement with no actual confidential information. The proposed redaction on page 107 relates to a decade-old agreement between McClane and Walmart, that is also connected and similar to kind of information I have already declined to redact in Docs. 1778-4, 1778-5, and 1778-6. |
| A15 | 1778-18 | Summary Judgment | The request to redact this document is denied. Some of the information McClane seeks to redact is too generic to be sensitive or summarizes agreements in broad terms (e.g., ¶¶ 859, 862, 865). Some of it is more specific but appears to connect to an agreement between Walmart and McClane |

19

| | | | |
|---|---|---|---|
| | | | made in 2011 (e.g., ¶ 883).  In the absence of more specific assertions about why decade-old information poses a competitive risk, the substantial burden to seal information connected to a motion for summary judgment is not met.  Finally, much of it is the kind of information I have already declined to redact in Docs. 1778-4, 1778-5, and 1778-6. |
| A16 | 1778-19 | Summary Judgment | The request to redact this document is denied.  The document is an email chain that is more than a decade old.  McClane does not offer anything to credibly suggest that this apparently stale information is properly sealed. |
| A17 | 1778-20 | Summary Judgment | The request to redact this document is granted.  The redactions concern specific portions of a 2012 contract McClane negotiated.  While I am somewhat doubtful that a decade-old contract is properly sealed, McClane has specifically indicated that it will be harmed if these contract provisions are disclosed because competitors will be able to leverage these disclosures.  (Doc. 1746, at 3.)  Thus, as in *Home Box Off., Inc.*, I am satisfied that these provisions reflect current practices that, if revealed, could be leveraged by competitors.  26 F. Supp. 2d at 614. |
| A18 | 1778-21 | Summary Judgment | The request to redact this document is denied.  The redactions concern specific provisions of a 2012 contract addendum.  Accordingly, they may be sealed for the same reasons discussed with regard to Doc. 1778-20. |
| A19 | 1778-22 | Summary Judgment | The request to redact this document is granted.  The redactions concern specific provisions of a 2012 contract addendum.  Accordingly, they may be sealed for the same reasons discussed with regard to Doc. 1778-20. |
| A20 | 1778-23 | Summary Judgment | The request to redact this document is granted.  The redactions concern specific provisions of a contract.  Accordingly, they may be sealed for the same reasons discussed with regard to Doc. 1778-20. |

20

Add.168

| A21 | 1778-24 | Summary Judgment | The request to redact this document is denied. The redactions concern emails from 2015, which discuss a specific overstocking issue at that time between McClane and Smuckers. McClane does not provide, nor do I see, any evidence that these emails discuss a current practice that could reasonably be classified as sensitive or confidential. |
|---|---|---|---|
| A22 | 1778-25 | Summary Judgment | The request to redact this document is denied. The redactions relate to another 2015 email chain discussing a specific overstocking issue. The email covers similar issues to those in Doc. 1778-24, and redaction is denied for substantially the same reasons. |
| A23 | 1778-26 | Summary Judgment | The request to redact this document is denied. The requested redactions are contained in a 2012 email chain discussing a specific overstocking issue. The email covers similar issues to those in Doc. 1778-24, and redaction is denied for substantially the same reasons. |
| A24 | 1778-27 | Summary Judgment | The request to redact this document is denied. McClane proposes an extensive set of redactions to a deposition transcript submitted in connection with a summary judgment motion. While it suggests in a cursory manner that this information is sensitive and confidential because it relates to contract terms, (Doc. 1778-1, at 6), the redactions cover more than contract terms. Some of the redactions cover information similar to that in Doc. 1778-4, which I have already indicated may not be redacted. Others relate to general business practices not directly connected to a contract. I cannot make the specific findings necessary to justify the sealing of such a broad range of information on the basis of this cursory justification. |
| A25 | 1778-28 | Summary Judgment | The request to redact this document is granted in part and denied in part. The proposed redactions to pages 22–25 and 33 are substantially the same type of information I have already indicated may |

21

Add.169

| | | | |
|---|---|---|---|
| | | | not be redacted in Doc. 1778-4. The redactions to pages 28–30 are permitted because they deal with current business relationships and sales numbers. The redaction to page 68 is denied because it is a single sales number from 2013 which does not relate to McClane's proposed rationale of protecting confidential business strategies. (Doc. 1778-1, at 7.) |
| A26 | 1778-29 | Summary Judgment | The request to redact this document is granted in part and denied in part. The material on pages 140–141 may be redacted because it covers an unrelated commercial transaction. The remaining redaction requests are denied because they discuss forecasting methods and deals that appear to have been used in 2014, and which appear to be specifically related to the business practices associated with single-serve Keurig products. It is not apparent from this data, nor does McClane explain, beyond conclusory assertions, why this information remains sensitive some eight years later. |
| A27 | 1778-30 | Summary Judgment | The request to redact this document is denied. The redactions address McClane's use of forecasting methods for various commercial transactions specifically related to its sale of Keurig K-Cups. All of the relevant business relationships were terminated by 2016, and McClane provides only conclusory assertions of commercial sensitivity to explain why this highly specific and seeming stale information should be redacted. |
| A28 | 1778-31 | Summary Judgment | The request to redact this document is denied. McClane proposes an extensive set of redactions to a deposition transcript submitted in connection with a summary judgment motion but does not explain with any specificity why these redactions are appropriate, save for a single reference to page 136, where it notes that it sells candy to Walmart. These conclusory assertions cannot justify redaction. |

| A29 | 1778-32 | Summary Judgment | The request to redact this document is denied, because the requested redactions relate to the kind of pricing and forecasting information I concluded is not appropriate for sealing in the context of Docs. 1778-4 and 1778-29. |
|---|---|---|---|
| A30 | 1778-33 | Summary Judgment | The request to redact this document is granted. The requested redactions address specific provisions of a 2011 contract between McClane and Walmart. McClane has indicated that these provisions are relevant to the broader long-term working relationship between these companies and that specific redactions of key agreements are therefore necessary to protect McClane from competitive harm. (Doc. 1778-1, at 8.) Additionally, the reasons for protecting contracts I discussed in relation to Doc. 1778-20 apply here. |
| A31 | 1778-34 | Summary Judgment | The request to redact this document is granted. The requested redactions are granted as they relate to contract provisions between Walmart and McClane substantially similar to the ones I approved in Doc. 1778-33. |
| A32 | 1778-35 | Summary Judgment | The request to redact this document is denied. The document is a 2016 email thread addressing business questions between McClane and Walmart in general terms. McClane does not provide more than conclusory assertions as to why this six-year-old email chain is the kind of sensitive information likely to have broader competitive harms. |
| A33 | 1778-36 | Summary Judgment | The request to redact this document is granted. The redactions relate to the specific terms of a 2014 contract, which I find are properly redacted for substantially the same reasons as discussed in Doc. 1778-20. |
| A34 | 1778-37 | Summary Judgment | The request to redact this document is denied. This document is Keurig's memorandum of law in support of its motion for summary judgment, and it is particularly inappropriate to seal the party's actual moving papers (as opposed to supporting evidence) absent the most compelling of |

23

| | | | |
|---|---|---|---|
| | | | reasons. The information McClane proposes to seal, moreover, is either information like the content discussed in Doc. 1778-4, which is not appropriately redacted, or generic assertions that do not work a competitive harm. |
| A35 | 1778-38 | Summary Judgment | The request to redact this document is granted in part and denied in part. The proposed redactions to footnote 161 are granted to the degree that they address current sales and business relationships. They are denied to the degree that they discuss sales associated with McClane's old K-Cup business. The proposed redactions to ¶¶ 163, 167, and 169 are denied because they relate specifically to K-Cup transactions from 2016, and McClane does not provide any non-conclusory explanation why information related to a specific product at the heart of this litigation is likely to work a broader competitive harm if released. The remaining redactions are denied because they are the kind of material that I addressed in my analysis of Doc. 1778-4, which is not appropriate for sealing. |
| A36 | 1778-39 | Summary Judgment | The request to redact this document is denied. The document contains requests for admissions discussing contract provisions between McClane and Smucker. The content is, as might be expected given that it was prepared by attorneys, heavily qualified, and framed in highly generic terms. Accordingly, this material lacks the specificity or detail to justify sealing. |
| A37 | 1778-40 | Summary Judgment | The request to redact this document is denied. This document is an internal 2016 McClane email summarizing its position on a K-Cup proposition by Walmart. McClane does not explain in more than a conclusory fashion why a brief six-year-old email related to a specific promotion is so sensitive that it is likely to inflict a competitive harm on McClane if released. |
| A38 | 1778-41 | Summary Judgment | The request to redact this document is denied. This document is an email chain discussing 2016 K-Cup transactions with |

24

Add.172

| | | | Walmart. It is similar to the material in Docs. 1778-35 and Docs. 1778-40, and redaction of this material is denied for substantially the same reason. |
|---|---|---|---|
| A39 | 1778-42 | Summary Judgment | The request to redact this document is denied. This document is an email discussing 2016 K-Cup transactions with Walmart. The proposed redactions cover content similar to that of Docs. 1778-35, 1778-40, and 1778-41, and I deny them for substantially the same reasons. |
| A40 | 1778-43 | Summary Judgment | The request to redact this document is denied. This document is a set of business records related to the McClane's K-Cup sales to Walmart from 2012 to 2015, with some projections for 2016. McClane does not explain why this apparently stale and deal-specific information would inflict a broader competitive harm on it. Additionally, some of the information related to mark-ups is the type of information that, consistent with my analysis of Doc. 1778-4, is not appropriate for redaction. |
| A41 | 1778-44 | Summary Judgment | The request to redact this document is denied. This document is a 2013 email chain about a K-Cup-based interaction with Walmart. I have found similar, more recent emails are not appropriate for redaction (*i.e.*, Docs. 1778-35, 1778-40, 1778-41, 1778-42); therefore, I find these redactions are inappropriate for the same reasons. |
| A42 | 1778-45 | Summary Judgment | The request to redact this document is denied. McClane seeks to redact information similar to the redactions I denied for Doc. 1778-4, and the request is denied for substantially the same reasons. |
| A43 | 1778-46 | Summary Judgment | The request to redact this document is granted in part and denied in part. The proposed redactions to footnote 161 are granted to the degree that they address current sales and business relationships. They are denied to the degree that they discuss sales associated with McClane's old K-Cup business. The proposed redactions to ¶¶ 163, 165 to 169, and any associated |

| | | | |
|---|---|---|---|
| | | | footnotes are denied because they relate specifically to K-Cup transactions from 2016, and McClane does not provide any non-conclusory explanation why information related to a specific product at the heart of this litigation is likely to work a broader competitive harm if released. The remaining proposed redactions are the kind of material that, consistent with my analysis of Doc. 1778-4, is not appropriate for sealing. |
| A44 | 1778-47 | Summary Judgment | The request to redact this document is denied. The requested redactions concern hypothetical of the type I have already indicated is inappropriate for redaction in Doc. 1778-7, and the request is denied here for the same reasons. |
| A45 | 1778-48 | Summary Judgment | The request to redact this document is denied. First, McClane only specifically indicates that it seeks redactions to a specific paragraph even though numerous redactions in a similar color appear throughout the document. If these redactions are also sought by McClane, it has provided no basis for them and so has failed to meet its burden. As to the sole item it seeks to redact (¶ 859), the proposed redaction is illogical since it redacts only part of a line while leaving the summary of the line that explains its import. The proposed redaction would thus create confusion without actually redacting the relevant information. |
| A46 | 1778-49 | Summary Judgment | The request to redact this document is denied. This is an internal 2012 email exchange discussing McClane and Keurig's negotiations. Although McClane indicates that this email is relevant to its contract negotiations more generally, a decade-old internal discussion of a contract negotiation between litigation adversaries is simultaneously too stale to justify sealing on broader competitive grounds and too relevant to the understanding of the present dispute to warrant redaction. |
| A47 | 1778-50 | Summary Judgment | The request to redact this document is denied. This document is a 2012 email |

| | | | |
|---|---|---|---|
| | | | chain discussing a specific overstocking issue. The email covers similar issues to those in Docs. 1778-24 and 1778-26, and the requested redactions are denied for substantially the same reasons. |
| A48 | 1778-51 | Summary Judgment | The request to redact this document is denied because the redactions cover the same kind of information as in Doc. 1778-4; therefore, the requested redaction is denied for substantially the same reasons |
| A49 | 1778-52 | Summary Judgment | The request to redact this document is denied. The document contains requests for admissions discussing contract provisions between McClane and Smucker. The content is, as might be expected given that it was prepared by attorneys, heavily qualified and framed in highly generic terms, and redaction is thus not appropriate for the same reasons I identify for Doc. 1778-40. The content, moreover, is substantially similar to the content in Doc. 1778-4, which again, is not the appropriate subject for redaction. |

## 2. Proprietary Business Practices

McLane requests to redact information about proprietary business practices. The information they wish to seal or redact is set out at Docs. 1778-53 to 1778-88 and summarized in Doc. 1778-2. Each of these documents are filed in connection with motions for summary judgment and Doc. 1778-53 also appears in *Daubert* motions. The First Amendment right of access therefore attaches to these documents. *Brown*, 929 F.3d at 47.

McClane's request to seal these documents is denied because they have not overcome the burden imposed by the stringent test for sealing or redacting materials under the First Amendment. McClane asserts that the information in the proposed redactions "reference[s] McLane's proprietary business practices and strategies, such as methods for measuring demand, creating forecasts, and placement of orders for its customers." (Doc. 1746, at 4.) The supporting

27

appendix provides virtually no additional information that would permit me to make the specific findings necessary to justify sealing under the First Amendment test.  In most cases, McClane simply asserts that the information in a particular document is "commercially sensitive" without providing additional information.  *See* Doc. 1778-2.  These kind of "broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test" for sealing. *Coventry Cap. US LLC*, 2017 WL 5125544, at \*3 (cleaned up).  Docs. 1778-55 and 1778-56 are not even described as commercially sensitive.  (Doc. 1778-2, at 1.)

The contrast between this request, and *Home Box Off., Inc.*, which McClane cites, is instructive.  26 F. Supp. 2d at 613.  There, "Defendants submit[ed] numerous affidavits attesting to the confidentiality of the information they [sought] to seal."  *Id.*  This included "specific testimony that, for example, the cost and profit structures of the defendants, the volume of subscribership and the strategies employed . . . have not significantly changed since 1991" and testimony that key agreements which the defendants wished to seal were "still in force."  *Id.* at 614.  The sworn testimony describing specific harms in detail differentiates *Home Box Off., Inc.* from McClane's requests.

Nor, based on my review, are any of these documents so facially sensitive that they would merit sealing even on this limited showing.  Some of this material is eight or nine years old at this point.  McClane does not explain why this apparently stale information is still commercially sensitive.  (*See, e.g.*, Docs. 1778-62, 1778-63, 1778-64.)  Other material appears highly specific to McClane's old K-Cup business so it is not clear why it would work a broader competitive harm on McClane if disclosed now.  (*See, e.g.*, Docs. 1778-64, 1778-68, 1778-72, 1778-75, 178-81.)  Some information is so generic that it is not clear why it would work a competitive harm.  (*See, e.g.*, Docs. 1778-65, 1778-69, 1778-71.)  In the absence of any facially

28

Add.176

sensitive information, crediting the unsworn and generic assertions of harm made by McClane would permit the sensitive commercial information exception to swallow the First Amendment rule. Accordingly, the requested redactions are denied.

### 3. Personal Information of Current and Former Employees

McLane requests to redact the phone numbers and email address of various individual employees that appear in exhibits supporting Plaintiffs' motion for summary judgment, Keurig's motion for summary judgment, and oppositions to these motions. This personal information appears at Doc Nos. 1778-89 to 1778-114, and is summarized in Doc. 1778-3.

These requests are granted. I have reviewed the proposed redactions in each of these as they relate to the email addresses and phone numbers of individuals.[4] The privacy of third parties is the type of higher value that justifies sealing even where the First Amendment right of access attaches. *Matter of New York Times Co.*, 828 F.2d at 116. In some cases, however, these redactions cover information that is clearly not private. Doc. 1778-98 seeks to redact corporate website (*e.g.*, "Keurig.com", "KeurigGreenMountain.com"), which is not appropriate and therefore the request to redact this type of information is denied.

### D.   *The AVB, DCS, and HWY Requests (Docs. 1755, 1765, 1774)*

Non-parties AVB Sales and Marketing, LLC ("AVB"), (Doc. 1755), Demitri Chesapeake Sales Specialty Brokerage ("DCS"), (Doc. 1765), and Harold W. Young Partners ("HWY"), (Doc. 1774), request to seal certain documents. These requests are granted to the extent that they relate to employees' personal information but are otherwise denied.

AVB requests to redact several paragraphs of Exhibit 141 of Doc. 1497. Specifically,

---

[4] In certain cases, McClane has including redactions based on multiple grounds in a single request. For example, McLane references the same email chain with the same proposed redactions twice: once to request the redaction of commercially sensitive information, (Doc. 1753-24), and once to request redactions of personal information (Doc. 1753-89). My approval of redactions of personal information does not extend to these other redactions.

Add.177

AVB seeks to redact paragraphs 8, 9, 10, 11, 13, 14, 15, 16, 17, and 18. (Doc. 1763-1.) DCS requests partial redactions covering employee personal information and business suppliers referenced in a 2016 email. (Doc. 1771-1.) HWY requests partial redactions covering employee personal information and business suppliers referenced in a 2012 email. (Doc. 1777-1.) All of these materials have been submitted in connection with motions for summary judgment.

These movants use virtually identical and equally generic language in their requests. In each case they assert that if this information becomes public, customers or business partners referenced "could become prejudiced towards [movant], resulting in lost revenues." They further assert that this information "may place [movant] at a competitive disadvantage were it to become public." (*Compare* Docs. 1755, 1765, 1774.) They provide no additional detail or declarations explaining why prejudice would result or what competitive harm would accrue.

As these materials have been submitted in connection with a motion for summary judgment, they are subject to the more stringent First Amendment standard for sealing. *Brown*, 929 F.3d at 47. I have already found that the redaction of personal employee information is permissible under this test in connection with McClane's request to seal. *See infra* Section II.C.3. Redacting the phone numbers and emails of employees is permissible here for the same reasons.

Movants do not otherwise make the showing required to support sealing. The type of "generalized concern of negative reaction" they proffer is not sufficient to overcome the common law presumption of access to documents like complaints. *Kim v. BTG Pactual Asset Mgmt. US, LLC*, No. 22-CV-3547 (RA), 2022 WL 4115955, at *2 (S.D.N.Y. Sept. 9, 2022); *see also Gen. Media, Inc. v. Shooker*, No. 97 CIV. 510 (DAB), 1998 WL 401530, at *12 (S.D.N.Y. July 16, 1998) ("The public interest in access to the courts, and the court's own interest in

30

Add.178

allowing such access, far outweigh [a defendant's] generalized concern of negative reaction on his business dealings.")  If generalized business concerns cannot overcome the common-law presumption of access, then it cannot overcome the stronger First Amendment right.

Additionally, even accepting that AVB may have privacy interests as a third-party, those interests are diminished here.  AVB is a broker for products sold by TreeHouse.  (Doc. 1763-1, at ¶ 1.)  It thus has a business relationship with the TreeHouse plaintiffs and a favorable opinion of TreeHouse and its products, (*id.* ¶¶ 20–21), and it also believes that Keurig's practices have cost it business, (*id.* ¶ 1).  Thus, although its privacy interests are entitled to consideration, as in *Olson*, these interests are diminished compared to those of a truly unassociated third-party.  29 F.4th at 91.  Accordingly, I do not find that these third-party privacy interests support redaction either.

As for DCS and HWY, they fail to show why the information they request to seal is not stale.  DCS and HWY seek to redact emails that are 6 and 10 years old respectively.  Although it is possible to show that such information is not so stale as to require disclosure through specific demonstrations of harm, neither movant has provided more than generic assertions.  These broad assertions do not meet the stringent First Amendment test for sealing or redaction.  Movants may therefore redact employee phone numbers and email addresses that appear in these materials, but nothing else.

### E.  *The JBR Materials (Doc. 1789)*

JBR, Inc. ("JBR") requests to seal selected pages of exhibits filed in connection with summary judgment and *Daubert* motions.  Requests to redact or seal materials associated with summary judgment and *Daubert* motions are subject to the more stringent test associated with the First Amendment right of access.

Add.179

The basis for JBR's request is that this information involves aggregate sales revenue, sales to specific customers in specific time frames, pricing and discounting at specific times, capitalized costs of manufacturing and marketing, and margins.  (Doc. 1789, at 2.)  It also notes that this material has been designated as "highly confidential" under the terms of the Protective Order and that the request is narrowly tailored such that it focuses on only these specific categories of information and does not involve the wholesale sealing or redaction of documents.  (*Id.* at 1–2.)  The documents JBR wishes to seal and my rulings on these requests are collected in Table 2 below.  References to tables, figures, and appendices refer to the relevant item in the document unless otherwise noted.

| Table 2: Sealing and Redaction Requests McLane Supplier and Customer Contractual Information | | | |
|---|---|---|---|
| JBR Exhibit Letter of Document to be Sealed | Associated Doc. No. | Motion or Motions Associated With Sealing Request | Ruling (all page number ) |
| A | 1790-1 | *Daubert* | The request to redact this document is granted in part and denied in part.  JBR seeks to seal information from 2011 to 2019.  It does not explain why some of this information that is more than a decade old is not stale.  This is notable since JBR has objected to similar efforts by parties to keep information eight years or older under seal.  (Doc. 1810, at 6–7.)  I agree with JBR that, as a general matter, years', and in some cases decade old information should not be sealed absence a compelling showing.  Accordingly, JBR may redact information from 2016 and later in Tables 44, 45, 46, and 48.  It may also redact Figures 35, 36, 37, 38, 39, 41, and 42, so that information from 2016 and thereafter can be redacted.  All other redaction requests are denied, including requests to redact |

32

Add.180

| | | | |
|---|---|---|---|
| | | | aggregated sums (e.g., the total sum from 2012 to 2019). |
| B | 1790-2 | *Daubert* | For the reasons discussed in Doc. 1790-1, JBR may redact specific figures associated with years 2016 forward on ECF pages 7, 9, and 11. The redaction requests covering information from 2015 and earlier are denied. The redactions to ECF pages 4 and 6 are also approved. These redactions concern specific machinery costs and totals that could not be disclosed without making it possible to "reverse engineer" the machinery costs. |
| C | 1790-3 | *Daubert* | JBR may redact Figures 44, 45, 47, 48, 50, and 51 so that information from 2016 onwards is redacted. All other redaction requests are denied. The information is stale, and, in any case, JBR has not requested to redact identical information for Doc. 1790-7, so granting the other redaction requests here would be moot. |
| D | 1790-4 | *Daubert* | For the reasons discussed in Doc. 1790-1, JBR may redact specific figures associated with years 2016 forward in Exhibits 40–43, Appendices D.22–25 and Appendices I.1 and I.2. It may also redact Appendices D.10 and D.11 so that information from 2016 onwards is redacted. All remaining redactions are denied as these items are either aggregate information that is too broad to permit sealing or expert projections and assessments not associated with the specific, actual data for which JBR has requested sealing. |
| E | 1790-5 | *Daubert* | For the reasons discussed in Doc. 1790-1, JBR may redact specific figures associated with years 2016 forward in Exhibits 22, 23, and 24. It may also redact Exhibits 42, 43, and 44 so that information from 2016 onwards is redacted. All other redaction requests are denied, including requests to redact aggregated sums (e.g., the total sum from 2012 to 2019). |
| F | 1790-6 | *Daubert* | For the reasons discussed in Doc. 1790-1, JBR may redact specific figures associated with years 2016 forward in Exhibits 22, 23, and 24. It may also redact Exhibits 42, 43, and 44 so that information from 2016 |

Add.181

| | | | onwards is redacted.  All other redaction requests are denied, including requests to redact aggregated sums (e.g., the total sum from 2012 to 2019). |
|---|---|---|---|
| G | 1790-7 | Summary Judgment | JBR may redact Figures 44, 45, 47, 48, 50, and 51 so that information from 2016 onwards is redacted. |
| H | 1790-8 | Summary Judgment | For the reasons discussed in Doc. 1790-1, JBR may redact Figures 44, 45, 47, 48, 50, and 51 so that information from 2016 onwards is redacted.  Other redaction requests are denied. |
| I | 1790-9 | Summary Judgment | JBR may redact Figures 38 and 39, as well as Tables 44, 45, 46, and 48, so that information from 2016 onwards is redacted.  All other redaction requests are denied. |
| J | 1790-10 | Summary Judgment | For the reasons discussed in Doc. 1790-1, JBR may redact specific figures associated with years 2016 forward in Exhibits 22 and 23. It may also redact Exhibits 43 and 44 so that information from 2016 onwards is redacted.  All other redaction requests are denied, including requests to redact aggregated sums (e.g., the total sum from 2012 to 2019). |

In cases where I have authorized partial redactions to a table, row, and column heading identifiers must remain unredacted.  This includes year headings, even if specific information associated with that year may be redacted (*e.g.*, if a table showed sales of $1.00 in 2019, the $1.00 may be redacted, but the "2019" table heading may not.)  Where I have partially authorized redactions for a period, information before that period must be disclosed.  For example, if redactions for 2016 onwards are granted for a table that also has information from 2012 to 2015, the 2012 to 2015 figures must be disclosed.

### F.      *The TreeHouse Materials (Doc. 1799)*

TreeHouse requests to seal information submitted in connection with the parties' *Daubert* and summary judgment motions.  (Doc. 1799.)  It requests sealing or redacting across three

34

Add.182

different categories of information: (1) recent pricing, margin, sales, and cost information (*id.* 3),

(2) business strategy, bid, and payment information, (*id.* 3–4), and (3) personal information of

current and former employees, (*id.* 4–5).  It has provided appendices setting out the rationale for

sealing or redacting each document.  (Docs. 1799-1 to 1799-3.)  Summary judgment and

*Daubert* motions are, as noted, subject to a First Amendment right of access, so the burden is on

TreeHouse to meet the stringent test for sealing by showing that their sealing requests are

narrowly tailored to preserve higher values.

### 1. Recent Pricing, Margin, Sales, and Cost Information

TreeHouse requests to redact information about its pricing, margins, sales, and costs.  It

asserts that this is recent, non-public, information that will work a competitive harm on

TreeHouse if it is released.  (Doc. 1799, at 3.)  The redactions it proposes are contained in Docs.

1801-1 through 1801-31, and summarized at Doc. 1799-1.  My rulings on these requests are

collected below in Table 3.  References to exhibits refer to a document's exhibits unless

otherwise noted.  "ECF pages" refers to the pagination applied by ECF.

| Table 3: Sealing and Redaction Requests for TreeHouse Recent Pricing, Margin, Sales, and Cost Information | | | |
|---|---|---|---|
| TreeHouse Exhibit Number of Document to be Sealed | Associated Doc. No. | Motion or Motions Associated With Sealing Request | Ruling |
| THS-1 | 1801-1 | Summary Judgment | These redaction requests are granted because they involve sufficiently recent and specific competitive information from 2016.  The proposed redactions are narrow in scope.  Certain redactions also involve personally identifying information that is properly redacted for the reasons discussed in Section II.C.3. infra. |

35

Add.183

| THS-2 | 1801-2 | Summary Judgment | These redaction requests are granted because they involve recent and specific competitive information from 2016 and the proposed redactions are narrow in scope. (Doc. 1799, at 3.) |
|-------|--------|------------------|------|
| THS-3 | 1801-3 | Summary Judgment | These redaction requests are granted because they address specific and recent price information from 2018 onward as well as future economic projections. Although some of the information to be redacted is expert projections that would otherwise be inappropriate for redaction, I find that the data is framed in such a way that unprotected expert information is inextricable from protected commercial information and that higher values still require sealing. |
| THS-4 | 1801-4 | Summary Judgment | This redaction request is denied. These are redactions to a 2016 email that does not reflect actual price points for TreeHouse products. |
| THS-5 | 1801-5 | Summary Judgment | This redaction request is granted. Although TreeHouse does not provide a date for this document, it is functionally identical to the document at Doc. 1801-11. Based on this, redaction is permissible because this is a narrow redaction covering specific price information. |
| THS-6 | 1801-6 | Summary Judgment | This redaction request is denied. Without a date for the information to seal, it is not possible to tell if this information is stale or not. It is also not clear from the face of the document if this is actual TreeHouse pricing information. |
| THS-7 | 1801-7 | Summary Judgment | This redaction request is granted because the redactions are specific 2016 to 2019 pricing information and the redactions are narrowly tailored to address just this information. |
| THS-8 | 1801-8 | *Daubert* | This redaction request is granted. The redactions concern specific pricing and unit sales information from 2019. Although some of the pricing information also covers earlier periods and would otherwise be stale, I find that this information is presented in such a way that |

36

Add.184

| | | | |
|---|---|---|---|
| | | | the sensitive information is inextricably connected to the otherwise stale information, and that the redactions are sufficiently narrow that no more information will be sealed than necessary given this issue. |
| THS-9 | 1801-9 | Summary Judgment | This redaction request is granted in part and denied in part. The redactions on ECF pages 4 and 13 are denied. The redactions on these pages are averages aggregating four to seven years of information, which is too broad a range to merit redaction. For the same reason, the total sales numbers in Exhibits 19, 21, and 52 may not be redacted. The remaining information is specific price, cost, and sales information from 2016 onward that may be redacted. |
| THS-10 | 1801-10 | *Daubert* | The request to redact this document is granted because the redaction concern specific price, cost, fixed-cost, and sales information that is from 2016 onward. |
| THS-11 | 1801-11 | Summary Judgment | The request to redact this document is granted for the reasons discussed in Doc. 1801-5. |
| THS-12 | 1801-12 | Summary Judgment | This redaction request is granted because the redactions concern specific 2016 unit pricing information. |
| THS-13 | 1801-13 | Summary Judgment | This document is substantially similar to 1801-12 and these redactions are granted for the same reasons. |
| THS-14 | 1801-14 | Summary Judgment | This redaction request is granted because the redactions are narrowly tailored to address only specific 2016 cost information as well as employee personal information. |
| THS-15 | 1801-15 | Summary Judgment | This redaction request is granted because the redactions concern specific 2016 unit costs. |
| THS-16 | 1801-16 | Summary Judgment | This redaction request is granted because the redactions are narrowly tailored to address only specific 2016 and 2017 cost information as well as employee personal information. |
| THS-17 | 1801-17 | Summary Judgment | This redaction request is granted because the redactions relate to unit cost |

| | | | information from less than two years ago. (Doc. 1799-1, at 7.) |
|---|---|---|---|
| THS-18 | 1801-18 | Summary Judgment | This redaction request is granted because the redactions include specific 2016 sales information as well as employee personal information. |
| THS-19 | 1801-19 | Summary Judgment | This redaction request is granted because the redactions relate to 2016 pricing information and sales incentives. |
| THS-20 | 1801-20 | Summary Judgment | This redaction request is granted in part and denied in part. The redaction to 2012 sales information on ECF page 5 is denied because it is from 2012 and is unredacted on ECF page 4. The remaining redactions are granted because they cover recent, sensitive business information from 2016 onwards. The requests are also narrowly tailored to restrict only that information. Where information in these redactions comes from before 2016, I have determined that it is presented in such a way that the pre-2016 information is inextricable from the post-2016 information and that the interest in preventing competitive harm still merits redaction. |
| THS-21 | 1801-21 | Summary Judgment | This redaction request is granted because the redactions relate to 2016 unit sales. |
| THS-22 | 1801-22 | Summary Judgment | This redaction request is granted because the redactions concern specific cost, price and margin information related to a 2018 product launch and are narrowly tailored to cover only that information. |
| THS-23 | 1801-23 | Summary Judgment | This redaction request is granted because the redactions concern specific margin, price, and sales information from 2017 onwards. Where information in these redactions comes from before 2017, I have determined that it is presented in such a way that the pre-2017 information is inextricable from the post-2017 information and that the interest in preventing competitive harm still merits redaction. |
| THS-24 | 1801-24 | Summary Judgment | This redaction request is granted because the redactions concern specific sales |

| | | | |
|---|---|---|---|
| | | | information for numerous products, including ones irrelevant to the present litigation, for a period from 2016 to 2019. |
| THS-25 | 1801-25 | Summary Judgment | This redaction request is granted because the redactions are narrowly tailored redactions of 2017 price figures for TreeHouse products. |
| THS-26 | 1801-26 | *Daubert* | This redaction request is granted because the redactions are narrowly tailored redactions sales and earnings information from 2017 through 2019. Where information in these redactions comes from outside this period, I have determined that it is presented in such a way that the otherwise stale information is inextricable from the non-stale information and that the interest in preventing competitive harm still merits redaction. |
| THS-27 | 1801-27 | *Daubert* | The redaction request is granted in part and denied in part. The numbers on ECF pages 9–16 are, in the main, expert projections based on expert analysis. These are projections prepared for litigation, not actual competitive information. TreeHouse may redact columns C, D and E of tables in this section (actual competitive information and two more columns to inhibit the "reverse engineering" of that information), but nothing else from this section. The remaining redactions are granted because they include profit and manufacturing capacity information from 2019 to 2020. Where information in these redactions comes from outside this period, I have determined that it is presented in such a way that the otherwise stale information is inextricable from the non-stale information and that the interest in preventing competitive harm still merits redaction. |
| THS-28 | 1801-28 | *Daubert* | This redaction request is granted in part and denied in part. These redactions are, in the main, expert projections based on expert analysis. These are projections prepared for litigation, not actual competitive information. TreeHouse may |

| | | | redact columns C, D and E of tables on ECF pages 6–8, and 10–13 (actual competitive information and two more columns to inhibit the "reverse engineering" of that information), the manufacturing information in the "Notes and Sources" section on ECF page 13, and column B in the table on ECF page 15. The remaining redactions are either expert projections or are included in unredacted form elsewhere in the document and thus not appropriate for redaction. |
|---|---|---|---|
| THS-29 | 1801-29 | *Daubert* | This redaction request is granted because the redactions are narrowly tailored to cover 2017 to 2019 profit and margin information. Where information in these redactions comes from outside this period, I have determined that it is presented in such a way that the otherwise stale information is inextricable from the non-stale information and that the interest in preventing competitive harm still merits redaction. |
| THS-30 | 1801-30 | *Daubert* | This redaction request is granted because the redactions are narrowly tailored to cover specific providing margin and sales information from 2016. |
| THS-31 | 1801-31 | *Daubert* | This redaction request is granted because the redactions concern specific sales, loss, revenue, and cost information from 2016 to 2019. Where information in these redactions comes from outside this period, I have determined that it is presented in such a way that the otherwise stale information is inextricable from the non-stale information and that the interest in preventing competitive harm still merits redaction. |

### 2. Confidential Strategic Business Information

TreeHouse requests to redact information about business practices that it asserts would work a competitive harm on it if the information was publicly disclosed. (Doc. 1799, at 3–4.) The proposed documents to be sealed or redacted are filed at Docs. 1801-32–1801-69, and

Add.188

summarized at Doc. 1799-2. All of these documents are filed in connection with motions for summary judgment or *Daubert* motions. My rulings on these requests are collected below in Table 4.

| Table 4: Sealing and Redaction Requests for TreeHouse Confidential Strategic Business Information | | | |
|---|---|---|---|
| TreeHouse Exhibit Number of Document to be Sealed | Associated Doc. No. | Motion or Motions Associated With Sealing Request | Ruling |
| THS-32 | 1801-32 | Summary Judgment | This redaction request is denied because the redactions appear to be information on proposed prices in 2016 specific to a particular bid that are not likely to work a broader competitive harm on TreeHouse. |
| THS-33 | 1801-33 | Summary Judgment | This redaction request is denied. There is no clear date for the information covered by the proposed redactions. Without this information, I cannot make the findings necessary to justify sealing. |
| THS-34 | 1801-34 | Summary Judgment | This redaction request is denied. The prices are from 2014 (Doc. 1799-2, at 1) and TreeHouse provides no information to explain why eight-year-old prices are not stale information. |
| THS-35 | 1801-35 | Summary Judgment | This redaction request is granted. The proposed redactions are narrowly tailored to address price and payment term information from 2014 to 2018. Where information in these redactions would otherwise be stale, I have determined that it is presented in such a way that the otherwise stale information is inextricable from the non-stale information and that the interest in preventing competitive harm still merits redaction. |
| THS-36 | 1801-36 | *Daubert* | This redaction request is denied because it is generic and does not address specific business information that would plausibly work a competitive harm on TreeHouse. Rather, it addresses the terms of the |

41

| | | | |
|---|---|---|---|
| | | | settlement of a lawsuit between Keurig and TreeHouse. This is not the kind of confidential business information that would work a broader competitive harm on TreeHouse. |
| THS-37 | 1801-37 | *Daubert* | This redaction request is denied for substantially the same reasons as Doc. 1801-36. |
| THS-38 | 1801-38 | *Daubert* | This redaction request is granted in part and denied in part. The redactions on ECF pages 4, 5, 12 are denied because they are expert opinions prepared for litigation or are otherwise not confidential business information that would work a competitive harm on TreeHouse. The redactions on ECF page 9 are denied because it is general information from 2014 that is stale and too general to work a competitive harm. The remaining redactions on ECF pages 6–8, 10, 11, 13, and 15 are granted because they cover recent, competitive business information about bid pricing, costs, and sales prices that could work a competitive harm on TreeHouse. |
| THS-39 | 1801-39 | *Daubert* | This redaction request is denied for substantially the same reasons as Doc. 1801-36. |
| THS-40 | 1801-40 | Summary Judgment | This redaction request is denied. I cannot determine a clear date for the information TreeHouse proposes to redact so I cannot make the necessary findings to determine if this information is stale or otherwise unsuitable for redaction. |
| THS-41 | 1801-41 | Summary Judgment | This redaction request is denied for substantially the same reasons as Doc. 1801-40. |
| THS-42 | 1801-42 | Summary Judgment | This redaction request is denied for substantially the same reasons as Doc. 1801-36. |
| THS-43 | 1801-43 | Summary Judgment | This redaction request is denied. TreeHouse does not provide dates for the information it proposes to redact so I cannot make the necessary findings to determine if this information is stale or otherwise unsuitable for redaction. |

| THS-44 | 1801-44 | Summary Judgment | This redaction request is denied. TreeHouse does not provide dates for the information it proposes to redact so I cannot make the necessary findings to determine if this information is stale or otherwise unsuitable for redaction. |
| THS-45 | 1801-45 | Summary Judgment | This redaction request concerns information substantially similar to the information in 1801-32 and the redaction is denied for substantially the same reasons. |
| THS-46 | 1801-46 | Summary Judgment | This redaction request is denied because the information is too generic and non-specific to plausibly work a competitive harm on TreeHouse. |
| THS-47 | 1801-47 | Summary Judgment | This redaction request is denied because the redactions do not involve actual pricing information but general summaries of non-TreeHouse parties negotiating positions from 2016. |
| THS-48 | 1801-48 | Summary Judgment | This redaction request is granted because the redactions are narrowly tailored to cover specific forward looking business strategies from 2017 that remain relevant. |
| THS-49 | 1801-49 | Summary Judgment | This redaction request is denied because the relevant document is from 2012 and there is no credible explanation for why this decade-old information will work a competitive harm on TreeHouse. |
| THS-50 | 1801-50 | Summary Judgment | This redaction request is denied. The date of this information is not apparent so I cannot make the necessary findings to determine if this information is stale or otherwise unsuitable for redaction. |
| THS-51 | 1801-51 | Summary Judgment | This redaction request is denied. The date of this information is not provided but the document appears to be from 2015 or earlier and TreeHouse does not explain why this information is not stale given its apparent age. |
| THS-52 | 1801-52 | Summary Judgment | This redaction request is denied. It does not provide a date for the information TreeHouse proposes to redact so I cannot make the necessary findings to determine if this information is stale or otherwise unsuitable for redaction. |

Add.191

| THS-53 | 1801-53 | Summary Judgment | This redaction request is granted because the redactions are narrowly tailored to cover specific confidential strategic business planning information from 2016 to 2021. |
| THS-54 | 1801-54 | Summary Judgment | These redactions cover information substantially similar to the information in 1801-36 and the redactions are denied for substantially the same reasons. Other information covers a contract and dispute with Unilever and TreeHouse does not explain how this information would work a competitive harm if disclosed. |
| THS-55 | 1801-55 | Summary Judgment | This redaction request is denied. TreeHouse has provided its redactions in a manner that makes it impossible to assess what material TreeHouse seeks to redact or why these redactions would be appropriate. Thus, I cannot make the kind of specific on the record findings necessary to permit sealing. |
| THS-56 | 1801-56 | Summary Judgment | These redactions cover information substantially similar to the information in 1801-36 and 1801-54, and the redaction requests are denied for substantially the same reasons. |
| THS-57 | 1801-57 | Summary Judgment | These redactions cover information substantially similar to the information about Unilever in 1801-54 and are denied for substantially the same reasons. |
| THS-58 | 1801-58 | Summary Judgment | This redaction request is denied because the redactions appear to be information on proposed 2016 prices specific to a particular bid that are not likely to work a broader competitive harm on TreeHouse. |
| THS-59 | 1801-59 | Summary Judgment | These redactions cover information substantially similar to the information in 1801-54 and are denied for substantially the same reasons. |
| THS-60 | 1801-60 | *Daubert* | This redaction request is denied because the redactions related exclusively to a specific 2015-2016 bid the disclosure of which is unlikely to work a broader competitive harm. |
| THS-61 | 1801-61 | Summary Judgment | These redactions cover information substantially similar to the information in |

| | | | 1801-36 and 1801-54 and are denied for substantially the same reasons. |
|---|---|---|---|
| THS-62 | 1801-62 | Summary Judgment | These redactions cover information substantially similar to the information in 1801-54 and are denied for substantially the same reasons. |
| THS-63 | 1801-63 | Summary Judgment | These redactions cover information substantially similar to the information in 1801-36 and are denied for substantially the same reasons. |
| THS-64 | 1801-64 | *Daubert* | These redactions cover the same information as in Doc. 1801-47 and are denied for substantially the same reasons. |
| THS-65 | 1801-65 | Summary Judgment | This redaction request is denied because the redactions are speculation about competitor prices rather than actual competitive information, and already recognized losses or specific bid information from 2017 unlikely to work a broader competitive harm on TreeHouse. Where TreeHouse prices are discussed, it is in general terms unlikely to work a broader competitive harm. |
| THS-66 | 1801-66 | Summary Judgment | This redaction request is granted because the redaction includes specific TreeHouse bid prices from 2017. |
| THS-67 | 1801-67 | *Daubert* | This redaction request is denied because the information is from 2014 and TreeHouse does not explain why this information is not stale. |
| THS-68 | 1801-68 | *Daubert* | These redactions cover information substantially similar to the information in 1801-36 and 1801-54. They are denied for substantially the same reasons. |
| THS-69 | 1801-69 | *Daubert* | These redactions cover information substantially similar to the information in 1801-36 and 1801-54 and are denied for substantially the same reasons. |

### 3.  Personal Information of Current and Former Employees

TreeHouse requests to redact personal information of current and former employees such as personal cell phone numbers, as well as addresses of non-party customers.  This personal information is identified in proposed redactions in the documents, located at Docs. 1801-70

Add.193

through 1801-95, and summarized in Doc. 1799-3.  These redactions are granted.  I have already permitted similar redaction requests by McClane.  *See* Section II.C.3 *infra*.  That analysis applies with equal force to these redactions.

### G.      *The Keurig Rule 72 Objection Opposition (Doc. 1822)*

TreeHouse requests to redact certain information associated with their opposition to Keurig's objections under Fed. R. Civ. 72 to Magistrate Judge Sarah L. Cave's April 11, 2022, Order.  (Doc. 1822.)  That order resolved reciprocal motions for spoliation sanctions precluding evidence and awarding fees that Keurig and Plaintiffs filed against each other based on the failure to preserve various materials for discovery.  (Doc. 1806, at 5–6.)

I do not find that a First Amendment right of access attaches to these documents.  As *Brown* notes, although "a court's authority to oversee discovery and control the evidence introduced at trial surely constitutes an exercise of judicial power . . . this authority is ancillary to the court's core role in adjudicating a case."  929 F.3d at 50.  Thus, while documents submitted to aid the court in the exercise of this authority are judicial documents to which the common law right attaches, "the presumption of public access in filings submitted in connection with discovery disputes or motions *in limine* is generally somewhat lower than the presumption applied to material introduced at trial, or in connection with dispositive motions such as motions for dismissal or summary judgment."  *Id.*  For requests to seal such discovery-oriented papers, "a court must still articulate specific and substantial reasons for sealing" but "the reasons usually need not be as compelling as those required to seal summary judgment filings."  *Id.*

Even under this more modest standard, I find that TreeHouse has not met the necessary burden to permit the redactions it requests.  The only justification it offers for sealing in its one-page letter is that the information it wishes to seal has been designated as "Highly Confidential"

46

under the Protective Order.  It does not indicate what harm would accrue if this information was disclosed.  As noted, the fact that material is covered by the Protective Order does not justify sealing.

### H.  *The Unilever Materials (Doc. 1788)*

Non-party Unilever United States, Inc. ("Unilever") requests to seal all of the deposition transcript of its Rule 30(b)(6) witness, Theodore Narozny, as well as the Expert Report of David S. Sibley, Ph.D.  (Doc. 1788.)  These materials were filed as part of summary judgment and *Daubert* motions and are therefore covered by the First Amendment right of access.  Unilever does not provide the kind of specific, particularized information necessary to justify sealing under the stringent First Amendment test nor does it explain with any particularity what harms would accrue to it if these materials were disclosed.  In the absence of such information, I cannot make the findings necessary to justify sealing, particularly since Unilever seeks to seal an entire deposition and expert report rather than to redact narrow portions of these materials.

### I.        *The Community Coffee Company Materials (Doc. 1759)*

Non-party Community Coffee Company, L.L.C., ("CCC") requests to seal certain materials submitted in connection with summary judgment and *Daubert* motions.  (Doc. 1759.) The First Amendment presumption of access attaches to the summary judgment and *Daubert* motion materials CCC wishes to seal.  CCC does not explain why the various materials it wishes to seal should not be public beyond generically asserting third party privacy rights and unspecified commercial harms.  Indeed, it does not even explain precisely what information it wishes to seal or redact in various documents.  Without this information, I cannot make the specific, on-the-record, document-by-document findings necessary to meet the First Amendment test for sealing.

Add.195

### III.    Subsequent Proceedings

Having addressed this first tranche of documents, I now turn to the procedure for implementing this Opinion & Order and for proceedings in the rest of this case.  There are still 25 sealing motions outstanding, some of which propose additional redactions to documents covered in this Opinion & Order.  Filing these documents based on only the redactions covered in this Opinion & Order would be premature and might lead to the disclosure of information that is properly sealed.  Accordingly, all parties who have a motion to seal materials either addressed by this Opinion & Order or pending before me shall meet-and-confer and submit a joint letter setting out a proposed plan for reconciling the redactions directed by this and future orders and getting properly redacted materials filed on the public docket.

This joint letter shall also indicate if parties and non-parties with sealing motions believe that expediting the sealing and reconciliation process through mechanisms such as the appointment of a special master to review sealing requests and make recommendations to the court would be beneficial to the resolution of this action.  If the parties have recommendations for such a mechanism, they may describe it in this letter.

The parties are understandably eager to move the adjudication of this dispute forward with decisions on their substantive motions.  Progress towards that goal will inevitably be slowed if Judge Cave and I are engaged in the kind of line-by-line reviews of thousands of pages of redaction requests required given our obligation to safeguard the public's common law and First Amendment rights of access to court materials.  Therefore, I request the parties use this Opinion & Order as guidance for their future applications to seal or redact documents.

Finally, if any party believes that a sealing request that they have made is mooted or no longer merited given the guidance and determinations in this Opinion & Order, they should raise

48

Add.196

that information as part of this letter. This letter shall be submitted by February 16, 2023.

Judge Cave and I will continue to move the adjudication of this case forward as expeditiously as possible. I expect to address the remaining sealing requests based on the information I receive in the letter I receive from the parties on February 16, 2023. I also plan to resolve two pending objections made under Fed. R. Civ. P. 72, and the class certification request as soon as practicable. Following the resolution of these motions, I will address the parties' *Daubert* motions, which will be useful when I the pending motions for summary judgment.

## IV.    Conclusion

Materials in this matter are to be sealed or redacted in compliance with the terms of this Opinion & Order. The parties shall submit the joint status letter directed by this Opinion & Order by February 16, 2023.

The Clerk of Court is respectfully directed to terminate the motions at Docs. 1405, 1411, 1416, 1746, 1755, 1759, 1765, 1774, 1788, 1789, 1799, and 1822.

SO ORDERED.

Dated: January 17, 2023
      New York, New York

Vernon S. Broderick
United States District Judge

49

Add.197

S.D.N.Y.-N.Y.C.
14-cv-4242
14-md-2542
Broderick, J.

# United States Court of Appeals
### FOR THE
### SECOND CIRCUIT

_____

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 28th day of June, two thousand twenty-three.

Present:

Gerard E. Lynch,
Raymond J. Lohier, Jr.,
Joseph F. Bianco,
*Circuit Judges.*

_____

In re JBR, Inc.,

*Petitioner.*

_____

JBR, Inc., DBA Rogers Family Company,

*Petitioner,*

v.                                                                          22-2079

Keurig Green Mountain Inc., as successor to
Keurig, Incorporated, FKA Green Mountain Coffee Roasters Inc.,

*Respondent.*

_____

Petitioner has filed a renewed petition for a writ of mandamus. Petitioner also moves for leave to file a reply in further support of its petition. Upon due consideration, it is hereby ORDERED that the motion for leave to file a reply is GRANTED. It is further ordered that the mandamus petition is DENIED. While Petitioner may lack an adequate alternative means of obtaining relief, it has not made a showing that its right to the writ is clear and indisputable or that granting the writ is appropriate under the circumstances. *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380–81 (2004).

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court



Add.198

# 26-

# United States Court of Appeals

## for the

# Second Circuit

In Re: JBR, INC.,

*Petitioner.*

************************************************

JBR, INC., DBA Rogers Family Company,

*Petitioner,*

– v. –

KEURIG GREEN MOUNTAIN INC., as successor to Keurig, Incorporated,
FKA Green Mountain Coffee Roasters Inc.,

*Respondent.*

ON PETITION FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**ADDENDUM TO PETITION FOR WRIT OF MANDAMUS
TO THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
Volume 2 of 2 (Pages Add.199-Add.387)**

DANIEL JOHNSON JR.
DAN JOHNSON LAW GROUP, LLP
*Attorneys for Petitioners JBR, Inc. d/b/a
Rogers Family Company*
100 Pine Street, Suite 1250
San Francisco, California 94111
(415) 604-4500
dan@danjohnsonlawgroup.com

CP COUNSEL PRESS    (800) 4-APPEAL • (392608)

| TAB | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Table of Attorneys Withdrawn from 14-md-2542 as of 2026-04-24 | Add.1 |
| 2 | 2019-09-30 Opinion & Order (ECF No. 688) | Add.5 |
| 3 | 2020-10-20 Scheduling Order (ECF No. 1152) | Add.9 |
| 4 | 2020-10-28 Scheduling Order (ECF No. 1160) | Add.15 |
| 5 | 2021-08-25 Plaintiffs' Motion for Summary Judgment (ECF No. 1489) | Add.18 |
| 6 | 2021-08-25 Keurig Motion for Summary Judgment (ECF No. 1493) | Add.24 |
| 7 | 2022-03-28 Opinion & Order (ECF No. 1815 (redacted public version of ECF No. 1806)) | Add.26 |
| 8 | 2022-04-11 Keurig Green Mountain, Inc.'s Motion and Objections to Magistrate Judge Cave's March 28, 2022 Opinion & Order (ECF No. 1816) | Add.145 |
| 9 | 2022-04-19 Table of pending motions (ECF No. 1818-1) | Add.147 |
| 10 | 2022-11-15 Order denying petition, In re JBR, Inc., No. 22-2079 (Document 29) | Add.148 |
| 11 | 2023-01-17 Opinion & Order (ECF No. 1978) | Add.149 |
| 12 | 2023-06-28 Order denying renewed petition, In re JBR, Inc., No. 22-2079 (Document 57) | Add.198 |
| 13 | 2024-07-23 Letter requesting special master (ECF No. 2342) | Add.199 |
| 14 | 2024-07-23 Johnson declaration in support of letter request (ECF No. 2342-1) | Add.203 |
| 15 | 2024-07-26 Order on Letter requesting special master (ECF No. 2344) | Add.208 |
| 16 | 2024-08-02 Letter requesting special master (ECF No. 2346) | Add.212 |

i

| 17 | 2025-01-30 Opinion & Order (ECF No. 2375) | Add.215 |
|----|---------------------------------------------|---------|
| 18 | 2025-07-31 Opinion & Order (ECF No. 2395) | Add.342 |
| 19 | 2026-02-11 Letter request concerning outstanding motions and trial date (ECF No. 2432) | Add.387 |



July 23, 2024

**<u>VIA CM/ECF</u>**

Hon. Vernon S. Broderick, U.S.D.J.
Thurgood Marshall United States Courthouse
40 Foley Square, Courtroom 518
New York, NY 10007

> **Re:**   ***In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,**
> **MDL No. 2542**
> **<u>Letter Motion Requesting Status Conference and Appointment of Special</u>**
> **<u>Master</u>**

Dear Hon. Judge Broderick:

I write on behalf of JBR to respectfully request a status conference in this matter and request appointment of a special master to alleviate the burdens on the Court and prejudice to the parties created by the voluminous set of motions filed in 2021.

It has been nearly four years since the last status conference in this matter, which occurred before the parties completed their expert reports and submitted their summary judgment and *Daubert* motions.  ECF No. 1152 [scheduling order terminating transfer request following status conference with Judge Cave in Oct. 2020]; ECF No. 1160 [amended scheduling order]; ECF No. 688 [amended case management plan and scheduling order].

In the nearly three years since the parties submitted summary judgment briefing in 2021 and nearly four years since the parties issued expert reports in 2020, Keurig's anticompetitive conduct in the market has continued to harm plaintiffs, while also resulting in the slow but inevitable decay of the evidentiary record due to the deaths, retirements, and career changes of key fact and expert witnesses.  Several of JBR's fact witnesses are in their 70s or 80s.  *See* Declaration of Daniel Johnson, dated July 23, 2024, ¶ 4.  Likewise, several of JBR's 30(b)(6) and expert witnesses (and witnesses it will seek to cross-examine) are either retired or in the process of retiring raising questions as to their availability for trial.  *Id*., ¶¶ 2-4.  Additionally, numerous Keurig and third-party witnesses whom JBR may call in its case have retired, changed careers, or passed away.  *Id*., ¶¶ 5-6, 8.  As set forth in the Declaration of Daniel Johnson, the continued failure to decide the numerous motions is having a materially adverse effect on the litigation.  To assist the Court in addressing the delay, JBR proposes that the Court use its statutory authority, as it did in dealing with the dispute over the designation of confidential materials, to assign all pending motions to a Special Master for resolution.  Many of the motions

📍 1350 Old Bayshore Highway, Suite 520   >   Burlingame, California 94010   >   415.604.4500        www.DanJohnsonLawGroup.com

Add.199

Hon. Vernon S. Broderick, U.S.D.J.
July 23, 2024
Page **2** of **4**

to be decided have already been reviewed by Special Master Judge Holwell in connection with the determination of the proper designation of confidential material.

Under Fed.R.Civ.P. 53(b) "[i]n actions to be tried by a jury, reference [to a master] shall be made only when the issues are complicated; in actions to be tried without a jury ... a reference shall be made only upon a showing that some exceptional condition requires it." The Court, on its own, previously appointed a special master to address voluminous pre-trial motions concerning the confidentiality designations made by all parties. The Special Master found that Keurig had improperly designated numerous documents and ordered Keurig to pay for the extra costs incurred by the Special Master. Still pending are 17 motions, including 9 *Daubert* motions filed by Keurig, 5 filed by plaintiffs, cross motions for summary judgment, and a class certification motion filed by the Direct Purchasers. All these motions were filed in 2021 and have been pending for several years. ECF No. 1818-1, Ex. A to Pls.' Letter Request for a Trial Date.

JBR proposes that those motions filed by JBR or directly affecting JBR should be assigned to a special master. JBR proposes assigning to a special master the *Daubert* motions filed by JBR in 2021 pertaining to Keurig experts Kevin Murphy (ECF No. 1474), Mark Wood (ECF No. 1478), and Marc Hillmyer (ECF No. 1484). Additionally, the special master would resolve the two *Daubert* motions filed by other plaintiffs concerning the opinions of Keurig experts about JBR's case; those motions pertained to Keurig experts Keith Ugone (ECF No. 1470) and Hon. Arthur Gajarsa (ret.) (ECF No. 1220). The special master would also decide the two *Daubert* motions filed by Keurig relating to JBR's experts Gareth Macartney (ECF No. 1456) and Hon. James Ware (ret.) (ECF No. 1449). Most importantly, the special master would decide Keurig's motion for summary judgment, which affects all of JBR's claims at issue in this matter. To expedite this matter and avoid further delay in remanding this matter to California, JBR is willing to withdraw from its joinder of Plaintiffs' motion for summary judgment so that JBR is not awaiting decision on that motion before remand to the Eastern District of California. In short, this proposal would result in a decision on all of the pending motions that affect JBR and would reduce the burden on the Court caused by the sheer volume of the pending motions.

FRCP Rule 53(b) provides a solution for dealing with multiple motions in a complex case by allowing the trial judge to obtain the assistance of a special master and unburden the trial judge. For example, in a case similar to the instant case, the issues involved Sherman Act and Clayton Act violations, breach of contract, breach of fiduciary duty, fraud, tortious interference with contract, tortious interference with prospective contractual relationships, and equitable estoppel, and the parties filed multiple motions. *Union Carbide Corp. v. Montell N.V.*, 179 F.R.D. 425, 426-7 (S.D.N.Y. 1998), as amended (May 18, 1998). The trial judge, Judge Scheindlin, appointed a special master without the consent of the parties to resolve the massive volume of summary judgment motions filed by defendants. *Id*.

In *Union Carbide*, Judge Scheindlin highlighted the burden created by the defendants' voluminous summary judgment motions and noted that "[t]he scope of the reference pursuant to Rule 53 may include a report and recommendation on a motion for summary judgment." *Id*. at

Hon. Vernon S. Broderick, U.S.D.J.
July 23, 2024
Page **3** of **4**

426, citing *Nebraska v. Wyoming*, 507 U.S. 584, 586 (1993); *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1566 (Fed.Cir.1988); *In re Armco, Inc.*, 770 F.2d 103, 104–05 (8th Cir.1985) ("We believe ... that the district court acted properly in granting the master the ... power to hear motions for summary judgment ...."); *Richardson v. Bedford Place Housing Phase I Associates*, 855 F. Supp. 366, 367 (N.D.Ga.1994) (special masters appointed pursuant to Rule 53 have "the authority to make proposed findings of facts and conclusions of law on dispositive motions such as those ... for summary judgment"); *Roberts v. Heim*, No. C–84–8069, 1990 WL 306009, at *3 (N.D. Cal. Aug. 27, 1990) (argument that Rule 53 did not authorize master to make a report on summary judgment motion "finds no support in any authority"). In *Union Carbide*, Judge Scheinlin rejected the antitrust defendants' objection to using a special master and further noted that: "A reference may be made without the consent of the parties." *Id.*, citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 72 F.3d 857, 865 (Fed. Cir. 1995), vacated on other grounds, 520 U.S. 1111 (1997).

Likewise, other cases have appointed special masters to address motions for class certification and *Daubert* motions involving complex data sets, expert analysis, and voluminous records. For example, in *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 564 (S.D.N.Y. 2007), Judge Scheindlin appointed multiple special masters to resolve motions *in limine* concerning expert reports, and the appointed special master issued a 192-page ruling on the motions. Similarly, in a case involving complex transactional data sets and competing expert opinions relevant to a motion for class certification, a district court appointed a special master to resolve the class certification and *Daubert* motions. *Sibley v. Sprint Nextel Corp.*, 315 F.R.D. 642, 645 (D. Kan. 2016) ("Because the subject matter of the experts' reports was so 'highly technical and complex,' and because the Court was concerned 'a jury will find the experts' opinions so opaque that the jury will be forced simply to guess' who was correct, the Court appointed the undersigned to recommend rulings on pending Daubert and decertification motions.").

Judge Scheindlin's reasoning in *Union Carbide* and *Malletier* was to appoint the special master to avoid delay and resolve the motions because they were extraordinarily lengthy or complex and involved voluminous expert reports and/or hundreds of exhibits. As with the defendant in *Union Carbide*, the burden on the court in this case was created by defendant Keurig's insistence on filing voluminous pre-trial motions that delay trial but have no chance of resolving the matter on summary judgment. Appointment of a special master will alleviate the burden on the Court created by Keurig and end the multi-year delay since the motions for summary judgment, *Daubert* motions, and the class certification motion were filed.

Appointing Special Master Judge Holwell will be particularly efficient in this matter because he already spent months examining much of the key evidence in the *Daubert* and summary judgment motions in connection with his work ruling on the parties' various motions to seal exhibits. Because the parties already paid over $368,000 for that work, it would only create even more efficiency and doubly benefit the parties if the experience the Special Master already gained in reviewing the evidence to now utilized to decide the merits of the motions that utilized those exhibits as evidence.

To alleviate the burden on the Court, accelerate the timeline for the rest of the case, and ensure that JBR has access to the evidence it needs to present its case, JBR requests a special master be

Hon. Vernon S. Broderick, U.S.D.J.
July 23, 2024
Page **4** of **4**

appointed forthwith. JBR's proposals will eliminate any roadblock to the remand of JBR's case to Eastern District of California, reduce JBR's ongoing injury caused by the current delay, and alleviate the burden on this Court. JBR is prepared to withdraw its joinder in any motions that it previously joined with other plaintiffs so that JBR does not need to await resolution of those motions before JBR's case can be remanded to the Eastern District of California.

Respectfully submitted,

*/s/ Daniel Johnson Jr.*
Daniel Johnson Jr.

DAN JOHNSON LAW GROUP, LLP
dan@danjohnsonlawgroup.com
1350 Old Bayshore Highway, Suite 520
Burlingame, CA 94010
(415) 604-4500
*Counsel for Plaintiff*
JBR, Inc. d/b/a Rogers Family Company

cc:    Counsel for All Parties (via ECF)

**1UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: KEURIG GREEN MOUNTAIN SINGLE SERVE COFFEE ANTITRUST LITIGATION<br><br>*This document concerns all related actions.* | ECF Case<br><br>MDL No. 2542<br><br>Master Docket No. 1:14-md-2542-VSB<br><br>Hon. Vernon S. Broderick<br>Hon. Sarah L. Cave |

**DECLARATION OF DANIEL JOHNSON IN SUPPORT OF**
**JBR'S REQUEST FOR STATUS CONFERENCE**

I, Daniel Johnson, declare and state as follows:

1.      I am an attorney licensed to practice law in the State of California, and I am admitted to practice before this Court.  I am a partner at Dan Johnson Law Group, LLP, and I am one of the attorneys representing Plaintiff JBR, Inc. in the above-captioned matter.  I make this declaration on personal knowledge, and if called as a witness, I could and would competently testify with respect to the matters stated herein.

2.      During the pendency of this case, 20 JBR employees and executives were deposed. During discovery in this matter, 10 of those 20 have left the company, including the majority of the individuals who served as 30(b)(6) witnesses.  Among the witnesses who have left the company are the following:

(1)      Vice President of Product Development and 30(b)(6) designee Tom Garber, who retired on July 15, 2022;

(2)      30(b)(6) witness and Sales Integration Manager Bob Giacomelli, who retired on January 3, 2023;

(3)      Purchasing Manager Chris Miller, who left the company on May 21, 2017;

(4)      CEO Pete Rogers, who left the company on January 3, 2020;

(5)      CFO and 30(b)(6) witness Mike Sarina, who left the company on December 30, 2017;

(6)      Art and Web Director James Schuett, who left the company on November 13, 2017;

(7)      Sales Manager Mark Schoeppe, who left the company on January 18, 2017;

(8)      CFO Mark Vincenzini, who left the company on September 30, 2019;

(9)      Sales Manager Jo Wilkens, who left the company on February 5, 2019;

(10)     Customer Service Manager Warren Yamauchi, who left the company February 27, 2017.

3.      In addition to the aforementioned witnesses, several JBR individuals who previously submitted declarations in this case have since left the company or have passed away.  Most importantly, Jon Rogers, the founder of JBR, passed away May 17, 2022 after his cognitive

1

Add.204

abilities had already deteriorated to the point that he was not deposed during discovery in this matter. Jon Rogers had submitted a declaration in support of the August 2014 motion for preliminary injunction filed by JBR in this matter. On January 1, 2023, Barbara Rogers, the co-founder of Rogers Family Coffee, died. Likewise, two other individuals who submitted declarations in support of JBR's August 2014 motion for preliminary injunction have retired or left JBR: Warren Yamauchi and Mike Sarina.

4.      The lengthy delays have also impacted several of JBR's experts who had submitted expert reports in 2020 and early 2021 and were deposed in spring 2021: (a) Bob Giacomelli, a market definition expert for JBR in this matter, retired from JBR in January 2023; (b) Barbara Frederiksen, software expert for JBR in this matter, retired from her company in 2023; (c) Dr. Joseph Greene, JBR's expert on sustainable plastics, retired from the university where he taught in 2022. In addition to Giacomelli, JBR's experts, Hon. James Ware (ret.) and Ron Castleman, are over the age of 70.

5.      In addition to the JBR witnesses who have retired, numerous Keurig witnesses relevant to JBR's case have retired or otherwise moved from their role in single-serve portion pack industry. All of the relevant Keurig employees and executives involved in the anti-competitive decision making in the lead up to the launch of Keurig 2.0 in 2014 have since left the company including the CEO Brian Kelley, the CFO Fran Rathke, President Michelle Stacy, President of U.S. sales and marketing John Whoriskey, the Senior VP of Sales Ron DiFabio, head of Keurig brand partnerships Mark Wood, and VP of Business Development and Strategic Partnerships Dan Cignarella.

6.      Even worse, Keurig's former CTO Kevin Sullivan passed away. He had led the team that designed the 2.0 brewer and was the 30(b)(6) designee during discovery in the preliminary injunction phase of the case in 2014. Many of the late Mr. Sullivan's direct reports including Ian Tinkler and Bob McCall have also retired. Likewise, the Keurig technical design team involved in removing the Keurig 2.0 product from the market, has left the company, including the CTO

2

Mark Choe, who left in December 2018 according to his LinkedIn profile. Similarly, the CEO of Keurig Bob Gamgort was replaced in April 2024 by Tim Cofer.

7. The turnover at Keurig extends beyond just leadership team, as Keurig's entire ownership has changed multiple times since this lawsuit was filed. As of 2014, Keurig Green Mountain was a publicly traded company. In March 2016, Keurig Green Mountain was acquired in a going private transaction by European private equity firm JAB, which owned a number of major coffee brands and luxury brands at the time. In July 2018, Keurig was acquired again — this time by Dr. Pepper Snapple Group, and resumed being publicly traded as a new entity called Keurig Dr. Pepper Inc.

8. The retirement of witnesses is also true of third-party witnesses. The account executives at several of the major retailers that dropped or scaled back JBR's single-serve portion packs have since left those roles. For example, the account executive responsible for single-serve portion pack purchases in 2014 at Costco, Shannon Axthelm, ceased that role in 2019. Likewise the individual responsible for the Staples retail account, Senior Category Manager Mike Caserta, left the company. He was responsible for the decision to remove JBR as a customer in 2017 at Staples. Mike Coppola, responsible for the BJ's purchases of JBR single serve product, left BJ's, as did Mark Griffin and Bob Eddy, who all attended meetings with Keurig in the lead up to BJ's decision to remove JBR from store shelves after Keurig announced the launch of Keurig 2.0.

9. During the pendency of this case, JBR has continuously monitored the public statements of Keurig. The following press releases indicate continued activity by Keurig to expand its distribution base and continue to exclude Rogers from distribution.

10. Attached as Exhibit **A** is a true and correct copy of a Keurig press release, dated July 2, 2023, announcing a new agreement between Keurig and La Colombe.

11. Attached as Exhibit **B** is a true and correct copy of a Keurig press release, dated February 1, 2024, announcing a new agreement between Keurig and Lavazza.

12. Attached as Exhibit **C** is a true and correct copy of a Keurig press release, dated March 13, 2024, announcing that it intends to sell compostable portion packs.

3

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Napa, California

July 23, 2024                                        By ___*/s/ Daniel Johnson*___
                                                            Daniel Johnson

4

Add.207

SO ORDERED:

*Vernon Broderick*

HON. VERNON S. BRODERICK
UNITED STATES DISTRICT JUDGE

The Court is in the process of resolving the outstanding motions, an endeavor that has taken longer due to the voluminous record, number of parties, and complexity of issues. The parties can expect a ruling on the *Daubert* motions by the fall. The remaining motions will be decided shortly thereafter. To the extent that other parties also request that I appoint Judge Holwell as Special Master to resolve any of the pending motions, they shall so advise the Court, by letter, no later than August 2, 2024.

Dated: July 26, 2024

July 23, 2024

**VIA CM/ECF**

Hon. Vernon S. Broderick, U.S.D.J.
Thurgood Marshall United States Courthouse
40 Foley Square, Courtroom 518
New York, NY 10007

> Re: ***In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,**
> **MDL No. 2542**
> **Letter Motion Requesting Status Conference and Appointment of Special Master**

Dear Hon. Judge Broderick:

I write on behalf of JBR to respectfully request a status conference in this matter and request appointment of a special master to alleviate the burdens on the Court and prejudice to the parties created by the voluminous set of motions filed in 2021.

It has been nearly four years since the last status conference in this matter, which occurred before the parties completed their expert reports and submitted their summary judgment and *Daubert* motions. ECF No. 1152 [scheduling order terminating transfer request following status conference with Judge Cave in Oct. 2020]; ECF No. 1160 [amended scheduling order]; ECF No. 688 [amended case management plan and scheduling order].

In the nearly three years since the parties submitted summary judgment briefing in 2021 and nearly four years since the parties issued expert reports in 2020, Keurig's anticompetitive conduct in the market has continued to harm plaintiffs, while also resulting in the slow but inevitable decay of the evidentiary record due to the deaths, retirements, and career changes of key fact and expert witnesses. Several of JBR's fact witnesses are in their 70s or 80s. *See* Declaration of Daniel Johnson, dated July 23, 2024, ¶ 4. Likewise, several of JBR's 30(b)(6) and expert witnesses (and witnesses it will seek to cross-examine) are either retired or in the process of retiring raising questions as to their availability for trial. *Id.*, ¶¶ 2-4. Additionally, numerous Keurig and third-party witnesses whom JBR may call in its case have retired, changed careers, or passed away. *Id.*, ¶¶ 5-6, 8. As set forth in the Declaration of Daniel Johnson, the continued failure to decide the numerous motions is having a materially adverse effect on the litigation. To assist the Court in addressing the delay, JBR proposes that the Court use its statutory authority, as it did in dealing with the dispute over the designation of confidential materials, to assign all pending motions to a Special Master for resolution. Many of the motions

Hon. Vernon S. Broderick, U.S.D.J.
July 23, 2024
Page **2** of **4**

to be decided have already been reviewed by Special Master Judge Holwell in connection with the determination of the proper designation of confidential material.

Under Fed.R.Civ.P. 53(b) "[i]n actions to be tried by a jury, reference [to a master] shall be made only when the issues are complicated; in actions to be tried without a jury ... a reference shall be made only upon a showing that some exceptional condition requires it." The Court, on its own, previously appointed a special master to address voluminous pre-trial motions concerning the confidentiality designations made by all parties. The Special Master found that Keurig had improperly designated numerous documents and ordered Keurig to pay for the extra costs incurred by the Special Master. Still pending are 17 motions, including 9 *Daubert* motions filed by Keurig, 5 filed by plaintiffs, cross motions for summary judgment, and a class certification motion filed by the Direct Purchasers. All these motions were filed in 2021 and have been pending for several years. ECF No. 1818-1, Ex. A to Pls.' Letter Request for a Trial Date.

JBR proposes that those motions filed by JBR or directly affecting JBR should be assigned to a special master. JBR proposes assigning to a special master the *Daubert* motions filed by JBR in 2021 pertaining to Keurig experts Kevin Murphy (ECF No. 1474), Mark Wood (ECF No. 1478), and Marc Hillmyer (ECF No. 1484). Additionally, the special master would resolve the two *Daubert* motions filed by other plaintiffs concerning the opinions of Keurig experts about JBR's case; those motions pertained to Keurig experts Keith Ugone (ECF No. 1470) and Hon. Arthur Gajarsa (ret.) (ECF No. 1220). The special master would also decide the two *Daubert* motions filed by Keurig relating to JBR's experts Gareth Macartney (ECF No. 1456) and Hon. James Ware (ret.) (ECF No. 1449). Most importantly, the special master would decide Keurig's motion for summary judgment, which affects all of JBR's claims at issue in this matter. To expedite this matter and avoid further delay in remanding this matter to California, JBR is willing to withdraw from its joinder of Plaintiffs' motion for summary judgment so that JBR is not awaiting decision on that motion before remand to the Eastern District of California. In short, this proposal would result in a decision on all of the pending motions that affect JBR and would reduce the burden on the Court caused by the sheer volume of the pending motions.

FRCP Rule 53(b) provides a solution for dealing with multiple motions in a complex case by allowing the trial judge to obtain the assistance of a special master and unburden the trial judge. For example, in a case similar to the instant case, the issues involved Sherman Act and Clayton Act violations, breach of contract, breach of fiduciary duty, fraud, tortious interference with contract, tortious interference with prospective contractual relationships, and equitable estoppel, and the parties filed multiple motions. *Union Carbide Corp. v. Montell N.V.*, 179 F.R.D. 425, 426-7 (S.D.N.Y. 1998), as amended (May 18, 1998). The trial judge, Judge Scheindlin, appointed a special master without the consent of the parties to resolve the massive volume of summary judgment motions filed by defendants. *Id*.

In *Union Carbide*, Judge Scheindlin highlighted the burden created by the defendants' voluminous summary judgment motions and noted that "[t]he scope of the reference pursuant to Rule 53 may include a report and recommendation on a motion for summary judgment." *Id*. at

Hon. Vernon S. Broderick, U.S.D.J.
July 23, 2024
Page **3** of **4**

426, citing *Nebraska v. Wyoming*, 507 U.S. 584, 586 (1993); *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1566 (Fed.Cir.1988); *In re Armco, Inc.*, 770 F.2d 103, 104–05 (8th Cir.1985) ("We believe ... that the district court acted properly in granting the master the ... power to hear motions for summary judgment ...."); *Richardson v. Bedford Place Housing Phase I Associates*, 855 F. Supp. 366, 367 (N.D.Ga.1994) (special masters appointed pursuant to Rule 53 have "the authority to make proposed findings of facts and conclusions of law on dispositive motions such as those ... for summary judgment"); *Roberts v. Heim*, No. C–84–8069, 1990 WL 306009, at *3 (N.D. Cal. Aug. 27, 1990) (argument that Rule 53 did not authorize master to make a report on summary judgment motion "finds no support in any authority"). In *Union Carbide*, Judge Scheinlin rejected the antitrust defendants' objection to using a special master and further noted that: "A reference may be made without the consent of the parties." *Id.*, citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 72 F.3d 857, 865 (Fed. Cir. 1995), vacated on other grounds, 520 U.S. 1111 (1997).

Likewise, other cases have appointed special masters to address motions for class certification and *Daubert* motions involving complex data sets, expert analysis, and voluminous records. For example, in *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 564 (S.D.N.Y. 2007), Judge Scheindlin appointed multiple special masters to resolve motions *in limine* concerning expert reports, and the appointed special master issued a 192-page ruling on the motions. Similarly, in a case involving complex transactional data sets and competing expert opinions relevant to a motion for class certification, a district court appointed a special master to resolve the class certification and *Daubert* motions. *Sibley v. Sprint Nextel Corp.*, 315 F.R.D. 642, 645 (D. Kan. 2016) ("Because the subject matter of the experts' reports was so 'highly technical and complex,' and because the Court was concerned 'a jury will find the experts' opinions so opaque that the jury will be forced simply to guess' who was correct, the Court appointed the undersigned to recommend rulings on pending Daubert and decertification motions.").

Judge Scheindlin's reasoning in *Union Carbide* and *Malletier* was to appoint the special master to avoid delay and resolve the motions because they were extraordinarily lengthy or complex and involved voluminous expert reports and/or hundreds of exhibits. As with the defendant in *Union Carbide*, the burden on the court in this case was created by defendant Keurig's insistence on filing voluminous pre-trial motions that delay trial but have no chance of resolving the matter on summary judgment. Appointment of a special master will alleviate the burden on the Court created by Keurig and end the multi-year delay since the motions for summary judgment, *Daubert* motions, and the class certification motion were filed.

Appointing Special Master Judge Holwell will be particularly efficient in this matter because he already spent months examining much of the key evidence in the *Daubert* and summary judgment motions in connection with his work ruling on the parties' various motions to seal exhibits. Because the parties already paid over $368,000 for that work, it would only create even more efficiency and doubly benefit the parties if the experience the Special Master already gained in reviewing the evidence to now utilized to decide the merits of the motions that utilized those exhibits as evidence.

To alleviate the burden on the Court, accelerate the timeline for the rest of the case, and ensure that JBR has access to the evidence it needs to present its case, JBR requests a special master be

Hon. Vernon S. Broderick, U.S.D.J.
July 23, 2024
Page **4** of **4**

appointed forthwith.  JBR's proposals will eliminate any roadblock to the remand of JBR's case to Eastern District of California, reduce JBR's ongoing injury caused by the current delay, and alleviate the burden on this Court.  JBR is prepared to withdraw its joinder in any motions that it previously joined with other plaintiffs so that JBR does not need to await resolution of those motions before JBR's case can be remanded to the Eastern District of California.

Respectfully submitted,

*/s/ Daniel Johnson Jr.*
Daniel Johnson Jr.

DAN JOHNSON LAW GROUP, LLP
dan@danjohnsonlawgroup.com
1350 Old Bayshore Highway, Suite 520
Burlingame, CA 94010
(415) 604-4500
*Counsel for Plaintiff*
JBR, Inc. d/b/a Rogers Family Company

cc:    Counsel for All Parties (via ECF)



WINSTON & STRAWN LLP    North America   Europe   Asia

200 Park Avenue
New York, NY 10166
T +1 212 294 6700
F +1 212 294 4700

**ALDO A. BADINI**
Partner
212-294-4601
ABadini@winston.com

August 2, 2024

**VIA ECF**

Hon. Vernon S. Broderick
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

**Re:**   *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, Case No.
1:14-md-02542-VSB-SLC
**Letter regarding TreeHouse's Position as to JBR's Letter Motion**

Dear Judge Broderick:

I write on behalf of Plaintiffs TreeHouse Foods, Inc., Sturm Foods, Inc., Bay Valley Foods, LLC (collectively, "TreeHouse") with respect to JBR's Letter Motion Requesting Status Conference and Appointment of Special Master, ECF No. 2342, and this Court's Order of July 26, 2025, ECF No. 2344.

TreeHouse appreciates the Court's advice that the parties can expect a ruling on the *Daubert* motions by the Fall and that the remaining motions will be decided "shortly thereafter." Nonetheless, TreeHouse writes separately to second JBR's showing of the significant prejudice to Plaintiffs and consumers caused by the long delay in resolving the pending motions and to highlight one pending matter in particular which the Court did not expressly mention in its Order but which was the subject of at least one previous Order of this Court.

In addition to the pending motions referenced by JBR's letter, TreeHouse directs this Court's attention to Magistrate Judge Cave's well-reasoned and comprehensive Opinion & Order dated March 28, 2022, which found extensive ESI and document spoliation by Keurig in this case, recommending an award of attorneys' fees, and permitting Plaintiffs to "present evidence on Keurig's failure to preserve" as well as requesting "a jury instruction informing the jury 'that it may consider that evidence, along with all the other evidence in the case, in making its decision.'" ECF No. 1806 at 90.  Notwithstanding the fact that this Order was issued *over two years ago*, the lack of any decision by this Court on Keurig's objections to that Order[1] means that Plaintiffs still have not been reimbursed their attorneys' fees and Keurig has effectively been sent a signal that it may spoliate critical evidence without consequence.

Indeed, resolving Keurig's meritless objections to Judge Cave's March 28, 2022 Opinion and Order now would be consistent with the sequence previously outlined by this Court when it

---

[1] ECF No. 1816 (Keurig's Objections to Magistrate Judge Cave's March 28, 2022 Opinion and Order).

Add.212



200 Park Avenue
New York, NY 10166
T +1 212 294 6700
F +1 212 294 4700

North America   Europe   Asia

noted that it planned to resolve this objection (as well as one other, ECF 550) *before* addressing the parties' *Daubert* motions. *See* Opinion & Order dated January 17, 2023, ECF 1978 at 49. Consequently, we hope that the Court addresses this issue before the Fall.

While TreeHouse differs with JBR's view that the Court should refer the pending summary judgment motions to the Special Master, it does believe that there may be a benefit to referring other motions to Judge Holwell, such as the class certification motion, so that the Court can focus on summary judgment. The Court has the authority to do so, even over the objections of one or more parties. *See, e.g., Sibley v. Sprint Nextel* Corporation, 298 F.R.D. 683 (D. Kan. 2014) (referring class certification issues to Special Master notwithstanding plaintiffs' objections). Moreover, the Court should not assume that a decision on class certification is a necessary prerequisite to the setting of a trial date or resolution of summary judgment, particularly for the trial of TreeHouse's claims. While the cases have been consolidated for pretrial proceedings, there has been no Order consolidating any of the cases for trial. Indeed, consolidation for trial would pose the risk of significant prejudice to TreeHouse, considering the additional time it may take to resolve complex class certification issues and the confusion to the jury that would result from addressing unrelated class issues in the trial of TreeHouse's claims. *See, e.g., In re JWP Inc. Securities Litigation,* 928 F. Supp 1239 (S.D.N.Y. 1996) (class case ordered to be tried separately from institutional investor case applying principles of Fed. R. Civ. Pro. 42(b) where "[s]ubstantial differences exist … between the class plaintiffs' and the [institutional investor] plaintiffs' claims"). In any event, sending the class certification motion to the Special Master will serve to expedite the proceedings overall, freeing up this Court's time to decide the other pending motions, irrespective of the ultimate contours of the first trial in this case.

In short, while the Court need not address this issue now, it is TreeHouse's position that as the first-filed competitor plaintiff who instituted this proceeding over a decade ago, the TreeHouse case should be tried first and alone. A trial date should be set for early next year without further delay so that the parties may begin trial preparations.

Finally, it bears emphasizing that TreeHouse wholeheartedly agrees with JBR that the delay in this case continues to cause severe harm to Plaintiffs and competition in the market. Although Keurig continues to shroud much of its anticompetitive conduct with secret agreements that are subject to nondisclosure obligations, Plaintiffs have reason to believe that the illegal conduct is continuing, effectively locking TreeHouse out of the Away-From-Home market, thwarting efforts of more efficient and innovative competitors and creating higher prices for consumers. These are compelling reasons for a swift determination of the pending motions, the entry of a trial date for TreeHouse, and the issuance of an injunction against Keurig's conduct. At a minimum, a status conference would allow for discussion of these matters.

We thank the Court for its attention to this matter.

Respectfully submitted,

*/s/ Aldo A. Badini*
Aldo A. Badini
**Winston & Strawn LLP**



North America  Europe  Asia

200 Park Avenue
New York, NY 10166
T +1 212 294 6700
F +1 212 294 4700

200 Park Avenue
New York, NY 10166
(212) 294-6700
abadini@winston.com

*Counsel for Plaintiffs TreeHouse Foods,
Inc., Bay Valley Foods, LLC, and Sturm
Foods, Inc.*

cc:  Counsel for All Parties (via ECF)

Add.214

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                :

IN RE:                               :
                                :

KEURIG GREEN MOUNTAIN SINGLE-    :
SERVE COFFEE ANTITRUST          :        14-MD-2542 (VSB)
LITIGATION                        :
                                :        __OPINION & ORDER__

*This order relates to all cases*    :
                                :
------------------------------------------------------X

VERNON S. BRODERICK, United States District Judge:

I.   Legal Standards ..................................................................................... 2

   A.   Admissibility of Expert Testimony ................................................ 2

   B.   Exclusion of Relevant Evidence for Prejudice Under Rule 403 ......... 8

II.   Discussion ............................................................................................ 8

   A.   Hon. Arthur Gajarsa (Ret.) (Doc. 1220)........................................... 8

   B.   Hon. James Ware (Ret.) and Hon. Randall Rader (Ret.) (Doc. 1449) ............... 13

   C.   Dr. Gareth Macartney (Doc. 1456) ................................................ 13

   D.   Dr. Gary L. French (Doc. 1406)..................................................... 31

   E.   Hal Poret (Doc. 1442) .................................................................. 40

   F.   Sarah Butler (Doc. 1445) ............................................................... 1

   G.   Dr. Mohan Rao (Doc. 1439)......................................................... 55

   H.   Dr. Phillip Johnson ("Johnson I") (Doc. 1452)................................ 62

   I.   Dr. Lauren J. Stiroh (Doc. 1460)................................................... 77

   J.   Dr. David Sibley (Doc. 1464) ....................................................... 82

   K.   Dr. Keith Ugone ("TMJ Motion") (Doc. 1470) ............................... 88

   L.   Dr. Kevin Murphy (Doc. 1474)................................................... 102

   M.   Mark Wood (Doc. 1478) ............................................................ 105

   N.   Dr. Marc Hillmyer (Doc. 1484) .................................................. 107

   O.   Dr. Keith Ugone ("Ugone Motion") (Doc. 2078) ........................... 110

   P.   Dr. Phillip Johnson ("Johnson II") (Doc. 2083)............................. 110

   Q.   Dr. Martin Asher (Doc. 2086)..................................................... 116

   R.   Drs. Keith Ugone & Kevin M. Murphy ("Ugone-Murphy") (Doc. 2089)........ 121

III.   Conclusion .......................................................................................... 125

This Opinion & Order addresses nineteen Rule 702 motions seeking to exclude expert testimony that are currently pending in this matter.[1]  I assume familiarity with the underlying facts and procedural history of this multidistrict litigation, which focuses on antitrust claims brought against Keurig Green Mountain, Inc. ("Keurig"), and is discussed in more detail in my Opinion & Order of April 3, 2019.  (Doc. 581.)  Where additional background is necessary, I address it in the context of the specific motion being considered.

I.    **Legal Standards**

A.  *Admissibility of Expert Testimony*

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*Id.*  I note that Rule 702 was "amended in two respects."  Fed. R. Evid. 702 Advisory Committee cmt. 2023.  First, Rule 702 was amended to "clarify and emphasize" that proffered expert testimony must meet Rule 702's admissibility requirements by a preponderance of the evidence.  *See id*.  Second, Rule 702(d) was amended "to emphasize that each expert opinion must stay

---

[1] There are nineteen motions delineated by gavels on the docket; however, two of them are duplicative.  (*See* Docs. 1470, 2237.)

within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id*. The amendment did not substantively change Rule 702. Instead, the Advisory Committee sought to clarify the Rule to provide guidance to district courts that were misapplying it. *See id.* ("[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a).").

The Rule 702 amendment, which was announced on April 24, 2023, and became effective on December 1, 2023, occurred after the submission of most of the briefing here. *See* U.S. S.Ct. Order § 2 (Apr. 24, 2023) (available online at: https://www.supremecourt.gov/orders/courtorders/frev23_5468.pdf). The amendment governs all proceedings pending at the time it became effective "insofar as just and practicable." *Id.* at 3. As the amendment did not change the meaning of Rule 702 and will not affect the outcome of the analysis in this Opinion & Order, I find that it is just and practicable to apply the current version of Rule 702 to the parties' existing arguments. *Cf. Maldonado v. Town of Greenburgh*, No. 18-CV-11077, 2024 WL 4336771, at *10 n.14 (S.D.N.Y. Sept. 26, 2024) ("The Court need not decide which version of [Rule 702] should apply as the amendment would not change the outcome here." (internal quotation marks omitted)).

Courts in this Circuit frequently distill Rule 702 down to a three-part test that requires the proponent of expert evidence to show "that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact." *Nike, Inc. v. StockX LLC*, No. 22-CV-0983, 2024 WL 3361411, at *2 (S.D.N.Y. July 10, 2024) (citing *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005)). Rule 702 thus imposes on the trial judge a "basic gatekeeping obligation" to ensure that all expert

testimony admitted at trial is relevant and reliable, regardless of whether the expert testimony is on scientific, technical, or other specialized matters. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–48 (1999). A court cannot bypass this gatekeeping responsibility and pass it off to the jury by declaring "questions of the sufficiency of an expert's basis, and the application of the expert's methodology, [to be] questions of weight and not admissibility." Fed. R. Evid. 702 Advisory Committee cmt. 2023.

Expert testimony must not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (citations omitted). "While an expert opinion 'is not objectionable just because it embraces an ultimate issue,' Fed. R. Evid. 704(a), it remains impermissible for experts 'to offer opinions embodying legal conclusions.'" *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 554 F. Supp. 3d 606, 612 (S.D.N.Y. 2020) (quoting *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012)), *aff'd*, 839 F. App'x 545 (Fed. Cir. 2021). "[A]lthough an expert may give an opinion to help the jury decide an issue in the case, he or she may not tell the jury what result to reach." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (citing *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).

"The party proffering expert testimony 'bears the burden of establishing these admissibility requirements.'" *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MD-01570, 2023 WL 3116763, at *2 (S.D.N.Y. Apr. 27, 2023) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016)). This showing must be made by a preponderance of the evidence. *Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 430 (S.D.N.Y. 2023) (citing *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020)). In other words, the proponent must show

4

Add.218

each of the three reliability components of Fed. R. Evid. 702, *i.e.*, Fed. R. Evid. 702(b)–(d), by a preponderance of the evidence. *See* Fed. R. Evid. 702 Advisory Committee cmt. 2023 ("The [2023] amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard.").

Ultimately, "a 'district court's decision to admit or exclude expert testimony [is reviewed] under a highly deferential abuse of discretion standard." *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 982 F.3d 113, 122 (2d Cir. 2020) (quoting *Zuchowicz v. United States*, 140 F.3d 381, 386 (2d Cir. 1998)). "Thus, the trial judge has broad discretion in determining 'what method is appropriate for evaluating reliability under the circumstances of each case.'" *Id.* (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)).[2]

## 1. Qualification

A court must address the "threshold question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions" before addressing the relevance or reliability of that witness's proposed testimony. *Nimely*, 414 F.3d at 396 n.11 (quoting Fed. R. Evid. 702). "To determine whether an expert is qualified

---

[2] "[T]he Court may police the opinions of expert witnesses sua sponte," *AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411, 2019 WL 1254763, at *13 n.88 (S.D.N.Y. Mar. 19, 2019), objections overruled, No. 1:15-CV-3411-GHW, 2019 WL 2992016 (S.D.N.Y. July 8, 2019), particularly if an expert's opinion appears unreliable or if the issue is of particular importance. *See, e.g.*, *Ajala v. W.M. Barr & Co., Inc.*, No. 16-CV-2615, 2018 WL 6322147, at *2 (S.D.N.Y. Dec. 4, 2018) ("Nor does it appear to the Court that [an expert's] opinion is unreliable under Daubert so as to trigger exclusion sua sponte."); *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 421 n.16 (S.D.N.Y. 2016) ("Although Plaintiffs did not raise this issue [with an expert's testimony], it seems important enough for the Court to address sua sponte.") However, the 2023 Advisory Committee note to Fed R. Evid. 703 is clear that a court is not obligated to assess reliability in the absence of an objection. *See* Fed. R. Evid. 702 Advisory Committee cmt. 2023 ("Nor does the amendment require that the court make a finding of reliability in the absence of objection."). Accordingly, I have addressed the parties' evidentiary objections as well as any issues I considered important to raise sua sponte. Where I have not raised issues concerning the qualification or reliability of an expert sua sponte, it is because I have found no issue or no issue of sufficient import to merit sua sponte consideration.

'courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony.'" *Conti v. Doe*, No. 17-CV-9268, 2020 WL 6162104, at *7 (S.D.N.Y. Oct. 21, 2020) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)).

Just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely*, 414 F.3d at 399 n.13 (citation omitted). "[D]istrict courts, in their role as gatekeepers, must be ever vigilant against expert testimony that could stray from the scope of a witness' expertise." *United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004). Expert testimony that strays outside the expert's area of qualified expertise must be excluded. *See, e.g.*, *Colon v. Metro-N. Commuter R.R. Co.*, 778 F. App'x 7, 12 (2d Cir. 2019) (summary order) ("[T]he district court did not abuse its discretion in precluding [an expert] from testifying about certain subjects that were either outside of his area of expertise or lay matters that the jury was capable of deciding without expert assistance.").

## 2. Reliability

The Court's inquiry into reliability "is fluid and will necessarily vary from case to case." *Amorgianos*, 303 F.3d at 266. Rule 702 requires both that an expert use "reliable principles and methods," and that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. *Daubert* lists a series of four factors courts may consider when evaluating reliability:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or

theory has gained general acceptance in the relevant scientific community.

*Amorgianos*, 303 F.3d at 266 (citing *Daubert*, 509 U.S. at 593–94). At the same time, *Daubert* did not "presume to set out a definitive checklist or test," *Daubert*, 509 U.S. at 593, and subsequent cases recognize that "the gatekeeping inquiry must be 'tied to the facts' of a particular 'case,'" *Kumho Tire Co.*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 150). For instance, "[f]lexible methodologies . . . can be implemented in multiple ways; despite the fact that the methodology is generally reliable, each application is distinct and should be analyzed for reliability." *In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 337 (S.D.N.Y. 2023) (quoting *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 795 (3d Cir. 2017)).

There is a two-sided cumulative element to a court's review of a method's reliability. On the one side, "once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." Fed. R. Evid. 702 Advisory Committee cmt, 2023.[3] On the other side, "there are only so many questions of weight that can be tolerated; as each flaw in a [method] diminishes its reliability and probative value, and correspondingly increases the risk of jury confusion and prejudice, eventually the cumulative effect of the flaws mandates exclusion." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 612 (S.D.N.Y. 2007).

---

[3] The existence of divergent opinions between parties' experts is not license for a court to abandon the gatekeeping function. In several places, the parties' papers suggest that when experts disagree, this "battle of the experts" obviates the need for the court to conduct this gatekeeping function. (*See, e.g.*, Doc. 1535 at 1.) However, appeals to avoid a "battle of the experts" is inapposite in the context of a Rule 702 motion where the court has yet to determine who is a qualified expert and what expert opinions are admissible. Once experts are qualified, then "trial courts should not arrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts" in a context like summary judgment. *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995) (cleaned up). However, Rule 702's gatekeeping function would be eviscerated if a court could simply abandon the gatekeeping function once the unevaluated opinions of two sides experts diverged.

7

Courts tasked with applying this standard have offered numerous insights into the reliability inquiry as it relates to specific scientific fields and practices. I discuss these as appropriate below in the context of a particular party's Rule 702 motion.

### B. *Exclusion of Relevant Evidence for Prejudice Under Rule 403*

"In addition to the requirements of Rule 702, expert testimony is subject to Rule 403." *Nimely*, 414 F.3d at 397. Rule 403 permits courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Exclusion under Rule 403 is appropriate where the testimony clouds the issue for the jury, wastes time by diverting attention from the relevant evidence, or would induce the jury to decide the case on a purely emotional basis." *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 3116763, at *2 (internal quotation marks omitted).

"The trial court has broad discretion in determining whether proffered evidence should be admitted, and in general in the absence of a significant showing of unfair prejudice, evidence with substantial probative value should not be excluded." *Martell v. Boardwalk Enters., Inc.*, 748 F.2d 740, 747 (2d Cir. 1984) (internal quotation marks omitted).

### II. <u>Discussion</u>

### A. *Hon. Arthur Gajarsa (Ret.) (Doc. 1405)*[4]

Keurig retained the Honorable Arthur Gajarsa (Ret.) to provide an expert opinion "in connection with Plaintiffs TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc. ("Treehouse"), JBR, Inc. d/b/a Rogers Family Company (hereinafter "JBR" or "Rogers"), McLane Company, Inc. ("McLane"), and the Direct Purchaser Plaintiffs' ("DPPs") sham

---

[4] "Doc." in each header references the relevant motion.

litigation claims against Keurig." (Doc. 1223, Ex. 1 ¶ 1.) The sham litigation claims involve two separate lawsuits: *Keurig Inc. v. Sturm Foods Inc.*, 1:10-cv-000841 (D. Del. filed Oct. 1, 2010) (hereinafter "Sturm Litigation"), and *Keurig Inc. v. JBR Inc. d/b/a Rogers Fam. Co.*, 1:11-cv-1194 (D. Mass. filed Nov. 2, 2011) (hereinafter "Rogers Litigation") (collectively the "Sturm and Rogers Litigations" or the "Litigations").

Keurig proffers Judge Gajarsa's expert opinion to "explain[] the patent process, the practice of patent litigation, and complex patent issues [which] will be important in helping the lay jury understand how a litigant goes about deciding whether and how to enforce its patent rights." (Doc. 1524 at 1.) Plaintiffs move to exclude this testimony as "improperly usurp[ing] the role of the Court by opining on the intellectual property law underlying Keurig's claims against Treehouse and Rogers in the sham litigations and asserting legal conclusions regarding the purported basis that Keurig had for bringing and maintaining these claims." (Doc. 1223 at 2.) In addition, Plaintiffs assert that Judge Gajarsa's "conclusions fail to delineate a methodology that would allow the court to assess the reliability of his opinions." (*Id.* at 3.)

Although Keurig attempts to disguise the core of Judge Gajarsa's expert opinion by claiming that his opinions merely seek to "explain[] the patent process, the practice of patent litigation, and complex patent issues [which] will be important in helping the lay jury understand how a litigant goes about deciding whether and how to enforce its patent rights," (Doc. 1524 at 1), Judge Gajarsa's opinion would usurp the role of the fact finder since he opines on the very question at issue—namely, whether Keurig had a reasonable basis to file the Litigations, *see Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc.,* 219 F.3d 92, 100 (2d Cir. 2000). Specifically, he purports to offer "an objective assessment of the Litigations based on the underlying patents and applicable intellectual property legal principles," (Doc. 1223, Ex. 1 ¶ 11),

and finds that "Keurig had a reasonable basis to enforce its patent rights," (*id.* ¶ 12); (*see also id.* ¶ 176 ("[B]ased on my experience, the record in the Sturm Litigation detailed above is not typical of a meritless lawsuit.  Instead, it is consistent with a Litigation in which the parties vigorously pursued their claims.")).

The Second Circuit has "consistently held [ ] that expert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely*, 414 F.3d at 397 (internal quotation marks omitted); *see also Doe v. Colgate Univ.*, 760 F. App'x 22, 29 (2d Cir. 2019) (summary order) (excluding expert opinion "that the University breached its contract with John Doe by failing to follow its own procedures [finding that it is] unhelpful because it usurps the jury's role in applying the law to the facts").

"To establish 'sham' . . . judicial proceedings, a plaintiff must show that the litigation in question is:  (i) 'objectively baseless,' and (ii) 'an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon.'" *Primetime,* 219 F.3d at 100 (quoting *Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60–61 (1993)).  With these elements in mind, courts in several circuits have consistently declined to permit experts to testify as to the baselessness or reasonableness in antitrust cases involving sham litigation claims*.  See, e.g., In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-MD-1628, 2009 WL 3241401, at *13 (S.D.N.Y. Sept. 30, 2009) (excluding a legal expert's testimony on sham litigation because it would usurp the role of the court and jury), *aff'd sub nom. Am. Banana Co. v. J. Bonafede Co.*,

Add.224

407 F. App'x 520 (2d Cir. 2010) (summary order); *Puerto Rico Tel. Co., Inc. v. San Juan Cable Co. LLC*, 196 F. Supp. 3d 248, 321 (D.P.R. 2016) (declining to admit expert testimony "regarding questions of law and objective reasonableness" in a sham litigation case), *aff'd sub nom. Puerto Rico Tel. Co., Inc. v. San Juan Cable LLC*, 874 F.3d 767 (1st Cir. 2017); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2020 WL 6887885, at *40 (E.D. Pa. Nov. 24, 2020) ("As one of the key issues in this case is whether Defendant's Citizen Petition was factually and legally baseless and used entirely for anticompetitive purposes, I find that [the expert's] opinion is a legal opinion that usurps the jury's role in applying the law to the facts."); *In re Wellbutrin SR Antitrust Litig.*, No. 04-CV-5525, 2010 WL 8425189, at *6 (E.D. Pa. Mar. 31, 2010) (excluding expert testimony "because large portions of each report contain explanations of specific areas of patent law . . . and conclusions of law—including whether [defendant] had an objectively reasonable basis to file its [] patent infringement suits"); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1797, 2015 WL 6750899, at *18 (E.D. Pa. Nov. 5, 2015) (finding, in a case involving sham litigation claims, that "[t]he proposed experts are attorneys who are evaluating the merits of a legal argument by applying the facts to the law, which invades the jury's role"); *see also VIM, Inc. v. Somerset Hotel Ass'n*, 19 F. Supp. 2d 422, 427 n.4 (W.D. Pa. 1998) (noting, in the context of sham litigation claims, "that lack of objective baselessness is not the sort of issue that lends itself to expert testimony under Fed. R. Evid. 702 and 704"), *aff'd*, 187 F.3d 627 (3d Cir. 1999).

The cases Keurig relies on, including *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152 (S.D.N.Y. 2018), and *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785, 2020 WL 1164869, at *1 (D. Kan. Mar. 10, 2020), are inapposite because they did not involve an expert's assessment of the objective

reasonableness of a case in a sham litigation matter.  Although there is no blanket prohibition on legal experts summarizing complex case histories or expanding the background of U.S. patent law, as occurred in *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d at 185–86, nothing in the cases Keurig relies on suggests that an expert may opine on the objective reasonableness of a lawsuit where such a conclusion speaks to the ultimate outcome of a sham litigation claim.

Here, Judge Gajarsa opines on precisely this question:  whether Keurig had a reasonable basis to file the Litigations.  *See Primetime,* 219 F.3d at 100.  He purports to offer "an objective assessment of the Litigations based on the underlying patents and applicable intellectual property legal principles," (Doc. 1223, Ex. 1 ¶ 11), and finds that "Keurig had a reasonable basis to enforce its patent rights," (*id.* ¶ 12); (*see also id.* ¶ 176 ("[B]ased on my experience, the record in the Sturm Litigation detailed above is not typical of a meritless lawsuit.  Instead, it is consistent with a Litigation in which the parties vigorously pursued their claims.")).  Even though he briefly summarizes U.S. patent law and discusses the Litigations, he does so merely to provide context for his ultimate conclusion that the litigations were objectively reasonable.

Such testimony would completely usurp the role of the jury.  *See Nimely*, 414 F.3d at 398 (finding that the trial judge erred in not striking expert opinion where expert "was permitted not only to state his belief that the officers were not lying, but also to give to the jury a series of rationales for that belief"); *Bobcar Media, LLC*, 554 F. Supp. 3d at 613 ("Roberts offers no analysis beyond highlighting aspects of the record that he finds important and demonstrating how it satisfies the legal standards he sets out. Because the jury would be engaging in the same process when assessing Bobcar's claims, this is impermissible ipse dixit testimony.") Accordingly, Judge Gajarsa's opinion is excluded.

Add.226

### B. *Hon. James Ware (Ret.) and Hon. Randall Rader (Ret.) (Doc. 1449)*

To rebut the proffered testimony of Judge Gajarsa, TreeHouse and McLane retained Judge Randall Rader (ret.) to provide his expert opinion "regarding whether various litigations brought by Defendant [Keurig] had an objective basis." (Doc. 1249, Ex. 1 ¶ 3.) JBR retained Judge James Ware (ret.) for the same purpose. (Doc. 1249, Ex. 2 ¶ 16.) However, "Plaintiffs have offered the testimony of Judge Rader and Judge Ware under protest and to protect their rights to provide such testimony at trial to the extent that the Court permits testimony regarding the objective baselessness of Keurig's sham litigations." (Doc. 1539 at 5.) Based on this assertion, I understand that Plaintiffs do not intend to use either Judge Ware or Judge Rader as an expert witness if Judge Gajarsa is not admitted as an expert. Therefore, because I grant Plaintiffs' motion to exclude the expert testimony of Judge Gajarsa, I need not reach Defendant's arguments concerning the admissibility of Judge Rader or Judge Ware's expert testimony. *See, e.g., Nisanov v. Black & Decker (U.S.) Inc*., No. 05-CV-5911, 2008 WL 11434465, at *3 (E.D.N.Y. Nov. 18, 2008) (denying plaintiffs' motion to exclude expert testimony as moot where the court previously found that the basis of his testimony inadmissible.") Keurig's motion to exclude the rebuttal expert testimony of Judge Ware and Judge Rader is therefore denied as moot.

### C. *Dr. Gareth Macartney (Doc. 1456)*

Keurig seeks to exclude the expert opinion of JBR's proposed liability and damages expert Dr. Gareth Macartney ("Dr. Macartney"). In discharging the responsibility to exclude unreliable expert testimony, "a court may exclude an expert's testimony as to some issues but permit it as to others." *Granite Ridge Energy, LLC v. Allianz Glob. Risk U.S. Ins. Co.*, 979 F. Supp. 2d 385, 390 (S.D.N.Y. 2013); *see also Hunt v. City of Portland*, 599 F. App'x 620, 621

13

Add.227

(9th Cir. 2013) (affirming the district court's decision to allow an expert witness to testify as to damages causation while excluding his liability opinion); *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 198 F. Supp. 2d 598, 611 (E.D. Pa. 2002) (permitting an expert witness's testimony as to the fact of damages in part and excluding it in part where different aspects of the expert opinion address "entirely different issue[s]"). After reviewing Dr. Macartney's analysis and noting that the issue of liability generally precedes the issue of damages, *see Guzman v. City of Chicago*, 689 F.3d 740, 745 (7th Cir. 2012) ("liability must be resolved before the question of damages is reached") (emphasis omitted), I find that Dr. Macartney's liability and damages opinions do not rise and fall together.  For the reasons that follow, Keurig's motion to exclude Dr. Macartney's expert opinion is denied as to the liability opinion and granted as to the damages opinion.

### 1. Liability Conclusions

Keurig objects to Dr. Macartney's liability opinions on the grounds that (1) it impermissibly narrates record evidence, (Doc. 1458 at 16–20); (2) that the resulting opinions are unsupported by economic analysis, (*id.* at 20–24); and (3) that his opinions go beyond his training as an economist, (*id.* at 24–25).  I find that these objections do not warrant the exclusion of Dr. Macartney's liability analysis.

With regard to Keurig's first objection, "[u]nlike lay witnesses, experts may give background information, but even that information must help the jury decide the case." *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 3116763, at *19 (citing *Daubert*, 509 U.S. at 592). Experts may explain background material to the extent it is relevant to their analyses and useful to the jury, but should not be used as a conduit for otherwise inadmissible evidence or as a mouthpiece to highlight irrelevant factual details.  *See Rotman v. Progressive Ins. Co.*, 955 F.

Add.228

Supp. 2d 272, 283 (D. Vt. 2013) (concluding that expert who merely repeated testimony of a lay witness was "not testifying as an expert witness based upon specialized knowledge, but rather [was] acting as a conduit for another witness's testimony in the guise of an expert's opinion"). Although I do not find that Dr. Macartney is being "presented to the jury solely for the purpose of constructing a factual narrative," unnecessary factual narration can be limited at trial. *Anderson News, LLC v. Am. Media, Inc.*, 2015 WL 5003528, at \*2 (S.D.N.Y. Aug. 20, 2015).

Keurig's objection to the lack of economic analysis in Dr. Macartney's opinion is without merit. "[E]xpert witnesses are 'permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.'" *Bank of New York Mellon Tr. Co. v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 640 (S.D.N.Y. 2012) (quoting *Daubert*, 509 U.S. at 592)). However, "proffered expert testimony should be excluded if it is speculative or conjectural" and the "admission of expert testimony based on speculative assumptions is an abuse of discretion." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (internal quotation marks omitted). "Similarly, conclusory opinions—often referred to as ipse dixit—fail to provide a methodology that would allow a court to assess reliability." *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-CV-8645, 2018 WL 1889763, at \*3 (S.D.N.Y. Apr. 18, 2018), *aff'd sub nom. ScentSational Techs. LLC v. PepsiCo, Inc.*, 773 F. App'x 607 (Fed. Cir. 2019).

Courts also reject expert testimony, including economist testimony, "to the extent that it 'does not demonstrate any particular scientific expertise that can be assessed for reliability or that would ultimately assist the finder of fact.'" *In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-MD-1628, 2009 WL 3241401, at \*16 (S.D.N.Y. Sept. 30, 2009) (quoting *Kennedy v. Joy Tech., Inc.*, 269 Fed. App'x. 302, 312 (4th Cir. 2008)), *aff'd sub nom. Am. Banana Co. v. J.*

15

Add.229

*Bonafede Co.*, 407 F. App'x 520 (2d Cir. 2010).  Expert opinion testimony is appropriate when it goes beyond what a lay juror would be able to comprehend from evidence in the record.  *See, e.g.*, *City of Almaty v. Ablyazov*, No. 15-CV-5345, 2021 WL 5154110, at *11 (S.D.N.Y. Nov. 5, 2021) (permitting an expert "assessment [that] goes beyond a lay juror's understanding of the evidence at issue").

At the same time, however, Rule 702's inherent flexibility permits experts to opine using a wide range of sources and methods.  In *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, for example, a court admitted expert testimony on brand value notwithstanding defendant's objections that the expert "relied on articles about brand value and deposition testimony without performing any analysis of her own" and engaged in qualitative, rather than quantitative analysis. 97 F. Supp. 3d 485, 505 (S.D.N.Y. 2015); *see also In re N. Sea Brent Crude Oil Futures Litig.*, No. 13-MD-02475, 2016 WL 1271063, at *7 (S.D.N.Y. Mar. 29, 2016) (finding that an expert's "reliance on literature and his background is permissible" as a basis for opinion testimony, notwithstanding objections that the opinion was not based on "rigorous economic testing"), *aff'd sub nom. Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x 4 (2d Cir. 2019); *see also Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1080 n.4 (10th Cir. 2006) ("[G]enerally, an economist's role in an antitrust case is not to prove facts, but to opine on economic theory.").

Finally, although an expert's opinion cannot be devoid of factual support, the opinion is not unreliable simply because another expert's opinion better accounts for the factual record or because experts disagree on the proper interpretation of the record.  *See City of Almaty, Kazakhstan*, 2021 WL 5154110, at *11 ("To the extent [opponent] argues that [one expert's]

16

report better accounts for the factual record than does [another's], that also does not justify exclusion of [an expert's] testimony.").

Dr. Macartney's liability opinions are not so speculative, conclusory, or unsupported that exclusion is required.  Keurig objects to various of his opinions on the grounds that Dr. Macartney has not performed certain economic tests such as event studies to test his opinions, (Doc. 1458 at 21), or conducted an assessment of sunk costs as applied to various single-serve brewer systems, (*id.* at 22).  However, over the course of 268 pages, Dr. Macartney develops a conception model for assessing anticompetitive behavior based on a cross-section of academic sources and case law, (Doc. 1459, Ex. 1 ¶¶ 9–22), assesses the relevant market and Keurig's position in it, again based on a wide range of sources including case-specific deposition and discovery material produced in this case, (*id.* ¶¶ 34–86), including, contrary to Keurig's argument, several pieces of original analysis conducted by Dr. Macartney, (*see, e.g.*, *id.* ¶ 82), and applies that conceptual framework to assess Keurig's alleged anticompetitive behavior (*id.* ¶¶ 88–202.)  He then describes the harms to competition and consumer choice that resulted.  (*Id.* ¶¶ 203–206.)

Given this, Dr. Macartney's opinions are not the kind of unsupported speculative or conclusory *ipse dixit* opinions that are properly excluded.  Dr. Macartney has expounded an economic framework, reviewed a broad range of documents, conducted certain analyses, and based the application of those analyses and reviews to his framework, rendered an opinion. Contrary to Keurig's assertion, his conclusions are not "simply hypotheses couched as expert opinions." (Doc. 1458 at 22.)  Rather, Dr. Macartney's opinions are adequately supported and developed on a basis similar to the ones found admissible in *Louis Vuitton Malletier S.A.*, 97 F. Supp. 3d at 505, and *In re N. Sea Brent Crude Oil Futures Litig.*, 2016 WL 1271063, at *7.

Finally, Keurig's objection that Dr. Macartney has opined on topics outside the scope of his expertise are properly addressed in the same manner as its objections about factual narration. Keurig objects that Dr. Macartney opines on areas outside of his expertise such as the parties' subjective knowledge, motivation, and intent, as well as on areas such as JBR's cup design. (Doc. 1458 at 24–25.)  The overall objection is that "[i]t is not appropriate for Dr. Macartney to regurgitate JBR's version of the facts to the jury and put his imprimatur as a Ph.D. on that story." (*Id.* at 25.)

Courts routinely decline to allow experts to comment on a party's state of mind.  *See, e.g.*, *Accent Delight Int'l Ltd. v. Sotheby's*, No. 18-CV-9011, 2023 WL 2307179, at *30 (S.D.N.Y. Mar. 1, 2023); *Noel v. City of New York*, No. 15-CV-5236, 2023 WL 3170430, at *5 (S.D.N.Y. Apr. 28, 2023).  However, "an expert can testify to whether a given practice is consistent with a given state of mind." *In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126, 2020 WL 5849142, at *23 (S.D.N.Y. Sept. 30, 2020) (internal quotation marks omitted).[5]  Dr. Macartney similarly may not opine as to parties' state of mind and as already noted, excessive factual narration can be curtailed at trial.  Beyond this, however, the statements Keurig objects to are the kind of background information an expert may permissibly provide.

### 2.  The Use of Keurig-Associated Brands as a Benchmark

Keurig's first objection to Dr. Macartney's damages opinion is that he fails to use the proper benchmark, thereby rendering his analysis unreliable.  The two most common approaches to measuring damages in antitrust cases are the "before-and-after" approach and the "yardstick" approach. *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 521 (S.D.N.Y. 1996).

---

[5] Given this, I need not address Keurig's argument that such testimony should alternatively be excluded pursuant to Fed. R. Evid. 403 or based on the fact that they would be unhelpful to the fact finder.  (Doc. 1458 at 20.)

18

Add.232

"The before and after theory compares the prices plaintiff paid during the period the violation continued with prices paid prior to the beginning of the violation or after its termination. The yardstick approach compares profits earned or prices paid by the plaintiff with the corresponding data for a firm or in a market unaffected by the violation." *Id.* (quoting ABA Antitrust Section, Antitrust Law Developments (3d ed. 1992) at 669–73); *see also* Herbert J. Hovenkamp, *A Primer on Antitrust Damages* 30 (February 28, 2011); University of Iowa Legal Studies Research Paper, available at https://ssrn.com/abstract=1685919 (noting that the before-and-after and yardstick approaches "have been used by courts not only to estimate overcharges but also to estimate lost profits in competitor antitrust suits").[6]

Although the yardstick method has been the subject of critique, *see, e.g.,* Molly L. Zohn, Comment, *How Antitrust Damages Measure Up With Respect to Daubert Factors*, 13 Geo. Mason L. Rev. 697 (2005), the Supreme Court approved the method in *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 257 (1946), and the methodology has been used and accepted by courts in this Circuit as a means for calculating damages in antitrust cases, *see, e.g.*, *Iowa Pub. Emps.' Ret. Sys.*, 2022 WL 2829880, at *25 ("Courts in this Circuit have recognized the yardstick method for calculating damages as an accepted means of measuring damages in an antitrust action." (cleaned up)) (collecting cases); *see also U.S. Football League v. Nat'l Football League*, No. 84-CV-7484, 1986 WL 10620, at *32 (S.D.N.Y. July 31, 1986) (describing "the 'yardstick' approach that is sometimes used to prove damages in antitrust cases").

---

[6] Somewhat confusingly, the "before-and-after" approach is sometimes also referred to as the "benchmark" approach. *See, e.g.*, Justin McCrary & Daniel L. Rubinfeld, *Measuring Benchmark Damages in Antitrust Litigation*, 3 J. Econometric Methods 63, 63 (2014), available at https://www.law.berkeley.edu/files/mccrary_and_rubinfeld2014_JEM.pdf. However, cases discussing the yardstick approach sometimes refer to the firm or market used in the analysis as the "benchmark" for the yardstick analysis. *See, e.g.*, *Iowa Pub. Employees' Ret. Sys. v. Bank of Am. Corp.*, No. 17-CV-6221, 2022 WL 2829880, at *25 (S.D.N.Y. June 30, 2022), *report and recommendation adopted as modified sub nom. Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith*, No. 17-CIV-6221, 2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024).

19

Despite its broad acceptance, a common problem arises with the use of the yardstick method when the market or firm used as the benchmark is tainted by a defendant's alleged anticompetitive conduct.  In these cases, courts have split on how to proceed.  Some courts have declined to permit the use of such benchmarks because they would allow plaintiffs to claim artificially high damages.  For example, in *Farmington Dowel Prod. Co. v. Forster Mfg. Co.*, the court noted that "[defendant] would be an inappropriate yardstick of comparison . . . because [its] sales and profits after that time reflected the illegal monopolization and discriminatory sales . . . Clearly [plaintiff] was no more entitled to the monopoly profit than [defendant] was."  421 F.2d 61, 82 n.48 (1st Cir. 1969).  Other courts, however, have declined to exclude expert damages opinions based on the calculation of damages using the yardstick method using firms or markets that may have been affected by alleged anticompetitive conduct.  *See, e.g.*, *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 40–42 (S.D.N.Y. 2016).

Even still, it would create an unworkable and unfair standard to require that any benchmark be completely unaffected by a defendant's anticompetitive conduct or that the yardstick selected perfectly reflect the affected company but for the anticompetitive conduct. "The selection of comparators will seldom approach the 'Utopian ideal' of identifying the perfect clone." *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 189 (S.D.N.Y. 2006) (citation omitted).  Indeed, there will be cases where "the selection of perfectly comparable benchmark firms . . . is impossible where [a monopolist's] alleged monopoly prevents comparable firms from operating within the market." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 119 (S.D.N.Y. 2015), *amended*, No. 13-CV-6802, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016). Therefore, precluding reasonable damage calculations in such cases "would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by

20

Add.234

rendering the measure of damages uncertain." *Bigelow*, 327 U.S. at 264.  Thus, as with all

experts, once a yardstick is found to be sufficiently reliable to meet the threshold admissibility

requirements, any additional criticisms of the benchmark go to weight.  *See, e.g.*, *In re Suboxone*

*(Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 43 (E.D. Pa.

2019) ("Arguments about what factors an expert should have controlled for in conducting a

yardstick analysis generally go to the weight, rather than the admissibility, of the expert's

testimony." (internal quotation marks omitted)), *aff'd sub nom. In re Suboxone (Buprenorphine*

*Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020).

However, there comes a point where the proposed benchmark is so different from the

plaintiff that it cannot serve as the "corresponding data for a firm or in a market unaffected by

the violation" necessary to support the yardstick analysis.  *In re NASDAQ Mkt.-Makers Antitrust*

*Litig.*, 169 F.R.D. at 521 (internal quotation marks omitted).  *See also Fed. Hous. Fin. Agency v.*

*Nomura Holding Am., Inc.*, No. 11-CV-6201, 2015 WL 539489, at *5 (S.D.N.Y. Feb. 10, 2015)

("[I]t is axiomatic that, when designing an experiment to test whether an observed result was

caused by given variable, the control or benchmark group must lack that variable.  That is the

whole point of a control group.").  Courts have addressed this issue by permitting the use of

other comparable firms in the relevant market besides the alleged monopolist firm, *see, e.g.*, *Dial*

*Corp.*, 2015 WL 4104624, at *10 (permitting expert opinion based on a selection of 20 non-

anticompetitive firms); *Malibu Boats, LLC v. Natique Boat Co., Inc.*, No. 3:13-CV-656, 2015

WL 11017799, at *6 (E.D. Tenn. Jan. 26, 2015) (permitting the use of a single comparable non-

anticompetitive firm); *In re Suboxone Antitrust Litig.*, 421 F. Supp. 3d at 43 (permitting expert

opinion based on the market share of four comparable products), or market-wide prices, *see, e.g.*,

*Hyland v. HomeServices of Am., Inc.*, No. 05-CV-612, 2012 WL 12995647, at *6–9 (W.D. Ky.

July 3, 2012) (expert used average national rates provided by a consulting firm); *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, No. 09-CV-0852, 2016 WL 3579953, at *10–11 (E.D. Wis. June 24, 2016) (expert used class-wide pricing data); *Allen v. Dairy Mktg. Servs., LLC*, No. 09-CV-230, 2013 WL 6909953, at *15–16(D. Vt. Dec. 31, 2013) (permitting the use of certain geographic markets as benchmarks to calculate damages). At least one court has also permitted the use of a defendant's products in a separate market from the one being challenged. *In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *23 (E.D. Pa. Oct. 19, 2015).

Using other firms besides the firm engaged in the alleged anticompetitive conduct is also more likely to be approved where it makes the resulting estimates more conservative. *See, e.g.*, *Fond Du Lac Bumper Exch., Inc.*, 2016 WL 3579953, at *9 (noting that anticompetitive conduct would make expert's damages estimate more conservative); *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 171, 195 (E.D. Pa. 2015) ("any anticompetitive activity during the benchmark period would make [expert's] results conservative"); *see also In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 675 (E.D. Pa. 2007) ("[A]ssuming that the benchmark period was not perfectly competitive, [expert's] damages calculation actually becomes a more conservative estimate.").

### 3. Modeling of the But-For World

Keurig's second damages objection is that Dr. Macartney's model (1) fails to separate lawful from unlawful conduct, (2) does not account for "economic realities," and (3) unrealistically speculates about damages. (Doc. 1458 at 7–15.)

"[C]ourts have allowed antitrust plaintiffs considerable latitude in proving the amount of damages" after proof of injury causation was established. *U.S. Football League v. Nat'l Football*

22

*League*, 842 F.2d 1335, 1378 (2d Cir. 1988). "The 'willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land. The vagaries of the marketplace usually deny sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation.'" *Discover Fin. Servs. v. Visa U.S.A. Inc.*, No. 04-CV-7844, 2008 WL 4067445, at \*2 (S.D.N.Y. Aug. 26, 2008) (quoting *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 567 (1981)) (alteration adopted).

However, "damages awarded must be traced to some degree to unlawful acts." *U.S. Football League*, 842 F.2d at 1378 (citation omitted). "When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage." *Id.* (quoting *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1162 (7th Cir. 1983)). Thus, the Second Circuit has recognized that some courts have held that "damage studies are inadequate when only some of the conduct complained of is found to be wrongful and the damage study cannot be disaggregated." *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 825 (2d Cir. 1983) (citations omitted); *accord MCI Commc'ns Corp.*, 708 F.2d at 1161 ("It is essential . . . that damages reflect only the losses directly attributable to unlawful competition.").

It is not, however, similarly necessary for a damages model to fully disaggregate the damages associated with each unlawful act, particularly where the various unlawful acts are interconnected. *See, e.g.*, *MCI Commc'ns Corp.*, 708 F.2d at 1161 ("Not requiring strict disaggregation of damages among the various unlawful acts of the defendant serves to prevent a defendant from profiting from his own wrongdoing and makes sense when damages arise from a series of unlawful acts intertwined with one another."); *LePage's Inc. v. 3M*, 324 F.3d 141, 166

(3d Cir. 2003) ("[I]t would be extremely difficult, if not impossible, to segregate and attribute a fixed amount of damages to any one act as the theory was not that any one act in itself was unlawful, but that all the acts taken together showed . . . [an antitrust] violation." (citing *Bonjorno v. Kaiser Aluminum & Chem Corp.*, 752 F.2d 802, 812 (3d Cir. 1984)).[7]

A damages model must also account for economic conditions affecting a plaintiff's damages such as "a general recession," *U.S. Football League*, 842 F.2d at 1378–79, sums that plaintiffs would have been required to expend if not for the anticompetitive conduct, *see, e.g.*, *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1368 (9th Cir. 1986) (finding that "[p]lacing plaintiff in the position it would have been, absent the antitrust violation, thus required deducting from gross damages the amounts plaintiff would have expended if" that conduct had not occurred); *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981) (damage calculation was unreasonable where "no jury could reasonably find that [defendant] could not significantly have cut its prices, in an attempt to protect its market share"), and damages attributable to plaintiffs' "management problems" or business decisions rather than any anticompetitive conduct, *U.S. Football League*, 842 F.2d at 1378–79.

---

[7] Keurig suggests that strict disaggregation is necessary based on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). This overstates the findings in *Comcast*. *Comcast* dealt with a class certification motion under Fed. R. Civ. P. 23 where an expert produced a damages model to assess class commonality, "assumed the validity of all four theories of antitrust impact initially advanced by respondents" and did not attribute specific damages to any one theory of antitrust impact. *Id.* at 36. However, at the time of the *Comcast* decision, all but one of these four theories of anticompetitive impact had been dismissed. *Id.* at 31. Thus, the failing of the damages model was not that it failed to precisely disaggregate damages across valid theories of antitrust liability—as *Comcast* noted, "[c]alculations need not be exact," *id.* at 35, and the proposed "methodology might have been sound, and might have produced commonality of damages, if all four of those alleged distortions remained in the case," *id.* at 37. Rather, the issue was that the damages model was based, at least in part, on claims that had explicitly been dismissed. The damages model did not examine whether the one remaining theory of anticompetitive conduct, standing alone, established damages "susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 35. *Comcast* thus establishes that predominance cannot be shown through a damages model that includes theories of anticompetitive conduct already dismissed from the case, but does not require that damages be precisely disaggregated across each remaining theory of liability.

24

Finally, an expert's damages model may not be too speculative. "Damages are speculative where countless other market variables could have intervened to affect pricing and the theory of antitrust injury depends upon a complicated series of market interactions." *Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86, 99 (2d Cir. 2022) (cleaned up). "A district court should not be required to entertain multiple layers of speculation and create an alternative universe to calculate damages." *Id.* (cleaned up). The length of time the damages model projects into the future may affect how speculative the model is. *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 293 (3d Cir. 2012) (affirming trial court's exclusion of expert opinion on a nine-year damages projection where the underlying data was unreliable); *Heartland Surgical Specialty Hosp. LLC v. Midwest Div. Inc.*, No. 05-CV-2164, 2007 WL 6215929, at *7 (D. Kan. Dec. 19, 2007) (excluding expert opinion on damages where "future damages [were] based on 2006 volume estimates, which would be far too speculative to be carried forward for six additional years without any analysis of forecasted market conditions"); *Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358 F. App'x 643, 654 (6th Cir. 2009) ("The district court hit the nail on the head when it characterized this ten-year prediction about the fortunes of the American automotive industry as utterly speculative."). However, a model is not speculative simply because its projections run numerous years in the future so long as those projections are adequately supported. *See, e.g.*, *Aetna, Inc. v. Blue Cross Blue Shield of Michigan*, No. 11-15346, 2015 WL 1497826, at *4 (E.D. Mich. Mar. 31, 2015) (permitting expert opinion on a nine-year damages period); *In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *11–12 (E.D. Pa. Oct. 19, 2015) (permitting expert testimony on a damages period running roughly eight years).

25

#### 4.  The Collective Issues with Dr. Macartney's Report

Considered collectively, Keurig's objections raise too many methodological concerns to ignore and require the exclusion of Dr. Macartney's opinion.

I find that using Keurig as a benchmark is problematic.  Dr. Macartney determined that "a reliable benchmark to compare Rogers' experience is one based on the set of Compatible Portion Packs owned or licensed by Keurig."  (Doc. 1459, Ex. 1 ¶ 252.)  This includes all of the brands licensed by Keurig, including ones that do not bear the Keurig label.  (Doc. 1531 at 4 n.4) (summarizing exhibits.)  Dr. Macartney justifies this comparison on the fact that JBR and Keurig's products "were sold in the same market" but "the products in the Keurig system were not subjected to the alleged anticompetitive practices that Keurig engaged in and that caused Rogers to suffer lost sales."  (Doc. 1459, Ex. 1 ¶ 252.)  He also argues that JBR "was an early mover," further making it a comparable firm to Keurig.  (*Id.*)  Keurig disputes each of these assertions.  Based on the opinions of its own expert, Keurig argues that it and JBR are "vastly different in terms of their size, geographic presence, business models, brand equity, and products" because, among other things, "JBR is primarily a regional company," relies on "word of mouth" for advertising, uses a different single-serve cup design[8], and lacks the "brand partnerships" that Keurig enjoys.  (Doc. 1458 at 5–6.)  JBR, through Dr. Macartney, contests each of these conclusions.  (*See* Doc. 1531.)

Dr. Macartney's report suggests that from 2013 to 2019, Keurig held an overwhelmingly dominant market share across numerous categories of single-serve cup sales.  (Doc. 1459, Ex. 1 ¶¶ 81–87.)  Although other non-licensed brands existed, they represented a small and

---

[8] Across the different briefing papers, parties use various terms to describe single-serve coffee cup products.  For ease of reference, I use "single serve cup" to refer to the generic product and use alternative or brand-specific terms and terminology only as necessary or when a quoted source uses that terminology.

Add.240

diminishing component of overall market share, which is allegedly attributable to Keurig's anticompetitive conduct.  (*Id.*)  Under these circumstances, virtually any yardstick will have issues, and venturing outside the single-serve cup market to an alternative product or industry will raise questions about the comparability of the firm or market selected.  Using a selection of other unlicensed firms as a benchmark would still result in a comparison tainted by anticompetitive conduct and would, assuming Plaintiffs' allegations have merit, suppress damage amounts since all of these firms would have had their market share and revenue suppressed by the anticompetitive conduct as well.

As in *Dial Corp.*, when the alleged anticompetitive conduct has skewed the field of possible comparison companies, a court must account for that in its assessment of reliable comparators.  Moreover, the decision to use Keurig as the benchmark means that, assuming Plaintiffs' theories of the case are correct, Keurig was favorably affected by the anticompetitive conduct, which raises the risk that using it as the benchmark could result in overly generous damages figures.[9]  This result cuts against the prevailing trend of using of benchmarks that are likely to render more conservative estimates.  *See, e.g.*, *Fond Du Lac Bumper Exch., Inc.*, 2016 WL 3579953, at *9; *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. at 195; *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d at 675.  Although a plaintiff is not required to generate a conservative estimate, it raises concerns when a litigant not only fails to use a conservative benchmark, but selects the benchmark firm or market most likely to be favorably affected by the anticompetitive conduct.

---

[9] Dr. Macartney's reply report asserts that the damages calculation is a conservative estimate of damages because its initial growth from 2012 to 2013 was greater than Keurig's. (*See, e.g.*, Doc. 1459, Ex. 27 ¶¶ 179–180.)  This, however, is somewhat misleading because, as Dr. Macartney admits, 2012 was JBR's first full year of sales, resulting in 4000 percent growth rate, followed by a 36 percent growth rate the next year. (Doc. 1459, Ex. 1 ¶ 253.) This is an unrealistically artificial baseline against which to measure growth.

Add.241

Finally, I would have greater confidence permitting the use this methodology if it were tested with other methods. For example, in *Bigelow* the court was presented with both the before-and-after and yardstick methods by comparing receipts of the plaintiff and competitor, and by examining receipts from the pre- and post-anticompetitive conduct period. 327 U.S. at 257–58. Other courts have acknowledged that a plaintiff is not restricted to these two methods and may devise alternative ones so long as the estimates are based on reliable data. *See, e.g.*, *Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 207 (5th Cir. 2000) ("While the two most common methods of quantifying antitrust damages are the 'before and after' and 'yardstick' measures of lost profits, a plaintiff may prove damages by a different measure tailored to the facts of the case, so long as the estimates and assumptions used rest on adequate data."). Having a set of estimates based on multiple methods would provide a cross-check on the yardstick method. Alternatively, selecting a second benchmark market or firm as a comparison could provide additional confidence that the estimates yielded are not unduly favorable.[10]

This issue also adds weight to Keurig's argument that Dr. Macartney's model fails to disaggregate lawful and unlawful conduct. However, JBR correctly notes that strict disaggregation and distribution of damages across the various theories of antitrust harm is not required, particularly where, unlike in *Comcast Corp.*, 569 U.S. at 37, the damages are not premised on a dismissed theory of harm. *See, e.g.*, *Pearlstein v. BlackBerry Ltd.*, No. 13-CV-7060, 2021 WL 253453, at *23 (S.D.N.Y. Jan. 26, 2021) (finding no requirement that a damages model disaggregate damages for each anticompetitive act for class certification); *Menaldi v.*

---

[10] In this regard, *Bigelow* is instructive. In *Bigelow*, the yardstick method yielded damages of $115,982.34 and the before-and-after method yielded damages of $125,659.00, a $9,676.66 or roughly 8 percent difference. 327 U.S. at 258. This spread, while not inconsequential, locates damages within a relatively circumscribed spread of possibilities. The jury—and it bears remembering that the goal here is to give the jury a "just and reasonable" basis on which to award its damages—settled on the midpoint of this range, or $120,000.00.

28

Add.242

*Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 99 (S.D.N.Y. 2018) (finding that *Comcast Corp.* did not preclude the use of a model that failed to "disaggregate the stock drop caused by the alleged misstatements from the stock drop caused by government fines" for class certification); *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (finding that the *Comcast Corp.* standard was satisfied notwithstanding the failure to disaggregate harms associated with a range of factors all encompassed within the plaintiffs' theory of liability for class certification).

Moreover, in most use cases for the yardstick method, there would be little merit to Keurig's claim that a damages model must disaggregate the benchmark comparator's (*i.e.*, Keurig's) lawful and unlawful conduct, (Doc. 1458 at 7–8), because the whole point of the yardstick method is that the "corresponding data for a firm or in a market" used as the benchmark is "unaffected by the [antitrust] violation." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. at 521 (citation omitted). Thus, there is no need to disaggregate lawful and unlawful conduct with the comparator because all conduct consists of lawful competitive practices. Here, however, the benchmark contains both lawful and unlawful conduct and there is insufficient evidence that Dr. Macartney properly segregated out the unlawful conduct in calculating JBR's damages.[11]

---

[11] Some commentators have been particularly critical of approving damages models that fail to disaggregate lawful and unlawful conduct. *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002), *cert. denied*, 537 U.S. 1148 (2003), for example, has come under particular scrutiny for its dismissal of concerns that a model did not discriminate between lawful and unlawful conduct and simply measured a plaintiff's market share. *See, e.g.*, Hovenkamp, *supra* at 52 (describing the *Conwood* decision as "indefensible"); Joshua D. Wright, *Antitrust Analysis of Category Management: Conwood v United States Tobacco Co*, 17 S. Ct. Econ. Rev. 311, 334 (2009) ("Conwood's damages analysis was inherently incapable of measuring any potential antitrust injury associated with UST's illegal conduct, and commentators have uniformly agreed that the testimony should have been precluded by *Daubert*.") It is thus appropriate for a court to be particularly on-guard against a damages benchmark that strongly risks commingling lawful and unlawful conduct.

Add.243

In short, the issue with the Keurig benchmark is not merely that it is an imperfect comparison, but that it is likely the benchmark that is most affected by the anticompetitive conduct, and in a way that is most likely to be favorable to JBR's damages estimation.

This issue is compounded by the problems with the end date of 2029 that Dr. Macartney selected for modeling damages. The problem is not merely, as JBR suggests, that there is a long damages period. Courts have permitted damages projections well into the future so long as they are adequately supported. *See, e.g.*, *Aetna, Inc.*, 2015 WL 1497826, at *4. Rather, it is that, as Dr. Macartney's deposition indicates, there was no particular reason behind choosing 2029—it could as easily have been 2028 or 2031. (Doc. 1459, Ex. 2 at 189:9-17.)[12] As Keurig notes, much of JBR's claimed damages stem from conduct involving the 2.0 Brewer, which was discontinued in 2017. (Doc. 1458 at 13) (summarizing exhibits.) As noted, it is not impossible that with adequate support a damages model could project future damages out for more than a decade, but there must be some support, beyond an expert's bald assertion, to justify a damages projection stretching to 2029, when it appears most of the relevant conduct occurred prior to 2017.

I find that Keurig's remaining objection about the failure to model the impact of various JBR business decisions warrants less consideration. (Doc. 1458 at 8–9.) JBR fairly objects that those business decisions were either accounted for or irrelevant. (Doc. 1531 at 11–13.) This is the kind of granular dispute over the impact of comparatively minute issues that goes to the weight of the analysis rather than its admissibility.

---

[12] "[I]f you're saying, for example, well, why not cut off in 2029 -- why not cut off in 2028 or, indeed, why not cut off in 2030 or 2031, you know, you have to stop the analysis at some point, and you have to pick a natural time to stop it, given that the harm would have persisted through that period and beyond. And so it was reasonable for the purposes of the calculation to go out ten years."

Add.244

As discussed, the pervasive problem is that Dr. Macartney, while selecting a potentially viable methodology, chose a particularly flawed benchmark. Using Keurig as the benchmark basis for a yardstick analysis creates a strong risk of a model tainted by anticompetitive conduct and likely to commingle lawful and unlawful conduct. This issue is compounded by the use of a long damages period without adequate support for the end date of that period. These compounding concerns diminish the reliability Dr. Macartney's damages opinion to the point that exclusion is required. *See Price, Inc.*, 2020 WL 4937464, at *5–8.

### D. *Dr. Gary L. French (Doc. 1406)*

Keurig moves to exclude the expert opinions regarding class certification, damages, and liability offered by the DPP's[13] expert Dr. Gary French ("Dr. French"). (Doc. 1408 at 1.) For the reasons that follow, Keurig's motion is granted in part and denied in part.

In his report, Dr. French (i) defines Keurig's relevant markets; (ii) assesses the extent of Keurig's monopoly power in those markets and the harm to competition caused by Keurig's conduct; (iii) assesses the impact of Keurig's alleged wrongdoing on members of the DPP Class; and (iv) quantifies the overcharge damages to the DPP Class. (Doc. 1362, Ex. 2 at 4–5.) Keurig argues that Dr. French's testimony should be excluded on three main grounds: (1) that Dr. French's regression model is flawed because it fails to account for certain variables, uses an inappropriate benchmark, produces implausible results, and improperly uses averages (collectively, the "Regression Model Objections"); (2) that Dr. French's damages calculation is unreliable; and (3) that Dr. French's liability opinions are inadmissible because they lack

---

[13] The Direct Purchaser Plaintiffs are also the proposed class representatives and include Kenneth B. Burkley, Roger Davidson, James G. Long, Sally Rizzo, Henry Rocker, and Todd W. Springer. (Doc. 1360 at 1 n.1; Doc. 1469 at 1 n.1.)

31

economic analysis, contain impermissible factual narration, and opine on motivations and intent (collectively, the "Liability Opinion Objections").  I address each argument in turn.

### 1.  Regression Model Objections

The Regression Model Objections are not grounds to exclude Dr. French's opinion.  Dr. French proffers a regression model comparing the prices of Keurig's K-Cups to the competitor product "OneCup" that is sold by Rogers.  (Doc. 1362, Ex. 2 at 193–200.)  Dr. French's model uses ten years of Keurig and eight years of Rogers transaction data that was reviewed, cleaned, and standardized.  (*Id.* at 201.)  The model also sources data from reputable sources including Information Resources Inc. ("IRI") and Nielsen.  (*Id.* at 201–02.)  Keurig argues that Dr. French's regression model is "fundamentally flawed and inadmissible" because it failed "to control for numerous lawful factors."  (Doc. 1408 at 3.)  These factors include Keurig's brand value, other coffee brands' portion pack brand premium, the physical cup design, and brand-specific events.  (*Id.* at 5–13.)

"Normally, failure to include variables [in a regression analysis] will affect the analysis' probativeness, not its admissibility."  *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J. concurring).  "Where a study accounts for the 'major factors' but not 'all measurable variables,' it is admissible.  *Gruber v. Gilbertson*, No. 16-CV-9727, 2021 WL 2482109, at *10 (S.D.N.Y. June 17, 2021) (quoting *Bazemore*, 478 U.S. at 400).  However, "[t]here may, of course, be some regressions so incomplete as to be inadmissible as irrelevant."  *Bazemore*, 478 U.S. at 400 n.10.  "[W]here significant variables that are quantifiable are omitted from a regression analysis, the study may become so incomplete that it is unreliable and therefore inadmissible."  *Gruber*, 2021 WL 2482109, at *10 (citing *Bickerstaff v. Vassar College*, 196 F.3d 435, 449 (2d Cir. 1999)).  However, such challenges will generally face a high bar and even the "fail[ure] to consider some

arguably significant variables" will generally go to a model's "probativeness rather than its admissibility." *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020).

"Because the burden of proving helpfulness and relevance rests on the proponent of a regression analysis, it is the proponent who must establish that the major factors have been accounted for in a regression analysis." *United States v. Teva Pharms. USA, Inc.*, No. 13-CV-3702, 2019 WL 13244252, at *2 (S.D.N.Y. July 1, 2019) (internal quotation marks omitted). "At the same time, a defendant challenging a regression analysis must at least identify the significant, missing variables." *Id.* (citing *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 34 (2d Cir. 1988). "While the burden to show relevance and admissibility always rests with the proponent, a "mere conjecture or assertion on the defendant's part" is insufficient." *Id.* (quoting *Sobel*, 839 F.2d at 34). Rather, "such an attack should be specific and make a showing of relevance for each particular variable it contends plaintiffs ought to include." *Sobel*, 839 F.2d at 34.

Dr. French's model includes explanatory variables beyond illegal conduct, such as cost difference, brand premium, and sub-channels. He thoroughly explains why and how he selected these variables. (Doc. 1362, Ex. 2 at 202–06.) He has thus sufficiently demonstrated that he has incorporated all important explanatory variables into his model. To the degree Keurig believes other factors ought to have been included, it can raise the matter on cross examination.

Keurig's second Regression Model Objection is that Dr. French did not choose a reliable benchmark. (Doc. 1408 at 13–15.) I have discussed the law governing the use and selection of benchmarks in Section II.C.1. Dr. French explains that he selected JBR's OneCup product as a benchmark because the product is compatible with the Keurig brewer, sold in the same channels, and has sufficient sales data to analyze and compare. (Doc. 1362, Ex. 2 at 193–95.) Although Keurig maintains that the OneCup is not reasonably similar to the Keurig K-Cup, I find that the

33

Add.247

OneCup is "sufficiently comparable" to the Keurig K-Cup "to permit a degree of reliable comparison," and therefore may be used as a benchmark. *SourceOne Dental, Inc. v. Patterson Cos., Inc.*, No. 15-CV-5440, 2018 WL 2172667, at *5 (E.D.N.Y. May 10, 2018); *see also Allen v. Dairy Mktg. Servs., LLC*, No. 5:09-CV-230, 2013 WL 6909953, at *15 (D. Vt. Dec. 31, 2013) (permitting expert testimony because imperfect proposed benchmarks, "when coupled with an appropriate regression analysis," will still "assist in a reasonable estimate of damages").

Keurig's third Regression Model Objection is that the model produces "implausible results." (Doc. 1408 at 15.) To generate these "implausible results," Keurig had an expert of its own, Dr. Laila Haider, apply Dr. French's model to new contexts. (*See, e.g.*, Doc, 1410, Ex. 2 ¶¶ 100–13.) Using Dr. Haider's application of Dr. French's model, Keurig identifies a number of proposed absurdities including overcharges within JBR's own brands (Doc. 1408 at 1), illogical prices in a hypothetical but-for world, (*id.* at 16), and the failure to predict actual prices, (*id.*).

In effect, all these critiques attack the robustness of Dr. French's model. The "robustness" of a model speaks to "whether regression results are sensitive to slight modifications in assumptions." David L. Rubinfeld, *Reference Manual on Scientific Evidence: Reference Guide on Multiple Regression* (3rd ed. 2011), 2011 WL 7724257, at *11. "Robustness testing . . . that produces contradictory or otherwise implausible results strongly suggest that a methodology has been insufficiently tested . . . ." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 468 (S.D.N.Y. 2018). As discussed in greater detail in Section II.K.1, robustness testing is a reliable means by which a rebuttal expert can challenge another expert's findings.

The question here, however, is when one expert's model must be struck based on another expert's robustness testing. It cannot be the case that a model must survive all tests under all circumstances—any model may be bent until it breaks. Rather, a model is only insufficiently robust when it is sensitive to even small changes. *See, e.g.*, *In re Pork Antitrust Litig.*, No. CV 18-1776, 665 F. Supp. 3d 967, 993 (D. Minn. 2023) ("robustness testing . . . ask[s] whether the models are sensitive to *small changes*") (emphasis added)); *In re Elysium Health-ChromaDex Litig.*, No. 17-CV-7394, 2022 WL 421135, at *22 (S.D.N.Y. Feb. 11, 2022) (noting that the question of robustness turns on "whether regression results are sensitive to *slight modifications*" (internal quotation marks omitted)).

Dr. Haider's alterations to Dr. French's model are not minor. She replaces benchmark variables, (Doc. 1410, Ex. 2 ¶¶ 98–99), and applies his model to different coffee brands, (*id.* ¶ 100). As discussed at length here and in Section II.D.1, the selection of a benchmark is a major modeling consideration, as is the determination of what variables to include in a model. Dr. Haider may modify these variables as part of her own robustness testing, and Keurig may use those results to challenge Dr. French, but findings based on such major modifications do not demonstrate that a model is so unreliable as to warrant exclusion.

Keurig's fourth Regression Model Objection is that Dr. French's model should be excluded because it uses averages. (Doc. 1408 at 17.) Keurig maintains that a model that uses averages will not assist the Court on the issue of class certification in particular because it cannot establish whether nearly all class members were injured. (*Id.* at 18.) At the class certification stage, the *Daubert* inquiry is "limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10-CV-8086, 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013) (internal quotation marks omitted).

35

"Plaintiffs seeking certification of a Rule 23(b)(3) damages class action must first establish numerosity, commonality, typicality, and adequacy of representation, and then predominance of common questions of law or fact and the superiority of a class action over other procedures." *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020) (citing Fed. R. Civ. P. 23(a), (b)(3)).  It is not the case that "plaintiffs must be prepared at the certification stage to demonstrate through common evidence the precise amount of damages incurred by each class member.  But we do expect the common evidence to show all class members suffered some injury." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013)).  While I need not yet determine whether the DPPs have made that showing, I do not find that Dr. French's model is methodologically incapable of making such a showing.  *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.,* No. 06-MD-1175, 2014 WL 7882100, at *64 (E.D.N.Y. Oct. 15, 2014) (allowing damages estimate which used averages at class certification stage), *report and recommendation adopted,* No. 06-MD-1775, 2015 WL 5093503 (E.D.N.Y. July 10, 2015).

Dr. French relied on four types of evidence to reach his common impact opinion:  (1) documents and testimony demonstrating barriers to competition that affected all or nearly all class members, (2) his regression model showing "statistically significant, large and pervasive overcharges," (3) empirical analyses of Keurig's price structure, and (4) record evidence such as price lists and testimony showing that Keurig raised prices simultaneously.  (Doc. 1469 at 15–16.)  Accordingly, I do not find that Dr. French's common impact opinions fails for lack of fit.

Keurig also asserts that the model does not assist with class certification because it does not distinguish harms attributable to specific claims.  (Doc. 1408 at 17.)  However, as already noted in Section II.C.2, a model does not need to strictly disaggregate the harms associated with

36

Add.250

each unlawful act that has been properly maintained in the action; it needs to avoid accounting for lawful acts and acts where the associated cause of action has been dismissed.

Dr. French testified that his "model is not designed to estimate any effect of a single activity or a single type of conduct.  It's designed to indicate the overcharge from the exercise of monopoly power that was caused initially by the legitimate patents and maintained thereafter by a series of conduct over time." (Doc. 1410, Ex. 1 at 178:4-9.)  Keurig does not allege that any of the anticompetitive conduct Dr. French models is based on a cause of action that has been dismissed, and there is no requirement that Dr. French specifically disaggregate the impact of various types of unlawful conduct for the reasons already discussed in Section II.C.2. Accordingly, I decline to exclude his testimony on these grounds.

### 2.  Damages Objections

Keurig disputes the reliability of Dr. French's damages calculation for the same reasons it disputes his regression model.  (Doc. 1408 at 19.)  For the reasons explained above, Dr. French's regression model is sufficiently reliable and will not be excluded.  Keurig also argues that Dr. French's decision to extrapolate certain data makes his damages calculation unreliable.  (*Id.*)  I again disagree.  Dr. French either extrapolated or estimated values for 30 percent of brands based on data from the remaining 70 percent that had available data.  (Doc. 1469 at 22–23.)  "Trained experts commonly extrapolate from existing data." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Dr. French performed additional economic analysis to confirm that the extrapolations were appropriate.  (*Id.* at 23.)  "[A]nalogy, inference and extrapolation can be sufficiently reliable steps to warrant admissibility so long as the gaps between the steps are not too great." *In*

37

Add.251

*re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181, 189 (S.D.N.Y. 2005).  Here, I find that these gaps are not too great.

### 3.   Liability Objections

Keurig's first Liability Opinion Objection is that Dr. French relies on insufficient economic analysis.  (Doc. 1408 at 20.)  Specifically, Keurig challenges Dr. French's opinions on the relevant market for single-serve brewers and the effects of Keurig's challenged conduct.  (*Id.* at 21.)  I disagree that Dr. French's opinions are "just *ipse dixit*."  (*Id.*)  Determining a relevant market requires that the expert take a "pragmatic, factual approach" and "not a formal, legalistic one."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962).  This determination can be based at least in part "on qualitative evidence."  *Park West Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 327 (S.D.N.Y. 2009).  In *Brown Shoe*, the Supreme Court recognized certain indicia of the boundaries of a submarket for antitrust purposes, such as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  370 U.S. 294, 325 (1962) (hereafter collectively the "*Brown Shoe* Indicia").

To assess the relevant market, Dr. French applies the *Brown Shoe* Indicia along with the small but significant and non-transitory increase in price test (the "SSNIP Test")[14] from the Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("DOJ/FTC

---

[14] *See also F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008) ("To facilitate this [market] analysis, the Department of Justice and the FTC developed a technique called the SSNIP ('small but significant non-transitory increase in price') test . . . In the SSNIP method, one asks whether a hypothetical monopolist controlling all suppliers in the proposed market could profit from a small price increase. . . . If a small price increase would drive consumers to an alternative product, then that product must be reasonably substitutable for those in the proposed market and must therefore be part of the market, properly defined." (citing Horizontal Merger Guidelines § 1. 11, 57 Fed. Reg. at 41,560–61)); *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) (recognizing the SSNIP method); *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009) ("The use of this [SSNIP Test] technique has been recognized in antitrust caselaw.").

Merger Guidelines"). (Doc. 1362, Ex. 2 ¶¶ 82–113 (*Brown Shoe* Indicia); *id.*¶¶ 114–32 (SSNIP Test).) Dr. French also relies on his regression model to explain the impacts of Keurig's challenged conduct. (*See id.* 193–95.) "This is not a case in which an expert is unable to articulate a rationale for his methodology; nor is it a case where the proffered rationale is patently flawed or unreasonable." *In re Vitamin C Antitrust Litig.*, 2012 WL 6675117, at *8 (E.D.N.Y. Dec. 21, 2012). Rather, Dr. French's model is based on sufficient data and reliably applies accepted economic principles and methods to permit him to give a reliable opinion.

Finally, Keurig objects that Dr. French performs improper factual narration, (Doc. 1408 at 22–25), and impermissibly opines on motive and intent. (*Id.* at 25.) I have already indicated that excessive factual narration can be objected to and curtailed by the trial judge if appropriate. Section II.C.4. Additionally, there are a few instances where Dr. French opines on what Keurig "believed" and "intended." (*See, e.g.*, Doc. 1362, Ex. 2 at 83, 89, 161.) The trial judge should not permit experts to offer opinions on a party or its representatives' state of mind or intent. *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (holding that expert may not opine on a party's subjective intent, state of mind, and knowledge); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543, 2015 WL 9480448, at *5 (S.D.N.Y. Dec. 29, 2015) ("[T]he Court agrees . . . that [expert] may not offer opinions regarding [defendant's] knowledge or beliefs, both because he is not qualified to give such opinions and because such testimony would impermissibly tread on the role of the jury."); *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d at 486 ("It is impermissible for experts to opine on the state of mind or motives of corporations or regulatory bodies."); *see also Scott.*, 315 F.R.D. at 45 ("[E]xperts may not offer opinions regarding the intent or motive of parties as part of their analysis.") Accordingly, Keurig's motion to exclude Dr. French is denied, except that Dr.

39

Add.253

French's opinions on the motive or intent of others, including that "Keurig did not believe the 2.0 brewer offered a consumer benefit," (Doc. 1362, Ex. 2 at 83), are excluded.

### E.   *Hal Poret (Doc. 1445)*

Keurig seeks to exclude the expert testimony of Mr. Hal Poret.  Plaintiff TreeHouse offers Mr. Poret's opinions primarily for the purpose of showing that Keurig statements misled consumers into believing that the 2.0 Brewer worked only with Keurig's K-Cups, and to provide an additional basis for TreeHouse's false advertising damages expert, Dr. Mohan Rao, to rely on when estimating Lanham Act damages resulting from Keurig's incompatibility statements. (Doc 1523 at 4.)  Keurig argues that Mr. Poret's testimony should be excluded because the survey suffers from methodological flaws that render it "scientifically invalid and inherently unreliable."  (Doc. 1444 at 1.)

"[C]ourts have long held that consumer surveys are the most persuasive evidence of secondary meaning."  *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 123 (S.D.N.Y. 2022) (internal quotation marks omitted), *motion to certify appeal denied*, No. 19-CV-1422, 2022 WL 3137131 (S.D.N.Y. Aug. 5, 2022).  "To evaluate the validity and reliability of a survey, a court should consider whether:  (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts."  *Id.* (quoting *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 449–50 (S.D.N.Y. 2017)). Although there is a strong presumption of favoring admissibility of surveys, *id*. at 225, surveys can be excluded under Rule 403 if "the survey is so far out of the realm of relevance that a jury

40

Add.254

should not even be permitted to consider it," *Friesland Brands, B.V. v. Vietnam National Milk Co.*, 221 F. Supp. 2d 457, 460 (S.D.N.Y. 2002). A "survey suffer[ing] from substantial methodological flaws . . . will be excluded under both Rule 403 and Rule 702." *Malletier*, 525 F. Supp. 2d at 581. However, as noted, courts generally favor the admissibility of survey evidence. *Id.* at 580.

Keurig challenges the admissibility of Mr. Poret's survey (the "Poret Survey") on the following grounds: (1) failure to test any false or misleading statements; (2) lack of controls in the method; (3) inclusion of improper questions; and (4) unrepresentative universe of respondents. I address each challenge in turn in light of the standards below and find Keurig's challenges to be unpersuasive.

### 1. False and Misleading Statements

Keurig argues that Mr. Poret not using the allegedly false or misleading statements, as alleged in the Complaint, renders his consumer survey fatally unreliable. (Doc. 1444.) This argument fails because although surveys "must 'be designed to examine the impression presented to the cosumer,'" *Capri Sun GmbH*, 595 F. Supp. 3d at 126 (quoting *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999)), there is no obligation that the survey use the exact language challenged, or mirror the advertising conditions exactly, *id.* Indeed, "any survey is of necessity an imperfect mirror of actual customer behavior under real life conditions." *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp 2d 723, 738 (S.D.N.Y. 2011) (internal quotation marks omitted).

In his consumer survey, Mr. Poret interviewed consumers about "what they did and why, and encompass[ed] the entirety of whatever happened in the marketplace." (Doc. 1448, Ex. 24 at 21:18-22:9.) His expert report addressed the broader question of why consumers had not

41

Add.255

purchased competitor's single-serve cups, and not only the effect of the allegedly false or misleading statements made by Keurig in their advertising campaign.  (Doc. 1523.)  Mr. Poret's choice to not show the allegedly false or misleading statements identified in the complaint does not automatically render the entire survey unreliable, because he is allowed to use other acceptable survey methodologies in his study.  Since Mr. Poret utilized survey methodology that is well accepted in the survey field, I find that the failure to use the allegedly false or misleading statements in the Poret Survey does not render it inadmissible.

### 2.  Lack of Control Group

Keurig alleges that the Poret Survey should be excluded because it lacks a test and control group.  Keurig asserts that because the Poret Survey measures causation between Keurig's allegedly false or misleading statements and the reduction in Keurig 2.0 owners' purchases of Competitive Cups, his survey must include a control group to be methodologically sound.  (Doc. 1444 at 7–11.)

Control groups are not the universal and inflexible requirement of survey research as Keurig seeks to portray them.  Control groups may be particularly useful when there is a need "not simply to describe attitudes or beliefs or reported behaviors, but to determine the source of those attitudes or beliefs or behaviors."  Federal Judicial Center, *Reference Manual on Scientific Evidence* 397 (3d ed. 2011) ("RMSE"), https://perma.cc/L48R-438Q.  For example, in a survey to assess whether a commercial misleads consumers, "if consumers already believe, before viewing the commercial, that Product A is a superior pain reliever, a survey that simply records consumers' impressions after they view the commercial may reflect those preexisting beliefs rather than impressions produced by the commercial."  *Id.*  Additionally, the value of a control group is increased where the survey seeks to "test directly the influence of [a] stimulus" such as

a commercial. *Id.* 26. *See also Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242, 2020 WL 1503452, at *7 (S.D.N.Y. Mar. 30, 2020) ("The [expert's] Survey aimed to analyze whether Defendants' advertisements caused consumer confusion, and is, therefore, a causal study warranting a control group." (emphasis omitted)).

However, a control group may not be necessary if the risk of simply recording pre-existing values is not as great. For example, "a control group is not required for a survey that purports only to understand what developers *perceive* as relatively more or less important factors in their decision-making process." *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 1743116, at *9 (N.D. Cal. May 2, 2016) (emphasis in original).

Mr. Poret states his objective as "what consumers perceived as factors in their decisions not to purchase [competitors' single-serve cups]." (Doc. 1523 at 10.) In light of this objective, I find the need for a control group to be less than compelling. The survey did not seek to directly test the impact of a stimulus (*i.e.*, the allegedly misleading statements) so the need for a control is less pressing. In the absence of a clear need for a control group, the lack of such a group does not undermine the reliability of Mr. Poret's testimony.

### 3. Inclusion of Improper Questions

Keurig alleges that the Poret survey design is unscientific because it uses biased closed-ended and leading questions. I have reviewed the allegedly improper questions and find that the issues regarding whether the questions are biased and leading are not sufficient to affect the admissibility of the report. "[Q]uestions that make up a survey instrument may be open-ended, closed-ended, or a combination of both." RMSE, *supra*, at 391. There are legitimate reasons to use closed-ended questions in a consumer survey—indeed, there are occasions where closed-ended questions are "more suitable" in a consumer survey than open-ended questions. *Id.* at *23.

43

Add.257

("Open-ended questions are more appropriate when the survey is attempting to gauge what comes first to a respondent's mind, but closed-ended questions are more suitable for assessing choices between well-identified options or obtaining ratings on a clear set of alternatives."). Courts in this District have also approved the use of close-ended questions in consumer surveys. *See, e.g.*, *POM Wonderful LLC v. Organic Juice USA, Inc.*, 769 F. Supp. 2d 188, 200 (S.D.N.Y. 2011).

Dr. Poret was tasked to "design and conduct a scientific survey to reliably assess the extent to which Keurig 2.0 owners did not purchase[] non-licensed pods due to a concern that non-licensed pods would not work, or would not brew well or safely, in the Keurig 2.0 as a result of Keurig's false or misleading advertising." (Doc. 1448, Ex. 21 at 5.) To do so, he noted that both licensed and unlicensed pods existed, (*id.* at 10–11), and for certain survey respondents, asked them to choose from a list of reasons that they did not purchase unlicensed pods, (*id.* at 13). Some of these choices favor Plaintiff's position (*e.g.*, "I heard or read that the Keurig 2.0 brewer works only with Keurig brand or licensed pods") but some did not (*e.g.*, "I prefer the taste of Keurig or Keurig-licensed brands."), (*id.* at 14). Determining consumers preferences on these kinds of clearly defined alternatives is the kind of task for which close-ended questions are frequently more appropriate. RMSE, *supra*, at 392. The use of this method thus provides no grounds to strike Dr. Poret's survey.

### 4. Unrepresentative Survey Participants

Keurig argues that the universe of survey participants chosen for the Poret Survey is unrepresentative because Mr. Poret "imposed near-equal age distribution within his sample survey," creating an underinclusive universe of respondents whose ages matched neither the

44

Add.258

population of Keurig users nor the population of the United States.  (Doc. 1444 at 18.)  I disagree.

The population of interest in the Poret Survey was Keurig 2.0 Brewer owners, because the study was about the reaction of Keurig 2.0 Brewer owners to Keurig's statements about the incompatibility of competitor cups.  (Doc. 1523 at 23.)  Keurig's own survey expert agrees that owners of the Keurig 2.0 Brewers were the proper population to survey.  (*Id.*)  Furthermore, a consumer survey performed for the purpose of "determining actual confusion must encompass a universe of potential consumers who use the product."  *Lon Tai Shing Co. v. Koch+Lowy*, No. 90-CV-4464, 1992 WL 18806, at *3 (S.D.N.Y. Jan. 28, 1992) (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984)).  Thus, I do not find that the makeup of the survey participants warrants the exclusion of Mr. Poret's testimony.

Because Keurig's challenges to the admissibility of Mr. Poret's survey are insufficient to warrant the exclusion of Mr. Poret's testimony, Keurig's motion with regard to Mr. Poret is denied.

### F.  *Sarah Butler (Doc. 1445)*

Keurig moves to exclude the testimony of TreeHouse expert Sarah Butler.  It seeks to exclude Ms. Butler's testimony on the basis that "she is completely unqualified to testify" regarding Keurig's testing of competitor cups as her "training is in consumer surveys, not laboratory testing of physical products."  (Doc. 1447 at 1.)  Keurig also objects to Ms. Butler's testimony on surveys that she "designed, fielded, and conducted."  (*Id.*)  Ms. Butler conducted two surveys:  (1) evaluating how consumers who purchased competitor cups for use at home (the "At-Home" segment) perceived certain quality, safety, performance, and warranty claims associated with competitor cups (the "At-Home Survey"); and (2) evaluating the buying

45

Add.259

preferences of customers who purchased competitor cups for use outside the home, primarily customers in charge of office or business coffee supplies (the "Away-From-Home Survey" of the "Away-From-Home" segment).

Defendants assert that "[b]oth surveys are so methodologically flawed" that they are rendered inadmissible. (Doc. 1447 at 1.) They assert that in the At-Home Survey, Ms. Butler "manipulates her control group for one survey measure and completely abandons her control group for another to reach her conclusions." (*Id.*) As to the Away-from-Home Survey, Defendant asserts that Ms. Butler surveys "the wrong population of individuals" and does not use a control group. (*Id.*) Her surveys were conducted using commonly used survey designs and methodologies, the validity of which Defendant has not challenged.[15] Instead, Keurig challenges the control group chosen, the wording of the survey questions, and the representativeness of the survey population.

I do not find Keurig's challenges to be persuasive. Therefore, its motion is denied. I begin by addressing the qualification objections, and then turn to the objections to Ms. Butler's surveys.

### 1. Qualifications

Ms. Butler is qualified to opine on whether Keurig's comparisons between K-Cups and competitive cups adhered to "specific research standards and methodology." (Doc. 1528 at 1.) Although an expert's testimony should be excluded if it "could stray from the scope of a witness' expertise," *Cruz*, 363 F.3d at 194, Keurig takes an unreasonably narrow view of what expertise would permit Ms. Butler to opine on its cup-testing practices.

---

[15] Indeed, in moving to exclude another expert, Keurig states that an experimental design survey is "the method best suited for the study of causal relationships." (Doc. 1444 at 8 n.8 (citation omitted)).

Add.260

Ms. Butler's evaluation of the cup testing reports and testimony on the reliability of the surveys relates to research standards and methodology generally, and not merely to "product testing." (Doc. 1447 at 4.) Therefore, her experience and education are sufficient to qualify her to opine on whether the methodology of a research study allows for statistically valid conclusions to be drawn. Ms. Butler is a Managing Director at NERA Consulting, an economic consulting firm that specializes in applying economic, finance, and quantitative principles to legal challenges. (*See* Doc. 1448, Ex. 1 ¶¶ 1–7.) She is an expert in the fields of survey research, market research, sampling, and statistical analysis, with decades of experience in these fields, has published more than 20 articles on these topics, and has been qualified as an expert in more than sixty cases. (*Id.*) Ms. Butler's testimony concerns whether the cup testing conducted by Keurig followed "generally accepted research standards for comparative product tests—such as objectivity, sufficient sample size, use of control groups where appropriate, and testing protocols—necessary for reliable statistical analyses," (Doc. 1528 at 4), and therefore aligns with her experience, training, and expertise.

### 2. Survey Control Group

Keurig proffers two objections to Ms. Butler's surveys. First, it asserts that her At-Home Survey "botches the control group," making it scientifically invalid. (Doc. 1447 at 9 (alterations omitted).) Its main objection is that Ms. Butler's use of a corrected or adjusted control group "inflates the degree to which respondents appear to have altered perceptions" because of allegedly misleading statements made by Keurig. (*Id.* at 11.) Second, it asserts that her Away-From-Home Survey did not utilize a control group at all. (Doc 1447 at 20.)

In response to Keurig's objection on control group adjustments in the At-Home Survey, TreeHouse responds that the adjustments Keurig complains of were made to ensure that

47

Add.261

"respondents who had previously been exposed to Keurig's false advertising campaign were controlled for."  (Doc. 1528 at 1.)  In devising her survey, Ms. Butler also noted her concern that "the rates in the Control group may be driven by past exposures to statements made by Keurig about the unreliability of Competitive Cups."  (Doc. 1448, Ex. 5 ¶ 83.)  Mitigating the impact of preexisting beliefs on survey feedback is a sound objective in survey research.  *See* RMSE, *supra*, at 397 ("[I]f consumers already believe, before viewing the commercial, that Product A is a superior pain reliever, a survey that simply records consumers' impressions after they view the commercial may reflect those preexisting beliefs rather than impressions produced by the commercial.").  Indeed, failure to control for the impact of preexisting beliefs can render a survey unreliable.  *See Procter & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 351 (S.D.N.Y. 2008).

In circumstances where a control group without preexisting beliefs is unavailable, social scientists sometimes employ statistical weights or adjustments to the control groups, or the construction of an artificial "synthetic control" group.  *See, e.g.*, Janet Bouttell et al., *Synthetic Control Methodology as a Tool for Evaluating Population-Level Health Interventions,* 72 J. Epidemiol Cmty. Health 673, 673–74 (2018) ("Synthetic control methodology (SCM) allows the construction of a counterfactual by selecting a weighted average of the outcome variable from a group of units similar to the treated unit."); Alberto Abadie, *Using Synthetic Controls: Feasibility, Data Requirements, and Methodological Aspects*, 59 J. Econ. Lit. 391, 391 (2021) ("Synthetic control methods . . . have become widely applied in empirical research[.]").  Given the threat that preexisting views pose to survey validity and the broad use of far more intensive methods of control group weighing in modern econometric methods, I do not agree with Keurig that there is no scientific justification for Ms. Butler's modification of the control group.

Add.262

The second objection may be disposed of quickly since I have already discussed the law and theory on the use of control groups in surveys, *see supra* § II.F.2, the key takeaway of which is that a control group is less necessary where a researcher does not seek to directly test the impact of a stimulus on a survey respondent to establish a causal relationship. That is the case here, since the Away-From-Home Survey targets "individuals responsible for beverage supplies or contracts with beverage suppliers for their office or business location to evaluate the impact of Keurig's relationships with Distributors[] on purchasing behaviors in the Away-From-Home Market." (Doc. 1448, Ex. 5 ¶ 10.) Ms. Butler does not seek to test the impact of a particular stimulus or statement on these individuals. Since she is not attempting to assess the impact of a particular stimulus on a group, the lack of a control group does not materially impact the reliability of Ms. Butler's analysis and resulting opinion so as to require exclusion.

### 3. Inclusion of Improper Questions

Keurig's next objection is to Ms. Butler's purportedly improper use of leading and closed-ended questions in her At-Home Survey. (Doc. 1447 at 17.) I have already discussed the law and theory governing the use of close-ended questions. *See supra* § II.E.3. The takeaway is that closed-ended questions do not render a survey per se unreliable and can be a suitable method for obtaining ratings of various clear alternatives. On other hand, courts have frequently found surveys to be unreliable where they use leading questions. *See, e.g.*, *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *2 ("To be admissible, a survey generally must, among other things . . . use precise, non-leading questions."); *Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*, No. 06-CV-550, 2007 WL 2258688, at *7 (S.D.N.Y. Aug. 6, 2007) (finding that a survey lacked probative value in part because it "employed a format that failed to approximate real world conditions and was impermissibly leading."); *see also Universal City Studios, Inc. v.*

Add.263

*Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (reasoning that a survey included an "obvious leading question" because the inquiry "suggested its own answer").

Because the use of close-ended questions is not itself an indicium of unreliability, the issue turns on whether Ms. Butler's survey used inappropriate leading questions. Keurig objects in particular to the development of a false dichotomy between "licensed" and "unlicensed" pods as well as the use of words like "unapproved" that it deems biased. (Doc. 1447 at 13–14.) It also objects that Ms. Butler employed stronger warranty language than Keurig itself used. (*Id.*) In support, Keurig had a rebuttal expert conduct a survey along its proposed lines which yielded substantially different results. (Doc. 1447 at 15.)

Having reviewed Ms. Butler's survey questions, (Doc. 1448, Ex. 5 at 135–40),[16] I do not find them to be biased or leading. In some cases, the wording of the questions is strictly necessary. Keurig objects to the overemphasis of the word "unapproved," but its own materials use that term, (*id.* 135), so TreeHouse may fairly ask about the impact of that language on consumers. Nor do any of the other questions Keurig complains of credibly "suggest[] its own answer," *Nintendo*, 746 F.2d at 118, in such a way as to be an impermissible leading question.[17] Similarly, although there are differences between "affecting" a warranty and "voiding" a warranty, none are so strong that exclusion of the survey is warranted or that it becomes more likely than not that Ms. Butler's opinion is unreliable. Although Keurig's survey produced different results, this is to be expected—surveys conducted in different ways produce different

---

[16] The pages numbers in this citation and similar citations to this document refer to the PDF pagination.

[17] As one example, Ms. Butler asks, "If you knew that other brand pods/unapproved portion packs without the Keurig Brewed seal were safe for your Keurig machine, would you . . . [(1)] Purchase only other brand pods/unapproved portion packs; [(2)] Purchase only pods with the Keurig Brewed seal; [(3)] Purchase a mix of pods with the Keurig Brewed seal and other brand pods/unapproved portion packs; [(4)] Don't know/unsure." (Doc. 1448, Ex. 5 at 135.) Nothing in that initial question prompt suggests that any one of the four options is the "correct" one. Ms. Butler's other questions are similarly formatted.

results.  In the absence of issues with Ms. Butler's questions, the existence of countervailing survey findings is grist for cross-examination but not grounds for exclusion.

### 4.  Unrepresentative Survey Population

Keurig mounts two challenges to the survey populations on which Ms. Butler relies. First, it argues that the Away-From-Home Survey should have used only Keurig's distributors and redistributors because that is "the relevant population for purposes of assessing the at-issue contracts between Keurig and its (re)-distributors," but instead inappropriately relied on end-users who purchased beverage supplies.  (Doc. 1447 at 18.)

TreeHouse does not dispute that "Ms. Butler's survey was directed at measuring the purchasing behavior of end-user consumers" rather than Keurig's distributors and redistributors. (Doc. 1528 (emphasis omitted).)  Given this, there is no actual objection as to "survey population"—Ms. Butler sought to survey end-user purchasers and no one disputes that this is precisely what she did.  To the degree that Keurig objects that the end-users have no relevant insight, that objection is properly addressed under Federal Rule of Evidence 401, which provides that "[e]vidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." "Rule 401 imposes a relatively low bar of relevance."  *United States v. Ray*, 585 F. Supp. 3d 445, 459 (S.D.N.Y. 2022) (internal quotation marks omitted).  Keurig does not address the relevance of end users, but at least one court has found that end-user customers' perception of products is relevant even when those products are purchased through intermediary distributors.  *Marketquest Grp., Inc. v. BIC Corp.*, No. 11-CV-618, 2018 WL 1782724, at *5 (S.D. Cal. Apr. 12, 2018) ("Ultimately, end consumers decide what Marketquest products to purchase; that they do so

Add.265

through intermediaries does not render their perception of the products and marks irrelevant.")
Accordingly, this does not provide grounds to strike Ms. Butler's testimony.

Keurig makes a separate population-based argument to the Away-From-Home Survey that the people surveyed are not representative of those who actually order beverages for companies, in particular because survey population appears to include a large portion of senior executives. (Doc. 1447 at 20–21.) Yet Keurig offers no evidence why this would not be the case. Ms. Butler's survey was restricted to respondents who "indicate[d] that they were responsible for beverage supplies" for their business—the exact population she sought to survey. (Doc. 1448, Ex. 5 ¶ 122.) Thus, something more than speculation on Keurig's part is necessary to mount a credible challenge to the survey's representativeness. *See, e.g.*, *Loussier v. Universal Music Grp., Inc.*, No. 02-CV-2447, 2005 WL 5644439, at *4 (S.D.N.Y. Aug. 24, 2005) (declining to exclude a purportedly unrepresentative survey because the challenger opponent had provided no data to suggest that the survey was unrepresentative).

Keurig similarly objects that the universe of survey participants chosen for the At-Home Survey is unrepresentative because it "skews much older than the general population of Keurig brewer purchasers." (Doc. 1447 at 16.) Keurig's objection on this point is similarly without merit. Ms. Butler describes a rigorous survey respondent screening process designed to capture present and prospective future owners of Keurig brewing systems. (Doc. 1448, Ex. 5 ¶¶ 27–45.) Keurig objects that this system did not produce a sample that comports with two of its own surveys or with United States Census Bureau numbers. (Doc. 1447 at 16 (summarizing evidence)). TreeHouse responds that Keurig's samples are unrepresentative because one sample included non-Keurig owners and was limited to a particular income range, while the other

52

Add.266

excluded Keurig customers who purchased through various channels such as online sales. (Doc. 1528 at 19–20.)

"[I]n practice, it is difficult to select a perfect sample. Sometimes, surveys are overinclusive in that the sample includes people whose opinions are irrelevant to the issue in the litigation . . . On the other end of the spectrum sit underinclusive surveys, which are flawed because they fail to capture a portion of the relevant respondents." *Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 498 (S.D. Ohio 2020). Thus, a survey becomes "unreliable" only if it is "over- or underinclusive to a significant degree." *Id.* Otherwise, issues with representativeness are the kind of "'errors in survey methodology [that] usually go to the weight of the evidence' and do not warrant wholesale exclusion." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 125 (S.D.N.Y. 2022) (quoting *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 231 (S.D.N.Y. 2010)). Even crediting Keurig's arguments about Ms. Butler's survey sample would only mean that her survey participants are older than might be desirable. That might go to the weight her survey is due, but it does not suggest the kind of significant issue that merits wholesale exclusion. Moreover, given the rigor of Ms. Butler's survey selection methodology, and the issues identified with Keurig's demographic evidence, I find that issues with representativeness do not undermine the reliability of Ms. Butler's survey evidence such that exclusion is required.

### 5. Recall-Based Measures

Keurig challenges the use of "recall-based measures" (*i.e.*, questions about past purchasing decisions) in Ms. Butler's At-Home Survey, on the grounds that "[i]t is widely recognized that recall-based measures do not yield reliable responses." (Doc. 1447 at 21.) "[R]ecall bias, which recognizes the potential for inaccurate responses due to fading memories

over time," is a known issue with survey reliability. *Jimenez v. Allstate Ins. Co.*, No. 10-CV-8486, 2019 WL 13088814, at *6 (C.D. Cal. May 13, 2019). "Potential issues with recall bias or imperfect recall," however, "go to the weight of [an expert's] findings and are appropriate to bring up on cross-examination, or through the introduction of other admissible evidence." *Oracle Am.*, 2016 WL 1743116, at *8. *See also Medlock v. Taco Bell Corp.*, No. 07-CV-01314, 2015 WL 8479320, at *5 (E.D. Cal. Dec. 9, 2015) ("[A]ny issues of recall bias and different experiences of respondents during the class period are appropriate questions for cross examination or their own evidence and go to the weight to be ascribed to the survey.").

Issues with recall bias may undermine a survey's reliability when the events at issue happened a very long time ago or when survey respondents are asked to recall highly specific events. *Compare In re Autozone, Inc.*, No. 10-MD-02159, 2016 WL 4208200, at *19 (N.D. Cal. Aug. 10, 2016) (finding a survey inadmissible where, among other issues "the survey asks respondents to recall very specific events that occurred between three and a half and eleven years ago"), *with GlaxoSmithKline LLC v. Glenmark Pharms. Inc.*, No. 14-CV-877, 2017 WL 8948975, at *11 (D. Del. May 30, 2017) (finding that a recall-based survey was not inadmissible where it "questioned physicians as to their treatment of . . . patients in the aggregate over the period from 2007–2015"); *see also Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, No. 11-CV-775, 2014 WL 12623025, at *4 (M.D. Fla. May 29, 2014) ("Asking a person for the reason behind their purchase is completely different than asking someone how much time they spent doing something over a period of years."). Moreover, the existence of a "don't know" survey response option can help mitigate the effect of recall bias. *GlaxoSmithKline*, 2017 WL 8948975, at *11 ("[I]f the physicians did have trouble recalling the details relevant to the survey questions, they could respond with 'don't know.'").

54

Add.268

Keurig does not identify any specific issues with Ms. Butler's survey stemming from questions that ask consumers to recall the reasons they did or did not purchase particular single-serving cups or the sources of information they used in making that decision. Moreover, the questions Ms. Butler asked were broad questions about aggregated purchasing preferences that, as noted in *GlaxoSmithKline*, limited the effect of recall bias. *See* 2017 WL 8948975, at *11. The impact of recall bias is further limited by the consistent inclusion of a "Don't know/unsure" option in the relevant survey questions. (Doc. 1448, Ex. 5 at 135–40.) Ms. Butler's use of recall-based questions therefore does not undercut the reliability of her testimony, and I decline to preclude her testimony concerning the At-Home Survey on this basis.

### G.  *Dr. Mohan Rao (Doc. 1439)*

Keurig moves to exclude the expert testimony of Dr. Mohan Rao ("Dr. Rao"), an expert for Treehouse whose proffered testimony relates to damages under the Lanham Act. (*See* Doc. 1439.) For the reasons that follow, this motion is denied.

Keurig seeks the exclusion of Dr. Rao's testimony because: (1) it relies on inadmissible survey data from Mr. Poret and Ms. Butler; (2) it uses an unreliable damages model that double-counts data, fails to provide statistical measures like confidence intervals, and relies on unsupportable assumptions (collectively the "Method Objections"); and (3) his opinions are outside the scope of his expertise (the "Expertise Objection"). (*See* Doc. 1441 at 1.) I have already determined that the expert opinions provided by Mr. Poret and Ms. Butler are admissible, so exclusion of Dr. Rao's testimony on those bases is unwarranted. *See supra* §§ II.E–F; *cf. Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000) ("[A]n expert may rely on data that she did not personally collect.").

Add.269

The Method Objections do not provide a basis to exclude Dr. Rao's opinion.  Keurig's first Method Objection is that Dr. Rao artificially inflates his damages assessment by double-counting damages inputs from both Ms. Butler and Mr. Poret.  (Doc. 1592 at 4.)  Dr. Rao developed two damages estimates that are relevant here.  The first estimate sought "[t]o determine what sales TreeHouse would have made 'but for' Keurig's alleged false advertising related to the quality, safety, performance, and warranty implications of" alternative single-serve cups.  (Doc. 1448, Ex. 30 ¶ 96.)  For this, Dr. Rao relied on Ms. Butler's survey findings of the number of customers exposed to Keurig's statements, (id. ¶ 98), and changes in those customers' purchasing habits, (id. ¶¶ 99, 101, 102).  The result was an estimate of profits lost due to alleged false advertising on quality, safety, performance, and warranty issues.  (Id. ¶ 106.)  The second estimate sought "[t]o determine what sales TreeHouse would have made 'but for' Keurig's alleged false advertising related to the compatibility of [competitors' single-serve cups] with the 2.0 Brewer."  (Id. ¶ 107.)  For this, Dr. Rao relied on information from Mr. Poret's survey of 2.0 Brewer owners.  (Id. ¶¶ 109, 110.)  Based on this information, Dr. Rao arrived at an estimate of profits lost due to alleged false advertising on compatibility issues.  (Id. ¶ 115.)

Keurig does not argue that these two estimates include the same group of people—inflating damages by, for example, counting the damages incurred as to someone from Ms. Butler's survey population and functionally the same the damages incurred as to someone from Mr. Poret's survey population.  (See Doc. 1441 at 8.)  As TreeHouse notes, and Keurig does not contest, Dr. Rao segregated the populations for each of the separate estimates.  (Doc. 1530 at 10.)  Rather, Keurig's double-counting argument is based on the claim that both Ms. Butler and Mr. Poret's surveys dealt with "safety" and "performance" issues related to alternative single-serve cups.  It argues this is improper because only Ms. Butler should have addressed safety and

56

Add.270

performance while Mr. Poret should have restricted himself to "compatibility questions." (Doc. 1441 at 4.) In essence, Keurig's argument boils down to the assertion that Mr. Poret's questions result in an overly broad measurement of compatibility, that, by extension, inflate his damages.

This argument is without merit. It is not "double counting," because Dr. Rao segregated the survey populations so that compatibility issues were assessed first based on Mr. Poret's data and only the residual population was assessed based on the safety and quality data provided by Ms. Butler. (*See* Doc. 1530 at 10.) Thus, TreeHouse could, at most, be giving itself a "second bite at the apple" by asking consumers who answer in the negative to the first survey a similar question in hopes of capturing them in the second survey, but each consumer is captured once. Even if this were Keurig's argument, it would be unavailing. Conceptually, it is reasonable that consumers' ability to safely use alternative single-serve cups in the 2.0 Brewer will influence their perception of whether those alternative cups are compatible with the 2.0 Brewer. There may also be consumers who view the issues of safety and compatibility as separate issues. It is perfectly reasonable to construct a survey to catch these different populations.

Keurig's second Method Objection is that Dr. Rao "cherry-picked" higher values from Ms. Butler's and Mr. Poret's surveys, artificially inflating his damages estimates. (Doc. 1441 at 9–11). Ms. Butler's and Mr. Poret's surveys provided two estimates of how Keurig's statements altered consumers' views of alternative single-serve cups; Keurig objects that Dr. Rao selected the higher of each estimate. (*Id.*) This is not grounds for exclusion. I have already determined that the expert opinions of Ms. Butler and Mr. Poret, and by extension their survey data, meet the admissibility requirements of Fed. R. Evid. 702. *See supra* §§ II.E–F. Since this data is admissible, it provides an adequate foundation for Dr. Rao's conclusions. Any further critiques about Dr. Rao's data selection practices speak to the weight a jury should give his analysis, not

57

the threshold admissibility of his opinion.  *See, e.g.*, *Capri Sun*, 595 F. Supp. 3d at 135

(explaining that so long as there is an adequate factual basis for an expert's opinion, "cherry-

picking" arguments go to weight, not admissibility); *Pearlstein v. Blackberry Ltd.*, No. 13-CV-

7060, 2021 WL 4131646, at *7 (S.D.N.Y. Sept. 10, 2021) (same).

Keurig's third Method Objection—that the lack of a confidence interval or margin of

error statistic undermines the reliability of Dr. Rao's testimony—is similarly without merit.  The

confidence level "indicates the percentage of the time that intervals from repeated samples would

cover the true value."  RMSE, *supra*, at 247.  It is based primarily on three numbers:  the size of

the sample, the variability of the item being assessed, and the confidence level—*i.e.*, the

percentage—selected by the researcher.  *See id.* at 381.  Importantly, the confidence level does

not express "the chance that repeated estimates" from the same sample "would fall into the

confidence interval."  *Id.* at 247.  There are cases, such as in nonprobability-based survey sample

research, where confidence intervals should not be calculated or would have limited value in

understanding the research findings.  *Id.* at 382.  Confidence intervals are also vulnerable to

misinterpretation.  The *Reference Manual on Scientific Evidence* devotes a footnote to the

misinterpretation of confidence interval information by courts.  *See id.* at 247 n.91.  Scholarly

commentary has also questioned the broad-based use of confidence intervals, suggesting that this

use is based on "a folk understanding rather than a principled understanding of [confidence

interval] theory" and that these intervals "can provide severely misleading inferences."  Richard

D. Morey, et al., *The Fallacy of Placing Confidence in Confidence Intervals*, 23 Psychonomic

Bull. & Rev. 103, 103–04 (2016).

Given this, Keurig's attempt to frame the lack of a confidence interval or margin of error

as per se disqualifying is unavailing.  Even accepting the value of confidence intervals as a

measure of reliability, the value of this statistical measure will vary based on the circumstances.

In some cases, the lack of a confidence interval reflects other methodological issues. For

instance, in *Price v. L'Oreal USA, Inc.*, the court noted an expert's failure to provide a

confidence interval indicated that his opinion was unreliable. No. 17-CV-614, 2020 WL

4937464, at *8 (S.D.N.Y. Aug. 24, 2020). That failure to provide a confidence interval,

however, was symptomatic of the more problematic issue of the expert's impermissibly small

sample size—just 105 individuals—because sample size is one of the three key determinants of

the size of a confidence interval. *See id.*; RMSE, *supra*, at 381. The real issue in *Price* was thus

not the absence of a confidence interval, but the deficient sample size, which was highlighted by

the lack of a confidence interval measure.[18] If Keurig pointed to similar errors in Dr. Rao's

work, those errors and the absence of a confidence interval might make a case for exclusion, but

the mere absence of a statistical measure of highly variable value is not *per se* grounds for

exclusion.[19]

Keurig's final Method Objection relates to the assumptions Dr. Rao uses in modeling

damages based on Keurig's allegedly false statements. (Doc. 1441 at 12–14.) Dr. Rao

---

[18] Keurig cites two additional cases on this point: *Gonzales v. Harley-Davidson Motor Company Group, Inc.*, No. CV-04-23, 2005 WL 8160757 (D. Ariz. Aug. 23, 2005), and *Gabbard v. Linn-Benton Housing Authority*, 219 F. Supp. 2d 1130 (D. Or. 2002). These cases discuss the error rate of an expert's technique and provide no insight into the use of confidence intervals or levels in statistical analysis. Confidence intervals and rates of error are not comparable terms. Rate of error as used in these cases and *Daubert* refers to how often a research method produces an erroneous result. *Daubert*'s discussion of rate of error, for example was based on an assessment of how often voice identification techniques misidentified a voice. 509 U.S. at 594 (1993) (citing *United States v. Smith*, 869 F.2d 348, 353–354 (7th Cir. 1989)). Conversely, "[t]he confidence level does not express the chance that repeated estimates would fall into the confidence interval" or "give the probability that the unknown parameter lies within the confidence interval." RMSE, *supra*, at 247. The same is true for "margin of error" which, despite the similar name, is just an alternative name for half the confidence interval, not an estimate of how likely it is that a statistical analysis has produced an incorrect result. *Id.* at 247 n.91.

[19] Keurig suggests that had Dr. Rao included confidence intervals he would have found "wide margins of error" that would show his estimates to be unreliable. (Doc. 1441 at 12.) Keurig does not provide sufficient evidence to allow me to assess this claim with reliably. Such specificity is essential in assessing the implication of a confidence interval for reliability. *See, e.g.*, RMSE, *supra*, at 248 ("[T]ake a 95% confidence interval for a damage claim. An interval that runs from $34 million to $44 million is one thing, but –$10 million to $90 million is something else entirely.").

59

Add.273

calculated three damages models:  one that makes no assumptions about consumer deception or materiality, instead drawing on Ms. Butler and Mr. Poret's surveys, (Doc. 1448, Ex. 30 ¶¶ 6–7); one that assumes that 100 percent of consumers would be deceived or confused by Keurig's statements but relies on survey data to assess the materiality of those statements (*i.e.*, whether those statements would change consumer behavior), (*id.* ¶ 7 n.2); and one that assumes both deception and materiality (*i.e.*, that 100 percent of consumers exposed to the allegedly false statements would be confused and deceived and 100 percent would change their consumer behaviors as a result, (*id.* ¶ 7 n.3).

Keurig objects to this third model on the ground that an assumption of 100 percent materiality is unsupported by law or economic theory.  (Doc. 1441 at 12–14; Doc. 1592 at 3.)  In support, Keurig cites *Apotex Inc. v. Acorda Therapeutics, Inc.*, in which the Court of Appeals observed that even where literal falsity is proven, a plaintiff must show those false statements were likely to influence consumer purchasing decisions in order to state a claim under the Sherman Act.  823 F.3d 51, 67–68 (2d Cir. 2016).  *Apotex*, however, does not stand for the principal that a plaintiff is legally barred from demonstrating a statement influenced 100 percent of consumers exposed to it, only that a plaintiff must prove both falsity and materiality.  *See id.*

Regardless of how likely it is that TreeHouse can prove 100-percent materiality, courts routinely permit experts to model various damages scenarios based on facts to be proven at trial. *See, e.g.*, *Fed. Trade Comm'n v. Vyera Pharms., LLC*, No. 20-CV-706, 2021 WL 5279465, at *5 (S.D.N.Y. Nov. 12, 2021) (permitting an expert to model "several counterfactual scenarios" and noting that "[t]o the extent any assumption on which [the expert] relied is unsupported by the record developed by the parties at trial, then his model will be of diminished relevance."); *AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411, 2019 WL 1254763, at *17 (S.D.N.Y. Mar. 19,

Add.274

2019) (admitting expert opinions on damages based on several different hypothetical negotiation outcomes); *see also Rosario v. City of New York*, No. 18-CV-4023, 2021 WL 1930293, at *5 (S.D.N.Y. May 13, 2021) ("[E]xperts may provide opinions tailored to different factual scenarios that the jury may consider"); *United States v. Asare*, No. 15-CV-3556, 2019 WL 5693477, at *5 (S.D.N.Y. Nov. 4, 2019) ("Experts regularly provide opinions based on facts they assume to be true.").

Although "expert testimony should be excluded . . . if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith," *Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233, 254 (2d Cir. 2021), Dr. Rao's assumptions are not contradictory and it is not unrealistic to model a party's best-case scenario so long as the assumptions underlying that scenario are disclosed and other scenarios are modeled that appropriately contextualize those best-case results. This Method Objection also does not warrant exclusion.

Keurig's Expertise Objection is also without merit. Keurig asserts that Dr. Rao testified outside of his area of expertise in opining on: (1) the truth or falsity of statements made by Keurig about alternative single-serve cups, (Doc. 1441 at 15–16); and (2) exposure and altered consumer behavior based on those statements, (*id.* 16–17).

With regard to the first ground, I find Keurig's objection to be based on a misstatement of Dr. Rao's testimony. Having reviewed his report, reply report, and deposition transcript, I find that Dr. Rao is consistently clear that he is not actually evaluating the truth or falsity of various Keurig statements, but rather making various assumptions regarding the truth or falsity of these statements as part of his damages calculations. TreeHouse also expressly disclaims any possibility that Dr. Rao seeks to testify on the actual truth or falsity of these statements, (Doc. 1503 at 21), and Dr. Rao's expert report consistently notes that the statements are only alleged to

61

Add.275

be false.  (*See, e.g.*, Doc. 1448, Ex. 30 ¶¶ 5, 21.)  If Dr. Rao attempts to testify as to the actual truth or falsity of these statements later, Keurig may object at the appropriate time.

As to Keurig's second argument, I find that Dr. Rao's opinions about exposure and altered consumer behavior are within the scope of his expertise.  Although Keurig objects that Dr. Rao cannot opine on consumer exposure or perception without conducting his own independent analysis, (Doc. 1441 at 16–17), courts in this District regularly permit experts to offer opinions based on materials they have not personally prepared, such as other expert opinions and reports, so long as the ultimate opinion is their own.  *See, e.g.*, *Redcell Corp. v. A. J. Trucco, Inc.*, No. 20-CV-0018, 2022 WL 3700148, at *12 (S.D.N.Y. Aug. 26, 2022); *United States v. Paracha*, No. 03-CR-1197, 2006 WL 12768, at *20 (S.D.N.Y. Jan. 3, 2006) (permitting an expert to opine based on a review of a secondary sources and original documents).

Dr. Rao has sufficient expertise to provide expert opinions on consumer surveys, particularly as part of using them as inputs as part of economic damages calculations.  (Doc. 1448, Ex. 32 at 16:3-29:22).   Keurig's motion to exclude the expert testimony of Dr. Rao is therefore denied.

### H.  *Dr. Phillip Johnson ("Johnson I") (Doc. 1452)*

Keurig seeks to exclude the expert report of Dr. Phillip Johnson ("Dr. Johnson"), the damages expert for McLane.  For the reasons that follow, this motion is denied.

As a preliminary matter, Keurig argues that Dr. Johnson's damages model produces implausible results because it finds price overcharges by entities not accused of anticompetitive conduct. (Doc. 1454 at 12–13.)  However, as McClane points out, (Doc. 1535 at 17–18), and Keurig does not contest in its reply, this is not a finding from Dr. Johnson's model.  Rather, it is an argument made by Keurig's own expert based on a modified version of Dr. Johnson's model.

It would be illogical to strike Dr. Johnson's opinion on the basis of a damages model that he did not create, and I decline to do so.

### 1. Failure to Account for Significant or Lawful Factors

Keurig's first set of objections center on Dr. Johnson's failure to model or otherwise account for significant or lawful factors in his damages estimate, which is derived from a yardstick model developed using regression analysis. In basic terms, regression analysis "determines the effect of two or more explanatory variables on a variable to be explained, called the dependent variable." *Actava TV, Inc. v. Joint Stock Co. "Channel One Russia Worldwide"*, No. 18-CV-06626, 2023 WL 2529115, at *6 (S.D.N.Y. Mar. 15, 2023) (internal quotation marks omitted). The yardstick method, as noted *supra* § II.C.1, is a widely accepted method for calculating antitrust damages. However, Keurig argues that the regression model Dr. Johnson employs in his yardstick analysis fails to isolate the effects of anticompetitive conduct in his damages model, (Doc. 1454 at 3), fails to account for lawful factors that contribute to the pricing differences he observes, (*id.* 4–10), and incorporates an unreliable control variable into his model, (*id.* 13). These objections are unfounded.

Beginning with Keurig's first argument, Dr. Johnson's model sufficiently disaggregates lawful conduct from unlawful conduct in his damages analysis. As noted *supra* § II.C.2, antitrust plaintiffs may only recover damages for harms that "flow[] from the distortion of the market caused by the monopolist's anticompetitive conduct." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979) (internal quotation marks omitted). Thus, damages studies that fail to disaggregate lawful and unlawful conduct are inadequate. *See Litton Sys.*, 700 F.2d at 825. Dr. Johnson's report, however, explicitly notes that he employed a regression model designed to "disentangle[] the effect of the alleged anticompetitive conduct from the effects of

63

Add.277

other factors that affect price differences." (Doc. 1455, Ex. 2 ¶ 102.)  He also details the various

variables used to control for pricing effects unrelated to the anticompetitive conduct.  (*See, e.g.*,

Doc. 1455, Ex. 2 ¶¶ 118–19, 122, 123.)

Given this, Keurig's objection that Dr. Johnson fails to disaggregate lawful and unlawful

conduct is without merit.  *Weiner v. Snapple Beverage Corp.*, to which Keurig cites as support

for its argument, is inapposite.  No. 07-CV-8742, 2010 WL 3119452, at *7 (S.D.N.Y. Aug. 5,

2010).  In *Weiner*, an expert's opinion had numerous systemic issues including the failure to

identify specific data that would be used to formulate the opinion or the methodology that the

expert would use to formulate his opinion.  *Id.*  Conversely, Dr. Johnson has sufficiently

explained how he has structured his model and what variables he selected in order to

disaggregate lawful from unlawful conduct to meet the threshold for admissibility.  Any issues

with his method for not further disaggregating lawful and unlawful conduct go to weight of his

opinions.

Keurig's objections about the failure to include important variables are also without

merit.  As discussed at length *supra* § II.D.1, the question of whether all important variables have

been accounted for in a model is an important one, affecting, at minimum, the model's

probativeness, *Bazemore*, 478 U.S. at 400, and potentially its admissibility, *Gruber*, 2021 WL

2482109, at *10.

Keurig's argument rests on Dr. Johnson's purported failure to include variables that

account for "major differences, including the value that consumers place on buying genuine

Keurig K-Cups for their Keurig brewers, K-Cups's different cup design, and K-Cups' quality."

(Doc. 1454 at 6.)  More specifically, Keurig claims that Dr. Johnson's model assumes that

Keurig has no brand value (*id.* 7–9), and that it ignores the differences between JBR's

64

Add.278

"OneCups," which are not airtight, and Keurig's "K-Cups," which are, (*id.* at 9).  Conversely, McClane, through Dr. Johnson, asserts that the differences between K-Cups and OneCups are not significant, (Doc. 1535 at 12–13), and that Keurig's brand lacked sufficient value to merit inclusion in Dr. Johnson's model, (*id.* 11–12).

Dr. Johnson's opinions regarding Keurig's lack of brand premium are sufficiently well-supported to permit his exclusion of Keurig's brand value as a variable in his model.  Keurig points to sections of Dr. Johnson's expert report, as well as an additional expert report by McLane liability expert, Dr. Jeffrey J. Leitzinger, indicating that the Keurig brand was well-known.  (*See, e.g.*, Doc. 1454 at 7 (citing Doc. 1455 ¶ 76 ("I do not dispute any of the material . . . about Keurig being a well-known manufacturer of coffee machines or even that the name 'Keurig' is well-known.")).  However, as Dr. Johnson points out, the fact that a brand is well-known is not the same as a brand having a premium value that might influence prices—Dr. Johnson found that "the 'Keurig Brewed' tag line on K-Cup packaging added little to no premium in the minds of consumers."  (Doc. 1455 ¶ 76.)  This determination was based on internal Keurig documents produced during discovery, (*id.* ¶¶ 66–75), the review of which led Dr. Johnson to conclude that "single serve customers shop by brand and the 'Keurig Brewed' adds little or no value to a product" (*id.* ¶ 77).  (*See also id.* ¶ 71 ("Keurig-brewed is important but not the brand shoppers are looking for.").)

This review gave Dr. Johnson sufficient grounds to exclude evidence of Keurig's brand value from his model and meet the burden of admissibility.  "Not all possible variables that might influence the dependent variable can be included if the analysis is to be successful; some cannot be measured, and others may make little difference."  RMSE, *supra*, at 314.[20]  Dr.

---

[20] Regression models frequently include some kind of measure explaining the amount of variation in the dependent

65

Add.279

Johnson determined that the inclusion of Keurig's brand value added little explanatory power to his model. This determination might lack credibility if, for example, "a preliminary analysis shows the unexplained portion of the multiple regression to be unacceptably high" or there was evidence of "[f]ailure to include a major explanatory variable that is correlated with the variable of interest in a regression model." *Id.* In *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, for example, an analysis was found to be unreliable where there was evidence that an omitted variable was "highly negatively correlated" with another variable of interest. 49 F. Supp. 3d 385, 404 (S.D.N.Y. 2014). The documents and evidence presented by the parties here provide no similar evidence that Keurig's brand value is a variable of sufficient importance to render a model unreliable without it.

Similarly, the design differences between the airtight K-Cups and the porous OneCups used by JBR are not an important design difference requiring incorporation into Dr. Johnson's model. Dr. Johnson's model already includes numerous product characteristics including "package-size, roast-type, special blends, flavored beverage" and similar factors. (Doc. 1455. Ex. 2 ¶ 119.) Despite this, the parties pepper the record with opposing quotes from depositions suggesting that various companies did or did not prefer the K-Cup to the OneCup based on this design attribute. (*Compare* Doc. 1454 at 9–10, *with* Doc. 1535 at 13.) Nothing in these conflicting deponent opinions suggests that cup design is so strongly correlated with price as to render it a "significant" variable. *Gruber*, 2021 WL 2482109, at *10. Moreover, nothing in the

---

variable (*i.e.*, the one being studied) accounted for by the various other variables included in the model. For example, "R-square ($R^2$) is a statistic that measures the percentage of variation in the dependent variable that is accounted for by all the explanatory variables." RMSE, *supra*, at 345. "A very low R-square ($R^2$) is one indication of an unexplained portion of the multiple regression model that is unacceptably high." *Id.*, at 314 n.31. In that case, it is more likely that important variables have been omitted that might help better explain the behavior of the dependent variable. Of course, as is always the case with statistical models, "the inference that one makes from a particular value of $R^2$ will depend, of necessity, on the context of the particular issues under study and the particular data set that is being analyzed" and "a low R2 does not necessarily imply a poor model (and vice versa)." *Id.*

Add.280

parties' papers suggests that Dr. Johnson's model is so lacking in explanatory power that it is likely that important variables are missing, RMSE, *supra*, at 314, and that, by extension, cup design is significant enough to provide that explanatory power.

Keurig also objects to Dr. Johnson's inclusion of bagged ground coffee as a proxy variable to account for the value of various coffee roasters' brands. (Doc. 1454 at 13–15.) "Occasionally when attempting to estimate and quantify the relationship between a dependent variable and explanatory variables using a multiple linear regression one or more of the explanatory variables may be unobservable, impossible to quantify, or the data may be missing." *Garg Tube Exp. LLP v. United States*, 569 F. Supp. 3d 1202, 1217 (Ct. Int'l Trade 2022) (internal citations omitted). "In those cases, a proxy variable may be used in place of the explanatory variable that the creator of the linear regression would like to control for. A proxy variable is a variable correlated with the unobservable explanatory variable." *Id.* (internal citations omitted). "If a proxy measure is used in place of a direct measure of the variable, the proxy is judged on the basis of how closely it is related to the variable of interest and what kind of distortions use of the proxy might introduce." *Trout v. Garrett*, No. 73-0055, 1990 WL 96640, at *13 (D.D.C. Mar. 30, 1990).

Dr. Johnson's model acknowledges that "[b]rand can matter to consumers for a variety of reasons, e.g., as a signal of quality." (Doc. 1455, Ex. 2 ¶ 120.) To address this, as one of the model's "product characteristic" variables, Dr. Johnson included "the average price of bagged ground coffee sold at the retail level by brand which should also reflect the way other less tangible aspects of branding translate into price differences." (*Id.*) Keurig's objects that bagged coffee is not a reliable variable and is built with cherry-picked data. Dr. Johnson's reply report, however, demonstrates that there is a positive correlated relationship between brand value as

67

Add.281

measured by his bagged coffee variable and price, particularly for unlicensed single-serve cup brands.  (Doc. 1455, Ex. 4 ¶¶ 98–99.)  As there is a correlated relationship between bagged coffee prices and brand value and no party has identified any meaningful distortions that would be introduced by the use of bagged coffee, I find that the use of this variable does not materially impact the reliability of Dr. Johnson's analysis such that exclusion is required.

### 2.  Use of JBR and Mother Parkers as a Benchmark

Keurig's objections to Dr. Johnson's use of JBR and Mother Parkers[21] as benchmarks for his yardstick damages analysis are without merit.[22]  Dr. Johnson selected these firms to provide an average price for single-serve market in a but-for world not affected by anticompetitive conduct in order to determine how much McClane was overcharged as a result of anticompetitive conduct.  (Doc. 1454 at 10–12.)  Keurig objects that both proposed benchmark firms were affected by the alleged anticompetitive conduct and that they have different business strategies.  Accordingly, Keurig argues that neither JBR nor Mother Parkers's prices can accurately represent a but-for world where the single-serve cup market is not affected by anticompetitive conduct.

I have already stated the law governing a court's assessment of a proposed benchmark firm in the context of a yardstick analysis.  *See supra* § II.C.1.  Based on those standards, I find Keurig's objection to these benchmarks without merit.  As the Court noted in *Dial Corp.*, a court may account for the fact that the alleged anticompetitive conduct has made it impossible for comparable firms to operate when assessing the viability of a given benchmark.  165 F. Supp. 3d

---

[21] Mother Parkers is another producer of single-serve cups that did not license its products to Keurig.  (Doc. 1454 at 1.)

[22] Although Keurig focuses on the issue of JBR and Mother Parkers as unreliable benchmarks, (Doc. 1454 at 10), Dr. Johnson includes both of these firms in his analysis, (Doc. 1455, Ex. 2 ¶¶ 103, 115), as well as incorporating TreeHouse data as a quality check, (*id.* ¶ 126).

at 40–41.  This accommodation is necessary, as any alternative formulation "would be an

inducement to make wrongdoing so effective and complete in every case as to preclude any

recovery, by rendering the measure of damages uncertain."  *Bigelow*, 327 U.S. at 264.

Accordingly, as noted, although courts may be properly skeptical of the use of data from

industries affected by the anticompetitive conduct, *see, e.g.*, *In re LIBOR-Based Fin. Instruments

Antitrust Litig.*, 299 F. Supp. 3d 430, 479 (S.D.N.Y. 2018), they have permitted the use of

benchmarks from industries potentially affected by the anticompetitive conduct, particularly

where the use of those industries is more likely to result in a conservative estimate of damages.

*See supra* § II.C.1.

Dr. Johnson selected JBR and Mother Parkers as benchmarks.  Both firms are makers of

competitor single-serve cup products, and Dr. Johnson selected them based on the relative

comparability of their single-serve cups, the availability of sufficient data to make reliable

comparisons, and the existence of internal Keurig documents suggesting that Keurig viewed

unlicensed cup manufacturers like Mother Parkers as competitors.  (*See* Doc. 1535 at 14

(summarizing Dr. Johnson's selection process with citations to the report and underlying data).)

This is sufficient to meet the preponderance of evidence standard for reliability.  A

reliable benchmark need not be a "perfect clone." *Celebrity Cruises*, 434 F. Supp. 2d at 189.  It

only needs to be "sufficiently comparable to permit a degree of reliable comparison," *SourceOne

Dental, Inc. v. Patterson Companies, Inc.*, No. 15-CV-5440, 2018 WL 2172667, at *5 (E.D.N.Y.

May 10, 2018).  Once the threshold of reliability is met, further questions about the

comparability of the benchmarks go to the weight of the testimony, not its admissibility.  *Cf.

DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, No. 11-CV-0564, 2019 WL 1515231, at

*10 n.6 (E.D.N.Y. Feb. 21, 2019) ("Plaintiff objects to defendants' choice of benchmark airlines.

69

Add.283

This choice—which airlines to compare—goes to the weight, not the admissibility of Dr. Moore's opinion.").

Given this, Keurig's objections that JBR and Mother Parkers have different business practices from its own and that these firms are affected by anticompetitive conduct are unavailing. As noted *supra* § II.C.1, a firm being affected by anticompetitive conduct is not a per se bar to its use as a benchmark, particularly where the impact of the anticompetitive conduct is likely to result in a more conservative damages estimate. Taking Plaintiffs' allegations as true, Keurig's anticompetitive conduct could have caused competitors' prices across the relevant market, including at JBR and Mother Parkers, to increase, which in turn would lower the amount of the estimated overcharge due to anticompetitive conduct. The overarching effect of this would be to make Dr. Johnson's overcharge damages estimate somewhat more conservative. (See Doc. 1455, Ex. 2 ¶ 101 n.208.) Permitting the use of this benchmark thus aligns with the prevailing legal trends in benchmark selection. *See supra* § II.C.1. Keurig's remaining objections to the differences between these firms' business practices and itself are similarly without merit. (Doc. 1454 at 11.) Although the differences in these firms' business strategies may be suitable grounds for cross examination, nothing Keurig describes is so unusual as to render either firm an unreasonable benchmark.

### 3. Reliability of Dr. Johnson's Data

Keurig proffers two related arguments concerning the purported unreliability of Dr. Johnson's data. First, it argues that the data Dr. Johnson relied on from Mother Parkers is incomplete and that Dr. Johnson's efforts to fill the gaps in that data make it unreliable. (Doc. 1454 at 15–17.) Second, Keurig argues that when that problematic data is removed, Dr.

70

Add.284

Johnson's results become statistically insignificant. (*Id.* at 17–20.)  These arguments are without merit.

"[T]o be admissible, a regression analysis must examine an appropriate selection of data." *Reed Const. Data*, 49 F. Supp. 3d at 400; *see also Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319 (S.D.N.Y. 2009) (excluding expert opinion in part because the expert "concede[d]" his calculations were based on "unreliable and inaccurate data").

The basic issue is that the Mother Parkers data Dr. Johnson uses is "missing product descriptions (or any information to identify product features such as brand, whether a private label, or package size), as well as customer names or channel information."  (Doc. 1455, Ex. 2 ¶ 152.)  To address this, Dr. Johnson integrated data from another company, European Roasterie, that sold Mother Parkers products during the period under study.  (*Id*. ¶ 152; Doc. 1535 at 21 n.20.)  Data across the two sets was matched using product numbers.  Additionally, although Keurig asserts that this matching technique inappropriately mixed sales from different market segments, (*see* Doc. 1454 at 21), Dr. Johnson restricted his dataset to the residential at-home sales market segment, (Doc. 1455, Ex. 2 ¶¶ 39(ii), 116).

There is nothing that is per se inappropriate about integrating data from different sources. Combining, integrating, or blending data from various sources is frequently a necessity in modern social scientific research.  *See generally, e.g.*, Panel on Improving Fed. Stat. for Pol'y and Soc. Sci. Rsch., *Federal Statistics, Multiple Data Sources, and Privacy Protection* 15–22 (Robert M. Groves & Brian A. Harris-Kojetin eds., 2017), https://perma.cc/5JEB-AWBJ (describing the increasing need for datasets produced by different sources).

Add.285

Keurig also objects that Dr. Johnson used only 31 percent of the data provided by Mother Parkers.  (Doc. 1454 at 20.)  Here again, missing data is an inescapable element of research in numerous fields.  *See, e.g.*, *Best Practices in Quantitative Methods* 214 (Jason W. Osborne ed. 2008) ("Missing data is a prevalent issue in many fields[.]").  Missing data can undermine the reliability of the study if, for example, "the missing data are likely to differ in some systematic way from the data that are collected."  RMSE, *supra*, at 224.  Keurig, however, has not identified, and I do not find, any systemic issues with the missing Mother Parkers data.  In the absence of evidence that the missing Mother Parkers data could translate into other methodological problems, I do not find that the mere existence of missing data makes Dr. Johnson's model unreliable, nor do I find that the use of a blended data set undermines Dr. Johnson's model so as to warrant exclusion.

Accordingly, I need not address Keurig's other argument on the statistical significance of Dr. Johnson's model, as that argument is based on results derived from excluding the Mother Parkers data.

### 4.  Dr. Johnson's Modeling Assumptions

Keurig's final set of arguments focus on the modeling choices Dr. Johnson made in the development of his model.  First, Keurig objects that Dr. Johnson unreasonably applied an average estimate of anticompetitive overcharges to Walmart, which unjustifiably fails to account for differences in the price Walmart would pay from the average price estimated.  (Doc. 1454 at 21–22.)  Second, Keurig objects that Dr. Johnson failed to account for the net effect of Keurig's conduct on McClane by discounting the benefits that accrued to McClane as a result of Keurig's anticompetitive conduct.  (Doc. 1454 at 22–24.)  I find that Dr. Johnson's modeling choices do not undermine the reliability of his opinion such that exclusion is warranted.

72

Keurig objects that Dr. Johnson created an average overcharge estimate for the at-home market segment and then applied that overcharge estimate to the overcharge paid by Walmart, "McLane's one and only significant portion pack customer." (*Id*. at 10.) Keurig further objects that Dr. Johnson failed to assess whether it was reasonable to apply this average overcharge estimate to the overcharge that would have been paid by Walmart. (*Id.* at 21.) In support, Keurig cites *In re Wholesale Grocery Prod. Antitrust Litig.*, in which a court questioned the use of an expert's model which assumed that both larger and smaller retailers' behavior would follow similar patterns. No. 09-MD-2090, 2018 WL 3862773, at *7 (D. Minn. Aug. 14, 2018). There, however, the expert's own analysis "show[ed] that the independent grocers' prices did not follow the same trajectory as [a major grocer's] before the" anticompetitive behavior at issue. *Id.* Dr. Johnson, however, ran a sensitivity analysis[23] that found little variability in the overcharge rates regardless of the use of several customer specific and market specific attributes in his model. (Doc. 1455, Ex. 2 ¶¶ 125, 130.) Given the lack of evidence of variability in the overcharge rates across the market, it was reasonable to apply the overcharges Dr. Johnson developed to Walmart.

Keurig's last objection is that Dr. Johnson failed to account for the benefits of the alleged anticompetitive conduct that accrued to McClane under McClane's theory of liability. (Doc. 1454 at 22–24.) These purported benefits are increased sales of Keurig products by McClane due to the suppression of non-Keurig products, (*id*. at 22–23), and the increased profits resulting from overcharges, (*id*. at 23–24). In effect, Keurig argues that Dr. Johnson calculates McClane's gross damages, when that law requires him to calculate the net damages.

---

[23] A sensitivity analysis refers to the process of "[a]nalyzing data in different ways to see how results depend on methods or assumptions." RMSE, *supra*, at 296. Here, Dr. Johnson ran his model using several different inputs and variable interactions to test if and how overcharges might vary depending on a model's inputs. (Doc. 1455, Ex. 2 ¶ 125.)

Add.287

Keurig's objection to the inclusion of damages resulting from overcharges is without merit. In *State of New York v. Hendrickson Brothers*, the Second Circuit noted that generally, "the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust laws . . . may recover the entire amount of the illegal overcharge even if some or all of the overcharge may have been passed on to others." 840 F.2d 1065, 1079 (2d Cir. 1988) (citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 491–94 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 734–35 (1977)).[24] Although this rule may put a direct purchaser plaintiff in a position to recover more in damages than it may have borne in antitrust harms, the determination to apportion overcharge damages in this way "rest[s] on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Illinois Brick*, 431 U.S. at 735. In *Hanover Shoe*, the Supreme Court also recognized that attempting to further account for the harms and benefits that accrue due to anticompetitive overcharges would require litigants to come up with "virtually unascertainable figures," particularly "in the real economic world rather than an economist's hypothetical model." 392 U.S. at 493. Permitting the overcharged direct purchaser to obtain the entire amount of the illegal overcharge prevents "[t]reble-damage actions" from "requir[ing] additional long and complicated proceedings involving massive evidence and complicated theories." *Id.*

---

[24] It is not contested that, assuming McClane's theory of liability is true, it would be a direct purchaser under antitrust law. (*See, e.g.*, ECF No. 1420 at 29 (noting, in Keurig's motion for summary judgment, that "plaintiff McLane is another example of a direct purchaser that benefitted from the challenged conduct.").)

Accordingly, the full overcharge amounts paid by McClane are properly included as damages. In arguing against this result, Keurig proffers the following hypothetical:

> Imagine a hypothetical 10% overcharge was combined with the 6% McLane markup on Keurig KCups. In the but-for world, McLane buys K-Cups from Keurig for $1000 and sells them to Walmart for $1060 (McLane's cost plus 6%). In the world with a 10% overcharge, those K-Cups cost McLane $1100 (the but-for price plus 10%) and are resold to Walmart for $1166. That is, McLane marked up the overcharge of $100 by 6%, and pocketed an extra $6. That $6 is a bonus McLane received in the real world that it would not receive in the but-for world, and any reliable damages calculation must deduct it.

(Doc. 1598 at 9 n.11.) This is contrary to *Hanover Shoe*, which dictates that the direct purchaser is entitled to recover the entire cost of the overcharge. *See* 392 U.S. at 491–94. The $6 Keurig describes as a "bonus" is part of the alleged overcharge. If, in a but-for world, Walmart would have paid $1060 for single-serve cups, and due to anticompetitive conduct, it pays $1166, then the whole of that extra $106 must be accounted for because that is "the difference between the prices actually paid and the prices that would have been paid absent the conspiracy." *Hendrickson Bros.*, 840 F.2d at 1077 (citing, *inter alia*, *Hanover Shoe*, 392 U.S. at 489). If McClane did not charge that $6 (*i.e.*, if it charged Walmart $1160 rather than $1166), then it would be receiving roughly a 5.45 percent mark-up on cost ($1100) rather than the 6 percent mark-up to which it was entitled. Thus, in Keurig's model, McClane would be effectively subsidizing the alleged antitrust violation by reducing its contractually agreed-upon mark-up.

Keurig's broader argument that McClane must reduce its damages estimate to account for only net harms by subtracting out benefits from increased sales due to anticompetitive conduct must be rejected as unduly speculative. "[A]n antitrust defendant may not alter [a] well-settled measurement of damages by speculatively raising potential offsets, even when those offsets are directly related to the goods at issue." *In re Elec. Books Antitrust Litig.*, No. 11-MD-2293, 2014 WL 1282293, at *17 (S.D.N.Y. Mar. 28, 2014); *see also Iowa Pub. Employees' Ret. Sys. v. Bank*

75

*of Am. Corp.*, No. 17-CV-6221, 2022 WL 2829880, at \*24 (S.D.N.Y. June 30, 2022) ("Any argument, however, about which Class Members would or would not have elected to join a platform in the but-for world is too speculative to undermine Plaintiffs' damages model."). Thus, for example, while *Hanover Shoe* approved offsetting a damages award by easily ascertainable capital costs that plaintiff would have expended but for the anticompetitive conduct, *see* 392 U.S. at 504, the Court in *Electronic Books* "rejected" as "shot-through with conjecture" an offset based on which customers would or would not have made purchases but for the anticompetitive conduct, 2014 WL 1282293, at \*20. Condoning the defeat of damages models based on such speculation would defeat the Supreme Court's admonishment to avoid damage assessments that require "additional long and complicated proceedings involving massive evidence and complicated theories." *Hanover Shoe*, 392 U.S. at 493; *see Elec. Books*, 2014 WL 1282293, at \*20.

Keurig's proposed offset more closely resembles the conjectural sales of *Electronic Books* than the defined capital offsets in *Hanover Shoe*. It proposes that because of a broad array of alleged anticompetitive harms inflicted by Keurig on unspecified competitors, McClane was able to sell more Keurig K-Cups to Walmart. Keurig also argues that these increased sales must be offset against damages in Dr. Johnson's model given that McClane "overwhelmingly chose to sell K-Cups." (Doc. 1454 at 22.) It is not inconceivable that McClane might have sold fewer K-Cups but for this conduct, but McClane might also have sold more competitor cups in place of those extra cups, or might have sold an equal number of K-Cups but at a lower price. There is simply too much speculation and conjecture inherent in the development of any such but-for world to require that it be included as an offset in Dr. Johnson's model.[25] For all of these

---

[25] This does not mean, as discussed *supra* § II.K.4, that any discussion of netting damages, particularly offered in

76

Add.290

reasons, the motion to exclude Dr. Johnson's opinion based on the failure to offset overcharge amounts is denied.

### I.  *Dr. Lauren J. Stiroh (Doc. 1460)*

Keurig moves to exclude expert opinions regarding damages offered by TreeHouse's expert Dr. Lauren Stiroh ("Dr. Stiroh").  (Doc. 1462 at 1.)  Dr. Stiroh opines on whether Keurig's alleged actions caused economic injury to Treehouse, and estimates the economic damages to TreeHouse resulting from Keurig's allegedly anticompetitive conduct.  Keurig argues that Dr. Stiroh should be excluded on two major grounds:  (1) that Dr. Stiroh's analysis improperly relies on an invalid record and would usurp the role of the jury, and (2) that her model ignores economic theories.

### 1.  Damages Objections

Keurig's first objection is that Dr. Stiroh's opinions about TreeHouse's purported lost customers is not based on sufficient data and would usurp the role of jury.  (*Id.* 4.)  Keurig argues that Dr. Stiroh relied on a "one-sided set of evidence provided to her by TreeHouse's counsel," and that she "consistently chose to rely on a biased selection of documents from counsel, and either did not review or did not account for evidence reflecting the procompetitive reasons why customers chose Keurig."  (Doc. 1462 at 4, 6.)  In support, Keurig cites Dr. Stiroh's failure to cite to Walmart's Fed. R. Civ. P. 30(b)(6) testimony, and her purported overreliance on the declaration of a former Kroger employee named Rosanna Klawon, which Keurig asserts was contradicted by Ms. Klawon's later deposition testimony.  (*Id.* 4–6.)  For the reasons that follow, this objection is without merit.

---

rebuttal is out of bounds for an expert, only that an expert's refusal to account for speculative netting is not a reason to strike his or her testimony.

Dr. Stiroh had access to the entire record, and spent hundreds of hours reviewing deposition testimony, declarations, and other information in the record on which to base her analysis.  (Doc. 1463–2 ¶ 3.)  She is not obligated to review and independently sort through "all of the discovery in a case in order to determine the relevant evidence."  *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 364 (N.D. Cal. 2018).  Nor is failure to use every relevant piece of information in the record a basis for exclusion.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,* No. 05-MD-1720, 2022 WL 14814183, at \*21 (E.D.N.Y. Oct. 26, 2022).

Indeed, addressing every single piece of discovery and record evidence in a case of this size with millions of pages of discovery produced would be virtually impossible and inefficient.  Thus, issues regarding the failure to use certain pieces of data arise only when there is a systemic problem with the data used or discarded, such as when an expert "cherry-picks" the data used for their opinion.  *See, e.g.*, *In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 296 (S.D.N.Y. 2018) (describing an expert's "cherry-picking approach . . . [as being] at odds with principles of sound science").  Even then, such critiques will frequently go to the weight of the expert's opinion rather than require admissibility so long as there remains a sufficiently reliable factual basis for the expert's opinion.  *See, e.g.*, *Capri Sun*, 595 F. Supp. 3d at 135 (explaining that a defendant "is at liberty to impeach [an expert] . . . for cherry-picking among sales data").  Dr. Stiroh has more than sufficient information to render a reliable opinion, and the issues Keurig has with her use of a few specific pieces of evidence are not the kind of systemic data issue that would merit exclusion.  Rather, as in *Capri Sun*, Keurig's objections to the weaknesses in any particular source relied upon by Dr. Stiroh are properly addressed through cross-examination, not the wholesale exclusion of her opinions.  595 F. Supp. 3d at 135.

78

Add.292

Turning to Keurig's next objection, Dr. Stiroh does not "usurp" the fact finder's role by opining on customers' states of mind. Keurig argues that Dr. Stiroh's "lost customer" methodology is "nothing more than a review of record evidence to draw conclusions about what she thinks customers were thinking," and that her analysis is merely a "factual narrative that does not draw technical or scientific conclusions." (Doc. 1462 at 7.) In support, Keurig wrongly[26] asserts that Dr. Stiroh testified that she is better suited than jurors to find facts because she is "better at reading documents, depositions, and declarations" than jurors are. (*Id.*) This argument is similarly without merit. Dr. Stiroh assesses whether Keurig's alleged actions caused economic injury to TreeHouse, and estimates the economic damage to TreeHouse resulting from Keurig's allegedly anticompetitive conduct by analyzing "ordinary course [of] business documents, deposition testimony, declarations, and transactional data." (Doc. 1463, Ex. 4 at ¶ 29.) Based on this review, she claims to have identified a "direct causal link between the conduct alleged by TreeHouse in its Amended Complaint and TreeHouse's economic outcomes" and claims that "Keurig's alleged misconduct resulted in economic damage to TreeHouse in the form of lost profits arising from lost revenue, higher costs and hampered growth." (*Id.* ¶ 6.i.)[27] This type of economic analysis does not speak to customers' state of mind and therefore is not impermissible expert testimony.

---

[26] Keurig misrepresents Dr. Stiroh's deposition testimony. Dr. Stiroh did not say she was "better at reading documents, depositions, and declarations" than jurors, but that she had "more experience than the jurors in reviewing the types of information that [she] reviewed and assessing the importance of the economic content that is in that information." (Doc. 1463, Ex. 1 at 25:19-25.) In other words, Dr. Stiroh merely provides her opinions as an expert to assist the jurors as fact finders.

[27] Keurig again cites Dr. Stiroh's deposition testimony to argue that she "admitted" she would tell the jury "why customers made the decision they did based on her interpretation of the record." (Doc. 1462 at 8.) This framing is not consonant with Dr. Stiroh's testimony that she would "opine that the conduct at issue caused the lost sales in [her] report, including the lost sales to Kroger", and that it was "part of [her] damages analysis." (Doc. 1463, Ex. 1 at 232:10-18.) To the extent that Dr. Stiroh does attempt to testify "why customers made the decision they did based on her interpretation of the record," Keurig is free to object to such testimony during any trial.

Add.293

Keurig further argues that Dr. Stiroh's testimony should be excluded because she relies on a "biased set of evidence provided by TreeHouse's counsel" to quantify the value of TreeHouse's purported lost sales, and that she conducted no independent analysis to verify the figures from their document. (Doc. 1462 at 9.) TreeHouse agrees that the figures were drawn from a document prepared by the Boston Consulting Group (the "BCG Document") and TreeHouse internal estimates, but argues that these are reliable facts and data that experts would reasonably rely on, and that Dr. Stiroh "independently verified the estimates presented" in the documents. (Doc. 1463 at 7.) TreeHouse is correct.

As an initial matter, Keurig's objections to Dr. Stiroh's use of the BCG Document and similar sources is undercut by her independent verification of these sources. (Doc. 1463, Ex. 2 ¶ 105.)[28] Certainly, "[a] company's study of damages, prepared for litigation" is not generally the most desirable basis for an expert report. RMSE, *supra*, at 484. However, given that these figures have been independently verified, I do not agree with Keurig's assertion that these materials provide an insufficient basis for Dr. Stiroh's opinion. I decline to exclude her testimony on this basis.

### 2. Modelling of Market Prices and Sales in the But-For World

Keurig's second major set of objections is that Dr. Stiroh's model "ignores economics and relies on speculative assumptions." (Doc. 1462 at 12.) None of these objections are grounds for the wholesale exclusion of Dr. Stiroh's testimony.

---

[28] Keurig suggests that this verification is inappropriate because it occurred after the fact, and cites cases such as *Compania Embotelladora Del Pacifico, S.A.*, 650 F. Supp. 2d at 320. I disagree. Ultimately, data underlying an analysis either is or is not reliable. Although sloppiness in data verification may speak to other issues regarding an expert's methodology, reliable data does not become unreliable simply because an expert does a safety-check later than is sensible.

Add.294

Having reviewed Dr. Stiroh's modelling of market prices and sales in the but-for world, I find that her methodology is admissible and in line with economic theory and practices. Therefore, I find Keurig's arguments unpersuasive, and go to weight rather than admissibility.

As summarized *supra* § II.C.2, antitrust plaintiffs necessarily have considerable latitude in proving damages given the challenges inherent in measuring the impact of anticompetitive conduct. Despite this, Keurig argues that Dr. Stiroh's failure to account for the possibility that "customers would substitute TreeHouse with lower priced competitors" renders her testimony "inconsistent with economic theory." (Doc. 1462 at 13.)

However, Dr. Stiroh accounts for competitive economic responses in developing her model, (Doc. 1463, Ex. 1 at 143:11-24), which includes not just the substitution effects that Keurig feels should be incorporated, but a lack of anticompetitive conduct by Keurig and the interaction of these and numerous other economic effects, (*id.* at 144:25–145:3) ("[T]he price effect alone is not a valid consideration. It is considering the price effect in conjunction with also removing the conduct at issue.")). Indeed, Dr. Stiroh spent a substantial amount of time during her deposition explaining how her model operated and how she accounted for competitive pressures and the influence of anticompetitive conduct to develop her model. (*See id.* at 135:1–146:2.)

Keurig objects that Dr. Stiroh's model does not account for "basic principles" of economics because "as the price of a good decreases, the quantity demanded of that good increases while the quantity demanded of substitute goods decreases." (Doc. 1462 at 12.) Dr. Stiroh testified that this is true only when "all else [is] equal." (Doc. 1463, Ex. 1 at 129:6-9.) However, as she immediately clarified, all else in her model is not necessarily equal, because one must also account for the impact of removing Keurig's anticompetitive conduct. (*Id.* at 129:17–

81

Add.295

130:8.)  Thus, while economic models are suspect when they fail to account for any competitive responses in the but-for world, *see, e.g.*, *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1125 (E.D. Cal. 2002), and but-for worlds must be "constructed in a reasonable way," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 560, once a reasonable effort has been made to construct that world, there is a limit to how much one is required to credit complaints that an economist's imaginary world is too imaginary.  Dr. Stiroh has adequately explained her model and accounted for the factors courts traditionally require to meet the necessary standard of reliability.[29]  Accordingly, neither this nor the other reasons proffered by Keurig provide a reason to exclude Dr. Stiroh's testimony.

### J.  *Dr. David Sibley (Doc. 1464)*

Keurig moves to exclude Plaintiff's expert Dr. David Sibley ("Dr. Sibley") on the grounds that he:  (1) offers biased factual narrative; (2) opines on matters outside his area of expertise; and (3) presents testimony that would be more prejudicial than probative.  (Doc. 1466 at 1.)  For the reasons stated below, this motion is granted in part and denied in part.

Keurig's first objection is that Dr. Sibley "impermissibly narrates a biased selection of evidence."  (Doc. 1466 at 2.)  Although Dr. Sibley's report is lengthy, the factual background is not mere narration but rather is necessary information to assess the reliability of his economic analysis.  (*See* Doc. 1467, Ex. 2 ¶¶ 21–180 (describing the processes of assessing and determining the relevant market and applying that methodology)).  As previously discussed in Sections II.C.4 and II.D.3, the trial judge will curtail unnecessary factual testimony at any trial,

---

[29] For the same reason, I do not credit Keurig's arguments that Dr. Stiroh could not explain how she accounted for competitive reactions.  (Doc. 1462 at 22.)  A review of her deposition, (Doc. 1463, Ex. 1 at 135:1–146:2), and expert report, (Doc. 1463, Ex. 4 ¶¶ 104–43), provides a fulsome explanation for how she constructed her but-for world and accounted for the impact of substation, changes in pricing, and changes in demand.  This is not the kind of *ipse dixit* failure to explain that renders an expert's opinion unreliable.  *Scentsational Techs.*, 2018 WL 1889763, at *3.

Add.296

and no expert will be permitted to offer testimony that is merely "constructing a factual narrative based upon record evidence." *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-CV-2227, 2015 WL 5003528, at \*2 (S.D.N.Y. Aug. 20, 2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018).

Keurig asserts that Dr. Sibley offers opinions on legal conclusions.  (Doc. 1466 at 23–24).  "Experts may testify on questions of fact as well as mixed questions of fact and law." *Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993).  However, it is improper for experts to testify on "issues of law."  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).  Thus, an expert in an antitrust case may "testify about factors that would tend to show anticompetitive conduct in a market and describe why, in the expert's opinion, those factors are present in case at hand."  *SourceOne Dental, Inc. v. Patterson Companies, Inc.*, No. 15-CV-5440, 2018 WL 2172667, at \*1 (E.D.N.Y. May 10, 2018).  However, an expert may not "testify to whether a party's conduct was 'anticompetitive' or 'unlawful' under the Sherman Act."  *Id.* at \*1; *see DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, No. 11-CV-564, 2019 WL 1515231, at \*7 (E.D.N.Y. Feb. 21, 2019) (prohibiting an expert from testifying "that defendants' conduct was anticompetitive or unlawful, [or] . . . that defendants did or did not engage in a price-fixing scheme, because that is the ultimate determination for the jury to make").

Dr. Sibley offers several impermissible legal conclusions in his report.  For example, he asserts that that "Keurig has undertaken anticompetitive actions in both the [At-Home] and [Away-From-Home] Markets to maintain its monopoly power in those markets and/or to conspire to monopolize those markets."  (Doc. 1467, Ex. 2 ¶ 1359; *see also id.* ¶ 1271 ("Keurig engaged in other anticompetitive conduct aimed at maintaining its monopoly share of the Compatible Cup Market"); *id.* ¶ 1286 ("[M]y opinion is that Keurig's conduct in threatening to remove funding from retailers unless they pulled Competitive Cups away from Keurig product in

the retailers' own merchandising displays constitutes another instance of Keurig's anticompetitive conduct.").)  This explicit classification of acts as "anticompetitive" is an impermissible legal conclusion, and such testimony will be excluded.

There is a more complicated question where Dr. Sibley's opinions touch on the factors set forth in *National Association of Pharmaceutical Manufacturers, Inc. v. Ayerst Laboratories*, 850 F.2d 904 (2d Cir. 1988) ("*Ayerst*").  Specifically, *Ayerst* sets out a set of six factors (the "*Ayerst* Factors") used to assess when advertising and other representations rises to the level of anticompetitive conduct.  *See id.* at 916.  These factors are whether "representations were [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or other offset by rivals." *Id.* (internal quotation marks omitted).

Dr. Sibley opines concerning the *Ayerst* Factors in several ways, some permissible, others not.  He first discusses whether TreeHouse would be harmed if the *Ayerst* Factors were satisfied. (Doc. 1467, Ex. 2 ¶¶ 1054–89.)  He then addresses each of the six factors.  (*See, e.g.*, Doc. 1467, Ex. 2 ¶¶ 1090–114; *id.* ¶ 1108 (discussing whether Keurig's conduct occurred over a prolonged period.))  This is permissible given that an expert may "testify about factors that would tend to show anticompetitive conduct in a market and describe why, in the expert's opinion, those factors are present in case at hand." *SourceOne Dental*, 2018 WL 2172667, at *1.  In other places, however, Dr. Sibley takes the ultimate step by distilling his evaluation of these factors into a legal conclusion about Keurig's conduct.  (*See, e.g.*, Doc. 1467, Ex. 2 ¶ 1115 ("[M]y opinion is that the evidence is consistent with Keurig's statements that unlicensed cups would not be and are not compatible in the 2.0 Brewer meet the standard of anticompetitive conduct as

84

Add.298

set out in *Ayerst*.")  Dr. Sibley may opine, for example, on whether a particular statement is "clearly material" as described in *Ayerst*, but may not render an ultimate conclusion that a particular representation is anticompetitive under *Ayerst*.  Such an opinion would "usurp either the role of the trial judge in instructing the jury as to the applicable law . . . [and] the role of the jury in applying that law to the facts before it," and thus must be excluded.  *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994); *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.").

Additionally, Dr. Sibley may not opine on Keurig's motives or intentions.  As discussed in Section II.D.3, such testimony is outside the proper scope of an expert and transgresses the role of the factfinder.  Dr. Sibley crosses this boundary by opining that Keurig "claim[ed] safety benefits for the 2.0 Brewer that it knew did not exist," (Doc. 1467, Ex. 2 ¶ 895), what Keurig's "purpose and intended effect of its agreements" were, (*id.* ¶ 477), and how "Keurig did not expect to prevail on the merits of its lawsuit," (*id.* ¶ 913).  Such opinions are improper and must be excluded.

Keurig also challenges certain opinions of Dr. Sibley on patents and product design as being outside of his areas of expertise.  (Doc. 1466 at 21–23.)  "[W]here an expert is admitted under Rule 702 and then purports to offer opinions beyond the scope of his expertise, courts strike the extraneous testimony, as the admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case."  *Davis v. Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013); *see also Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015) ("Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702." (citations omitted)).

Add.299

Dr. Sibley is an economics professor at the University of Texas at Austin who holds a Ph.D. in economics from Yale. (Doc. 1467, Ex. 2 ¶¶ 1, 3.) Dr. Sibley has served as the Deputy Assistant Attorney General for Economic Analysis in the Antitrust Division of the U.S. Department of Justice. (*Id.* ¶ 2.) He analyzed materials including sales transaction data, business records, contracts, communications, academic literature, and deposition transcripts in order to evaluate Plaintiffs' claims from an economic perspective. (*Id.* ¶ 5.)

Given this background Dr. Sibley's opinions on patent litigation, (Doc. 1467, Ex. 2 ¶¶ 896–933), are excluded both under Rule 702 and Rule 403. There are several issues with his opinion on this point. First, it incorporates certain state-of-mind opinions that I have already excluded. (*See, e.g.*, Doc. 1467, Ex. 2 ¶ 913.) Second, it does not appear to rest on economic considerations in any meaningful way and what economic assertions it makes appear to be incorrect. For example, Dr. Sibley opines that "[w]ithout a reasonable expectation of success, a firm acting competitively could not conclude that the benefits of filing a lawsuit would outweigh the costs." (*Id.* ¶ 913.) He cites nothing to connect this opinion to economic theory and, at a very basic level, it appears to be dubious. Imagine a party is deciding whether to bring a lawsuit that has only a 0.01 percent chance of prevailing but that will yield $1,000,000,000 recovery.[30] The expected value of this lawsuit would be $100,000. Even if the cost to bring the lawsuit was $10,000, it is not unreasonable to think that at least a few rational actors would conclude, miniscule chances of success notwithstanding, that it was economically worth initiating that suit. Indeed, commentators have theorized that as the use of litigation finance increases, "the number of high-value frivolous claims could very easily increase, as such claims might offer sufficient

---

[30] Also assume (Parties' experience with litigation notwithstanding) that the lawsuit will be finally decided instantaneously.

potential for reward." Jeremy Kidd, *To Fund or not to Fund: The Need for Second-Best Solutions to the Litigation Finance Dilemma*, 8 J.L. Econ. & Pol'y 613, 628 (2012).

In addition, Dr. Sibley is not a lawyer or a litigator,[31] so he lacks the expertise necessary to accurately quantify the risks associated with litigation or any non-economic factors (e.g., the cultivation of a reputation for defending intellectual property) that might lead a firm to bring cases with only a limited chance of success. This is particularly true once impermissible components of his opinion, such as opinions on Keurig's state of mind, are stripped from the opinion. Taken together, these issues render Dr. Sibley's opinion unreliable because it is outside the scope of his expertise and otherwise without a reasonable basis. Indeed, even if this were not the case, I would find that his opinion on this score is more prejudicial than probative such that in must be excluded under Federal Rule of Evidence 403.

The same analysis does not apply to Dr. Sibley's opinions on the use of design changes in the 2.0 brewer. (Doc. 1467, Ex. 2 ¶¶ 941–1050.) Keurig objects that these opinions fall outside the scope of Dr. Sibley's expertise because he does not have an engineering degree or first-hand experience with the brewer. (Doc. 1466 at 22–23.) Dr. Sibley, however, is not opining on the technical implementation of this technology or the in-depth operation of these systems, but on the economic impact of these technologies on competition in the marketplace and on Keurig's market share. (*See, e.g.*, Doc. 1467, Ex. 2 ¶¶ 942–43.) This is the type of economic analysis for which Dr. Sibley is qualified.

Finally, except as otherwise noted above, I see no reason to exclude Dr. Sibley's testimony pursuant Federal Rule of Evidence 403. Keurig argues that exclusion under Rule 403

---

[31] His role at the Department of Justice was as an economic advisor supervising economic analysis, not as a lawyer or litigator. (*See, e.g.*, Doc. 1467, Ex. 2 ¶ 2.)

Add.301

is necessary because his narrative is inflammatory, unnecessarily cumulative of other information that will be introduced, and impermissible because it usurps the jury's role. I have already excluded testimony that would usurp the fact-finder's role or that is otherwise outside the scope of Dr. Sibley's expertise, and I have also indicated that the trial judge should curtail extensive narrative testimony at trial. A decision on whether testimony is "unnecessarily cumulative[] is a determination that requires a contextual underpinning that only trial can provide." *United States v. Gotti*, No. 02-CR-743, 2004 WL 2423799, at *5 (S.D.N.Y. Oct. 29, 2004) (citing *Medallic Art Co. v. Novus Mktg., Inc.*, No. 99-CV-502, 2004 WL 396046, at *2 (S.D.N.Y. Mar. 2, 2004)). Given this and the testimony I have excluded, I do not find that the remaining topics on which Dr. Sibley may opine on are more prejudicial than probative. Accordingly, Keurig's motion to exclude the testimony of Dr. Sibley is granted in part and denied in part.

### K. *Dr. Keith Ugone ("TMJ Motion") (Docs. 1470 & 2237)*

Plaintiffs TreeHouse, McClane, and JBR (collectively for the purposes of this section, the "TMJ Plaintiffs") move to strike certain opinions of rebuttal expert Dr. Keith R. Ugone ("Dr. Ugone"). This motion is granted in part and denied in part.

A part of this motion can be resolved by applying the same logic I used in connection with my rulings concerning other experts. The component of the motion that seeks to exclude Dr. Ugone's opinion that McClane's damages must by offset by part of the alleged overcharge is granted. (*See* Doc. 1546 at 8–10.) The parties' dispute here is essentially the inverse of the dispute over Dr. Johnson's refusal to exclude those offsets covered in Section II.H.4. "Expert testimony also should be excluded when it applies the wrong legal standard," although not when "the legal or factual sustainability of a party's theory has not yet been decided." *Olin Corp. v.*

*Lamorak Ins. Co.*, No. 84-CV-1968, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018). Having held that overcharges amounts are not properly offset from McClane's damages, Dr. Ugone's opinion on this point is excluded.

### 1. Dr. Ugone's Adjusted Models

The TMJ Plaintiffs seek to strike Dr. Ugone's opinions concerning their experts' (Drs. Stiroh and Johnson) damages model on the basis "adjustments" Dr. Ugone made to those models made to illustrate that the models are unreliable. (Doc. 1472 at 3–6.) These objections are without merit.

Rebuttal experts must meet the same thresholds for qualification and reliability of opinion as other experts. *See Scott*, 315 F.R.D. at 44. However, "robustness testing of an expert's methodology—by applying that methodology to different data or with different assumptions and examining the results produced by the methodology so applied—is not an impermissible challenge to the expert's results." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 468 (S.D.N.Y. 2018). Indeed, "[t]he issue of robustness—whether regression results are sensitive to slight modifications in assumptions (e.g., that the data are measured accurately)—is of vital importance." Rubinfeld, 2011 WL 7724257, at *11; *see also Reed Const. Data Inc.*, 49 F. Supp. 3d at 407 (S.D.N.Y. 2014) ("[W]here, as here, very minor changes in arbitrarily selected model parameters can entirely alter the model's conclusions, that model is insufficiently robust to withstand the scrutiny of Rule 702. Scientific conclusions cannot depend upon the arbitrary choice of parameters.").

Thus, a rebuttal expert may properly engage in robustness testing of an opposing expert's model by exploring if the results from a regression model change substantially or produce unreasonable or absurd results when small changes are made to the model's assumptions or

89

parameters.  It is no bar to admitting an expert's opinions that the findings or model created as a result of this robustness testing are also unreliable—the entire point of robustness testing is to demonstrate the unreliability of the original model by showing that small changes to that model result in a (perhaps more self-evidently) unreliable model and result.  To the extent that *In re Cathode Ray Tube (CRT) Antitrust Litigation* suggests that a rebuttal expert should not be allowed to opine on the results of their robustness test to demonstrate the fallacy of the underlying model, I do not find it compelling. No. 07-5944, 2017 WL 10434367, at *2–3 (N.D. Cal. Jan. 23, 2017).[32]

Dr. Ugone's opinions fall within bounds permitted when describing the results of robustness testing.  Dr. Ugone made several adjustments to Drs. Johnson's and Stiroh's damages models and observed the changes in results based on those adjustments.  (*See, e.g.*, Doc. 1547, Ex. A at 45:10–46:19 (explaining that Dr. Stiroh's "model is unreliable given the wide swing in damages, given the change in certain underlying assumptions"); Doc. 1547, Ex. B at 62:20–63:9 (describing how attempting various adjustments to Dr. Johnson's model led Dr. Ugone to conclude that the model is unreliable)).  Based on this, Dr. Ugone opines that the models of Dr. Stiroh and Dr. Johnson and the estimates produced by those models are unreliable.  Dr. Ugone does not, however, opine that the estimates created as a result of this robustness testing are actual estimates of damage, so his opinion reaches the threshold of admissibility under Rule 703.  (*See,*

---

[32] It would be another matter if a rebuttal expert sought to affirmatively present the results of their robustness test as the "true" measure of the variable being tested.  To put it in concrete terms, imagine a rebuttal expert offering an opinion on expert-created model that shows a party is entitled to $1 billion in damages.  The rebuttal expert then makes a minor adjustment to the model during robustness testing and damages decrease to $10.  The rebuttal expert can point to the massive decrease in damages from $1 billion to $10 to suggest that the model under examination is unreliable.  The expert could not opine that the true amount of damages from this apparently unreliable model was $10—one party is no more entitled to the fruits of an unreliable model than another.

Add.304

*e.g.*, Doc. 1547, Ex. A at 37:17–24; *see also id.* at 45:17–20 ("I'm not giving the opinion, as you asked, that damages are, you know, negative.").)

I also find that there are no grounds to exclude Dr. Ugone's opinion under Federal Rule of Evidence 403.  The TMJ Plaintiffs posit a series of questions jurors would ask if they heard Dr. Ugone's testimony to suggest the confusion that would result from his opinion.  (Doc. 1472 at 6.)  Neither these questions nor the general concept of robustness testing suggest that confusion will likely result from Dr. Ugone's opinion.  To illustrate through a more basic example, children frequently confront their parents with the argument that "all their friends" are engaged in some undesirable course of action, to which the parent invariably responds "if everyone jumped off a bridge, would you?"  This is a basic form of robustness testing:  take a decision model, modify the parameters, and see if the model continues to produce reliable results.  In this illustration, no reasonable person would interpret the parent to be advocating their child jump off a bridge.  Similarly, it is unlikely that a reasonable juror will confuse Dr. Ugone's proffer of absurd results from his modified model as an endorsement of this flawed model.[33]  To merit exclusion under Rule 403, the probative value of testimony must be "substantially outweighed" by the danger of confusion.  I do not find any meaningful risk of confusion, much less a serious one that would merit exclusion.

### 2.  Use of the Appropriate Statistical Test

The component of the motion that seeks to exclude Dr. Ugone's opinions about the statistical significance of Dr. Johnson's damages model is denied.  (Doc. 1472 at 9–10.)  Dr. Ugone opines that "when Mother Parkers is removed from the regression, the coefficients of

---

[33] At any trial a curative instruction could also be given concerning the scope and parameters of Dr. Ugone's opinion.

91

interest are no longer statistically significant" based on the results from a "t-test," a statistical test applied to Dr. Johnson's model.  (Doc. 1455, Ex. 3 ¶ 42.)  TMJ Plaintiffs, however, assert that a joint test called an "f-test" is the proper measure of statistical significance and that Dr. Ugone's use of the t-test merits the exclusion of his opinion.  (*See* Doc. 1472 at 10.)

T-tests and f-tests are classes of statistical tests used in the context of regression analysis to assess the models against the "null hypothesis"—"that the results observed in a study with respect to a particular variable are no different from what might have occurred by chance." Rubinfeld, 2011 WL 7724257, at *33.[34]  The f-test assesses the assertion "that there is no linear association between the dependent variable and any of the explanatory variables." *Id.* at *28. The t-test, is "[a] test of the null hypothesis that a regression parameter takes on a particular value, usually 0." *Id.* at *34.

There are cases where the nature of the data to be tested makes it inappropriate to assess a model using a t-test or an f-test.  For example, a "t-test is strictly valid only if a number of important assumptions hold." *Id.* at *10 n.46.  Neither party has proffered any evidence that the necessary assumptions for these tests are not met.  Absent that, researchers commonly use both tests (and others) as part of a battery of tests designed to assess the reliability and import of finding from given statistical model.  *See generally*, Greenfield et al., *A Statistics Primer: Tests for Continuous Data*, 25 The American Journal of Sports Medicine 882–83 (1997) (summarizing an array of statistical tests, including the f-test and t-test, and their uses); *see also Gutierrez v. Johnson & Johnson*, No. 01-5302, 2006 WL 3246605, at *8 (D.N.J. Nov. 6, 2006) ("[T]he Chow

---

[34] The discussion in this section is necessarily a simplification of these tests which have broad application outside their use in multiple regression.

test, fixed effects models, f-tests, and t-tests are all standard, peer-reviewed tests with acknowledged reliability.")

I have determined that Dr. Johnson's model should not be excluded based on its use of the Mother Parkers data. *See supra* Section II.H.3. In the absence of evidence that a particular statistical test may not be reliably employed, evidence of the weakness of Dr. Johnson's data or the vulnerability of his findings to given statistical tests is the type of "presentation of contrary evidence" that is properly used to challenge expert opinions that have met the threshold for reliability. *Daubert*, 509 U.S. at 596 (1993).

The TMJ Plaintiffs have also not offered any evidence that admitting Dr. Ugone's opinion on this point would "cloud[] the issue for the jury" or "waste[] time by diverting attention from the relevant evidence." *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 3116763, at *4 (cleaned up). They assert that the admission of this testimony could be confusing, (Doc. 1472 at 9), but offer no explanation for why weighing the impact of information yielded by two different statistical tests is likely to be particularly confusing for the jury.

### 3. Causation Opinions

The TMJ Plaintiffs seek to exclude a portion of Dr. Ugone's opinion on the ground that it attacks Dr. Stiroh's analysis based on the wrong legal standard for causation. (Doc. 1472 at 11.) For the reasons that follow, this aspect of the motion is denied.

The TMJ Plaintiffs object that Dr. Ugone "posit[s] that a plaintiff establishes causation by (1) showing that the defendant's bad act was 'the determinative or the primary reason' for the plaintiff's injury, 'and/or' (2) 'rul[ing] out all other potential reasons' for the plaintiff's injury." (Doc. 1472 at 12 (quoting Doc. 1473, Ex. D at 85:23-87:25) (second alternation in original)).

93

Add.307

This, the TMJ Plaintiffs assert, is the wrong legal standard under which to assess causation. (Doc. 1472 at 12.)

I do not find this to be an accurate statement of Dr. Ugone's opinion. The comments the TMJ Plaintiffs identify emerge from a somewhat confused portion of Dr. Ugone's deposition but the test to which TMJ Plaintiffs object appears nowhere in Dr. Ugone's expert report. (*See* Doc. 1473, Ex. A.) Moreover, to the extent that the TMJ Plaintiffs object that this misstates the standard for causation in antitrust liability determinations, (Doc. 1472 at 13–14), that is beside the point. Dr. Ugone is opining as a rebuttal expert on the issue of damages, and specifically, on flaws in Dr. Stiroh's damages model, not the question of Keurig's liability. (Doc. 1473, Ex. B ¶ 4 ("I have been asked by counsel for Keurig to evaluate TreeHouse's claimed monetary remedies as presented in the Stiroh Report.").

Accordingly, Dr. Ugone's critiques of Dr. Stiroh's model focuses on the failure to account for various economic factors and modeling decisions that, in his opinion, would reduce TreeHouse's damages if properly accounted for, such as the failure to account for new entrants into the marketplace absent the anticompetitive conduct, (*id.* ¶¶ 107–10), the overstatement of the impact of certain patent litigation, (*id.* ¶¶ 127–31), and the impact of various business decisions made by TreeHouse, (*id.* ¶¶ 132–41). He also opines that "Dr. Stiroh appears to not have considered factors unrelated to Keurig's alleged conduct that contributed to TreeHouse's limited success in the [Away-From-Home] segment, and which would have been present in the but-for world as well" such as the fact that "TreeHouse does not offer brewers to [Away-From-Home] customers." (*Id.* ¶ 167.)

Accordingly, while "[e]xpert testimony . . . should be excluded when it applies the wrong legal standard," *Olin Corp.*, 2018 WL 1901634, at *21, it is a permissible critique of an expert's

damages opinion that the expert failed to account for losses that resulted from non-anticompetitive factors. "A plaintiff's proof of amount of damages . . . must provide the jury with a reasonable basis upon which to estimate the amount of its losses caused by other factors, such as management problems, a general recession or lawful factors." *U.S. Football League*, 842 F.2d at 1378–79. In *U.S. Football League*, for example, the Court of Appeals upheld a nominal damages award of $1.00 after finding that the jury could have properly credited evidence of "self-destructive" management decisions made by the plaintiff in reducing damages to a nominal award. *Id.* at 1377. Cases cited by the TMJ Plaintiffs, such as *In re Publication Paper Antitrust Litigation*, 690 F.3d 51, 66 (2d Cir. 2012), are thus inapposite because they deal with the question of causation for liability purposes, not the question of how damages should be calculated.

I thus find no basis to exclude Dr. Ugone's opinion regarding whether Dr. Stiroh has adequately accounted for lawful factors that might impact the jury's assessment of damages.

### 4. Benefit Deduction

The branch of the TMJ Motion seeking to strike Dr. Ugone's opinions concerning Dr. Stiroh's failure to deduct certain amounts from her damages is also denied. Dr. Ugone opines that Dr. Stiroh's damages model is flawed because she fails to account for how TreeHouse's profits would have declined in a but-for world without the alleged anticompetitive conduct. (Doc. 1472 at 18–20.) Specifically, Dr. Ugone opines that, among other things, if Keurig had been forced to offer lower prices on K-Cups, then it would not have needed to invest as much in advertising and selling brewers. If it made fewer investments in selling brewers, then there would have been less demand for TreeHouse's products and a concomitant decline in profits for which Dr. Stiroh should have accounted. (Doc. 1473, Ex. B ¶¶ 23–25, 101–105.) Dr. Ugone

95

Add.309

argues that Dr. Stiroh also failed to account for the entry of new competitors into the market in the absence of anticompetitive conduct. (*Id.* ¶ 25.)

Courts both in this District and others have found that the benefits a plaintiff receives, such as from a defendant's anticompetitive conduct, may be properly considered in the calculation of net antitrust damages. *See, e.g.*, *Nypl v. JP Morgan Chase & Co.*, No. 15-CV-9300, 2022 WL 819771, at *4 (S.D.N.Y. Mar. 18, 2022) ("That plaintiffs in an antitrust action may recover only for their net injury is a common-sense and well-established principle."); *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 563 (S.D.N.Y. 2017) ("[A]ny damages would need to be netted out as to each plaintiff to offset any benefit from defendants' manipulation in other transactions."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MD-2262, 2016 WL 7378980, at *18 (S.D.N.Y. Dec. 20, 2016) ("[P]laintiffs may ultimately recover only to the extent of their net injury, given that plaintiffs may well have benefited from [Defendants'] suppression in the same transaction or in a different transaction."); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486, 488 (S.D.N.Y. 1987) ("Defendants' 'offset' argument has considerable force. Under most circumstances, it is clear that a plaintiff both injured and enriched by illegal activity cannot choose to recover for his injuries yet retain his windfall. This principle has been applied . . . [in] antitrust actions."); *see also Los Angeles Mem'l Coliseum Comm'n*, 791 F.2d at 1367 ("An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct."); *Farmington Dowel Prod. Co.*, 421 F.2d at 82 n.48 ("[Defendant's] sales and profits after that time reflected the illegal monopolization and discriminatory sales which [Plaintiff] had

to show in order to be entitled to any damages. Clearly [Plaintiff] was no more entitled to the monopoly profit than [Defendant] was.").[35]

Indeed, even lawful competition by a defendant convicted of antitrust violations should be properly accounted for in a damages calculation, *see, e.g.*, *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1168 (7th Cir. 1983) ("[Plaintiff] need not disaggregate its proof of damages among individual unlawful acts which have caused financial loss, but [Plaintiff] must be able to rationally separate these damages from those losses (or reductions in profit) which are caused by the purely lawful competitive actions of [Defendant]."), as may factors unassociated with the anticompetitive acts such as "a general recession." *U.S. Football League*, 842 F.2d at 1379.

Accordingly, courts in this District have permitted rebuttal experts to identify benefits from the anticompetitive conduct that accrued to the plaintiff and that are properly excluded from their damages. *See, e.g.*, *Nypl*, 2022 WL 819771, at *3–4. So long as such offsets are not merely speculative, *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *17, they may properly be considered by a jury in the damages calculation. Moreover, rebuttal experts have "no burden to produce models or methods of their own; they need only attack those of the plaintiffs' experts." *Scott*, 315 F.R.D. at 44 (internal quotation marks omitted). Dr. Ugone's opinion is thus a permissible critique that Dr. Stiroh failed to properly account for the lawful competition that might have resulted but for the anticompetitive conduct or any benefits to TreeHouse that may have accrued as a result.

I also find no evidence that the probative value of Dr. Ugone's testimony is substantially outweighed by the risk of confusion to the jury such that exclusion under Rule 403 is

---

[35] None of this disturbs the more specific rules associated with overcharges damages discussed in Section II.H.4.

appropriate.  When courts decline to exclude an expert's opinion on damages, that opinion may have "significant probative value to the jury's consideration of damages in the event the jury finds liability."  *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 356 (S.D.N.Y. 2023).  Indeed, in many cases where exclusion under Rule. 403 is merited, it has been the case that the testimony was of questionable reliability.  In *Shatkin v. McDonnell Douglas Corporation*, for example, the excluded expert testimony was "so unrealistic and contradictory as to suggest bad faith."  727 F.2d 202, 208 (2d Cir. 1984).  No comparable flaw exists here.  Moreover, the calculation of antitrust damages may properly include numerous factors such that Dr. Ugone's testimony may have substantial probative value to the jury if it is credited.  Accordingly, I find exclusion under Rule 403 unwarranted.

### 5.  Survey Opinions

The portion of TMJ Plaintiffs' motion seeking to exclude certain of Dr. Ugone's opinions related to surveys is denied.  The TMJ Plaintiffs take issue with certain opinions in which Dr. Ugone criticizes how Dr. Rao uses survey inputs from Mr. Poret and Ms. Butler to build his model.  (Doc. 1472 at 21 (citing Doc. 1473, Ex. B ¶¶ 43, 259–61, 277, 287).)  Dr. Ugone's understanding of the flaws in these survey inputs is based on his discussions with a separate Keurig expert, Dr. Peter Rossi.  (*See, e.g.*, Doc. 1473, Ex. B ¶ 57.)

An "expert witness must in the end be giving his *own* opinion.  He cannot simply be a conduit for the opinion of an unproduced expert."  *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) (emphasis in original).  However, "expert witnesses are entitled to rely on facts, opinions and data developed or prepared by another so long as the expert in the end gives his or her own opinion instead of simply aggregating or reciting the opinions of others," *Bocoum v. Daimler Trucks N. Am. LLC*, No. 17-CV-7636, 2022 WL 902465, at *20

(S.D.N.Y. Mar. 28, 2022) (cleaned up), so long as the expert at least "understand[s] the materials or methods underlying the other expert's opinions," *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015).[36]  Thus, in *Solid Oak Sketches, LLC v. 2K Games, Inc.*, for example, one expert's "reliance in part on [another expert's] survey results, which . . . have not been excluded, [was] not improper."  449 F. Supp. 3d 333, 353 (S.D.N.Y. 2020).

Dr. Ugone's challenged opinions fall into the category approved of in *Solid Oak Sketches, LLC*, 449 F. Supp. 3d at 353.  The gravamen of his opinion is that Dr. Rao relied on various survey inputs from Ms. Butler and Mr. Poret in the development of his damages model, (Doc. 1473, Ex. B ¶ 260 (listing survey inputs from Ms. Butler), ¶ 277 (noting the use survey inputs from Mr. Poret)), and that, based on Dr. Rossi's opinion that the survey inputs from Ms. Butler and Mr. Poret were flawed, (*id.* ¶¶ 261, 277), Dr. Rao's damages model is also, by extension, flawed.  Nowhere does Dr. Ugone suggest based on his own expertise that the surveys are flawed.  Dr. Ugone's critique is thus not a survey critique or a "conduit" for Dr. Rossi's opinions nor is he simply reciting them.  Rather, he uses Dr. Rossi's opinion as a basis for his own, separate opinion about Dr. Rao's purported failure to use appropriate data to model economic damages.  No one contests that Dr. Ugone is sufficiently qualified as an economic damages expert, (*see id.* ¶¶ 51–55 (reciting his qualifications)), or that he consulted sufficiently

---

[36] This should not be taken to mean, and I have found no authority for, the proposition that "understanding" requires that the expert who relies upon another expert's opinion to have had sufficient expertise to themselves qualify as an expert on the material they seek to rely on.  *U.S. Bank National Association*, for example, did not find that one expert "failed to understand [another expert's] work or incorporate it properly in formulating his own conclusions" despite the fact that the expert relying on that work had not overseen the other expert's work, verified the underlying data behind it, or ensured the second expert's method was properly implemented.  112 F. Supp. 3d at 131.  Much as lawyers may be able to understand and explain expert materials they would not themselves be qualified to prepare, experts may comprehend and use other expert materials in fields outside of their own area of expertise so long as they sufficiently understand it.

Add.313

with Dr. Rossi to understand Dr. Rossi's critiques enough to rely on them in rendering his ultimate opinion, (*id.* ¶ 57).

However, Dr. Ugone may not simply recite Dr. Rossi's critique of Ms. Butler and Mr. Poret's surveys. If Dr. Ugone's testimony at trial appears to be merely a conduit for Dr. Rossi's opinions, upon objection the trial judge should consider limiting it accordingly.

### 6.  Consumer Perception Opinions

The TMJ Plaintiffs seek to exclude Dr. Ugone's opinions on "consumer and retailer perception of JBR and unlicensed portion packs and whether those portion packs were compatible with Keurig 2.0 brewers" on the grounds that Dr. Ugone lacked sufficient data to make these statements. (Doc. 1472 at 22 (citing Doc. 1473, Ex. C ¶¶ 136–39, 183–85.) For the reasons stated below, this component of the motion to exclude is denied.

The opinions that the TMJ Plaintiffs seek to exclude are best classified as critiques of the variables selected in a damages model, for which Dr. Ugone has the requisite qualifications and supporting data, rather than consumer perception, for which his opinions might rest on less sound footing. As discussed in Section II.D.1, variable selection refers to the process of deciding what inputs to include in a particular analysis. Consumer perception addresses issues such as "whether Defendant's alleged misstatement and omission would be important to consumers." *Passman*, 2023 WL 3195941, at *4.

The opinions the TMJ Plaintiffs seek to exclude fall into the category of variable selection rather than consumer perception. The first class of opinions the TMJ Plaintiffs seek to exclude relate to the extent to which consumers would be confused by false statements allegedly made about and disseminated through the 2.0 Brewer. Dr. Ugone asserts that Dr. Macartney erred by calculating damages based on the assumption that all Keurig-brewer owners would have

been confused by statements about the 2.0 brewer even if they did not own a 2.0 brewer.  (Doc. 1473, Ex. C ¶¶ 136–39.)  More specifically, Dr. Ugone opines "prior purchasers of JBR's products would have known their brewers were compatible with JBR's portion packs . . . only owners of 2.0 Brewers would have been exposed to the 'Oops' message 2.0 Brewers displayed when using cups not compatible with 2.0 Brewers; and . . . JBR launched its very popular 'Freedom Clip' in Fall 2014 and 2.0-compatible lids in January 2015, further limiting consumer exposure to the 'Oops' message."  (*Id.* ¶ 136.)[37]  He also opines, based on sales data, (*id.* ¶ 139), that "owners of 1.0 Brewers are unlikely to have changed their purchasing decisions based on statements about a brewer that they did not own," (*id.* ¶ 138).

These statements speak to the methodological soundness of Dr. Macartney's damages model rather than consumers' perception of a message such as the "oops message."  The thrust of Dr. Ugone's opinion is that the broad Keurig-brewer owners segment included both people who owed a 2.0 Brewer, and people who did not.  Dr. Ugone could properly question whether Dr. Macartney erred in his treatment of a potentially important variable as a monolithic block given that even basic exposure to allegedly misleading statements like the "oops message" could vary based on whether a consumer possessed a 2.0 brewer.  No one disputes that Dr. Ugone is qualified to opine on the treatment of variables in economic modeling, nor, given his qualifications, would I credit such objections.  (*Id.* ¶¶ 28–32.)

The second set of opinions the TMJ Plaintiffs seek to exclude focus on other factors Dr. Ugone proffers that might have led brands not to partner with JBR.  (*Id.* ¶¶ 183–85.)  These opinions, again, are not about how these brands perceived JBR, but concern Dr. Macartney's

---

[37] The "oops message" refers to an allegedly anticompetitive statement by Keurig in which the 2.0 brewer displays a message indicating that using certain unlicensed single-serve cups will damage the brewer, and blaming Keurig competitors for this outcome. (Doc. 1473, Ex. C ¶ 42.)

101

purported failure to consider possible alternative explanations for why various brands did not partner with JBR and, by extension, why the failure to consider these brands renders Dr. Macartney's model unreasonably generous. Dr. Ugone cites sufficient information so that it is more than a "mere conjecture or assertion" that these variables may influence damages. *Teva Pharms. USA, Inc.*, 2019 WL 13244252, at \*2 (internal quotation marks omitted). Opining on these deficiencies in variable selection is again within the scope of his expertise as a rebuttal damages expert, and I decline to preclude Dr. Ugone's testimony on this basis.

### L. *Dr. Kevin Murphy (Doc. 1474)*

TreeHouse moves to exclude the testimony of Keurig's expert Dr. Kevin Murphy under *Daubert* and Federal Rules of Evidence 702 and 403 on the grounds that (1) his opinions do not "fit" the appropriate legal framework; (2) he failed to conduct economic analysis in arriving at his market definition; and (3) he ignores and contradicts the factual record. (*See* Doc. 1475.) Keurig and plaintiffs BJ's Wholesale Club, Inc., Winn-Dixie Stores, Inc., and Bi-Lo Holding LLC, also adopted the papers and arguments in favor of and against exclusion in their own action, also pending in this multidistrict litigation by stipulation. (Doc. 2075.) My holding as to Dr. Murphy in this section therefore applies to that action as well save to the extent set out in paragraph three of that stipulation. (*See id.* ¶ 3.)

TreeHouse's first objection to Dr. Murphy's testimony is that it does not comport with controlling law or my prior holdings. (Doc. 1475 at 3–9.) Expert opinions that conflict with controlling law are not helpful to the jury. *In re Payment Card*, 2022 WL 15053250, at \*23; *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11-CV-6201, 2015 WL 640875, at \*3 (S.D.N.Y. Feb. 16, 2015) ("Defendants' interpretation of [the statute] is incorrect as a matter of

law, and conclusions drawn therefrom cannot 'help the trier of fact ... to determine a fact in issue.'") (quoting Fed. R. Evid. 702)).

In his report, Dr. Murphy performs a market definition analysis wherein he determines that the relevant market should be defined in terms of brewing systems.  (Doc. 1418, Ex. C ¶¶ 149–55.)  TreeHouse argues that Dr. Murphy's opinion that the relevant market is "brewing systems" is contrary to controlling law.  (Doc. 1475 at 3–4.)  Specifically, TreeHouse asserts that this opinion is inconsistent with the *Keurig, Inc. v. Sturm Foods, Inc.* holding that the Keurig brewer was a completed product (the "*Sturm* Ruling").  *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373–74 (Fed. Cir. 2013).  In *Sturm,* the court determined that the patent exhaustion doctrine did not apply because the brewers were sold in a completed form.  *Id.*  The court was not opining on what the proper comparator market was for the Keurig brewer—and, indeed, does not mention a comparator market at all.  Because the *Sturm* Ruling was specifically related to the applicability of the patent exhaustion doctrine, and not the boundaries of a market for antitrust purposes, Dr. Murphy's opinion is not precluded by the *Sturm* Ruling.

TreeHouse also challenges the fact that Dr. Murphy arrives at his opinion on Keurig's market without utilizing the *Brown Shoe* indicia or the SSNIP test.  (Doc. 1475 at 4–6.)  Rather than apply these tests, Dr. Murphy considers factors such as Keurig's product pricing choices and consumer adoption decisions.  (*See, e.g.*, Doc. 1418, Ex. C ¶¶ 150–51, 153–55.)  The closest that Dr. Murphy comes to engaging with these tests is to critique Plaintiffs' experts' application of them which, as TreeHouse correctly notes, (Doc. 1615 at 4), is not the same as performing the tests himself.  However, it is not required that Dr. Murphy use any specific test when performing a market analysis, because "emphasis always is on the actual dynamics of the market rather than rote application of any formula." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d

Add.317

485, 496 (2d Cir. 2004). "A relevant product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.'" *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (*citing United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). Dr. Murphy's analysis considers economic factors, such as consumer substitution patterns and Keurig's pricing decisions, therefore I will not exclude his market definition opinion.

Next, TreeHouse claims that Dr. Murphy's opinions flout this Court's prior holdings. (Doc. 1475 at 6–11.) I disagree. None of the opinions by Dr. Murphy that TreeHouse points to are inconsistent with my prior opinions. For example, although TreeHouse argues that Dr. Murphy unreliably opines that total foreclosure is necessary for economic harm, (Doc. 1475 at 6), his report clearly and repeatedly applies the "substantial foreclosure" standard, (*see* Doc. 1418, Ex. C ¶¶ 194, 198–99), that I referenced in my Opinion & Order resolving Keurig's Motions to Dismiss, (Doc. 581).

TreeHouse also claims that Dr. Murphy's opinions related to the purported sham litigation are inconsistent with my prior opinions. (Doc. 1475 at 9.) Here again, I disagree. In my Opinion & Order resolving Keurig's Motion to Dismiss, I explained that Plaintiffs alleged an antitrust injury by pleading that they incurred costs through sham litigation because "[l]itigation costs incurred in defending against a sham litigation are 'a well recognized type of antitrust injury.'" (Doc. 581 at 44–45 (citation omitted).) That statement of law does not preclude Keurig from arguing that Plaintiff's experts have not established that Keurig's alleged sham lawsuits harmed competition. (Doc. 1418, Ex. C ¶¶ 342–50.)

TreeHouse's final objection to Dr. Murphy's report is that his opinions ignore and contradict the factual record. (Doc. 1475 at 18–25.) Dr. Murphy explains his methodology for

Add.318

reaching his opinions and cites to the factual evidence upon which he relies to support his opinions. (*See, e.g.*, Doc. 1418, Ex. C ¶¶ 121, 154, 164–66.) The fact that TreeHouse has identified evidence to the contrary of certain opinions is grounds for cross-examination, not exclusion. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") Accordingly, TreeHouse's motion to exclude Dr. Murphy is denied.

### M. *Mark Wood (Doc. 1478)*

JBR moves to strike certain opinions of rebuttal expert Mark Wood ("Mr. Wood"). Keurig offers Mr. Wood to rebut JBR's proffered industry expert, Bob Giacomelli. Keurig offers the expert testimony of Mr. Wood concerning competition in the coffee industry, and to rebut Mr. Giacomelli's conclusion that consumers do not view Keurig-compatible packs as "interchangeable with any other form of coffee—including whole bean, pre-ground, or other single-cup formats." (Doc. 1518, Ex. 1 ¶ 17.) Mr. Wood responds that "Keurig works hard to compete with other forms of coffee," whether that coffee is "brewed from whole bean, ground coffee, or portion packs." (*Id.* ¶ 34.)

Plaintiff JBR argues that Mr. Wood's testimony should be excluded because he is unqualified as an expert in the coffee industry due to his experience being "solely in single-serve coffee," (Doc. 1480 at 1), and because his findings are based on an insufficient factual record, (*id.* at 10–14). This argument understates Mr. Wood's experience and the data supporting his opinion. He has 18 years of experience in the coffee industry, has held positions across different product lines (including Keurig's whole bean and ground coffee lines), (Doc. 1516 at 3), and senior management positions overseeing "Keurig's entire coffee business, including its product

105

Add.319

launch of bagged ground coffee in 2018," (*id.* at 4).  Mr. Wood also served for five years as a Director for the National Coffee Association, a trade organization that serves the coffee industry in the United States.  (*Id.*)  Similarly, JBR's argument that Mr. Wood's expertise is largely based on his MBA, (*see* Doc. 1480 at 12), misses the mark given his substantial practical, hands-on experience applying his business training to various roles in the coffee industry.

Mr. Wood's testimony is also based on reliable data.  He is a long-term employee at Keurig who has significant knowledge of Keurig's documents, and by JBR's own admission, "had access to any Keurig documents he wished for, including any of the ten million pages of documents Keurig produced in this litigation." (*Id.*)  However, the fact that an expert has access to millions of documents does not, as JBR intimates, make it a requirement that millions of documents be cited or that Mr. Wood use whatever documents JBR believes are most appropriate.  JBR's last objection is simply a more specific version of this critique:  that Mr. Wood's analysis did not incorporate testimony from certain Keurig and Walmart executives developed in the course of Federal Rule of Civil Procedure 30(b)(6) depositions.  (*See* Doc. 1480 at 12–13.)

These objections are misplaced because Federal Rule of Evidence 702(b) requires only that expert testimony be based "on sufficient facts or data."  Thus, when "the underlying data is not inherently unreliable," *Better Holdco, Inc.*, 666 F. Supp. 3d at 360, or "highly relevant to [the expert's] conclusion," *In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 242 (S.D.N.Y. 2018), *aff'd sub nom. Mirena II*, 982 F.3d 113 (2d Cir. 2020), "a contention that an expert did not weigh a certain piece of evidence adequately does not take an expert opinion into the realm of speculative or conjectural."  *In re Omnicom Grp. Inc. Erisa Litig.*, No. 20-CV-4141, 2022 WL 18674830, at *10 (S.D.N.Y. Dec. 23, 2022) (cleaned up).

Rather, once an expert has sufficient sources, "the method to contest the factual underpinning of expert opinion is vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof." (*Id.*) (cleaned up).

I see no evidence that the sources JBR identifies are so highly or self-evidently relevant that they materially undermine the reliability of Mr. Wood's opinion such that exclusion is required. Rather, JBR provides its interpretation of a selection of deposition quotes, (Doc. 1480 at 12–13), and Keurig provides a separate plausible interpretation of those deposition quotes, (Doc. 1516 at 7–8). Nothing in the parties' dueling interpretations suggests that the sources JBR proffers are the kind of vital information whose absence renders Mr. Wood's opinion inherently unreliable. Thus, Mr. Wood's experience and the information underlying his opinion are more than sufficient to demonstrate reliability by a preponderance of the evidence, and JBR's motion to strike aspects of Mr. Wood's opinion is denied.

### N.  *Dr. Marc Hillmyer (Doc. 1484)*

JBR moves to exclude Dr. Marc Hillmyer[38] as an expert. Keurig's counterclaim against Plaintiff JBR alleges that JBR's products are misleadingly advertised as biodegradable, compostable, and eco-friendly. (*See* Doc. 416.) In support of its counterclaim, Keurig offers the expert testimony of Dr. Marc Hillmyer regarding his scientific opinion on JBR's OneCup, (*see* Doc. 1522 ¶ 1), which it claims has no plastic and is 97% biodegradable and compostable, (*see* Doc. 416 at 38).

---

[38] JBR hired Dr. Joseph P. Greene "to provide [his] scientific opinion on the biodegradability and compostability of the OneCup single serve coffee portion pack or pod" and to "review and opine in response to the opinions and data contained in the expert report of Dr. Marc A. Hillmyer." (Doc. 1522, Ex. 5 ¶¶ 2, 19.) Dr. Hillmyer filed an expert report in response to the assertions made by Dr. Greene, (Doc. 1522, Ex. 6), but Keurig did not file a *Daubert* motion to exclude Dr. Greene as an expert in this case.

Add.321

JBR moves to exclude Dr. Hillmyer's testimony because his expertise "simply does not match the scientific questions at issue in Keurig's claim against JBR" and is therefore "unreliable and without sufficient foundation." (Doc. 1485 at 1.) Specifically, JBR asserts that Dr. Hillmyer "has no expertise in measuring or analyzing the rate and timing of degradation of bioplastics in soil, landfills, compost, or even lab simulations" and did not do any degradation studies of JBR's OneCup. (*Id.*) In opposition, Keurig argues that "Dr. Hillmyer is not required to undertake JBR's preferred methodology" and "take JBR's OneCups, bury them in a compost pile or a landfill, wait years or decades, and confirm that the packs had not degraded." (Doc. 1519 at 2.)

In analyzing the OneCup, Dr. Hillmyer identified three main components: (1) the lid; (2) the ring; and (3) the mesh filter cup. (Doc. 1522, Ex. 2 ¶ 10.) Dr. Hillmyer first provides the definitions for biodegradation based on various scientific works and outlines the findings of a 2012 study entitled "Assessment of anaerobic degradation of Ingeo™ polylactides under accelerated landfill conditions" evaluating the biodegradation of polylactide. (*Id.* ¶¶ 18–22.) After discussing biodegradation, Dr. Hillmyer discusses the definition of compostability and the EPA's finding that "[t]here are currently no [American Society for Testing Materials] standard test methods in place for evaluating the ability of a plastic to compost in a home environment." (*Id.* ¶¶ 28–33.)

Dr. Hillmyer then evaluated the composition of each of the three components and determined that each contained materials that "will not significantly biodegrade in a landfill, an industrial composting facility, or a typical home composting environment for decades." (*Id.* ¶¶ 55, 65, 71.) The lid contains polyactide, which "requires hydrolysis and long times to significantly degrade under simulated landfill conditions where the temperatures are relatively low, and the conditions are anaerobic." (*Id.* ¶ 53.) In addition to polyactide, the lids also contain

108

Add.322

common plastics such as polyethylene and polyethylene terephthalate "that have not been established as compostable" and "are highly resistant to natural degradation." (*Id.* ¶ 55.) The ring is made from DaniMer 15120-UrthPact, and Dr. Hillmyer opined that based on the order of the components of DaniMer 15120-UrthPact, "the principal component is likely polyactic acid."[39] (*Id.* ¶ 60.) As previously stated in his analysis of the lid, polyactide "will not significantly biodegrade in a landfill or typical home composting environment, over the course of many years." (*Id.* ¶ 62.)

Lastly, the mesh filter cup consists of polyethylene terephthalate plastic, (*id.* ¶ 69), which is a "traditional plastic" that is "highly resistant to natural degradation," (*id.* ¶ 71). The bio filter of the mesh filter cup contains polylactide, which Dr. Hillmyer again opines "will not significantly biodegrade in a landfill or typical home composting environment, over the course of many years." (*Id.* ¶ 72.) In order to assess JBR's claim that 97% of the coffee-filled OneCup is biodegradable, Dr. Hillmyer analyzed and weighed 20 individual cups. (*Id.* ¶ 77.) After finding that the lid, ring, and mesh filter make up at least 20% of the weight of a No Waste OneCup that is filled with coffee, Dr. Hillmyer opined that in "no version of the coffee-filled OneCup will 97% of the coffee-filled OneCup biodegrade in the natural environment, a landfill, or a typical home composting environment within one year." (*Id.* ¶ 78.)

I find that Dr. Hillmyer's approach is admissible under Rule 702. First, I find that Dr. Hillmyer is qualified as an expert on the biodegradation and compostability of plastics. While recognizing the importance of not allowing expert testimony that could "stray from the scope of [a witness's] expertise," *United States v. Dukagjini*, 326 F.3d 45, 56 (2d Cir. 2003), JBR's assertion that this case requires a specific expertise in "measuring or analyzing the rate and

---

[39] Polyactic acid is also sometimes referred to as polylactide. (*See* Doc. 1522 ¶ 59.)

timing of degradation of bioplastics in soil, landfills, compost, or [] lab simulations" is too narrow, (Doc. 1485 at 1). JBR's assertion speaks more to its arguments regarding methodology than to Dr. Hillmyer's actual expertise. Dr. Hillmyer's experience qualifies him as an expert in the field of sustainable polymers, including the preparation, chemical recyclability, biodegradation, and reprocessing of polymers.

Second, his proposed opinion is based on reliable data and his methodology involved utilizing the reliable data in order to evaluate the OneCup based on its composition. *See* Fed. R. Evid. 702(c)–(d). I agree with Keurig's assertion that JBR's preferred methodology of conducting degradation studies on the OneCups specifically, (*see* Doc. 1485 at 1), is not the only appropriate method. Furthermore, as Keurig points out, JBR's assertion that Dr. Hillmyer should have tested the product is undermined by the fact that "no one—neither Dr. Hillmyer, nor anyone else—has tested the OneCup or any similar product in real world conditions to assess its rate of degradation in landfills, industrial compost conditions, or home compost conditions." (Doc. 1519 at 6 n.10.) Finally, I find that Dr. Hillmyer's proposed testimony would be helpful to the trier of fact in evaluating Keurig's allegation that JBR's claim that its OneCups have "No Plastic" and are "97% biodegradable" and "compostable" are false and misleading. (*See* Doc. 416 at 38.)

### O. *Dr. Keith Ugone ("Ugone Motion") (Doc. 2078)*

Plaintiff BJ's Wholesale Club, Inc. ("BJ's") seeks to exclude certain opinions of Dr. Ugone. (Doc. 2078.) For the reasons that follow, this motion is denied.

BJ's seeks to exclude Dr. Ugone's opinions on the grounds that he presents unreliable "adjustments" to the damages model of BJ's expert, Dr. Johnson, (Doc. 2079 at 5–6), and that, even if admissible under Rule 703, Dr. Ugone's opinion should be excluded under Rule 403, (*id.*

110

Add.324

6–7).  In essence, BJ's arguments against Dr. Ugone's opinions are the same as the ones asserted by the TMJ Plaintiffs regarding Dr. Ugone's "adjustments" to their experts' models, including BJ's reliance on *In re Cathode Ray Tube (CRT) Antitrust Litigation*, 2017 WL 10434367.  For the reasons explained in Section II.K.1, Dr. Ugone may engage in this kind of robustness testing without offending the requirements of Rules 702 and 403.  As explained *supra* at footnote 34, such robustness testing only becomes unreliable when an expert presents the results of robustness testing of an unreliable model as reliable results.  Although BJ's attempts to frame Dr. Ugone's presentation along these lines, Dr. Ugone's expert report makes clear that he is not presenting his adjustments as reliable damages estimates.  (*See, e.g.*, Doc. 2079, Ex. A ¶ 164 ("For illustrative purpose only, I provide in Table 21 how Dr. Johnson's claimed overcharges amount is impacted by adjusting his regression models to address certain (but not all) of the deficiencies present in his regression models.  Even with these select adjustments, Dr. Johnson's regression models remain unreliable.").)  Dr. Ugone also adhered to this position in his deposition.  (*See* Doc. 2079, Ex. B at 222:15–16 ("I am not proffering these as alternative damage numbers.").)  Accordingly, the Ugone Motion is denied.

### P.  *Dr. Phillip Johnson ("Johnson II") (Doc. 2083)*

Keurig moves to exclude the testimony of Dr. Johnson, BJ's damages expert.  (Doc. 2083.)  Keurig asserts that Dr. Johnson's opinion (1) fails to isolate the effect of Keurig's purportedly unlawful conduct because it does not account for significant lawful factors such as brand value, (Doc. 2084 at 5, 8–10), cup design differences, (*id.* at 6), and business practices, (*id.* at 7); (2) uses a flawed benchmark (unlicensed portion packs), (*id*. at 10–11); (3) is inconsistent with evidence, (*id.* at 11–12); and (4) produces implausible results, (*id.* at 12–13.)  For the following reasons, this motion is denied.

Three of Keurig's arguments I address here with reference to my previous rulings in this Opinion & Order.  First, Keurig's objections to Dr. Johnson's use of unlicensed single-serve cup manufacturers Mother Parkers, TreeHouse, and JBR as benchmarks, (*id.* at 10–11), is without merit.  I explained why Dr. Johnson's use of a comparable benchmark analysis involving the same companies does not render his analysis unreliable in Section II.H.2.  Keurig proffers no argument to undermine the application of that argument to Dr. Johnson's opinion here.

Second, Keurig objects that Dr. Johnson failed to account for the value of Keurig's brand or the impact of the companies' different cup designs.  (*See* Doc. 2089 at 5–6.)  These objections are also without merit.  Keurig raised similar objections in *Johnson I*, and I found that Dr. Johnson had a sufficient factual basis to determine that Keurig's brand value was not a necessary variable that had to be incorporated into his model to render it admissible.  *See supra* § II.H.1.  Here, Dr. Johnson has similarly identified a sufficient factual basis to discount Keurig's brand value in his evaluation of BJ's damages.  (*See* Doc. 2090, Ex. 1 ¶¶ 125, 125 n.252 (summarizing the bases for this determination).)  I similarly found that Keurig had made no showing that cup design was a substantial variable that Dr. Johnson had to control for in his model.  *See supra* § II.H.1.  The parties' dispute over Dr. Johnson's BJ's analysis involved a similar exchange of dueling documents as over the relative merits of JBR's versus Keurig's cup design.  (*Compare* Doc. 2084 at 6, *with* Doc. 2112 at 8–9.)  As before, this dispute does not suggest that cup design is the kind of "significant" variable whose absence merits the exclusion of Dr. Johnson's model.  *Gruber*, 2021 WL 2482109, at *10.

Third, Keurig objects that Dr. Johnson's model is inconsistent with evidence in the record because it shows that, during the relevant time period in this case, overcharges increased even as prices decreased, and that price changes continued to increase after most of the alleged

112

Add.326

anticompetitive conduct ceased.  (Doc. 2084 at 11–12.)   As in the *Johnson I* motion, Keurig's argument on this point is based not on Dr. Johnson's model, but on a modified model created by its own expert to evaluate Dr. Johnson's model.  (*Id.* (citing Doc. 2090, Ex. 6, Ex. 19).)  As Dr. Johnson explained, the results from his model might change when run using a modified model drawing on a different data analysis method.  (Doc. 2111, Ex. 1 at 127:4-129:20.)  As I previously noted in Section II.H, I will not strike an expert's opinion on the basis of a model misattributed to that expert which that expert did not create.

### 1.   Failure to Account for Significant or Lawful Factors

Keurig lodges two objections based on Dr. Johnson's failure to account for significant or lawful factors in his damages estimate.  I do not find that these objections suggest unreliability in Dr. Johnson's opinion sufficient to warrant exclusion.  Keurig first objects that Dr. Johnson's model fails to account for differences between Keurig's business practices and JBR's business practices.  (Doc. 2084 at 7.)  Keurig hypothesizes that "JBR's choice to prioritize a couple of customers that buy in bulk at lower prices likely resulted in a price difference between JBR's packs and genuine K-Cups, which are not so heavily tilted toward these channels."  (*Id.*)  However, although Keurig cites support for the fact that JBR sold through different channels, (*id.*), there is no support that these business practices actually resulted in price differentials or inflated Dr. Johnson's estimates.  This is the kind of "conjecture or assertion" that is insufficient to demonstrate a model is unreliable for failure to include a specific variable.  *Teva Pharms. USA, Inc.*, 2019 WL 13244252, at *2 (internal quotation marks omitted).  Indeed, if this type of conjecture was sufficient to mount a missing variable challenge, it is unlikely that any regression model could survive Rule 702 review.

Keurig's second objection is that Dr. Johnson has inappropriately controlled for the value of coffee brand value, first by using bagged coffee as a proxy variable, and then by using an alternative "brand tier" method of controlling for coffee brand value. (Doc. 2084 at 8–10.) I have previously found in *Johnson I* that bagged coffee may be used as a proxy variable for brand value so long as it is related to the variable of interest and does not distort the model's results. *See supra* § II.H.1. Similarly, here, Dr. Johnson concluded that bagged coffee prices can represent a viable proxy variable for brand value given consumers' association with common brands in the bagged coffee and single serve coffee markets, and the correlations between bagged coffee prices and single-service coffee costs. (Doc. 2090, Ex. 1 ¶¶ 122–24.) Moreover, this proxy variable had a statistically significant role in explaining price differentials. (*Id.* ¶ 130.) Thus, I find this objection without merit for the same reasons previously found in Section II.H.1.

Keurig's objection to Dr. Johnson's alternative "brand tier" methodology is similarly without merit. (Doc. 2084 at 9–10.) As a sensitivity test,[40] Dr. Johnson ran a model using, as an alternative to bagged coffee, a variable based on "brand tiers," in which various brands were sorted into two tiers, and a variable was created to reflect this sorting. (Doc. 2090, Ex. 2 ¶¶ 47, 50, Fig. 10.) The brand sorting was based on Keurig documents suggesting that Keurig follows a similar "brand tier" strategy in pricing and product placement. (*Id*. ¶¶ 48–49.) The results from models using this brand tier variable are consistent with the results produced when bagged coffee is used. (*Id.* ¶ 51.) Given that both proxy variables produce consistent results and do not evidence any distortive effects in the model, I find that the use of these proxies does not render Dr. Johnson's model unreliable.

---

[40] The process of sensitivity testing is described *supra* at Section II.H.4 footnote 24.

114

## 2. Production of Implausible Results

Keurig's final objection is that Dr. Johnson's model produces implausible results.  It identifies two such purported improbabilities.  (Doc. 2084 at 12–13.)  The first is that Dr. Johnson's model shows overcharges even for companies not alleged to have engaged in anticompetitive conduct.  (*Id.* at 12–13.)  These results were created not by Dr. Johnson, but by Keurig's expert, Dr. Ugone, who applied Dr. Johnson's model to Mother Parkers and found that Mother Parkers similarly showed an "anticompetitive overcharge" for three of four Mother Parkers brands Dr. Ugone tested.  (Doc. 2090, Ex. 6 ¶¶ 72–74.)  Keurig cites the Palgrave Handbook of Econometrics, which describes this methodology as an "anti-test," or a "placebo test," a robustness testing methodology that "appl[ies] a model or identification strategy in a context where no effect should be detected."  (Doc. 2090, Ex. 10 at 574 (*Applied Econometrics*, Palgrave Handbook of Econometrics 2 (Terence C. Mills & Kerry Patterson eds., 2009)).)  Put another way, Keurig proposes to undermine the reliability of Dr. Johnson's model by showing that it produces false positives, *i.e.*, overcharges, in a situation where none should be found—here, the prices of a competitor not alleged to have engaged in anticompetitive conduct. However, as Dr. Johnson explains, the model he developed was not designed to be used to assess pinpointed, disaggregated prices for individual brands during a specific time period.  (Doc. 2111, Ex. 1 at 175:7-177:6.)  Although Keurig's experts are free to make modifications to Dr. Johnson's model, either by applying it to different scenarios, or using it for different purposes than it was designed, the further these modifications take the model from its original function and inputs, the less weight the critique deserves in assessing the model's reliability.  In other words, if Dr. Johnson has built a car, that car is not unreliable because Keurig shows that it

Add.329

makes a poor boat.  Keurig's arguments on this point thus fail to suggest Dr. Johnson's opinion is unreliable.

Second, Keurig asserts that the results are implausible because Dr. Johnson's model "illogically finds that, in the but-for world, genuine K-Cups with leading coffee brands would be sold at prices *lower* than those of unlicensed packs with little-known coffee brands."  (Doc. 2084 at 13 (emphasis in original).)  Dr. Ugone suggests that "[t]his result is inconsistent with the economic evidence in support of a Keurig brand premium and the premium value of many K-Cup brands."  (Doc. 2090, Ex. 6 ¶ 119.)  As has been discussed at length, *see supra* §§ II.H.1, II.P, the question of whether a Keurig brand premium exists, and the impact of that brand premium, if any, is not so clear as to render fluctuations and differentiations in value across different brands the kind of issue that bring the reliability of an expert's opinion below the threshold for admissibility.  If Keurig wishes to litigate the issue of its brand value at trial, it is free to do so, but given the limited evidence of brand value's impact, such attacks go to weight, not admissibility.  *See* Fed. R. Evid. 702 Advisory Committee cmt. 2023 ("[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence.").

### Q.  *Dr. Martin Asher (Doc. 2086)*

Keurig moves to exclude the testimony of Plaintiff Winn-Dixie Stores Inc.'s ("Winn-Dixie") damages expert, Dr. Martin A. Asher.  For the reasons that follow, this motion is denied.

Several of Keurig's objections to Dr. Asher's analysis may be addressed briefly in light of my prior holdings in this Opinion & Order.  Indeed, Keurig explicitly aligns several of its critiques of Dr. Asher with critiques previously made concerning Dr. Johnson, (Doc. 2087 at 1), and notes that in many places, Dr. Johnson's and Dr. Asher's analyses are virtually identical, (*id.*

at 2, 5, 11, 12).  Specifically, Keurig objects that Dr. Asher has failed to account for Keurig's brand value, (*id.* at 5–6), differences in cup design, (*id.* at 6–7), differences in Keurig and JBR's business practices, (*id.* at 7–8), the use of bagged coffee as a proxy variable for brand value, (*id.* at 8–9), the use of JBR, TreeHouse, and Mother Parkers as benchmarks, (*id.* at 10–11), and the implausibility of his results relating to overcharges and price differentials across brands, (*id.* at 13–14).

I have considered and rejected Keurig's virtually identical arguments on these grounds in the context of Dr. Johnson's opinion.  *See supra* §§ II.H.1, II.P, II.P.1 (declining to credit objections based on the failure to account for Keurig's brand value, differences in cup design, or differences in Keurig and JBR's business practices); §§ II.H.1, II.P.1 (approving the use of bagged coffee as a proxy variable); §§ II.H.2, II.P (approving the use of JBR, TreeHouse, and Mother Parkers as benchmarks); § II.P.2 (finding objections to the implausibility of Dr. Johnson's results relating to overcharges and price differentials across brands to be without merit).  Although comparable objections to an expert's methodology may lead a court to different results when that methodology varies across experts, that is not the case here.  Indeed, Keurig asserts that the analyses of Dr. Johnson and Dr. Asher are virtually identical in numerous material aspects, (Doc. 2087 at 2, 5, 11, 12), and, having reviewed the bases for Dr. Asher's opinion, I agree.  Given that I have rejected comparable objections to comparable methods previously in this Opinion & Order, I do so again here for the same reasons previously articulated.

### 1.  Nature of Claimed Overcharges

Keurig objects that Dr. Asher's overcharge assessment is merely a price differential that does not differentiate between the effects of Keurig's anticompetitive conduct and

117

Add.331

procompetitive conduct.  (Doc. 2087 at 9–10.)  To capture the effect of Keurig's anticompetitive conduct, Dr. Asher created a binary variable called "challenged conduct," based on whether the relevant product is sold by Keurig.  (Doc. 2114, Ex. 1 at 36:4-10.)  The yardstick model then estimates a price differential based on this challenged conduct variable after controlling for various other effects on prices.  (*Id.* at 38:2-18.)  Keurig objects that this is insufficient to separate out the price impact of its procompetitive acts from any anticompetitive acts.  (Doc. 2087 at 9.)  It further notes that, the model might need to be reconsidered if the fact-finder rejects any of Winn-Dixie's allegations.  (*Id.* at 10.)

These objections are insufficiently substantiated to merit the exclusion of Dr. Asher's opinion.  As Dr. Asher notes in his reply report, the price differentials he finds are not merely the difference between licensed and unlicensed cups as Keurig suggests, but that differential accounting for several control variables and based on the use of benchmark comparators not alleged to have engaged in anticompetitive conduct.  (Doc. 2090, Ex. 13 ¶¶ 11, 19–22.)  Although the model does not disaggregate the damages associated with each alleged competitive act, such disaggregation, as noted *supra* in Section II.C.3, is not necessary where no allegations have been rejected.  Indeed, Dr. Asher's model and method, as Keurig repeatedly notes, (Doc. 2087 at 2, 5, 11, 12), is similar to the model and method I have approved when employed by Dr. Johnson.

Moreover, although Keurig suggests the possibility that these price differentials might be the result of procompetitive conduct, it offers no concrete evidence of how to account for such conduct.  This kind of challenge based on the failure to include purportedly significant factors cannot survive unless it is "specific" and makes a particular "showing of relevance."  *Sobel*, 839

118

Add.332

F.2d at 34.  Keurig's generalized assertions about the failure to account for procompetitive conduct are thus insufficient.

## 2.  Consistency with Undisputed Evidence

Keurig asserts that Dr. Asher's opinion is inconsistent with undisputed evidence because his model finds increased overcharges even as unlicensed single-serve cup prices declined and Winn-Dixie's purchase of unlicensed cups increased.  (Doc. 2087 at 12–14.)  This objection is without merit in light of Dr. Asher's bases for his opinion.  As he explained at this deposition, even if Winn-Dixie purchased more unlicensed single-serve cups, the overcharges are based on increasing levels of anticompetitive activity by Keurig over time, (Doc. 2114, Ex. 1 at 67:1–68:7), which he asserts had a cumulative effect on the overcharges paid by Winn-Dixie, notwithstanding increased purchases of unlicensed single-serve products not affected by the anticompetitive conduct, (*id.* 69:7–15).  Winn-Dixie also disputes Keurig's broader premise that prices uniformly declined during the relevant period.  (*See* Doc. 2114 at 14 (summarizing evidence)).

The Advisory Committee on the Federal Rules of Evidence caution that "[w]hen facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts."  Fed. R. Evid. 702 Advisory Committee cmt. 2000.  However, Rule 702(b)'s emphasis on "'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."  *Id.*  Rather, so long as there are "sufficient facts or data," "it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."  *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003); *see also Richardson v. Corr. Med. Care, Inc.*, No. 22-210, 2023 WL 3490904, at *3 (2d Cir. May 17, 2023) ("In excluding [expert's]

119

Add.333

opinion, the district court strayed from its role as the gatekeeper of reliable and relevant expert evidence into the realm of resolving contested issues of fact.").

Thus, while Keurig may cross Dr. Asher on the factual bases for his opinion, the fact that Dr. Asher and Keurig disagree on the interpretation and weighing of various facts in the record does not render his opinion the sort that is "not grounded in the economic reality" because it "ignored inconvenient evidence." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000). Rather, such factual disputes are the kind of issues that go to weight and that are therefore properly considered by the fact-finder.

### 3. Testimony on Starbucks and Smucker Damages

Keurig finally objects that Dr. Asher's opinion on damages based on Winn-Dixie's purchases of K-Cups from companies such Starbucks and Smucker is irrelevant because these damages are indirect and therefore not recoverable pursuant to *Illinois Brick Company v. Illinois*, 431 U.S. 720, 736 (1977). (*See* Doc. 2087 at 14.) Both parties cite to their own summary judgment briefing in their arguments on this issue. (*See* Doc. 2129 at 10 (citing to Doc. 2120 at 9–10); Doc. 2114 at 20 (citing to Doc. 2102 at 23–25)). The parties' arguments thus turn on my determination of this legal issue. Courts in this District similarly faced with Rule 702 objections that would require them to prejudge the legal merits of a party's argument have, instead, denied motions on those grounds with leave to renew in the event that subsequent rulings merit such renewal. *See, e.g.*, *Bozick v. Conagra Foods, Inc.*, No. 19-CV-4045, 2022 WL 4561779, at *39 (S.D.N.Y. Sept. 28, 2022) (granting parties leave to renew objections to expert testimony given that "the parties' arguments as to the relevancy of certain of this testimony and its admissibility under Rule 702 are likely to change substantially" following a ruling narrowing which causes of action were triable); *Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18-CV-5075,

120

Add.334

2022 WL 2757643, at *3 (S.D.N.Y. July 14, 2022) (denying *Daubert* motions with leave to renew where "[t]he *Daubert* motions—particularly those pertaining to Plaintiffs' damages expert—present several questions related to damages that raise legal questions that may shape the way the parties present their cases").

I similarly decline to address a Rule 702 motion that would require me to prejudge the legal sufficiency of arguments raised by parties in a pending summary judgment motion.  To the degree that later holdings render Dr. Asher's opinion on Starbucks and Smucker-based damages irrelevant, Keurig may renew its motion as to this objection.

### R.  *Drs. Keith Ugone & Kevin M. Murphy ("Ugone-Murphy") (Doc. 2089)[41]*

Winn-Dixie moves to exclude the testimony of Drs. Ugone and Murphy.  Winn-Dixie proffers numerous objections to these experts' opinions, none of which merit the exclusion of these opinions.

#### 1.  Variable Testing

Winn-Dixie's first objection is that one of Dr. Ugone's methods of testing the reliability of Dr. Asher's model is unsupported by econometric literature.  (Doc. 2089 at 3–6.)  Specifically, Winn-Dixie objects that the use of a test Dr. Ugone ran on Dr. Asher's model, which was derived from the textbook *Quantitative Techniques for Competition and Antitrust Analysis*, is contradicted by that source.  (*Id.* at 3–4.)  Setting aside whether it would be appropriate to strike an expert's opinion based on divergent interpretations of a properly-implemented economic method, Winn-Dixie's argument overstates the import of the source.  The basic dispute is that Dr. Ugone implemented a data testing method from a particular textbook,[42] in which an analyst

---

[41] Winn-Dixie also suggests that these opinions should be excluded under Rule 403, but offers no substantial analysis as to why.  Accordingly, I decline to exclude any testimony on these grounds.

[42] Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis* 361 (Princeton

121

removes all variables from a model and then interactively adds them back in to assess how the variable of interest (e.g., anti-competitive conduct) responds.  This textbook notes that if the variable of interest does not appear to respond to changes in which variables are added, that may suggest that the model is properly capturing that variable's effect.  (Doc. 2090, Ex. 1 at 361.)  However, as Dr. Ugone explained in his deposition, an alternative explanation when a variable is added to a model and does not do anything is that this variable has no effect on the outcome of interest.  (Doc. 2089, Ex. 3 at 129:17–24.)  Commonsense confirms the intuition:  if one created a model with a variable of interest designed to capture anti-competitive conduct, but then introduced non-sensical or unrelated "control variables" such as the number of SDNY law clerks hired in 2024, the value that the variable of interest failed to change in response to a non-sensical variable could as easily suggest that the model is not being properly developed as it could that the variable of interest is properly identified.  This is the thrust of Dr. Ugone's objection to the control variables employed by Winn-Dixie's experts:  that they are not actually capturing anything related to anticompetitive conduct, and his variable testing method is a permissible way of demonstrating this proposition.

### 2. Cherry-Picking

Winn-Dixie next objects to Dr. Ugone opining that their expert's model is flawed based on tests he ran on Mother Parkers data.  (Doc. 2089 at 6–9; *see also supra* §§ II.P.2, II.Q (discussing Keurig's objections based on Mother Parkers data).)  It asserts that Dr. Ugone is engaged in "data mining" or "data snooping" (effectively "cherry-picking" favorable data) by selectively testing Mother Parkers data and not running similar tests on other data.  (Doc. 2089 at 7.)  This is wrong.

---

University Press, 2010), located at Doc. 2090, Ex. 1.

122

"When constructing a benchmark statistic, the regression analyst may not 'cherry-pick' the time-frame or data points so as to make her ultimate conclusion stronger." *Reed Const. Data Inc.*, 49 F. Supp. 3d at 400; *Daniels-Feasel v. Forest Pharms., Inc.*, No. 17-CV-4188, 2021 WL 4037820, at *5 (S.D.N.Y. Sept. 3, 2021) ("An expert must not cherry-pick from the scientific landscape and present the Court with what he believes the final picture looks like." (internal quotation marks omitted)), *aff'd*, No. 22-146, 2023 WL 4837521 (2d Cir. July 28, 2023).  Here, Dr. Ugone did not "pick" Mother Parkers—Plaintiffs did.  Once Plaintiffs decided to put Mother Parkers data at issue, Dr. Ugone was entitled to test the reliability of that data and findings derived from it.

It is of no account that Dr. Ugone did not run similar tests on TreeHouse or JBR data. (*See* Doc. 2089 at 8.)  As a rebuttal expert he does not need to produce comprehensive models or methods, only to attack Plaintiffs' models, *Scott*, 315 F.R.D. at 44, and he can do this by attacking only specific components of the analysis or data Plaintiffs have put forward, *see, e.g.*, *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 193 (S.D.N.Y. 2006) ("[T]here is nothing inappropriate about accepting the majority of that expert's analysis and demonstrating the consequence of changing certain variables.").

Winn-Dixie similarly accuses Dr. Murphy of selection bias or "data snooping."  (Doc. 2089 at 15–18.)  Winn-Dixie's critique on this point is not entirely coherent, and I do not find it provides any basis to exclude Dr. Murphy's opinion.  Winn-Dixie does not specifically identify which brands or data Dr. Murphy uses to engage in selection bias, and this kind of "mere conjecture or assertion on [Winn-Dixie's] part is insufficient," as a basis to strike an expert's opinion.  *Teva Pharms. USA, Inc.*, 2019 WL 13244252, at *2 (internal quotation marks omitted).  In any case, I have approved robustness testing, the assessment of an expert's model by

123

Add.337

"applying that methodology to different data or with different assumptions and examining the results produced," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 468, for the reasons discussed *supra* in Section II.K.1, and Dr. Murphy's robustness testing of Dr. Asher's model by using different comparison brands constitutes this kind of permissible robustness testing.

### 3.    Brand Value and Bagged Coffee

Winn-Dixie's next objection is an inverse of Keurig's criticism on brand values:  Winn-Dixie objects that the opinions of Dr. Ugone and Murphy that the failure to account for Keurig's brand value renders Plaintiffs' experts' opinion unreliable is, itself, unreliable.  (Doc. 2089 at 9–11.)  It also objects to these experts' opinion that bagged coffee is not a reliable proxy variable for brand value and should be excluded.  (Doc. 2089 at 12–13.)

I have found that Plaintiffs' experts had sufficient reason to determine that Keurig's brand value was not a variable so important that its exclusion rendered their models unreliable. *See supra* §§ II.H.1, II.P.1.  However, "[w]hen a trial court . . . rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable." *U.S. Info. Sys., Inc.*, 313 F. Supp. 2d at 229 (internal quotation marks omitted).  It merely means that it is "more likely than not that the admissibility requirement has been met" and that any further attacks go only to the weight a fact-finder should give the expert opinion, not its admissibility. Fed. R. Evid. 702 Advisory Committee cmt. 2023.

Although plaintiff experts have marshalled a sufficient body of evidence to suggest that Keurig brand-value is not relevant, and that bagged coffee is a proper proxy variable, Keurig has also mustered evidence suggesting that their brand has value that ought to have been considered in these experts' opinions, (Doc. 2115 at 7–9 (summarizing record evidence)), and that the

explanatory value of bagged coffee as a proxy variable is marginal, (*id.* at 10 (summarizing evidence)).  The dispute between these comparably reliable bodies of evidence over the value of Keurig's brand and the factual connection of bagged coffee to broader brand value is the kind of factual dispute properly left to the fact finder.  *Richardson,* 2023 WL 3490904, at *3.

### 4.  Regression Control Variables

Winn-Dixie's final objection is that Dr. Ugone should not be able to critique their selection of regression variables because those variables contribute to the ability of their expert's model to explain price differences in the market.  (Doc. 2089 at 13–15.)  Winn-Dixie submits no authority for the proposition that the inclusion of certain proper variables in a model immunizes an expert's opinion from rebuttal critiques that other variables would have been more appropriate or rendered a more accurate model, and courts have permitted rebuttal experts to attack an opposing expert's model even if that model meets the baseline requirements for admissibility. *See, e.g.*, *Capri Sun GmbH*, 595 F. Supp. 3d at 135–42 (permitting a rebuttal expert to critique admitted expert testimony).  Given this, and the lack of any countervailing authority shared by Winn-Dixie, I do not find this objection a sufficient reason to exclude Dr. Ugone's critique of Dr. Asher's variable selection.

### III.    Conclusion

For the reasons stated, IT IS HEREBY ORDERED that

- The motion to exclude the testimony of the Hon. Arthur Gajarsa (ret.) is GRANTED.

- The motion to exclude the testimony of the Hon. James Ware (ret.) and the Hon. Randall Rader (ret.) is DENIED as moot.

- The motion to exclude the testimony of Dr. Gareth Macartney is GRANTED in part and DENIED in part.

125

- The motion to exclude the testimony of Dr. Gary French is GRANTED in part and DENIED in part.

- The motion to exclude the testimony of Hal Poret is DENIED.

- The motion to exclude the testimony of Sarah Butler is DENIED.

- The motion to exclude the testimony of Dr. Mohan Rao is DENIED.

- The Johnson I motion to exclude the testimony of Dr. Phillip Johnson is DENIED.

- The motion to exclude the testimony of Dr. Lauren Stiroh is DENIED.

- The motion to exclude the testimony of Dr. David Sibley is GRANTED in part and DENIED in part.

- The TMJ Motion to exclude the testimony of Dr. Keith Ugone is GRANTED in part and DENIED in part.

- The motion to exclude the testimony of Dr. Kevin Murphy is DENIED.

- The motion to exclude the testimony of Dr. Mr. Mark Wood is DENIED.

- The motion to exclude the testimony of Dr. Marc Hillmyer is DENIED.

- The Ugone Motion to exclude the testimony of Dr. Keith Ugone is DENIED.

- The Johnson II motion to exclude the testimony of Dr. Phillip Johnson is DENIED.

- The motion to exclude the testimony of Dr. Martin Asher is DENIED.

- The Ugone-Murphy motion to exclude the testimony of Drs. Keith Ugone and Kevin M. Murphy is DENIED.

Because this Opinion & Order was decided based on sealed materials not filed on the public docket, the Opinion & Order will be filed under seal. The parties are directed to meet and confer with regard to proposed redactions, and to propose redactions to me within the next thirty days. I will then review the proposed redactions and, if appropriate, implement them before

publicly filing the Opinion & Order.  If the parties do not submit proposed redactions within thirty (30) days, I will file the Opinion & Order in its current form on the public docket.

The Clerk of Court is respectfully directed to close the motions at Docs. 1220, 1406, 1439, 1442, 1445, 1449, 1452, 1456, 1460, 1464, 1470, 1474, 1478, 1484, 2078, 2083, 2086, 2089, and 2237.

SO ORDERED.

Dated: January 3, 2025
        New York, New York

Vernon S. Broderick
United States District Judge

Add.341

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                                          :
IN RE:                                                    :
KEURIG GREEN MOUNTAIN                                      :
SINGLE-SERVE COFFEE ANTITRUST                              :
LITIGATION                                                 :          14-MD-2542 (VSB) (SLC)
                                                          :          14-MC-2542 (VSB) (SLC)
*This order relates to all cases.*                        :
                                                          :          **OPINION & ORDER**
----------------------------------------------------------X

Appearances:

Aldo A. Badini
Susannah Torpey
Diana Hughes Leiden
Winston & Strawn LLP
New York, NY & Los Angeles, CA
*Counsel for Plaintiffs TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc.*

Alexander G. Brown
James C. Grant
Valarie C. Williams
B. Parker Miller
Steven L. Penaro
Alston & Bird LLP
Atlanta, GA & New York, NY
*Counsel for Plaintiff McLane Company, Inc.*

Michael M. Buchman
Motley Rice LLC
New York, NY

Robert G. Eisler
Grant & Eisenhofer P.A.
New York, NY

William V. Reiss
Robins Kaplan LLP
New York, NY
*Counsel for Direct Purchaser Plaintiffs and Interim Co-Lead Counsel for the Proposed Direct
Purchaser Plaintiff Class*

1

Add.342

Fred T. Isquith
Thomas H. Burt
Patrick Donovan
Wolf Haldenstein Adler Freeman & Herz, LLP
New York, NY

Robert N. Kaplan
Hae Sung Nam
Jason A. Uris
Kaplan Fox & Kilsheimer LLP
New York, NY

Bruce L. Simon
Pearson, Simon & Warshaw, LLP
San Francisco, CA
*Counsel for Indirect Purchaser Plaintiffs and Interim Co-Lead Counsel for the Proposed Indirect Purchaser Plaintiff Class*

Daniel Johnson, Jr.
Mario Moore
Dan Johnson Law Group, LLP
San Francisco, CA
*Counsel for Plaintiff JBR, Inc.*

Patrick J. Ahern
Ahern and Associates, P.C.
Chicago, IL
*Counsel for Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holding, LLC*

Leah Brannon
Carl Lawrence Malm
Alan B. Freedman
Rahul Mukhi
Lev L. Dassin
George S. Cary
Cleary Gottlieb Steen & Hamilton LLP
Washington, DC & New York, NY

Wendelynne J. Newton
Mackenzie A. Baird
Buchanan Ingersoll & Rooney PC
Pittsburgh, PA
*Counsel for Defendant Keurig Green Mountain, Inc.*

2

<u>VERNON S. BRODERICK</u>, <u>United States District Judge</u>:

Before me are various pending motions objecting to:  (1) Magistrate Judge Henry

Pitman's March 7, 2019 order concerning whether certain documents are privileged, (Doc. 544);

(2) Magistrate Judge Sarah L. Cave's March 28, 2022 Opinion & Order regarding cross-motions

for spoliation sanctions, (Doc. 1806); (3) Judge Cave's February 10, 2023 Opinion & Order

regarding certain requests for admission, (Doc. 2004); and (4) Judge Cave's May 8, 2023

Opinion & Order regarding certain attorneys' fees, costs, and sanction requests, (Doc. 2038).  For

the reasons that follow, Keurig's objections to Judge Pitman's March 2019 Order are

SUSTAINED IN PART AND OVERRULED IN PART, Keurig's objections to Judge Cave's

March 2022 Opinion & Order are SUSTAINED IN PART AND OVERRULED IN PART, Winn-

Dixie's objection to Judge Cave's February 2023 Opinion & Order is OVERRULED, and

Keurig's and Winn-Dixie's objections to Judge Cave's May 2023 Opinion & Order are

OVERRULED.[1]

## I.      **Legal Standard**

When a party objects to a magistrate judge's non-dispositive order, the district court must

review the objections and "modify or set aside any part of the order that is clearly erroneous or is

contrary to law."  Fed. R. Civ. P. 72(a).  An order is "clearly erroneous" when "the reviewing

court on the entire evidence is left with the definite and firm conviction that a mistake has been

committed."  *Gualandi v. Adams*, 385 F.3d 236, 240 (2d Cir. 2004) (quoting *United States v. U.S.

Gypsum Co.*, 333 U.S. 364, 395 (1948)) (internal quotation marks omitted).  A decision is

"contrary to law" when it "fails to apply or misapplies relevant statutes, case law or rules of

---

[1] I assume familiarity with the underlying facts and procedural history of this multidistrict litigation, which focuses on antitrust claims brought against Keurig Green Mountain, Inc. ("Keurig"), and is discussed in more detail in my Opinion & Order dated April 3, 2019, (Doc. 581).  Where additional background is necessary, I address it in the context of the specific motion being considered.

procedure." *Weiss v. La Suisse*, 161 F. Supp. 2d 305, 321 (S.D.N.Y. 2001) (internal quotation marks omitted).  A party may serve and file any objections to a magistrate judge's ruling on a non-dispositive matter within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(a).

## II.    <u>Objections to March 2019 Order (Doc. 547)</u>

### A. *Background*

On March 7, 2019, Magistrate Judge Henry Pitman issued an order ("March 2019 Order") regarding 50 sample documents submitted by Keurig for in camera review stemming from the parties' dispute over Keurig's withholding of certain documents as privileged.  (*See* Doc. 544 ("Mar. 2019 Order") at 1.)  Judge Pitman's conclusions fall into three categories:  (1) privileged, (2) not privileged, and (3) privilege is "questionable" or "[n]ot clear."  (*See id.* at 4–6.)  Judge Pitman noted that Keurig seemed to assert attorney-client privilege for some documents "simply because an attorney was copied on the document."  (*Id.* at 7.)

On March 21, 2019, Keurig filed objections to the March 2019 Order.  (Doc. 547.)  On March 25, 2025, Keurig filed a supporting memorandum of law, which clarified that its objections related only to five specific documents.  (Doc. 550 ("Priv. Obj. Mem.").)  On April 4, 2019, Privilege Plaintiffs[2] filed an opposition brief, (Doc. 563 ("Priv. Obj. Opp'n")), and an accompanying declaration, (Doc. 564).  On April 11, 2019, Keurig filed a reply brief.  (Doc. 568 ("Priv. Obj. Reply").)

On January 27, 2023, I issued an order directing the parties to file a letter stating whether the issues in their objections are moot.  (Doc. 1987.)  On February 3, 2023, the parties filed a

---

[2] "Privilege Plaintiffs" refers to TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc. (collectively, "TreeHouse"), the Direct Purchaser Plaintiffs ("DPPs"), the Indirect Purchaser Plaintiffs and JBR, Inc.

joint letter stating that Keurig's objections to three of the five documents were either withdrawn or moot because exact duplicates of the documents were produced.  (Doc. 1997 ("Priv. Ltr.").)

### B.  *Discussion*

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice."  *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011).  For the third prong, courts "consider whether the predominant purpose of the communication is to render or solicit legal advice."  *In re Cnty. of Erie*, 473 F.3d 413, 420 (2d Cir. 2007) (collecting cases).  The predominant-purpose inquiry is to "be assessed dynamically and in light of the advice being sought or rendered, as well as the relationship between advice that can be rendered only by consulting the legal authorities and advice that can be given by a non-lawyer."  *Id.* at 420–21.

Keurig initially objected to "five specific privilege rulings" in the March 2019 Order.[3] (Priv. Obj. Mem. 2.)  The parties later clarified that Keurig's objections to three of the five documents no longer required a ruling because the objections were either withdrawn or moot because an exact duplicate had been already produced.  (*See* Priv. Ltr.)  I therefore address only the two remaining objections.

The first document (KGM00322136–60) is a draft agreement that contains edits and comments from Keurig's in-house counsel Sean Murphy.  Although the March 2019 Order does not list which ruling corresponds with which document, Keurig states that the March 2019 Order held that this document was not privileged because there was "no legal advice sought or

---

[3] Keurig does not challenge Judge Pitman's rulings in the third category regarding documents where privilege is "questionable" or "not clear" because those documents are "not ripe for review" in their objections.  (Priv. Obj. Mem. 2.)

Add.346

Case: 26-1153   04/29/2026   DktEntry: 1.1   Page 386 of 428

requested.  (Priv. Obj. Mem. 6 & n.3 (quoting Mar. 2019 Order at 5–6).)  Keurig objects and contends that Murphy's edits involve legal analysis as he notes or revises contractual language regarding the scope of the contract, the legal effect of an attachment, and termination rights.  (*Id.* at 7–8.)  Privilege Plaintiffs argue that Judge Pitman already considered and rejected Keurig's arguments, and that Keurig could not establish any clear error.  (Priv. Obj. Opp'n 7.)  The parties also dispute whether this privilege was waived when a "later version" of this document was sent to a third party.  (Priv. Ltr. at 2.)

I agree with Keurig.  The disputed document includes edits and comments from Murphy, including the scope of the contract's coverage of certain affiliates, the parties' expectations for a specific contractual obligation, and whether a provision regarding pricing contemplated potential price changes.  Because the edits do not concern merely commercial figures and extend to the contracting parties' rights and obligations, Murphy clearly made these comments in his role as an attorney.  It was clear error to hold that a document that clearly reflects an attorney's edits and comments about the legal effect of several provisions in a contract was not privileged.  The document at issue clearly shows an attorney's predominant purpose to render legal advice. Further, I reject Privilege Plaintiffs' argument that Keurig waived privilege of this document because "a version of the document at issue" was already produced to Privilege Plaintiffs.  (Priv. Ltr. at 1.)  The parties have not provided a copy of the produced document, but it is of little consequence to my determination here.  On the one hand, if the produced document and the document at issue here are identical, then Privilege Plaintiffs already have a copy of the document, so it makes little difference to Privilege Plaintiffs.  On the other hand, if the two documents are not identical, then Keurig's production of a different document does not waive the

6

Add.347

privilege for this document and Privilege Plaintiffs' argument fails. Accordingly, I sustain Keurig's objections regarding this document and hold that KGM00322136–60 is privileged.

The second "document" (KGMPRIV-00000204–69) is actually several documents consisting of a cover email and four attachments. According to Keurig, Judge Pitman held that the document was "[n]ot privileged," and explained: "It appears that Sean Murphy (an attorney) had some comments on the draft agreement, but the document does not reveal the content of his comments. Because the document does not reveal the content of counsel's communications, it is not privileged." (Priv. Obj. Mem. 8 (quoting Mar. 2019 Order at 5).) Keurig originally claimed that because each attachment contains attorney-client communication, the cover email is also privileged. (*Id.* at 8–9.) However, Keurig has since produced exact duplicates of the cover email and one of the attachments, and states that I "therefore no longer need[] to rule on the Objections to these two documents." (Priv. Ltr. at 2.) Therefore, Keurig's objections as to the cover email and one of the attachments (KGM-PRIV00000204–25) are moot.

Keurig's objections thus relate only to the three remaining attachments (KGM-PRIV00000226–69). (Priv. Ltr. at 2.) As an initial matter, I disagree with the parties' interpretation of Judge Pitman's ruling. The March 2019 Order seems to hold only that the cover email was not privileged; it did not opine on whether the four attachments are privileged. In any event, upon review, I find that that the three remaining documents are privileged because they all include Murphy's comments on a draft agreement or draft amendments to that agreement. The remaining documents clearly indicate Murphy's edits and comments, which do not comport with the March 2019 Order's description that "the document does not reveal the content of [Murphy's] comments." I therefore construe the March 7 Order to only have ruled on whether

7

Add.348

the cover email was privileged.  I hold that the remaining three attachments (KGM-PRIV00000226–69) are privileged because they reflect Murphy's edits and comments.

For these reasons, I SUSTAIN IN PART AND OVERRULE IN PART Keurig's objection to the March 2019 Order.  Documents KGM00322136–60 and KGM-PRIV00000226–69 are privileged; the other documents involve objections that were withdrawn or are moot so I need not consider them.

### III.    Objections to March 2022 Opinion (Doc. 1816)

#### A.  *Background*

On March 28, 2022, Judge Sarah L. Cave issued an Opinion & Order ("March 2022 Opinion") regarding the parties' cross motions for sanctions related to alleged spoliation of relevant evidence.  (Doc. 1806 ("Mar. 2022 Op.").)  The March 2022 Opinion first granted in part and denied in part Rule 37 Plaintiffs'[4] motion for sanctions under Rules 37(b) and 37(e) of the Federal Rules of Civil Procedure.  (*Id.* at 29–91.)  The March 2022 Opinion then denied Keurig's motion as to Treehouse under Rule 37(e) because Treehouse's preservation efforts were reasonable and because Keurig failed to establish prejudice, (*id.* at 91–110), and denied Keurig's motion as to JBR, Inc. under Rule 37(e) for failure to establish prejudice, (*id.* at 110–18).

On April 11, 2022, Keurig filed objections to the March 2022 Opinion, (Doc. 1816), and an accompanying memorandum, (Doc. 1817 ("Spoliation Obj. Mem.")).  On April 25, 2022, Rule 37 Plaintiffs filed an opposition brief, (Doc. 1825 ("Spoliation Obj. Opp'n")), and an accompanying declaration, (Doc. 1827).  On May 2, 2022, Keurig filed a reply brief, (Doc. 1832 ("Spoliation Obj. Reply")), and an accompanying declaration, (Doc. 1833).

---

[4] "Rule 37 Plaintiffs" refers collectively to TreeHouse, McLane Company, Inc. ("McLane"), and DPPs.

### B. *Discussion*

#### 1. Applicable Law

Federal Rule of Civil Procedure 37 governs discovery sanctions. "Discovery sanctions under Federal Rule 37 are deterrents (specific and general) meant to punish a recalcitrant or evasive party." *In re Gravel*, 6 F.4th 503, 515 (2d Cir. 2021) (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)). "Federal Rule 37 protects more than the interest of a party in remedying or avoiding certain costs; it protects the interests of the parties, the court, and the public in a speedy and just resolution of the case." *Id.* As relevant here, Rule 37(b) provides for a party's failure to comply with discovery-related court orders, and Rule 37(e) provides for a party's failure to preserve electronically stored information ("ESI").

Rule 37(b) governs when a party fails to comply with a court order. Specifically, Rule 37(b)(2)(C) states that the court "must" award "reasonable expenses, including attorney's fees caused by the failure" to comply with court orders "unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). The Supreme Court has recognized that courts are required to find a "causal connection" between the party's violation and the court's sanction "before shifting fees." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 n.5 (2017).

Rule 37(e) gives courts discretion to issue sanctions "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Rule 37(e) contemplates two scenarios, only one of which is relevant here because the March 2022 Opinion did not impose sanctions under the second scenario, Rule 37(e)(2), after failing to find clear and convincing evidence of

9

Add.350

Keurig's intent to deprive Plaintiffs of the disputed discovery's use.  (Mar. 2022 Op. 85.)

"[U]pon finding prejudice to another party from loss of the information," a court "may order

measures no greater than necessary to cure the prejudice."  Fed. R. Civ. P. 37(e)(1).  "Rule 37(e)

'does not place a burden of proving or disproving prejudice on one party or the other.'"  *Kosher

Ski Tours Inc. v. Okemo Ltd. Liab. Co.*, No. 20-CV-9815, 2024 WL 3905742, at *2 (S.D.N.Y.

Aug. 22, 2024) (quoting Fed. R. Civ. P. 37(e)(1) adv. comm. note to 2015 amendment).  The

prejudice inquiry "necessarily includes an evaluation of the information's importance in the

litigation."  *Id.* (quoting Fed. R. Civ. P. 37(e)(1) adv. comm. note to 2015 amendment) (internal

quotation marks omitted).  Even still, "[t]he prejudiced party must not be held to too strict a

standard of proof regarding the likely contents of the destroyed or unavailable evidence, because

doing so would allow parties who have destroyed evidence to profit from that destruction."

*Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 580 (S.D.N.Y. 2017) (internal

quotation marks omitted).  Notably, district courts are afforded "broad discretion" under Rule

37(e).  *Ungar v. City of New York*, No. 21-1384-CV, 2022 WL 10219749, at *3 (2d Cir. Oct. 18,

2022) (summary order).

### 2.  Analysis

Keurig objects to three aspects of Judge Cave's March 2022 Opinion.  (*See* Spoliation

Obj. Mem. 1–2.)  First, Keurig claims that the March 2022 Opinion erroneously authorized Rule

37 Plaintiffs to present certain evidence to the jury regarding spoliation under Rule 37(e)(1).  (*Id.*

at 5–13.)  Second, Keurig claims that the March 2022 Opinion erroneously awarded attorneys'

fees and expert costs due to Keurig's incomplete production of transactional and archived email

data under Rule 37(b).  (*Id.* at 13–16.)  Third, Keurig claims that the March 2022 Opinion

erroneously imposed sanctions based on Keurig's numerous failures to issue litigation holds to

10

six former employees, interview 11 custodians in a timely fashion, and preserve certain hard

drives under either Rule 37(b) or Rule 37(e).  (*Id.* at 16–23.)  I address each in turn.

### a.   Presentation of Spoliation Evidence to the Jury

The March 2022 Opinion authorized Rule 37 Plaintiffs to present evidence of spoliation

to any jury in a future trial under Rule 37(e)(1) as a sanction for three reasons.  (Mar. 2022 Op.

88–90.)  First, the sanction helps reduce the "evidentiary imbalance" between the parties for

Keurig's spoliation of relevant ESI and Barberio's hard copy notes.  (*Id.* at 89.)  Second, this

sanction provides the jury with context of this imbalance, context that goes to the parties'

credibility and other issues within the jury's fact-finding purview.  (*Id.*)  Third, this sanction does

not encroach on a trial judge's authority during trial regarding this spoliation evidence and any

related jury instructions.  (*Id.*)

Keurig objects to the March 2022 Opinion's purported failure to sufficiently address

prejudice as it relates to spoliation related to custodians Don Barberio, Joe Mueller, and Steve

Ferreira.  (Spoliation Obj. Mem. 7.)  I address each custodian below.

### i.   *Don Barberio*

Judge Cave concluded that Rule 37 Plaintiffs were prejudiced by Keurig's failure to

preserve and produce Don Barberio's laptop, given Barberio's role in meeting with important

customers regarding the 2.0 Brewer.  (Mar. 2022 Op. 45.)  Barberio, former Vice President of At-

Home Sales, met with customers who moved from Treehouse to Keurig after it released the 2.0

Brewer, and called or emailed Tom Ferguson, Senior Vice President of Sales for

Grocery/Drug/Club, with updates with "meeting highlights."  (*Id.* at 31, 40, 44–45.)  Judge Cave

made at least two factual findings before determining that there was prejudice.  First, Keurig lost

Barberio's laptop, even though Barberio received a litigation hold notice on February 17, 2014

11

Add.352

and turned in his laptop, in the presence of Ferguson and a Human Resources employee, when Barberio left Keurig in June 2014. (*Id.* at 44.) Second, Judge Cave inferred that, because Barberio did not know what a share drive was, "any documents he saved were saved to his hard drive only." (*Id.* at 45.) These two factual findings, as well as the fact that Barberio met key customers to discuss the 2.0 Brewer and communicated notable "highlights" to Ferguson, led Judge Cave to conclude that Rule 37 Plaintiffs were prejudiced by Keurig's failure to locate and produce the contents of Barberio's hard drive. Even after acknowledging that Keurig produced more than 21,000 emails for Barberio, almost 81,000 emails for Ferguson, and over 25,000 documents from Barberio's supervisor Jim Travis, Judge Cave found that "Keurig produced essentially <u>no</u> non-email documents for Barberio." (*Id.* at 45 (emphasis in original).)[5]

Keurig argues that Judge Cave's finding of prejudice as to Barberio is erroneous for two independent reasons. First, Keurig argues that Judge Cave's failure to provide the requisite analysis of alternative sources of information for those documents, either from those key customers or other meeting attendees, is contrary to law. (Spoliation Obj. Mem. 9–10.) Keurig insists that Rule 37 Plaintiffs could have but failed to depose or collect documents from those customers, meeting attendees, or other custodians. (*Id.*) Second, Keurig argues that the March 2022 Opinion failed to find an "evidentiary imbalance" as to any legal claim, as required to permit evidence to go to the jury about spoliation. (Spoliation Obj. Mem. 10.) Keurig essentially argues that Barberio's notes are not helpful to Rule 37 Plaintiffs, either because they pertain to undisputed facts or are contrary to Rule 37 Plaintiffs' claims that the announcement of

---

[5] Although the March 2022 Opinion noted that Keurig failed to preserve and produce a yellow binder of Barberio's handwritten notes from customer meetings with "Giant Eagle, Wakefern, Kroger, Ahold, and others," (Spoliation Obj. Mem. 38, 40–41), it did not analyze whether Rule 37 Plaintiffs were prejudiced as a result.

12

Add.353

the 2.0 Brewer resulted in lost customers, or that there are alternative sources of information about Barberio's customer meetings. (*Id.* at 10–11.) Both arguments fail.

Keurig's first argument fails because the March 2022 Opinion sufficiently addressed the issue of alternative sources of discovery. A party's ability to obtain discovery materials from third parties "merely turns the question of prejudice from one of *kind* to one of *degree*." *Coan v. Dunne*, 602 B.R. 429, 440 (D. Conn. 2019) (emphasis in original). Judge Cave noted that among the over a hundred thousand emails for Barberio and Ferguson and documents for Travis that Keurig produced, essentially none were non-email documents for Barberio. (Mar. 2022 Op. 45.) In doing so, Judge Cave implicitly stated that these other sources were insufficient to preclude a finding of prejudice. Indeed, Judge Cave inferred that any and all non-email documents Barberio were saved only to his hard drive. (*Id.*) Moreover, even if other meeting attendees were deposed or had their documents collected, Rule 37 Plaintiffs would still be prejudiced by the absence of Barberio's meeting notes, especially in his personal analysis of what constituted meeting "highlights." Only Barberio had copies of his notes, which he kept as hard copies or in his hard drive; Rule 37 Plaintiffs were prejudiced in Keurig's inability to preserve and produce them. Keurig cannot show that there was an alternative source "to obtain the same evidence" that demonstrate the lack of prejudice. *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 25 (S.D.N.Y. 2010).

Keurig's second argument likewise is doomed because Keurig fails to cite any binding authority requiring that a court find an evidentiary imbalance for a specific legal claim before permitting the presentation of spoliation evidence to a jury. (*See* Spoliation Obj. Mem. 10 ("[P]resenting evidence to the jury about spoliation is a serious sanction available only to remedy an 'evidentiary imbalance' created by the loss.").) This argument—which is essentially a type of argument that Rule 37 Plaintiffs are not prejudiced from the spoliation of Barberio's hard copy

13

Add.354

documents—is not persuasive. As an initial matter, Keurig fails to demonstrate that a court is required to make a finding of an evidentiary imbalance at all before permitting a party to present evidence of spoliation to a jury, let alone that the evidentiary imbalance must be tied to a particular legal claim. True, some courts have noted that a spoliation-evidence instruction, after presentation of such evidence to the jury, would help rectify an evidentiary imbalance. *See, e.g.*, *Linde v. Arab Bank, PLC*, 706 F.3d 92, 102 (2d Cir. 2013) ("The permissive inference instruction will, according to the District Court, help to rectify this evidentiary imbalance."); *Morgan Art Found. Ltd. v. McKenzie*, No. 18-CV-4438, 2025 WL 1344347, at *22 (S.D.N.Y. Jan. 17, 2025) (holding that spoliation evidence "will help 'rectify the evidentiary imbalance'" (quoting *Linde*, 706 F.3d at 102)). However, a court's description of an effect of a jury instruction does not turn it into a required finding prior to permitting that instruction. Keurig does not cite to any authority requiring courts to make a finding of evidentiary imbalance pegged to a specific legal claim prior to permitting presentation of spoliation evidence. Nor have I found any. This means that the March 2022 Opinion's purported failure to tie the evidentiary imbalance to a specific legal claim does not categorically render it clearly erroneous or contrary to law to have permitted Rule 37 Plaintiffs to present evidence of Keurig's failure to preserve Barberio's documents to the jury. In short, I do not have a "definite and firm conviction that a mistake has been committed" upon review of the "entire evidence" or that the March 2022 Opinion misapplied relevant law in its sanctions related to Barberio.

In contrast, an adverse-inference instruction may require a finding that there was an evidentiary imbalance. *See Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 291 (S.D.N.Y. 2009) ("[W]ithout some proof that the defendant's actions created an unfair evidentiary imbalance, an adverse inference is not appropriate."). Here, Judge Cave explicitly

14

Add.355

declined to authorize sanctions of adverse inferences.  (Mar. 2022 Op. 90–91.)  No party objects to this part of the March 2022 Opinion.

In any event, Judge Cave noted that Keurig failed to preserve and produce a yellow binder of Barberio's handwritten notes from customer meetings with "Giant Eagle, Wakefern, Kroger, Ahold, and others."  (Mar. 2022 Op. 38.)  As an example, Judge Cave highlighted Barberio's meeting with Publix's president on January 29, 2014.  (*Id.*)  Keurig makes several arguments, including that Plaintiffs could have but failed to ask any attendees of that meeting for more information, and that any notes would have been "unhelpful to Plaintiffs' claims" because Publix decided to "stay[] with its unlicensed pack supplier through the launch of the 2.0 Brewer."  (Spoliation Obj. Mem. 11.)  With regard to the former argument, I have already addressed the issue of alternative sources of information.  *See supra* § III.B.2.a.i.  With regard to the latter argument, Keurig's argument is mere speculation.  The hard copy notes could have been helpful to Plaintiffs' claims, even if Publix as an entity eventually decided to stay with its current vendor.  Keurig fails to demonstrate evidence that leaves me with a "definite and firm conviction that a mistake has been committed."  *Gualandi*, 385 F.3d at 240 (quoting *U.S. Gypsum Co.*, 333 U.S. at 395) (internal quotation marks omitted).

Accordingly, Keurig's objections as to Barberio are OVERRULED.

#### ii.  *Joe Mueller and Steve Ferreira*

Keurig, citing *Alter v. Rocky Point School District*, No. 13-1100, 2014 WL 4966119, at *12 (E.D.N.Y. Sept. 30, 2014), claims that "[u]nder Rule 37(e), a finding that the loss of relevant evidence caused prejudice *cannot* be grounded solely on the basis that some evidence in the custody of *key witnesses* no longer exists."  (Spoliation Obj. Mem. 8 (emphases in original and

15

Add.356

internal quotation marks omitted).)  Notably, Judge Cave cited and quoted the exact same language.  (*See* Mar. 2022 Op. 18.)  I find some, but not all, of Keurig's arguments persuasive.

With regard to Joe Mueller, the March 2022 Opinion found that Rule 37 Plaintiffs were prejudiced by Keurig's failure to locate Mueller's hard drive or produce any documents from Mueller's network drive.  (Mar. 2022 Op. 59.)  Mueller, Keurig's Senior Vice President of Sales, received a litigation hold notice on February 17, 2014.  (*Id.*)  Ron DiFabio, Mueller's supervisor at Keurig, "testified that he and his direct reports," including Mueller, "saved everything to network drives."  (*Id.*)  Despite this testimony, Keurig claimed that Mueller's network drive "contained no documents."  (*Id.*)  Keurig's only production for Mueller were emails.  (*Id.*)  Judge Cave concluded that there was a "gap in Keurig's production" that prejudiced Rule 37 Plaintiffs. (*Id.*)

Keurig opposes Rule 37 Plaintiffs' argument that Mueller, who worked with Keurig's customer Walmart, could have had documents relevant to the Keurig-Walmart relationship. (Spoliation Obj. Reply 4.)  Keurig essentially argues that there is no prejudice because both Mueller and Walmart were deposed and because Rule 37 Plaintiffs already received—and indeed could have requested additional—productions regarding Walmart.  (*Id.*)  This argument is not persuasive.  The existence and production of some Walmart-related documents do not necessarily mean that all of Mueller's Walmart-related documents were duplicative.  Mueller's missing hard drive could have contained documents unique to Mueller.  Rule 37 Plaintiffs "cannot prove the specific contents of" the lost documents due to Keurig's failure to preserve and produce them, and I "will not allow [Keurig] to benefit from its failure to do." *Kosher Ski Tours Inc.*, 2024 WL 3905742, at *4.  Further, the fact that both Mueller and Walmart were deposed does not necessarily eliminate all prejudice.  Their depositions could have gone differently if Mueller's

Add.357

missing hard drive were located and produced, including by permitting the Rule 37 Plaintiffs to question Mueller and Walmart concerning unique documents from Mueller's hard drive. A witness's deposition testimony is subject to the limitations of that witness's memory, and unique documents from Mueller's hard drive could have refreshed his recollection or filled in the gaps in his memory. *See, e.g.*, *Shaholli v. 50 Front St. Enters., Inc.*, No. 17-CV-6076, 2018 WL 11630890, at *3–4 (E.D.N.Y. Dec. 18, 2018) (discussing discovery sanctions based on non-produced documents that could have "refresh[ed] [Plaintiffs'] respective recollections prior to being deposed"). In short, Keurig's arguments may somewhat mitigate the degree of Rule 37 Plaintiffs' prejudice, but they do not establish that the March 2022 Opinion was clearly erroneous or contrary to law as to Mueller in finding such prejudice.

With regard to Steve Ferreira, the March 2022 Opinion found that Rule 37 Plaintiffs were prejudiced by Keurig's failure to preserve and produce an encryption key for Ferreira's hard drive. (Mar. 2022 Op. 52–53.) Ferreira, Keurig's Vice President of Finance, Business Analytics, Demand Planning and Strategy, received a litigation hold notice on February 16, 2015, and indeed was "under a pre-existing litigation hold relating to other matters." (*Id.* at 52.) TreeHouse flagged to Keurig potential production deficiencies related to Ferreira in July 2018. (*Id.*) However, it was not until May 2019 when Keurig first disclosed to Rule 37 Plaintiffs that Keurig was unable to decrypt one of Ferreira's hard drives, even though Keurig had made such a determination months earlier in September 2018. (*Id.*) Judge Cave noted that over 141,000 documents for Ferreira were produced, including from three hard drives, 141 documents from his network drive, and three documents from his home computer. (*Id.*) Judge Cave concluded that due to the six-month gap in document production—between the October 2015 date of the latest

17

Add.358

document on his hard drive, and the date of his last day at Keurig in April 2016—Rule 37 Plaintiffs were prejudiced.  (*Id.* at 52–53.)

Keurig correctly notes that Rule 37 Plaintiffs fail to identify or even suggest what documents Ferreira's missing hard drive would have contained and how it would support Rule 37 Plaintiffs' claims.  (Spoliation Obj. Reply 4–5.)  Although Rule 37 Plaintiffs need not show any "smoking gun," they must still show that the existing evidence plausibly suggests that the missing hard drive would support their claims.  *See Karsch v. Blink Health Ltd.*, No. 17-CV-3880, 2019 WL 2708125, at *21 (S.D.N.Y. June 20, 2019) (internal quotation marks omitted).  Because they have failed to do so, it is difficult to evaluate the missing "'information's importance in the litigation.'"  *Castro v. Smith*, No. 16-CV-8147, 2023 WL 5371311, at *10 (S.D.N.Y. Aug. 22, 2023) (quoting Fed. R. Civ. P. 37(e) adv. comm. note to 2015 amendment).  Unlike Mueller, who was tied to an important customer, Walmart, the findings related to Ferreira are more limited and warrant a different outcome here.

Moreover, Rule 37 Plaintiffs misstate the March 2022 Opinion's findings—Judge Cave did not find that the more than 141,000 documents were produced from three hard drives, and instead found that 141,000 documents were produced overall, some of which were from hard drives.  (Mar. 2022 Op. 52.)  Keurig claims that "only 112 [documents] came from [Ferreira's] three hard drives," (Spoliation Obj. Reply 4 n.6), further suggesting Rule 37 Plaintiffs' inability to demonstrate the significance of Ferreira's missing hard drive.[6]

---

[6] Keurig argues that the March 2022 Opinion's factual finding of a six-month gap in document production was based on Rule 37 Plaintiffs' false assertions.  (Spoliation Obj. Mem. 8 n.9.)  Keurig claims that it collected and de-duplicated documents during that six-month time period.  (*Id.*)  Because I sustain Keurig's objections on other grounds, I need not resolve whether Keurig had indeed failed to produce any documents from Ferreira's hard drive for six months.

Accordingly, Keurig's objections as to Mueller are OVERRULED, but Keurig's objections as to Ferreira are SUSTAINED. Rule 37 Plaintiffs will not be permitted to present evidence of spoliation as to Ferreira.

### b. Attorneys' Fees and Costs

Under the Preliminary Case Management Plan and Scheduling Order (the "Scheduling Order"), the parties had to complete "substantial productions of all documents" for Agreed Custodians[7] by April 30, 2018. (*See* Mar. 2022 Op. 5; Doc. 354-1 (Scheduling Order).) On December 12, 2018, Magistrate Judge Pitman so ordered the parties' joint stipulation and proposed order regarding production deadlines (the "Production Deadline Order"), which extended the substantial-production deadline for Agreed Custodians from April 30, 2018 to January 4, 2019. (Doc. 484 ("Prod. Deadline Order") at 1.) That order also set a deadline of February 28, 2019 for Keurig, among others, "to substantially complete production of non-privileged documents . . . in response to requests for production served on August 31, 2016." (*Id.* at 2.)

Keurig claims that the March 2022 Opinion erroneously awarded Rule 37 Plaintiffs attorneys' fees and expert costs due to Keurig's incomplete production of transactional data and archived email data under the email system CommVault for some Agreed Custodians.[8] (Spoliation Obj. Mem. 13–16.) Keurig argues that Judge Cave appears to have imposed these sanctions under Rule 37(b), but failed to identify which court order was violated. (*Id.* at 13.)

---

[7] "Agreed Custodians" refers to Keurig's fifty-four custodians that the parties agreed upon. (*See* Mar. 2022 Op. 5 n.5; Doc. 1287 ¶ 1.)

[8] Keurig does not object to the March 2022 Opinion's award of attorneys' fees and expenses in the other categories: (1) "Plaintiffs' efforts from May 7, 2018 to July 25, 2018 to determine deficiencies in Keurig's productions for Agreed Custodians"; (2) "preparing for and participating in meet-and-confer communications and calls concerning Keurig's productions for the Agreed Custodians between July 25, 2018 and May 20, 2019"; (3) "undertaking additional measures with respect to the hard drives for [Fran] Rathke and [Michelle] Stacy that TreeHouse selected to send to its vendor"; and (4) "preparing the Motion and presenting oral argument."

19

Add.360

### i. *Archived CommVault Emails*

A week after the April 30, 2018 deadline for "substantial productions of all documents" for Agreed Custodians had passed, "Keurig notified [Rule 37] Plaintiffs that it had substantially completed its obligations." (Mar. 2022 Op. 79.)  However, roughly three months later, in August 2018, Keurig notified Plaintiffs that it had not collected certain archived emails "for most of the initial 29 Agreed Custodians." (*Id.*)  Keurig had not collected and produced the CommVault documents until October 2018, approximately five months after the deadline for substantial production. (*Id.*)

The initial April 30, 2018 deadline was later extended to January 4, 2019 pursuant to a joint stipulation and court order dated December 12, 2018. (Mar. 2022 Op. 5.)  The deadline to respond to TreeHouse's subpoenas regarding Keurig's former employees was January 11, 2019. (*See id*.)  Judge Cave recognized that "Plaintiffs incurred not only the expense of investigating the deficiencies but also of continued efforts to confirm the nature, scope, and volume of information that was not preserved," as well as expenses associated "with identifying where possible gaps in Keurig's production remained." (*Id.* at 87.)

Keurig claims that it complied with the Scheduling Order because it timely made a "substantial production of more than 900,000 documents from its custodians." (Spoliation Obj. Mem. 13–14.)  However, Keurig's fails to show how the volume of documents alone, even if it is high, constitutes a "substantial production" in compliance with the Scheduling Order.  Rule 37 Plaintiffs correctly emphasize that "Keurig had not searched and produced emails from the very custodians who were the subject of litigation holds." (Spoliation Obj. Opp'n 14.)  Keurig does not dispute that it only discovered that it had not collected the custodial emails in August 2018 after Plaintiffs had already engaged in "extensive investigation and inquiry." (*Id.*)  Although I

20

Add.361

recognize that the March 2022 Opinion did not explicitly invoke the Scheduling Order as the basis for awarding attorneys' fees and expenses under Rule 37(b), it is clear that Judge Cave was referring to it. (*See* Mar. 2022 Op. 86–87 ("Keurig represented on May 7, 2018 that it had substantially completed its production for the Agreed Custodians.").)[9]

Keurig also argues that there is no "causal connection" between its violation and the fee awards. (Spoliation Obj. Mem. 15–16.) Keurig opposes as overbroad the fee award "for time spent investigating *any* 'discrepancies' in archival email productions completed by October 31, 2018 even if that investigation showed no violation." (*Id.* at 15 (emphasis in original).) Keurig's argument fails because the March 2022 Opinion establishes the requisite causal connection. Keurig essentially asks for a retrospective analysis such that Rule 37 Plaintiffs' efforts should be compensated only if a violation was subsequently identified. However, Keurig's violation may not have been identified at all, but for Rule 37 Plaintiffs' investigatory efforts. In fact, Keurig's violations of its discovery obligations, despite its own declaration of compliance, led Rule 37 Plaintiffs to investigate other potential violations. I find that Judge Cave sufficiently established the causal connection between her sanctions and Keurig's violations.

Finally, to the extent that Keurig claims the fee award is unreasonable, that claim is rejected. Judge Cave did not award any specific monetary amount and instead stated that a "precise determination of reimbursable attorneys' fees and expenses would follow Plaintiffs' submission of a fee application with supporting documentation." (Mar. 2022 Op. 87.)

---

[9] Keurig emphasizes that Judge Cave "*rejects* Plaintiffs' claim of an intent to deprive based on alleged delays in Keurig's production" in support of the argument that the March 2022 Opinion did not discuss which court-order was violated. (Spoliation Obj. Reply 7 n.8 (emphasis in original).) However, Judge Cave's conclusion that Rule 37 Plaintiffs had failed to show an intent to deprive, as required for a harsher sanction under Rule 37(e)(2), is not alone sufficient to show that Keurig substantially complied with the Scheduling Order under Rule 37(b)(2)(A).

21

Accordingly, Keurig's objection regarding the attorneys' fees and expenses in connection with the CommVault emails is OVERRULED.

### ii.  *Transactional Data*[10]

Judge Cave found that "[i]n the Fall of 2019, the parties discovered that a 'material' amount of data was missing from Keurig's transactional data production."  (Mar. 2022 Op. 28.) By then, "Plaintiffs had already invested months of work and significant resources into analyzing Keurig's incorrect data."  (*Id.* (internal quotation marks omitted).)  In February 2020, Plaintiffs flagged for Keurig the deficient production of transactional data, and Keurig "subsequently determined that rows of data were in fact missing."  (*Id.* at 80.)  Pursuant to a court order, Keurig reproduced this data, including the missing data, by March 17, 2020.  (*Id.*)  Judge Cave then "extended the expert discovery deadline to mitigate any prejudice."  (*Id.*)  The March 2022 Opinion awarded attorneys' fees and expenses to Rule 37 Plaintiffs for their efforts "investigating discrepancies in Keurig's transactional data from February 7, 2019 until February 2020," and for "Plaintiffs' experts' costs while working with Keurig's deficient transactional data between February 7, 2019 and February 2020."  (*Id.* at 88.)

Keurig first argues that the March 2022 Opinion did not identify any court-order that was allegedly violated and that Keurig had substantially completed its productions related to transactional data. (Spoliation Obj. Mem. 14.)  Keurig, again, leans on the February 28, 2019 deadline for substantial completion, and insists that "it fully and timely produced its transactional data" by that date, and also "completed its supplemental production of transactional data on March 19, 2020."  (*Id.* at 14 & n.15.)  Keurig also cites a subsequent scheduling order's safe-

---

[10] "Transactional data" means "financial data on sales of portion packs and brewers, which typically includes, among other things, quantity, price, product information, and customer information."  (Mar. 2022 Op. 28 n.11.)

22

harbor provision governing technical or unforeseen issues. (*Id.* at 14 (citing Prod. Deadline Order 1 n.1).) Finally, Keurig argues that there is no "causal connection" between Keurig's violations and the fee award of one year of experts' costs. (*Id.* at 16.) According to Keurig, Rule 37 Plaintiffs' experts only needed to add data to their existing models, so Keurig should not be responsible for a full year of expert work that is "untethered to incremental work caused by a violation of a court order." (*Id.*) Keurig's arguments fail.[11]

At the March 4, 2020 hearing before Judge Cave, Rule 37 Plaintiffs represented that they were told in February 2019 that Keurig had completed production of transactional data. (Doc. 843 at 9:8-10.) Plaintiffs flagged potential production deficiencies to Keurig "as early as August this summer of 2019" and again in November of 2019, but Keurig did not acknowledge the deficiency until February of 2020. (*Id.* at 10:6-13.) Keurig accordingly supplemented its production of transactional data. Counsel for indirect purchaser plaintiffs confirmed that Keurig's new productions involved more than simply inputting new data into Plaintiffs' experts' existing models of analysis and instead would require verification of already analyzed data. (*Id.* at 17:25-18:17.) Judge Cave clearly agreed with Plaintiffs' arguments because she awarded "Plaintiffs' experts' costs while working with Keurig's deficient transactional data between February 7, 2019 and February 2020." (Mar. 2022 Op. 88.) In other words, Judge Cave already considered and rejected Keurig's arguments that the prior work done by Plaintiffs' experts were accurate and that new analysis from Keurig's supplemental production was merely "incremental work." Judge Cave's fee award sufficiently explains the causal connection to Keurig's violations. Finally, Judge Cave did not find that Keurig's belated production was the result of a

---

[11] Keurig also points the finger at TreeHouse for allegedly violating discovery orders, as evident in TreeHouse's own supplemental production. (Spoliation Obj. Mem. 14–15.) Treehouse's purported discovery violations is irrelevant, because such alleged violations do not vindicate or justify Keurig's own violations. Moreover, Judge Cave denied Keurig's motion for sanctions as to TreeHouse. (*See* Mar. 2022 Op. 109–110.)

23

technical issue, and therefore did not err in not discussing any safe-harbor provision. It is clear that Judge Cave found that Keurig's production of transactional data was materially deficient in violation of the Production Deadline Order's deadline of February 28, 2019 for substantial completion.

In short, because Keurig failed to substantially complete production of transactional data in a timely manner despite Keurig's representation to Plaintiffs that it had done so, Judge Cave awarded expert fees for Plaintiffs' experts' prior work. Keurig does not cite to any binding case law that requires a Rule 37 sanction to explicitly identify what discovery order was violated, even if it can be inferred from the opinion and order, such that the March 2022 Opinion is contrary to law. Nor has Keurig demonstrated evidence that leaves me with a "definite and firm conviction that a mistake has been committed." *Gualandi*, 385 F.3d at 240 (quoting *U.S. Gypsum Co.*, 333 U.S. at 395) (internal quotation marks omitted).

Accordingly, Keurig's objections to the March 2022 Opinion's award of attorneys' fees and expert costs due to Keurig's incomplete production of transactional data and archived email data are OVERRULED.

        c.  <u>Sanctions Based on Litigation Holds, Interviews, and Preservation of Hard Drives</u>

The March 2022 Opinion found that Keurig's failure to issue litigation holds to six former employees and to interview eleven custodians were violations of the ESI Order[12] under Rule 37(b)(2)(A) and amounted to a failure to take "reasonable steps" to preserve ESI under Rule 37(e). (Mar. 2022 Op. 33.) The March 2022 Opinion also found that Keurig failed to

---

[12] "ESI Order" refers to the joint electronic discovery submission and order, dated July 1, 2014. (Doc. 41.)

24

Add.365

preserve relevant hard copy documents for Barberio, as required by the ESI Order, under Rule 37(b)(2)(A).  (*Id.* at 42.)

Keurig objects and argues that it took reasonable steps to preserve data and therefore the March 2022 Opinion erroneously imposed sanctions under either Rule 37(b) or Rule 37(e). (Spoliation Obj. Mem. 16.)  Keurig notes its efforts "suspending routine destruction processes, putting in place a sweeping litigation hold in this case, and packaging up and saving the ESI of departing employees," and sending out litigation hold notices "to more than 700 employees." (*Id.* at 17.)  Keurig also emphasizes the fact that the March 2022 Opinion did not find that Keurig "failed to suspend normal operations or that a different, more reasonable system was required," or "spoliated *any email* in this case."  (*Id.* (emphasis in original).)

### i.  *Custodian Interviews*

The ESI Order had required the parties "to ask each of their document custodians whether he or she maintains potentially responsive documents or data in any of the electronic or hard-copy sources listed above, whether at the custodian's office, home, or online."  (Doc. 41 at 16.) The March 2022 Opinion found that Keurig failed to timely interview 11 custodians "to determine whether they had any relevant documents" under Rule 37(b) and Rule 37(e).  (Mar. 2022 Op. 31–33.)  As examples, Michelle Stacy, Keurig's former President, testified that she was first contacted by Keurig's counsel around October or November 2019, which was "more than five years after this action commenced," and Don Holly, former Vice President of Beverage Quality, testified—which Keurig disputes—that he was not contacted by Keurig's counsel to preserve any documents.  (*Id.* at 31.)  Even after acknowledging that the ESI Order did not impose an explicit deadline to interview these custodians, Judge Cave noted that Keurig failed to even ask seven custodians whether they had relevant documents until months after the

Add.366

substantial-completion deadline of January 4, 2019. (*Id.* at 32.)  One of these custodians was

Barberio, and Judge Cave explicitly connected Keurig's failure to timely interview Barberio with

the loss of his hard copy notes and hard drive. (*Id.* at 32, 70–71.)

Keurig's objection does not differentiate the seven custodians Judge Cave referenced

from the four custodians that she did not.  In other words, Keurig does not argue that the related

sanction was erroneously imposed because Judge Cave failed to find specifically that the

remaining four custodians were not timely interviewed.  Rather, Keurig raises objections for all

11 custodians and argues that it was not obligated to interview Keurig employees before they

became document custodians, who were first named in "December 2017 at the earliest."

(Spoliation Obj. Mem. 18–19.)  Keurig highlights the fact that the ESI Order does not require the

parties to interview custodians by a specific deadline. (*Id.* at 18.)

I do not find that the March 2022 Opinion was clearly erroneous or contrary to law in

finding that Keurig violated Rule 37(b) and Rule 37(e) by failing to timely interview document

custodians.  Keurig makes much of Judge Cave's note that the custodians should have been

questioned at a time contemporaneous with the date the custodians received litigation hold

notices, emphasizing the impractical implications that Keurig would be obligated to conduct 700

interviews of all individuals who received hold notices. (Spoliation Obj. Mem. 19.)  Although

the March 2022 Opinion uses the term "interview," Keurig mischaracterizes the ESI Order.

Under the ESI Order, the parties agreed merely to "ask" the document custodians whether they

had potentially responsive documents. (Doc. 41 at 16.)

It is neither clearly erroneous nor contrary to law that Judge Cave found Keurig at fault

for failing to even "ask" the 11 custodians whether they had any responsive documents until

several months after the January 4, 2019 deadline.  True, it was possible that those custodians did

26

Add.367

not have any potentially responsive documents. However, it was also possible that they had voluminous tranches of unique, unproduced documents such that Keurig could not be said to have substantially completed production by the deadline. The point is that Keurig could not have known what responsive documents, if any, the custodians had because Keurig did not bother to ask. Keurig failed to ask agreed-upon custodians whether they had responsive documents at all until several months after the January 2019 deadline. Whenever the "deadline" was, Keurig first asking these custodians late in 2019 was too late. Even assuming that the March 2022 Opinion was erroneous in requiring Keurig to "ask" the document custodians contemporaneously with issuing the litigation hold notices, Judge Cave clearly found that the custodians were not asked until late in 2019, in violation of the January 2019 deadline. The same reasoning applies for Judge Cave's finding that Keurig "failed to take reasonable steps to preserve" ESI in violation of Rule 37(e). The reasonable step would have been to "ask" each document custodian whether they had potentially relevant documents well before the substantial-completion deadline. Keurig has not carried the "heavy burden" required to overturn a magistrate judge's non-dispositive order. *Kumaran v. Vision Fin. Markets, LLC*, No. 20-CV-3871, 2022 WL 17540669, at *2 (S.D.N.Y. Dec. 6, 2022) (quoting *McFarlane v. First Unum Life Ins. Co.*, 2017 WL 4564928, at *2 (S.D.N.Y. Oct. 12, 2017)) (internal quotation marks omitted).

### ii. *Hard Drives*

Judge Cave found that "[a]ltogether, 16 hard drives, although preserved, were inaccessible, and nine hard drives were lost altogether for 23 Agreed Custodians whose files were required to be preserved and searched." (Mar. 2022 Op. 36.) Judge Cave concluded that Keurig failed to preserve related ESI in violation of the ESI Order under Rule 37(b) and failed to take reasonable steps under Rule 37(e). (*Id.* at 36–37.)

27

Add.368

Keurig argues that it took reasonable steps to preserve hard drives. (Spoliation Obj. Mem. 20.) Keurig first highlights its corporate policy, (*id.* at 20), which instructed employees "to save company documents not to their local drives . . . which were not backed up, but rather on network or 'share' drives . . . which were backed up," (Mar. 2022 Op. 24). Keurig next emphasizes its practice of migrating data from an old hard drive to a new one whenever employees received upgraded laptops, which meant that older hard drives were unlikely to contain non-duplicative material. (Spoliation Obj. Mem. 20.) Keurig contends that, despite neither the corporate policy nor the corporate practice requiring such actions, Keurig preserved 99 hard drives and therefore could not be said to have violated the ESI Order or have failed to have taken reasonable steps for ESI production. (*Id.*)

I disagree. I do not find that the March 2022 Opinion was clearly erroneous or contrary to law in finding that Keurig violated Rule 37(b) and Rule 37(e) by failing to preserve and produce these hard drives. Keurig cites only one case from the Middle District of Florida, (Spoliation Obj. Mem. 20), in support of the argument that Rule 37(e) does not require a party to "immediately clone [old phones] or to maintain the old phones once custodians upgraded to new phones," *Burns v. Medtronic, Inc.*, No. 15-CV-2330, 2017 WL 11633269, at *4 (M.D. Fla. Aug. 9, 2017). This non-binding authority is insufficient to sustain Keurig's objections. With regard to the 16 hard drives that were preserved but not accessible, Judge Cave found that they were physically damaged or could not be digitally unencrypted to be reviewable by the parties. (Mar. 2022 Op. 35–36.) With regard to the nine hard drives lost altogether, Judge Cave noted that the majority of custodians whose hard drives were lost "had received preservation notices." (*Id.* at 36.) Judge Cave also found that Keurig failed to "take any steps when this action commenced to determine which devices Keurig had issued to an individual were under litigation hold." (*Id.* at

28

Add.369

34 (internal quotation marks omitted and alterations adopted).)  Nor did Keurig's IT department "check storage locations of devices to locate and collect any drives [that] were under litigation hold." (*Id.*)  The fact that Judge Cave acknowledged the steps that Keurig took in preserving over 90 hard drives does not negate her finding that Keurig's failure to preserve other hard drives violated Rule 37(b) and Rule 37(e).

### iii.  *Litigation Holds*

Pursuant to the ESI Order, the parties "certif[ied] that they ha[d] issued preservation or 'litigation hold' communications to all individuals reasonably identified as having information that may be potentially relevant to the Related Actions." (Doc. 41 at 8.)  The parties affirmed their obligation "to take measures to identify additional individuals who may have potentially relevant [*sic*] to the Related Actions in accordance with applicable law and each party's ethical obligations." (*Id.*)

The March 2022 Opinion recognized that Keurig issued litigation hold notices to over 400 employees within a week of TreeHouse filing its complaint in February 2014, and 300 additional people afterwards. (Mar. 2022 Op. 2, 30.)  However, Judge Cave found that Keurig failed to issue litigation hold notices to six custodians as required by the ESI Order under Rule 37(b) and the general discovery obligations under Rule 37(e). (*See* Mar. 2022 Op. 30–33.) These six custodians were four people who left Keurig before TreeHouse's complaint was filed in February 2014 (Ken Crites, Don Holly, Steve Smits, and Chris Stevens), one person who left in March 2014 (Susan Cote), and one who left in August 2015 before McLane's complaint was filed (Brad Tidwell). (*See id.* at 2, 30–31.)  Judge Cave emphasized that a company's discovery obligations extend to documents related to former employees. (*Id.* at 32–33.)

Add.370

Keurig disputes that the ESI Order actually required Keurig to issue litigation holds to six former employees.  (Spoliation Obj. Mem. 21.)  Keurig claims that it complied with its preservation obligations by "tak[ing] measures to identify additional individuals who may have potentially relevant [sic] to the Related Actions in accordance with applicable law and each party's ethical obligations" by issuing litigation holds to more than 700 people.  (*Id.*)  Keurig also notes that Plaintiffs neither challenged those litigation holds nor argued that those six former employees should have received litigation holds.  (*Id.*)  Keurig contends that the March 2022 Opinion presented no finding that any of the six individuals were "reasonably identified" as having potentially relevant information, as required by the ESI Order.  (Spoliation Obj. Reply 10.)

I disagree.  As an initial matter, the March 2022 Opinion found that Keurig's discovery obligations extended to former employees.  (Mar. 2022 Op. 32–33.)  Judge Cave noted that "Keurig asserted that documents in the custody of former employees 'were no longer within the possession, custody or control of Keurig.'"  (*Id.* at 33.)  The applicable Federal Rule of Civil Procedure here is Rule 34, which governs the production of documents, ESI, and tangible things.  *See generally* Fed. R. Civ. P. 34.  Under Rule 34, "corporations, at the very least, ask their former employees to cooperate before asserting that they have no control over documents in the former employees' possession."  *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, 233 F.R.D. 338, 341 (S.D.N.Y. 2005).  Keurig highlights the fact that *Asia Pulp* involved Rule 34, and argues that the March 2022 Opinion's requirement of litigation hold notices to former employees "is not supported by case law."  (Spoliation Obj. Mem. 21 n.20.)  However, that is not the legal standard regarding objections to a Report & Recommendation.  Keurig fails to demonstrate that Judge Cave failed to apply or misapplied relevant case law.  Indeed, Judge Cave cited multiple cases

30

Add.371

imposing discovery sanctions under Rule 37.  *See, e.g.*, *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 507 (S.D.N.Y. 2013) (finding party grossly negligent for taking six months to direct its IT vendor to preserve documents based on a litigation hold, which led to the destruction of "the ESI of *at least* two significant former [] employees") (emphasis in original); *F.D.I.C. v. Horn*, No. CV 12-5958, 2015 WL 1529824, at *8 (E.D.N.Y. Mar. 31, 2015) (holding that party was required to preserve potentially relevant documents from former employees).  Keurig accordingly fails to show that the March 2022 Opinion was contrary to law.

Nor do Keurig's arguments leave me "with the definite and firm conviction that a mistake has been committed" based on my review of "the entire evidence."  *Gualandi*, 385 F.3d at 240 (quoting *U.S. Gypsum Co.*, 333 U.S. at 395) (internal quotation marks omitted).  True, Judge Cave may not have explicitly explained why each custodian was "reasonably identified" to have potentially relevant information.  However, my review of the entire record, including Judge Cave's discussion of the six custodians and their connection with the claims in this action[13], do not show that it was clearly erroneous to have found that Keurig should have issued them litigation hold notices.

Accordingly, Keurig's objections to the March 2022 Opinion's sanctions based on litigation holds, interviews, and hard drives are OVERRULED.

---

[13] Crites was the Senior Category Director.  (Mar. 2022 Op. 49–50.)  Holly was the Vice President of Beverage Quality and designated by Keurig "as a person with information about Keurig's supplier relationships and the quality of K-cups."  (*Id.* at 54.)  Smits was Vice President of At-Home Sales, and was identified by Keurig "as having discoverable information about Keurig's relationships with WalMart, Sam's Club, and McLane and the sale of the Keurig 2.0 Brewer and K-cups."  (*Id.* at 62.)  Stevens was Vice President for Corporate Relations and Customer Development.  (*Id.* at 65.)  Cote was the Senior Category Director for Specialty Coffee.  (*Id.* at 48.)  Tidwell was the Supply Chain Lead and designated by Keurig "as having discoverable information about the company's supply chain and McLane."  (*Id.* at 65–66.)

31

Add.372

#### iv. *Breadth of Fee Awards*

Judge Cave awarded costs for, among other things, "Plaintiffs' efforts from May 7, 2018 to July 25, 2018 to determine deficiencies in Keurig's productions for Agreed Custodians"; "preparing for and participating in meet-and-confer communications and calls concerning Keurig's productions for the Agreed Custodians between July 25, 2018 and May 20, 2019"; and "investigating discrepancies in Keurig's CommVault productions." (Mar. 2022 Op. 87–88.) She did so after explicitly stating her intent not to impose "every expense related to document discovery, or even every expense related to Keurig's violations of the ESI Order," given Rule 37(b)(2)(C)'s limitations for "reasonable" expenses and Rule 37(e)(1)'s required tailoring to the specific prejudice found. (*Id.* at 87.) Indeed, Judge Cave did not impose any specific monetary amount and instead stated that "a precise determination of reimbursable attorneys' fees and expenses would follow Plaintiffs' submission of a fee application with supporting documentation." (*Id.*)

Keurig unpersuasively argues that the March 2022 Opinion's fee awards for Plaintiffs' investigatory efforts are overbroad under either Rules 37(b) or 37(e). (Spoliation Obj. Mem. 22–23.) The March 2022 Opinion was neither clearly erroneous nor contrary to law in reserving judgment on specific fee awards. Once Plaintiffs submit specific requests for attorneys' fees and expenses, Keurig can raise arguments related to specific work performed with regard to Rule 37's requirements regarding causal connections and tailoring to prejudice. However, at this juncture, no specific requests or awards have been made.

For these reasons, Keurig's objections to Judge Cave's March 2022 Opinion are SUSTAINED IN PART AND OVERRULED IN PART.

Add.373

IV.     **Objections to February 2023 Opinion (Doc. 2015)**

A.  *Background*

On August 6, 2021, Winn-Dixie[14] filed a complaint asserting claims against Defendants under the Sherman and Clayton Antitrust Acts.  *See* Compl., *Winn-Dixie Stores, Inc. v. Keurig Green Mountain, Inc.*, No. 21-CV-7504 (S.D.N.Y. Aug. 6, 2021), ECF No. 1.  Winn-Dixie's action is "on its own behalf and/or as the assignee of" C&S Wholesale Grocers, Inc. ("C&S"), a grocery wholesaler which "purchased Price-Fixed K-Cups directly from [Keurig] for resale to Winn-Dixie and has specifically and expressly assigned its antitrust claims arising out of those purchased to Winn-Dixie."  *See id.* ¶¶ 24–25; (*see also* Doc. 2004 ("Feb. 2023 Op.") at 2).

During discovery proceedings overseen by Judge Cave, Keurig moved for Winn-Dixie to respond to certain requests for admissions ("RFAs"), each of which sought "admission[s] that C&S took certain actions or knew certain information."  (Feb. 2023 Op. 5.)  Judge Cave granted the motion, reasoning that the subject matter of the requests was appropriate under Rule 36, that Winn-Dixie "could have made a reasonable inquiry" regarding the information necessary to respond to the requests, and that the requests were not unduly burdensome.  (*See id*. at 8–12.)  Judge Cave rejected Winn-Dixie's argument that Keurig could not obtain RFAs based on information from C&S as the assignor of Winn-Dixie's claims.  (*See id*.)

On February 24, 2023, Winn-Dixie filed an objection to the February 2023 Opinion, (Doc. 2015), along with a supporting memorandum of law, (Doc. 2016 ("RFA Obj. Mem.")).  On March 10, 2023, Keurig filed an opposition brief.  (Doc. 2020 ("RFA Obj. Opp'n").)  Winn-Dixie did not reply or request an extension of time to do so.

---

[14] "Winn-Dixie" refers to Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC, consistent with Judge Cave's February 2023 Opinion.  (Doc. 2004 at 1 n.2.)

**B.  *Discussion***

"Requests for admission are governed by Rule 36 of the Federal Rules of Civil Procedure, which provides in relevant part as follows: 'A party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to: (A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents.'" *Republic of Turkey v. Christie's, Inc.*, 326 F.R.D. 394, 399 (S.D.N.Y. 2018) (quoting Fed. R. Civ. P. 36(a)(1)).  "Rule 36 is not a discovery device." *T. Rowe Price Small-Cap Fund, Inc. v. Oppenheimer & Co., Inc.*, 174 F.R.D. 38, 42 (S.D.N.Y. 1997).  Rather, the "function" of RFAs "is to define and limit the matters in controversy between the parties."  Charles Alan Wright & Arthur R. Miller, 8B FEDERAL PRACTICE & PROCEDURE ("Wright & Miller") § 2252 (3d ed. 2025).  "The rule is intended to expedite the trial and to relieve the parties of the cost of proving facts that will not be disputed at trial, the truth of which is known to the parties or can be ascertained by reasonable inquiry." *Id*. A party responding to an RFA may either:  (1) admit to the request, (2) deny the request, or (3) "state in detail why the answering party cannot truthfully admit or deny it."  Fed. R. Civ. P. 36(a)(4).  If the "reason for failing to admit or deny" is "lack of knowledge or information," the party must state "that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny." *Id*.

In general, "the assignee of a claim in litigation has a duty to obtain and produce the same documents and information to which the opposing parties would have been entitled had the assignors brought the claim themselves." *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 314 F.R.D. 341, 344 (S.D.N.Y. 2016) (citing *JPMorgan Chase Bank v. Winnick*, 228 F.R.D. 505, 506–07 (S.D.N.Y. 2005)); *see also Natta v. Hogan*, 392 F.2d 686, 691 (10th Cir. 1968)

(finding that a non-party assignee is "the real party in interest and may not hide behind its assignors" under Rule 34). As then-District Judge Gerard E. Lynch stated in *JPMorgan Chase Bank v. Winnick*, it would be "both logically inconsistent and unfair to allow the right to sue to be transferred to assignees of a debt free of the obligations that go with litigating a claim." 228 F.R.D. at 506. Further, "[i]t would be unfair to the defendants to permit plaintiff and the assignees to divorce the benefits of the claims from the obligations that come with the right to assert them, to the detriment of defendants." *Id*. at 507. "Numerous courts in this and other circuits have come to the same conclusion—both before and after *Winnick*." *See Royal Park*, 314 F.R.D. at 344 (collecting cases).

Here, Winn-Dixie does not appear to dispute that the subject matter of Keurig's RFA's are "straightforward admissions concerning the C&S Claims," and are "appropriate requests for admission under Rule 36." (Feb. 2023 Op. 9; *see generally* RFA Obj. Mem. (not disputing RFAs on this ground).)[15] Winn-Dixie also does not dispute that the contract assigning the C&S Claims to Winn-Dixie "obligates C&S to respond to Winn-Dixie's inquiries for the purpose of responding to the C&S RFAs." (Feb. 2023 Op. 9 (citing Doc. 1875-1 at 8).) In other words, the RFAs seek information regarding "matters within the scope of Rule 26(b)(1)," and the contractual arrangement provides the means by which Winn-Dixie may make "reasonable inquiry" to C&S to obtain this information. Fed. R. Civ. P. 36(a)(4); *see also T. Rowe Price*, 174 F.R.D. at 43 (explaining that "parties may be required to inquire of third parties in order to properly respond to requests to admit" when such efforts are "reasonable" and the information sought is "readily obtainable" (internal quotation marks omitted)). Judge Cave was therefore

---

[15] Winn-Dixie does assert that the subject matter of the RFAs "have all been addressed by the C&S discovery." (RFA Obj. Mem. 3.) If that is so, then Winn-Dixie's response to the RFA must either admit it, deny it, or state "that [Winn-Dixie] has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny." Fed. R. Civ. P. 36(a)(4).

35

Add.376

correct to conclude that "[a]s long as Winn-Dixie continues to seek to hold Keurig liable on the C&S Claims, it must respond to reasonable requests under the Federal Rules of Civil Procedure concerning those claims." (Feb. 2023 Op. 10.)  Indeed, Winn-Dixie has responded to other RFAs using information from C&S, and C&S executives have been deposed in this action as well.  (*See id.* at 4.)

Winn-Dixie's arguments to the contrary are without merit.  First, Winn-Dixie stresses that because C&S is not an "opposing party" within the meaning of Federal Rule of Evidence 801(d)(2), its statements are not admissible under that rule, and thus Winn-Dixie has no obligation to respond to RFAs that would be based on such inadmissible evidence.  (*See* RFA Obj. Mem. 2.)  This is not a valid basis for objection.  Federal Rule of Civil Procedure 36 authorizes RFAs "to admit . . . the truth of any matters within the scope of Rule 26(b)(1)."  Fed. R. Civ. P. 36(a)(1).  In turn, Rule 26(b)(1) provides that "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable."  Fed. R. Civ. P. 26(b)(1).  Thus, the text of Rules 36 and 26 clearly contemplate that responses to RFAs may be based on inadmissible material.  I note that a response to an RFA is "subject to all pertinent objections to admissibility that may be interposed at the trial."  Wright & Miller § 2264.  Thus, rather than object to the RFAs, the proper procedure is for Winn-Dixie to respond with either an admission, denial, or explanation for why it cannot admit or deny the RFA.  *See* Fed. R. Civ. P. 36(a)(4).  Winn-Dixie may then invoke its admissibility argument should Keurig offer the response to an RFA at trial.  However, it is improper to object at this stage of the case on that basis now.

Second, Winn-Dixie argues that "the *Winnick* principle"—that the assignee of a claim takes the assignor's discovery obligations—"does not apply to [RFAs]," because "Rule 36 is not a discovery device."  (RFA Obj. Mem. 3 (internal quotation marks omitted).)  The notion that

36

Add.377

RFAs are not to be used to conduct "discovery" refers to the fact that Rule 36 is meant to "establish admission of facts about which there is no real dispute," whereas "the basic purpose of discovery is to elicit facts and information and to obtain production of documents." *Republic of Turkey*, 326 F.R.D. at 399 (quoting 7 *Moore's Federal Practice* § 36.02[1] (3d ed. 2013)) (internal quotation marks omitted). Thus, "where requests for admission are not designed to identify and eliminate matters on which the parties agree, but to seek information as to fundamental disagreement at the heart of the lawsuit . . . a court may excuse a party from responding to the requests." *Id*. This functional distinction does not mean that there is an exception to Rule 36 for assigned claims.[16] As discussed, "[n]umerous courts in this and other circuits have come to the same conclusion" that claim assignees are obligated "to obtain and produce the same documents and information to which the opposing parties would have been entitled had the assignors brought the claim themselves." *Royal Park*, 314 F.R.D. at 344 (collecting cases). Winn-Dixie, citing *Winnick*, claims that the assignee-discovery rules apply only to "documents, information, and witness testimony," not to RFAs. (RFA Obj. Mem. 3 (quoting *Winnick*, 228 F.R.D. at 507).) I reject this contention—RFAs are simply another way to get at the "information" contained in discovery material, provided there is no "real dispute" about the facts. *Republic of Turkey*, 326 F.R.D. at 399 (quoting 7 *Moore's Federal Practice* § 36.02[1] (3d ed. 2013)) (internal quotation marks omitted).

Accordingly, Winn-Dixie's objection to Judge Cave's thorough and well-reasoned February 2023 Opinion is OVERRULED.

---

[16] Contrary to Winn-Dixie's argument, (*see* RFA Obj. Mem. 2–3), the reference in *Winnick* to Rule 36 as part of "discovery," 228 F.R.D. at 507, is consistent with the structure of the Federal Rules of Civil Procedure, which places Rule 36 within Title V, governing Disclosures and Discovery.

## V.      Objections to May 2023 Opinion (Docs. 2044, 2049)

### A. *Background*

On February 15, 2022, I entered a case management plan and scheduling order setting a deadline of June 17, 2022 for the parties to complete fact discovery on Winn-Dixie's claims against Keurig.  (Doc. 1714 ¶ 9.)  As discussed *supra* § IV.A., Magistrate Judge Cave oversaw discovery proceedings on Winn-Dixie's claims.  (*See also* Doc. 2038 ("May 2023") Op. 4–7.)  Discovery on these claims involved numerous extensions; Keurig also moved, among other things, to enforce Winn-Dixe's discovery obligations and for dismissal of the C&S Claims.  (*See id*.; Docs. 1908, 1915.)  Judge Cave denied these motions without prejudice to renewal following the close of fact discovery.  (*See* Docs. 1909, 1919.)  On November 4, 2022, Keurig requested that the C&S Claims be dismissed for Winn-Dixie's failure to comply with its discovery obligations.  (Doc. 1930.)

Judge Cave resolved Keurig's motion to dismiss in an Opinion & Order dated May 8, 2023.  (*See* May 2023 Op.)  First, Judge Cave found that Winn-Dixie failed to timely comply with her orders dated August 1, August 26, and December 14, 2022.  (*Id*. at 18–23.)  Next, applying the pertinent sanctions factors, Judge Cave found:  (a) Winn-Dixie was not "sufficiently willful" in its noncompliance "to justify the ultimate penalty of dismissal"; (b) Winn-Dixie was noncompliant over a period of five months, a sufficiently lengthy period to warrant sanctions; (c) Winn-Dixie was on notice that its noncompliance could lead to sanctions; and (d) Keurig was prejudiced by Winn-Dixie's noncompliance because it had to resort to motion practice to enforce Winn-Dixie's discovery obligations.  (*Id*. at 23–29 (internal quotation marks omitted).)  Judge Cave ultimately concluded that attorneys' fees were the least harsh sanction to remedy Winn-Dixie's noncompliance, and that dismissal was unwarranted as a sanction because Winn-Dixie

38

belatedly complied in part with the Court's orders and "show[ed] a renewed interest in prosecuting their claims." (*Id*. at 25, 30–33.)

Keurig filed an objection to Judge Cave's May 2023 Opinion on May 22, 2023, (Doc. 2044), along with a memorandum of law, (Doc. 2045 ("Keurig May 2023 Obj. Mem")), arguing that Judge Cave erred in declining to dismiss the claims in their entirety. Winn-Dixie filed an objection to the Opinion the same day in the form of a memorandum, (Doc. 2049 ("WD May 2023 Obj. Mem.")), arguing Judge Cave erred in finding it had not timely complied with her orders. Keurig filed an opposition brief to Winn-Dixie's objection on June 5, 2023. (Doc. 2056 ("Opp'n WD May 2023 Obj. Mem.").) On June 12, 2023, Winn-Dixie filed a brief in support of its objection and in opposition to Keurig's objection. (Doc. 2060 ("WD May 2023 Obj. Reply").) On June 19, 2023, Keurig filed a reply in support of its objection. (Doc. 2069 ("Keurig May 2023 Obj. Reply").)[17]

### B. *Discussion*

At the outset, I note that "[a] magistrate judge's resolution of discovery disputes deserves substantial deference." *Dubai Islamic Bank v. Citibank, N.A.*, 211 F. Supp. 2d 447, 449 (S.D.N.Y. 2001). Judge Cave's May 2023 Opinion imposing "[m]onetary sanctions" is a "nondispositive" order that I review "under the clearly erroneous or contrary to law standard." *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990) (internal quotation marks omitted); *see also supra* § I. I next address each party's objections in turn, concluding that neither has demonstrated any error, let alone clear error, in Judge Cave's May 2023 Opinion.

---

[17] The parties' unopposed requests to redact portions of their objection pleadings from public viewing, (*see* Docs. 2043, 2048, 2055, 2059, 2068), are GRANTED as consistent with Judge Cave's prior ruling on the matter, (*see* Doc. 1945), and the caselaw governing redaction and sealing of similar confidential discovery information. *See, e.g.*, *W.J. Deutsch & Sons Ltd. v. Diego Zamora, S.A.*, No. 21-CV-11003, 2022 WL 890184, at *3 (S.D.N.Y. Mar. 25, 2022); *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, No. 15-CV-211, 2021 WL 2935963, at *2 (S.D.N.Y. July 13, 2021).

### 1. Winn-Dixie's Objection (Doc. 2049)

Winn-Dixie's objects to Judge Cave's finding that it failed to timely comply with her orders dated August 1, August 26, and December 14, 2022, (the "August 1 Order," "August 26 Order," and "December 14 Order," respectively). (*See generally* WD May 2023 Obj. Mem.) I disagree.

As a general matter, Judge Cave is in a better position than I am to evaluate Winn-Dixie's compliance with her own orders. By my count, Judge Cave held no fewer than seven conferences with the parties in order to move discovery along: one in June 2022; one in July 2022; four in August 2022; and one in December 2022. (*See* Docs. 1855, 1872, 1891, 1895, 1897, 1901, 1957.) Because Judge Cave "personally oversaw the[] [discovery] efforts and adjudicated the parties' disputes," she is in the "best position" to determine whether Winn-Dixie's actions violated the letter or spirit of her orders. *City of Almaty v. Ablyazov*, No. 15-CV-5345, 2021 WL 4846366, at *3 (S.D.N.Y. Oct. 18, 2021). I am mindful of this, and the "substantial deference" owed to Judge Cave's conclusions, in reviewing Winn-Dixie's objections. *Dubai Islamic Bank*, 211 F. Supp. 2d at 449.

#### a.   August 1, 2022 Order

Judge Cave found that Winn-Dixie did not comply with her August 1 Order because it did not locate any emails from two C&S custodians and did not produce a Rule 30(b)(6) witness for deposition before the applicable September 16, 2022 deadline to complete fact discovery. (May 2023 Op. 19.) Winn-Dixie first claims this finding is error because the August 1 Order did not contain a deadline to produce the deposition witnesses. (WD May 2023 Obj. Mem. 2–3.) However, at the time of the August 1 Order, the operative case management plan and scheduling order set September 16, 2022 as the deadline to complete fact discovery. (Doc. 1894 ¶ 9.) Winn-

40

Add.381

Dixie did not seek an extension of the fact discovery deadline until September 20, 2022—after the fact discovery deadline had already passed. (*See* Doc. 1917.) The fact that Judge Cave eventually granted this extension, (Doc. 1919), does not change the fact that Winn-Dixie did not comply with the September 16 deadline or request an extension of time to do so before it passed. I do not find clear error in Judge Cave's determination that belatedly requesting an extension indicated noncompliance with her August 1 Order.

Winn-Dixie also continues to press its arguments that discovery from C&S was not its responsibility as an assignee of C&S's claims, and that existing Winn-Dixie productions covered anything in discovery from C&S. (*See* WD May 2023 Obj. Mem. 3–8.) I reject these arguments for the reasons discussed *supra* § IV.B.

### b.  August 26, 2022 Order

Judge Cave concluded that Winn-Dixie did not comply with her August 26 Order because it did not produce certain C&S-transactional data and document-retention policies by the August 30, 2022 deadline, and did not produce certain C&S custodians' emails or respond to Keurig's questions about them by the September 2, 2022 deadline. (May 2023 Op. 20.) Winn-Dixie's objection centers on its belated extension request of these deadlines and that it eventually made more fulsome productions responsive to these discovery requests. (WD May 2023 Obj. Mem. 8–10.) As discussed, requesting an extension after the date for compliance has passed is not compliance with the August 26 Order. Similarly, eventually producing responsive documents does not change the fact that Winn-Dixie did not meet the original deadline. Judge Cave did not err in finding noncompliance with the August 26 Order.

41

Add.382

c.    December 14, 2022 Order

Judge Cave found that Winn-Dixie did not comply with her December 14 Order because it did not comply with the Order's deadlines to produce certain documents by December 16, 2022 or to respond to questions from Keurig regarding other productions by December 19, 2022. (May 2023 Op. 21–22.)  Although Winn-Dixie objects to Judge Cave's characterization of its eventual productions as "deficien[t]," (*id*. at 21), it does not contest that it did not timely comply with the deadlines in the December 14 Order, (*see* WD May 2023 Obj. Mem. 10–15). Regardless of the quality of Winn-Dixie's eventual productions, the fact remains that failure to obey a discovery deadline is noncompliance.  Judge Cave did not err in so finding.

In sum, Winn-Dixie did not comply with multiple discovery deadlines, and Judge Cave found much of Winn-Dixie's eventual productions deficient.  It was not error, let alone clear error, for Judge Cave to find that Winn-Dixie's untimely responses violated her orders.  *See, e.g.*, *Rivera v. United Parcel Serv.*, 325 F.R.D. 542, 546–47 (S.D.N.Y. 2018) ("Plaintiff's untimely disclosure . . . is a clear violation of the federal discovery rules.").

For these reasons, Winn-Dixie's objection to the May 2023 Opinion is OVERRULED.

## 2.  Keurig's Objection (Doc. 2044)

Keurig asserts that Judge Cave's May 2023 Opinion erred in:  (a) concluding that Winn-Dixie's noncompliance only prejudiced Keurig by "impos[ing] undue delays and costs," (May 2023 Op. 29), rather than also prejudicing Keurig by "depriv[ing] [it] of evidence it was entitled to receive and use for its defense" against Winn-Dixie's C&S Claims, (Keurig May 2023 Obj. Mem. 5); and (b) declining to order a sanction of dismissal of Winn-Dixie's C&S Claims, (*id*. at 7–10).

42

Add.383

It is true that Federal Rule of Civil Procedure 37(b)(2) authorizes dismissal of claims as sanctions for failing to comply with discovery orders. *See, e.g.*, *Park v. Kim*, 91 F.4th 610, 612–13 (2d Cir. 2024) (discussing dismissal in such circumstances). Additionally, Keurig is correct that discovery is "not a one-way street" for plaintiffs to obtain information; rather it is "a mechanism for defendants to accumulate evidence to defend themselves and to test the evidence of their opponents." (Keurig May 2023 Obj. Mem. 5 (quoting *Fioranelli v. CBS Broad., Inc.*, No. 15-CV-952, 2019 WL 1059993, at *5 (S.D.N.Y. Mar. 6, 2019) (internal quotation marks omitted)).) I also agree with Keurig that much of Winn-Dixie's conduct indicates the sort of "continual[] and willful[] fail[ures] to respond to and comply with . . . discovery orders" that in analogous cases can justify dismissal under Rule 37. *Park*, 91 F.4th at 613.

However, the question before me in reviewing objections to Judge Cave's May 2023 Opinion is not whether I might order dismissal in the first instance; rather, it is whether Judge Cave committed clear error in declining to dismiss Winn-Dixie's C&S Claims. *See, e.g.*, *Ahmed v. T.J. Maxx Corp.*, 103 F. Supp. 3d 343, 350 (E.D.N.Y. 2015) (explaining that, in reviewing a non-dispositive order, "a magistrate judge's findings should not be rejected merely because the court would have decided the matter differently") (citation modified); *see also Kumaran*, 2022 WL 17540669, at *6 (same).

I find that Keurig has failed to meet its "heavy burden" to show clear error in Judge Cave's decision. *Kumaran*, 2022 WL 17540669, at *6. Judge Cave applied the correct four-factor test governing Rule 37 sanctions, noted that the purposes of discovery sanctions include remedying and "deter[ring] noncompliance," and concluded that monetary sanctions were the least harsh remedy adequate to serve these purposes. (May 2023 Op. 23–33.) Keurig is incorrect that Judge Cave "presumed that [the] absence of C&S discovery would hurt Winn-

43

Add.384

Dixie only." (Keurig May 2023 Obj. Mem. 5.) Rather, Judge Cave recognized that the discovery Winn-Dixie eventually produced was "not particularly illuminating," and noted in any event that Keurig was "prejudiced" by "undue delays and costs." (May 2023 Op. 29.) I also note that none of the cases Keurig cites in support of its argument that I should reverse Judge Cave's decision, (Keurig May 2023 Obj. Mem. 7–10), involve a district or appellate court finding clear error with a decision below to impose sanctions other than dismissal. *See Nat'l Hockey League*, 427 U.S. at 643 (holding that a "District Judge did not abuse his discretion in finding bad faith . . . and concluding that the extreme sanction of dismissal was appropriate," thus reversing contrary appellate decision); *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 303 (2d Cir. 2009) ("The record before us reveals no abuse of discretion by the District Court in affirming [the] Magistrate Judge['s] [] recommendation of dismissal."); *Martin v. City of New York*, No. 09-CV-2280, 2010 WL 1948597, at *2–4 (S.D.N.Y. May 11, 2010) (dismissing case for discovery noncompliance and failure to prosecute at the District, rather than Magistrate Judge level); *Handwerker v. AT&T Corp.*, 211 F.R.D. 203, 208–14 (S.D.N.Y. 2002) (same, solely for discovery noncompliance); *Park v. Kim*, No. 20-CV-2636, 2022 WL 4229258, at *3–11 (E.D.N.Y. Apr. 25, 2022) (dismissing case at the Magistrate Judge level for discovery noncompliance and failure to prosecute), *report and recommendation adopted*, 2022 WL 3643966 (E.D.N.Y. Aug. 24, 2022), *aff'd*, 91 F.4th 610 (2d Cir. 2024).

Ultimately, Judge Cave was in the "best position" to exercise the discretion inherent to any imposition of discovery sanctions. *City of Almaty*, 2021 WL 4846366, at *3. Keurig has not demonstrated the clear error necessary to disturb that exercise of discretion. Its objection is therefore OVERRULED.

44

Add.385

## VI.    **Conclusion**

For the reasons that follow, Keurig's objections to Judge Pitman's March 2019 Order are SUSTAINED IN PART AND OVERRULED IN PART, Keurig's objections to Judge Cave's March 2022 Opinion are SUSTAINED IN PART AND OVERRULED IN PART, Winn-Dixie's objection to Judge Cave's February 2023 Opinion is OVERRULED, and Keurig's and Winn-Dixie's objections to Judge Cave's May 2023 Opinion are OVERRULED.

Due to potential references to sealed filings and information[18], this Opinion & Order is being issued temporarily under seal.  Within 30 days of this Opinion & Order, the parties are directed to submit any proposed redactions to this Opinion & Order.

The Clerk of Court is respectfully directed to terminate the pending motions at Documents 547, 1816, 2015, 2043, 2044, 2048, 2049, 2055, 2059, 2068.

The Clerk of Court is also respectfully directed to make this Opinion & Order available only to the parties and the Court.

SO ORDERED.

Dated: July 31, 2025
         New York, New York

Vernon S. Broderick
United States District Judge

---

[18] For example, the parties' joint letter filed on February 3, 2023, (Doc. 1997), the March 2022 Opinion, (Doc. 1806), Keurig's letter filed on November 4, 2022, (Doc. 1930), and Keurig's and Winn-Dixie's respective objections to Judge Cave's May 2023 Opinion, (*see* Docs. 2045, 2049, 2056, 2060, 2069), are viewable only to the parties and the Court.

45

# ALSTON & BIRD

55 2nd Street
Suite 2100
San Francisco, CA 94105
415-243-1000

Valarie C. Williams                    415.243.1058                    valarie.williams@alston.com

February 11, 2026

**VIA CM/ECF**

The Honorable Vernon S. Broderick
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse, 40 Foley Square
New York, New York 10007

**Re:**    ***In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, MDL No. 2542,
Master Docket No. 1:14-md-2542-VSB-SLC – Request for Schedule Clarification**

Dear Hon. Vernon S. Broderick:

I write on behalf of Plaintiffs McLane Company, Inc., TreeHouse Foods, Inc., Bay Valley
Foods, LLC, and Sturm Foods (collectively, "Plaintiffs") pursuant to Section 1(B) of your Honor's
Individual Rules & Practices to respectfully request clarification regarding the schedule for the
remaining motions and for trial in this matter. Plaintiffs appreciate the Court's diligence in
addressing the outstanding motions over the past year and a half. In its July 26, 2024, docket entry,
the Court indicated that following resolution of the *Daubert* motions, the remaining motions would
likely be decided shortly thereafter. The *Daubert* motions were resolved nearly a year ago, and the
Court issued its Class Certification Order in November 2025. Plaintiffs therefore anticipate that
rulings on the pending Summary Judgment motions may be forthcoming.

In light of this progress, Plaintiffs would appreciate any guidance the Court can provide
regarding the expected timing of those remaining orders and a prospective trial date. The Court
has not held a status conference since 2020 and, given the developments over the past year,
Plaintiffs respectfully suggest that now may be an appropriate time for the parties to convene and
plan for the next phase of the case.  Keurig's anticompetitive conduct has continued unabated such
that Plaintiffs and the market continue to be harmed with each passing day.

Respectfully Submitted,

*/s/Valarie C. Williams*

Valarie C. Williams (pro hac vice)

cc: Counsel of Record (via ECF)

Alston & Bird LLP                                                                                                    www.alston.com

Atlanta | Brussels | Century City | Charlotte | Chicago | Dallas | London | Los Angeles | New York | Raleigh | San Francisco | Silicon Valley | Washington, D.C.

Add.387

| | | | |
|---|---|---|---|
| STATE OF NEW YORK | ) | | **AFFIDAVIT OF SERVICE** |
| | ) | ss.: | **BY OVERNIGHT** |
| COUNTY OF NEW YORK | ) | | **FEDERAL EXPRESS** |
| | | | **NEXT DAY AIR** |

I, Tyrone Heath, 1702 Clay Avenue, Apt 11, Bronx, New York 10457, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age and resides at the address shown above or at

**On April 28, 2026**

deponent served the within: **PETITION FOR WRIT OF MANDAMUS TO THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK and ADDENDUM (VOLUMES 1-2)**

**upon:**

**SEE ATTACHED SERVICE LIST**

the address(es) designated by said attorney(s) for that purpose by depositing **1** true copy of same, enclosed in a properly addressed wrapper in an Overnight Next Day Air Federal Express Official Depository, under the exclusive custody and care of Federal Express, within the State of New York.

**Sworn to before me on 28th day of April, 2026.**

**MARIANA BRAYLOVSKIY**
Notary Public State of New York
No. 01BR6004935
Qualified in Richmond County
Commission Expires March 30, 2030          **Job#  392608**

**SERVICE LIST:**

| **Direct Purchaser Plaintiffs:** | **Treehouse**: |
|---|---|
| Robert Gerard Eisler<br>Grant & Eisenhofer, PA (DE)<br>123 Justison Street<br>Wilmington, DE 19801<br>(302) 622-7000<br>Email: reisler@gelaw.com | Aldo A Badini<br>Winston & Strawn LLP (NY)<br>200 Park Avenue<br>New York, NY 10166<br>(212) 294-4601<br>Email: abadini@winston.com |
| **McLane**: | **Winn-Dixie & Bi-Lo & BJ's Wholesale**: |
| Alex Brown<br>Alston & Bird LLP<br>1201 W. Peachtree Street NE, Suite 4900<br> Atlanta, GA 30309<br>(404) 881-7000<br>Email: alex.brown@alston.com | Philip J. Iovieno<br>Cadwalader, Wickersham & Taft LLP<br>200 Liberty Street<br>New York, NY 10281<br>(212) 504-6868<br>Email: philip.iovieno@cwt.com |
| **Keurig**: | **USDC Judge**: |
| Leah Brannon<br>Cleary Gottlieb Steen & Hamilton LLP<br>2112 Pennsylvania Avenue NW<br>Suite 1000<br>Washington, DC 20037<br>(202) 974-1508<br>Email: lbrannon@cgsh.com<br><br>*-and-*<br><br>Wendelynne J. Newton<br>Buchanan Ingersoll & Rooney PC<br>Union Trust Building<br>501 Grant Street, Suite 200<br>Pittsburgh, PA 15219<br>(412) 562-8932<br>Email: wendelynne.newton@bipc.com | Hon. Vernon S. Broderick<br>United States District<br>Court for the Southern<br>District of New York<br> 40 Foley Square<br>New York, NY 10007 |